**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **LIBERTY POWER HOLDINGS, LLC,** | **Case No. 21-13797-PDR** |
| Debtor._____/ | |

**DECLARATION OF BOB BUTLER, PROPOSED CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Bob Butler, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1. I am the proposed Chief Restructuring Officer (the "CRO") of Liberty Power Holdings, LLC (the "Debtor" or "Holdings"). I have served in my current role since being engaged on April 16, 2021. The Debtor plans to promptly submit a motion seeking an order approving my retention as CRO along with Berkeley Research Group, LLC ("BRG") to provide financial and restructuring advisory services to me as CRO. I am a Managing Director of BRG in Atlanta, Georgia and have almost 20 years of experience in the insolvency and restructuring field and 40 years of business experience. BRG is a global consulting firm with offices around the world, specializing in, among other things, insolvency and restructuring matters, disputes and investigations, corporate finance, and performance improvement. I hold a Bachelor of Science degree in Accounting from the University of Arizona. I am a Certified Public Accountant and a member of the American Institute of Certified Public Accountants

2. On April 20, 2020 (the "Petition Date"), the Debtor filed in this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). I submit this declaration (this "Declaration") in support of the Debtor's voluntary petition for relief and

certain motions filed concurrently herewith and which I anticipate the Debtor will file shortly (the "First Day Declaration"). I am authorized to submit this Declaration on behalf of the Debtor.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by various sources, my opinion based upon experience, knowledge and information concerning the Debtor's operations and financial condition, or my discussions with the Debtor's advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. This Declaration has been organized into four sections. The first section provides an overview of the Debtor and its business. The second summarizes the Debtor's organizational and capital structure. The third describes the events leading to the filing of this chapter 11 case and the objectives of this case. The fourth section summarizes the relief requested in, and the legal and factual bases supporting, the "first day" motions and applications the Debtor has filed and expects to file with this Court (the "First Day Motions").

## I. THE DEBTOR'S BUSINESS

5. Holdings is a retail energy provider (an "REP") that is active in competitive electricity markets in over a dozen jurisdictions operating in five organized markets. Specifically, Holdings and its subsidiaries are certified and licensed to provide retail electric service by the Public Utilities Commissions or Public Service Commissions in each of California, Connecticut, District of Columbia, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas and Virginia. Holdings currently services hundreds of thousands of customer accounts in 14 states

6. Holdings operates a relatively simple business model in concept, but a very complicated one in execution. In general, Holdings sells electricity to residential, commercial and

industrial customers, wherein it competes in price and terms with other REPs and the public utility in a given market area. Holdings typically makes a profit in the form of a margin between the price it charges a customer under a sales contract for electricity and the cost at which Holdings sources such electricity in the wholesale markets. However, that margin must also account for the costs associated with hedging, financing, and commercial operating expenses, among other things.

7. Holdings' business is credit intensive. This feature is a function of how power is ultimately consumed and secured in organized markets. Each organized market is operated by an independent system operator (each, an "ISO"), including the Electric Reliability Council of Texas ("ERCOT"), Pennsylvania, Jersey Maryland Power Pool ("PJM"), New York ISO, or ISO-New England. As Holdings' customers consume electricity, each ISO balances that consumption with generation, and this balancing is treated as a purchase by Holdings in the wholesale markets and a resale to the customer. Typically, on a monthly basis, the ISO settles accounts and, in doing so, invoices Holdings for the power collectively consumed by its customers as a purchase in the wholesale market. Because the ISO is effectively taking counterparty credit exposure to Holdings as any month progresses, the ISO demands that Holdings provide it with credit assurance. Holdings funding and capital is provided by Boston Energy Trading and Marketing LLC ("BETM") pursuant to a secured credit facility described in more detail below.

8. The Debtor's ultimate parent company, Liberty Power Corp, LLC ("ParentCo"), provided management and operating services seven (7) days a week to Holdings pursuant to the terms of that certain Management Services Agreement, dated as of August 8, 2006, as amended by First Amendment to Management Services Agreement, dated January 27, 2009, and as further amended by the Amended and Restated Management Services Agreement, dated January 27, 2014, and by the Second Amended and Restated Management Services Agreement dated as of July 6,

2020 (the "Management Agreement"). As such, Holdings relied on ParentCo to be able to conduct its business, manage customers' accounts, deal with regulatory matters and perform other critical business operations on a daily basis. ParentCo employed in excess of 80 employees in order to provide these management services to Holdings. Pursuant to the Management Agreement, Holdings provided the funding to ParentCo on a weekly basis in order to cover the actual expenses incurred by ParentCo in providing the Management Services.

## II.     CORPORATE AND CAPITAL STRUCTURE

### A.     Corporate Structure

9. The Debtor is a limited liability company duly organized under the laws of the State of Delaware. As set forth on the attached corporate organizational chart, Holdings is a wholly-owned subsidiary of Liberty Power Super Holdings, LLC, which in turn is a wholly owned subsidiary of ParentCo. Holdings in turn owns and holds 100% of the outstanding membership interests in each of three subsidiaries, namely LPT, LLC, a Delaware limited liability company (authorized to do business in Texas as LPT SP, LLC) ("LPT"), Liberty Power Maryland LLC, a Delaware limited liability company ("LPMD") and Liberty Power District of Columbia LLC, a Delaware limited liability company ("LPDC").

10. Holdings was founded in 2001 by David Hernandez, CEO ("Hernandez") and Alberto Daire, President ("Daire"). On or about September 15, 2020, ParentCo appointed Derik Viner ("Viner") as President of Holdings.

11. Holdings' principal place of business is located at 2100 West Cypress Creek Road, Suite 130 Ft. Lauderdale, Florida 33309 ("Corporate Office"). ParentCo's principal place of business is located at the same address as the Debtor.

12. In July 2020, Holdings completed a restructuring of its capital structure and

transitioned its wholesale energy supply arrangement from Shell Energy North America (US), L.P ("Shell Energy") to BETM. In that transaction, Shell agreed to take a third-tier note in lieu of outstanding debt that Holdings owed to Shell at that time in the amount of $63,492,663 (the "Shell Loan"). In addition, Hernandez and Mr. Martin Halpern provided Holdings with a $10 million second-tier mezzanine loan (the "Mezzanine Loan").

13. In connection with the foregoing, BETM and Holdings entered into several documents to establish this facility including:

(i) that certain Supply and Services Agreement, dated as of July 6, 2020 (as modified and supplemented and in effect from time to time, the "Supply Agreement"), between BETM and Holdings;

(ii) that certain ISDA 2002 Master Agreement, the Schedule and all annexes thereto (including the Credit Support Annex and any Confirmations thereunder), dated as of July 6, 2020, by and between BETM and Holdings (the "ISDA Agreement" and, together with the Supply Agreement, the "Trading Documents"), and

(iii) Pledge and Security Agreement, dated as of July 6, 2020 (the "Pledge Agreement"), by and among LPDC, MPMD, LPT, Liberty Power Super Holdings LLC (collectively, "Other Pledgors" and, together with Debtor, "Pledgors"), Holdings and BETM.

14. The Supply and Services Agreement is the central document in the supply facility between the Debtor and BETM. Under the Supply and Services Agreement, BETM provides, among others, the following services to the Debtor:

(i) Provision of credit support to the ISOs and other key service providers or regulators for the operation of an REP like the Debtor;

(ii) Provides hedges, either as financial instruments (e.g., a fixed/float swap) or as physical trades (e.g., selling power to the REP in the wholesale market);

(iii) Working capital in the form of payment provisions that, among other things, bridges the gap between when the REP collects invoices from its customers and when the REP must pay the ISO, and allow certain amounts above in excess of available funds to be deferred to following month;

(iv) Access to third-party sellers in the wholesale markets and or financial hedge provider through intermediation trades; and

    (v) Supports the REP through various operational services, like risk management and scheduling.

  15. Under the Supply and Services Agreement, BETM extended credit to Holdings based upon a borrowing base, subject to a cap of $40,000,000.  So long as the amount of credit extended to Holdings was less than the borrowing base amount and the cap, then BETM could extend additional credit to Holdings, such as rolling an amount due to the next payment period. However, extensions of credit were subject to certain conditions, and certain transactions required the consent of BETM, such as when the principals entered into a derivative to hedge Holdings' exposure to commodity prices, principally the price of electricity in an organized market.

  16. BETM provides a unique form of credit support to the ISOs in order to support Holdings' activities.  In essence, BETM provided a guaranty to each ISO for payments due to the ISOs in respect of electricity that Holdings' customers consumed.  In addition, BETM provided collateral to the ISOs in order to secure Holdings' payment obligation prior to any settlement cycle (this financial support is known as "ISO Credit Support").

  17. BETM and Holdings also executed certain physical transactions for energy and financial derivatives under the ISDA Master Agreement.  Under the Pledge Agreement, Holdings and the Pledgors granted BETM a security interest in certain collateral in order to secure certain obligations under the Pledge Agreement, the Trading Documents, and certain other transaction documents executed by the parties.  More specifically, BETM holds a perfected, first-priority lien on substantially all of the assets of Holdings and its subsidiaries, and a perfected first-priority lien on all of the equity interests of Holdings.

**III.** **EVENTS LEADING TO CHAPTER 11 FILING**

  **A.** **North American Winter Storm Uri**

  18. On February 14 and 15, 2021, Winter Storm Uri dropped prolific amounts of snow

across Texas and Oklahoma. Because of this winter storm and a concurrent cold wave, power grids—which were unable to sustain the higher-than-normal energy and heating demand from residential and business customers—failed across the Texas. At the peak of the outages, at least 4.5 million Texas residents were left without electricity. The available power generation in the area failed to perform and the power grid nearly collapsed. Two of the electricity reliability commissions servicing the Southern U.S., the Southwest Power Pool (SPP) and the Electric Reliability Council of Texas (ERCOT), ordered rolling blackouts amid the frigid temperatures, in an attempt to manage the strain on the power grid and prevent widespread, long-duration blackouts. The controlled outages were initiated after the Southwest Power Pool declared Level 3 Emergency Energy Alerts on both February 15 and 16. At one point during the rolling outages, over 4.2 million people across the south-central states were left without power, with over 3.5 million of them in Texas alone.

19.     The impact of Winter Storm Uri caused a spike in wholesale prices for electricity. ERCOT set wholesale energy and ancillary services prices at stratospheric and unprecedented levels, creating a "perfect storm" of conditions that were impossible for Holdings and other market participants to anticipate or prepare for. These events, in turn, resulted in the Debtor incurring a financial charge from ERCOT that was well beyond its capability to pay. In fact, such charge was larger than the amount of credit that BETM would have provided otherwise to Holdings under the Supply and Services Agreement. Primarily because of this storm event, Holdings became unable to pay its debts when due and had liabilities in excess of its assets. Many other retail electric providers, municipalities and cooperatives have suffered similarly to Holdings and are facing similar financial challenges as a result of this situation.

**B.     Notice of Default By BETM**

20.    On March 26, 2021, BETM provided Holdings with a Notice of Potential Event of Default for Failure to Pay (the "Potential Event of Default Notice"). In the Potential Event of Default Notice, BETM advised Holdings that BETM's invoice dated February 22, 2021 (the "February Invoice") in the amount of $85,908,252.15 had not been paid in full and that Holdings continued to owe BETM $81,284,305 (the "Unpaid Amount"). BETM notified Holdings that its failure to pay to BETM the Unpaid Amount by March 31, 2021 would constitute an Event of Default under the Supply and Services Agreement. Holdings failed to pay the Unpaid Amount. On March 31, 2021, BETM provided Holdings with a Notice of Event of Default.

21.    Following a protracted set of negotiations in which BETM and Holdings were unable to agree on the terms of a forbearance, BETM terminated the supply facility by notice to Holdings on Monday, April 12, 2021. Even though BETM terminated its obligations under the Transaction Documents, BETM did not and has not withdrawn the ISO Credit Support, despite being entitled to do so. The continued ISO Credit Support has allowed Holdings to continue its retail operations to date despite the pendency of the default.

**C.     Reconstitution of Board of Managers and Retention of Chief Restructuring Officer.**

22.    On or about April 15, 2021, BETM exercised certain of its rights and remedies under the Pledge Agreement and, among other things, reconstituted the Board of Managers of Holdings. Thereafter, on April 16, 2021, the newly constituted Board of Managers of Holdings held a meeting and engaged me as CRO to provide certain financial advisory and restructuring services to Holdings.

23.    Over the weekend of April 16th and 17th, I took immediate steps to assess the situation and the status of the Debtor's operations with the intent of communicating with ParentCo

first thing Monday morning to coordinate the continued provision of management services. I also engaged in discussions with BETM to confirm BETM's agreement and willingness to provide funding to ParentCo to continue providing services to the Debtor under and through the Management Agreement.

### D.     Termination of Employees

24.     On Sunday evening April 18, 2021, ParentCo, under the direction of Messrs. Viner and Hernandez, took precipitous action to terminate all of ParentCo's approximately 80+ employees effective immediately, thereby placing the entire business operation and going concern value of the Debtor in serious jeopardy. ParentCo's action was taken notwithstanding the commitment made by BETM to fund ParentCo's payroll for the next two (2) week period through April 30, 2021.

25.     The termination of ParentCo's employees was communicated to counsel to the Debtor in the morning of April 19, 2021 via email. No attempt was made to discuss such termination of employees with me or counsel prior to taking this serious and damaging action. News of the employee termination was immediately leaked and disseminated to various media sources, causing more harm to the Debtor.

26.     Immediately upon learning of the termination, I attempted to negotiate a solution that would include immediately rehiring the employees and granting me and my team access to the Debtor's books, records, systems and processes that were in the possession and control of ParentCo. ParentCo refused to cooperate with my request for access. Additionally, I directed counsel to make demand on ParentCo, its management, owners, professionals and employees to preserve any and all books and records in their possession, custody or control involving or related in any way to the Debtor, including without limitation all financial records (and related servers)

and all emails (and related servers). To date, no response nor access has been provided to the Debtor or access to the corporate premises.

27. Faced with the lack of management services from ParentCo due to the termination of all of its employees and a refusal by ParentCo to provide access to the Debtor's books, records, systems and processes, the Debtor was forced to file the within Chapter 11 proceedings to preserve and protect the going concern value of the Debtor for the benefit of all of its stakeholders.

28. Since being advised of the termination of ParentCo's employees on Monday morning, April 19, 2021, I have attempted to resolve the issues with ParentCo without success. Moreover, the ParentCo has refused to cooperate with and has imposed unacceptable conditions in regards to the Debtor's requests for turnover of the Debtors' books and records and access to the corporate premises at which the Debtor's operations were conducted.

29. Given the drastic measures taken by ParentCo in terminating all of the employees and its failure to cooperate with the Debtor, emergency relief is being sought to compel turnover of the Debtor's books, records, systems and processes to as to enable the CRO to try to preserve and protect and value of the Debtor's business for the benefit of all of its stakeholders.

**IV.    First Day Motions**

30. The First Day Motions seek relief to allow the Debtor to meet necessary obligations and fulfill its duties as a debtor in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Declaration is narrowly tailored to continue the Debtor's operations to the extent necessary to permit it to orderly and efficiently wind down in chapter 11, maximize value and the relief sought in the best interest of the Debtor's estate and creditors' interest. The facts set forth in each First Day Motion are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall

have the meanings given to them in the relevant First Day Motions.  Below is an overview of each of the First Day Motions.

 A. **<u>Operations-Related Motions</u>**

 1. **Debtor's Emergency Motion To Compel (I) Turnover Of Debtor's Books, Records, Systems And Processes Related to the Debtor and it Operations In the Possession and Control Of Liberty Power Corp, LLC, (II) Access To Corporate Premises, and (III) For Related Relief ("<u>Turnover Motion</u>")**

 31. Under the Turnover Motion, the Debtor respectfully requests entry of an order of the Court compelling (i) ParentCo and its principals to immediately turnover all books, records, systems and processes of and related to the operation of the Debtor's business (the "<u>Books and Records</u>"), (ii) ParentCo to provide the Debtor, through me, immediate access to the corporate premises under the control of ParentCo at which the Debtor's operations are conducted, (iii) ParentCo to cooperate and comply with any and all other reasonable requests of the Debtor (through me as CRO) for documents and information necessary for the Debtor to continue its operations and comply with its obligations under the Bankruptcy Code, and (iv) ParentCo and all principals of and persons in control of ParentCo to comply with the automatic stay under section 362(a) of the Bankruptcy Code, including preventing ParentCo and its principals from taking any action against property of the Debtor's estate.

 32. I believe that the relief requested in the Turnover Motion is critical and in the best interests of the Debtor, its estate and its creditors, and will make the Debtor's transition into chapter 11 smoother, less costly and more orderly. Accordingly, on behalf of the Debtor, I respectfully submit that the Turnover Motion should be approved.

 2. **Debtor's Emergency Motion For Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, And 364, and (B) Use Cash Collateral and Grant Adequate Protection In Connection Therewith Pursuant To 11 U.S.C. §§ 361 And 507, and (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001 (the "<u>Cash Collateral Motion</u>").**

33. I am in the process of negotiating the final terms of the use of cash collateral and the provision of DIP Financing from BETM. Due to the emergency nature of the filing of this Chapter 11 case, those terms were not able to be finalized in advance. BETM has advised me that they intend to allow the Debtor to use cash collateral and that BETM intends to support the credit support and other related needs of the Debtor in order to enable the Debtor to (a) continue the day-to-day operation of its business; (b) fund the expenses necessary to preserve the value of it business operations; and (c) fund this chapter 11 case.

34. As soon as the terms of the Cash Collateral Motion are finalized, I will direct counsel to the Debtor to bring an emergency motion before the Court for authority to use cash collateral and obtain DIP financing on an interim, and then final basis.

**B.** **Retention-Related Motions**

1. **Debtor's *Expedited* Application for Authority to Employ and Retain Paul J. Battista and the Law Firm of Genovese Joblove & Battista, P.A. Effective as of April 20, 2021 (the "GJB Application")**

35. The Debtor will file an application seeking approval, on an interim and final basis, of the employment of Paul J. Battista ("Battista") and the law firm of Genovese, Joblove & Battista ("GJB"), to represent the Debtor as its general bankruptcy counsel in this Chapter 11 case effective as of April 20, 2021.

2. **Debtor's Emergency Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code for Authority to Employ and Retain Bob Butler as Chief Restructuring Officer and Other Personnel at Berkeley Research Group, LLC to Provide Advisory Services Effective as of April 20, 2021 ("CRO Retention Motion")**

36. The Debtor will file a motion seeking approval to employ and retain me as CRO and Berkeley Research Group, LLC to provide advisory services effective as of April 20, 2021.

**C.** **Other First Day Motions**

37. Once the Debtor is able to obtain the Books and Records pursuant to the Turnover Motion, then I anticipate that the Debtor will prepare and file several additional "first day" motions with the Court. As a result, I reserve the right to file additional or supplemental Declarations in connection therewith.

## CONCLUSION

In furtherance of its restructuring effort, the Debtor respectfully requests that orders granting the relief requested in the First Day Motions be entered.

Dated: April 21, 2021

   /s/  *Bob Butler*   
By:    Bob Butler
        Chief Restructuring Officer
