UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

LIBERTY POWER HOLDINGS, LLC,                    Case No.: 21-13797-PDR
                                                Chapter 11

      Debtor.

_____/

### LIBERTY POWER CORP., LLC'S RESPONSE TO DEBTOR'S EMERGENCY MOTION TO COMPEL (I) TURNOVER OF ALL BOOKS, RECORDS, SYSTEMS AND PROCESSES RELATED TO THE DEBTOR AND ITS OPERATIONS IN THE POSSESSION AND CONTROL OF LIBERTY POWER CORP, LLC, (II) ACCESS TO CORPORATE PREMISES AND (III) FOR RELATED RELIEF

      Liberty Power Corp., LLC (**"LPC"**), by and through its undersigned counsel, files its Response (**"Response"**) in opposition to the Debtor's Emergency Motion to Compel (I) Turnover of all Books, Records, Systems and Processes Related to the Debtor and its Operations in the Possession and Control of Liberty Power Corp, LLC, (II) Access to Corporate Premises and (III) for Related Relief [ECF No. 11] (the **"Turnover Motion"**), for the reasons set forth below.  LPC also relies on and incorporates by reference the accompanying Declaration of David Hernandez for the factual background relevant to this Response, which is attached hereto as **Exhibit A**.

### PRELIMINARY STATEMENT

      1.      Less than a week after his appointment, the Debtor's CRO – who was handpicked by the Debtor's senior secured lender – precipitously commenced the Debtor's bankruptcy case by filing a barebones petition. Only after this case was filed did the Debtor and its senior secured lender likely realize the extent to which Debtor needs LPC and its employees to run its business. Now, facing an erosion in value based on their hasty decision, the Debtor (through its

1

representatives appointed by its secured lender), seeks emergency relief from the Court which greatly exceeds the limitations imposed by the Bankruptcy Code.

2.    As acknowledged by the Debtor in its Turnover Motion, the Debtor relied on LPC "to be able to conduct its business, manage customers' accounts, deal with regulatory matters and perform other critical business operations on a daily basis." See Mot., at ¶ 10. The Debtor has no employees of its own, no systems to manage its assets, and no structure of any kind. Similarly, LPC depends on revenue from the Debtor to reimburse its expenses incurred pursuant to the Second Amended and Restated Management Services Agreement dated as of July 6, 2020 (the *"Management Agreement"*). Without this revenue – which only included reimbursement of expenses and did not include any profit margin – LPC has no way of paying the employees or vendors necessary for its business *and* for the Debtor's business.

3.    It was against this backdrop of mutual dependency that the Debtor and LPC started negotiating with Boston Energy Trading and Marketing LLC (*"BETM"*), the Debtor's secured lender, regarding a potential sale or other disposition of the Debtor. These negotiations commenced after the Debtor's alleged obligations to BETM skyrocketed as a result of the dramatic increase in wholesale prices for electricity following Winter Storm Uri in Texas in mid-February. For more than eight (8) weeks, BETM, on the one hand, and the Debtor and LPC, on the other hand, discussed ways that they might work together to maximize the value of their respective assets and ensure continuity of operations for both the Debtor and LPC.

4.    The negotiations were complicated by the fact that, pursuant to its loan documents, BETM had a security interest against substantially all of the Debtor's assets, but not the assets of LPC. Similarly, BETM had a pledge of the membership interest of the Debtor's direct corporate parent, Liberty Power Super Holdings LLC (*"Super Holdings"*), but no

corresponding pledge of the membership interest of LPC. In short, BETM had remedies that it could seek to employ in an attempt to take control of the Debtor, but no way to control LPC. Since the Debtor is dependent on LPC and LPC's employees, computer systems, and business structure, LPC believed BETM would make every effort to reach a consensual agreement before putting the Debtor and LPC on a path that would severely diminish the value of their respective assets. That belief proved wrong.

5.     By letter dated April 15, 2021 (the *"Step-In Letter"*), BETM attempted to sever the Debtor from LPC when it purported to take control of Super Holdings, and to reconstitute the Debtor's Board of Managers. Among the attachments to the Step-In Letter were draft board resolutions authorizing a bankruptcy filing. Faced with the prospect that its *only* significant source of revenue would file for bankruptcy on some unknown date over the next few weeks or months, LPC exercised its contractual right to request that the Debtor shift from paying LPC in arrears for its expenses and immediately pay a total of $1,453,883.26, which would allow LPC to pay outstanding amounts owed to employees and vendors, and would fund the next two weeks of payroll. When BETM refused to pay all but one-third of this amount, which would leave (and has left) LPC with unreimbursed employee and substantial unpaid expenses owed by the Debtor, LPC – fearing it could not continue to incur expenses and employee costs with no ability to pay them – had no choice but to shut down.

6.     While LPC reached out to BETM over the next two days to try to reach some agreement that would allow LPC to be put back together, these negotiations were unsuccessful. Of note, for purposes of this Response, LPC reached out to BETM the night before this bankruptcy was filed with an offer that included cooperation in a bankruptcy, and again reached out to BETM after the bankruptcy was filed, but before Turnover Motion was filed, with a

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

request to continue the discussions from the prior evening and that, as, a sign of good faith, it was willing to discuss potential options for providing BETM with access to the documents and records the BETM-controlled Debtor now seeks pursuant to the Turnover Motion.

7.      LPC stands by its offers, both in terms of a global resolution of the issues between LPC and the Debtor that are necessary to preserve value of the Debtor and LPC, but also as an indication of its good faith to turnover to the Debtor the property to which it would be entitled under Section 542 of the Bankruptcy Code if the Debtor's bankruptcy is deemed to have been properlyy filed.[1/] Assuming this case was properly filed, LPC fully recognizes the Debtor's right to such property under the Bankruptcy Code and intends to start providing the Debtor with the books and records it requests on a rolling basis and on the timeline set forth in Part D hereof, starting as early as this afternoon. Still, many of the Debtor's requests are extremely time-consuming, especially considering that the number of individuals at LPC available to transfer the Debtor's assets has gone from more than 80 to 4 due to the required shut down of LPC. LPC will provide the books and records to the Debtor as soon as it practically can, and is willing to work with the Debtor on an appropriate schedule, but some requests will take some time.

8.      Finally, LPC objects to the Turnover Motion to the extent it requests turnover of any property belonging to LPC or entities who are not before the Court. As noted above, the Debtor's assets, which consist primarily of data, are stored on LPC's computer system and require LPC's software to be accessed. This software and the accompanying computer system are the crown jewel of LPC's assets, the result of tens of millions of dollars of development costs. If the Debtor's Turnover Motion is granted in the form suggested – including (i) that the

---

[1/]      On April 16, 2021, Super Holdings sent a detailed letter to BETM demonstrating why BETM's exercise of its Step-in Rights was invalid. As a result of BETM improperly exercising remedies prior to this bankruptcy, without which this bankruptcy would not be properly authorized, as well as other issues, Super Holdings and LPC

4

Debtor have access to the **systems** and **processes related to** the operation of the Debtor's

business, (ii) that the Debtor (through its CRO) be given immediate and unfettered access to the

corporate premises (which are primarily **LPC's** corporate premises); and (iii) that LPC comply

with all other requests of the Debtor (through the CRO) for documents and information

necessary for the Debtor to continue its operations and comply with its obligations under the

Bankruptcy Code – the Debtor will have effectively procured the benefit of LPC's assets and

systems, and will be able to force LPC to help prepare and run the bankruptcy case that BETM

devised to force LPC to help BETM liquidate its collateral – even though BETM never had a

security interest in the LPC assets. The Debtor is entitled to the turnover of **its** property, **not**

LPC's. The Debtor's requests go too far.

## I.    BACKGROUND

9.    Contemporaneously herewith, LPC filed Declaration of David Hernandez in

support of this Response, which is expressly incorporated herein by reference.

## II.    ARGUMENT

### A.    <u>LPC will voluntarily turn-over any of **the Debtor's** property it has in its possession</u>.

10.    Through the Turnover Motion, the Debtor seeks an order:

> (i) compelling [LPC (and the principals and persons in control of
> LPC)] to immediately provide access to and turnover to the Debtor
> . . . all books, records, systems and processes of and related to the
> operation of the Debtor's business (the "<u>Books and Records</u>"), (ii)
> compelling [LPC] to provide the Debtor . . . immediate access to
> the corporate premises under the control of [LPC] at which the
> Debtor's operations are conducted, (iii) compelling [LPC] to
> cooperate and comply with any and all other requests of the Debtor
> . . . for documents and information necessary for the Debtor to
> continue its operations and comply with its obligations under the
> Bankruptcy Code, and (iv) compelling [LPC (and the principals

---

reserve all rights related to the filing of this bankruptcy, and any agreement by LPC to – in the meantime – provide
records belonging to the Debtor is subject to and without waiver of LPC's rights.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

and persons in control of LPC)] to comply with the automatic stay under section 362(a) of the Bankruptcy Code, including preventing [LPC] and its principals from taking any action against property of the Debtor's estate.

Mot., at ¶ 20.

11.    To the extent the Debtor seeks turnover of its property, its request is unnecessary. LPC fully recognizes the Debtor's right to turnover of property of its estate pursuant to section 542 of the Bankruptcy Code. In fact, even before the filing of the Turnover Motion, LPC offered to provide access to the Debtor's documents and records, and, despite the Debtor's refusal to respond to LPC's offer, LPC started the process of compiling these books and records. The categories of these documents, books and records, as well as the time-frame that LPC believes it can transfer these documents is discussed in more detail in Part D below. Despite LPC's willingness to cooperate, the Debtor filed the Turnover Motion on an emergency basis, without even informing LPC that the motion would be filed or conferring with LPC about the relief requested therein.

**B.    The Debtor is not entitled to turnover of property that is not the Debtor's property.**

12.    Based on the Debtor's aggressive actions in the face of LPC's offer to provide exactly what it has requested from the Court, the Turnover Motion appears to be a litigation tactic intended to provide the Debtor with books, records, and other assets of non-debtors, without affording LPC and other non-debtors a meaningful opportunity to protect their rights or the due process to which they are entitled under Federal Rule of Bankruptcy Procedure 7001. More specifically, through the Turnover Motion, the Debtor seeks to compel LPC to turn over

6

not only the Debtor's books and records, but property belonging to LPC and other non-debtors[2/] as well. In addition, the Debtor requests a sweeping order requiring non-debtor LPC and its principals to provide **any** documents or information which the Debtor unilaterally determines are necessary to the Debtor's operations – even if the documents and information requested by the Debtor are not property of the estate, and even if the requested documents and information are proprietary to LPC or other non-debtors.

13.     This relief is not authorized by the Bankruptcy Code. Section 542 provides that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a). Courts – including the Eleventh Circuit – have limited section 542(a)'s reach to property of the estate. *See, e.g., Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234, 1243 (11th Cir. 2006) ("§542(a) authorizes turnover of property in another's possession only if it is property of the estate"), *cert. denied*, 548 U.S. 1301 (2007); *see also* 5 COLLIER ON BANKRUPTCY ¶ 542.03 (citing *Bailey v. Suhar (In re Bailey)*, 380 B.R. 486, 490 (B.A.P. 6th Cir. 2008) (in a turnover action, trustee or debtor in possession must prove, by a preponderance of the evidence, that subject asset is property of the estate).

14.     In light of the limitations imposed by Section 542(a), the broad relief requested by the Debtor must be denied. For example, the Debtor seeks an order compelling LPC "to provide . . . immediate access to the corporate premises under the control of [LPC] at which the Debtor's operations are conducted." Mot., at ¶ 20. However, all premises belong to LPC, not the Debtor,

---

[2/]     It appears that the relief requested by the Debtor would reach any property of the Debtor's subsidiaries even though those subsidiaries have not filed bankruptcies. To the extent an order is necessary and procedurally appropriate, the Court should limit the scope of the order to turnover of assets of the Debtor.

so it is unclear how the Court could order access to premises which the Debtor has no right to occupy.  Hernandez Decl., ¶ 18.

15.     As a second example of how the Debtor overreaches, the Debtor seeks an order compelling LPC "to immediately provide access to and turnover to the Debtor . . . all books, records, systems and processes of and related to the operation of the Debtor's business." Mot., at ¶ 20 (emphasis added). Among other issues, because the Debtor has no systems or processes, this request implicates LPC's computer systems and certain software, which store and process information about customers of the Debtor, as well as other entities. The Debtor has no license, contract, or other right to use or even access these computer systems, related to the operation of the Debtor or not. While LPC is willing to work cooperatively to furnish data regarding the Debtor's customers to the Debtor, the Debtor has no legal or equitable right to use or access LPC's computer systems and software. If the Court were to grant the Debtor's Turnover Motion as suggested, arguably the Debtor's request for a "system[] [or] process[] [] related to the operation of the Debtor's business" would reach LPC's software and systems. *See* Mot., at ¶ 20.

16.     Third, the Debtor seeks an order compelling LPC "to cooperate and comply with any and all other requests of the Debtor (through the CRO) for documents and information necessary for the Debtor to continue its operations and comply with its obligations under the Bankruptcy Code." Mot., at ¶ 20, 21. Not only does this request arguably reach the assets of LPC (as opposed to the Debtor) since it includes information required for the Debtor to continue its operations, but it seemingly requires LPC to cooperate with the Debtor to prepare the Debtor's schedules and statements and other requirements of a bankruptcy filing that were not completed by the Debtor before this case was filed, as well as the routine financial reports that are required in bankruptcy. In so requesting, the Debtor seeks to use LPC as its accounting department or

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

financial advisor for purposes of preparing its bankruptcy, despite the fact that the Debtor's dispute with LPC was the primary reason why the Debtor filed a bankruptcy in the first instance.

17.    Thus, much of the relief sought by the Debtor cannot be granted, and, to the extent LPC is compelled to turnover any assets, the relief must be strictly and clearly limited to the books and records *of the Debtor*, which constitute property of the estate, as further described in Part D below.

### C.    The relief requested by the Debtor requires the filing of an adversary proceeding.

18.    Nevertheless, the Turnover Motion should be denied in its entirety because it is procedurally improper. Turnover cannot be sought by motion; it must be sought by adversary proceeding. Fed. R. Bankr. P. 7001(1) ("The following are adversary proceedings: (1) a proceeding to recover money or property, other than a proceeding to compel the debtor to deliver property to the trustee . . ."); *see* 5 COLLIER ON BANKRUPTCY ¶ 542.02 ("Generally, an adversary proceeding – not a motion – is required for section 542 turnover actions. A trustee must file an adversary proceeding to bring a turnover action against a nondebtor."); *Camall Co. v. Steadfast Ins. Co. (In re Camall Co.)*, 2001 U.S. App. LEXIS 17243, at \*14 (6th Cir. July 31, 2001) ("Courts have given effect to Bankruptcy Rule 7001 by holding that 'a turnover proceeding commenced by motion . . . [rather than by complaint] will be dismissed.") (citing *In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990)); *In re Wheeler Tech. Inc.*, 139 B.R. 235, 240 (B.A.P. 9th Cir. 1992) (the debtor's *ex parte* turnover motion "does not provide the due process protection required for the ordered turnover of property"); *In re Dillon*, 148 B.R. 852, 852-53 (Bankr. E.D. Tenn. 1992) (the debtor's motion for turnover was denied because turnover proceedings are properly commenced by filing a complaint); *In re Ace Indus, Inc.*, 65 B.R. 199, 200 (Bankr. W.D. Mich. 1986) (the debtor's motion for turnover should have been commenced by an

9

adversary proceeding); *In re Taronji*, 174 B.R. 964, 966 (Bankr. N.D. Ill. 1994) (typically a trustee must bring an adversary proceeding to recover estate property; however, the trustee may cover property held by the debtor via motion); *In re IGC Roofing, Inc.*, Case No. 6:06-bk-00223-ABB, 2006 Bankr. LEXIS 4015, at *1 (Bankr. M.D. Fla. Dec. 29, 2006) (debtor's "Emergency Motion for Turnover of Funds" was "require[d] to be filed as an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001."); *In re Dean*, Case No. 06-71654-pwb, 2006 Bankr. LEXIS 3931, at *7 (Bankr. N.D. Ga. Dec. 18, 2006) ("the Debtor contends that the banks are holding property that belongs to him and that should be turned over to him. Obtaining such relief requires an adversary proceeding under Rule 7001(1)."); *In re Gold Leaf Corp.*, 73 B.R. 146, 147 (Bankr. N.D. Fla. 1987) (application to compel turnover was "not the proper method for obtaining refunds, and such relief is appropriate only in the context of an adversary proceeding" unless the application sought relief from a custodian).

19.     Requiring the Debtor to comply with Rule 7001 in order to afford LPC the due process protections of an adversary proceeding is especially necessary here, given the expansive and unsupported relief sought by the Debtor. As explained above, the Turnover Motion is not restricted to property of the estate, but also demands books, records, and other assets which belong to LPC and other non-debtors. *See* Mot., at ¶ 20 (requesting turnover of "all books, records, systems and processes of and ***related to*** the operation of the Debtor's business") (emphasis added). The Turnover Motion does not even clearly delineate which books and records LPC must provide to comply with the Debtor's demands. Moreover, the relief sought by the Debtor is potentially limitless, and includes an open-ended requirement that LPC to provide ***any*** documents or information which the Debtor unilaterally determines are necessary to the

10

Debtor's operations – even if the documents and information requested by the Debtor belong to LPC or another non-debtor – without further judicial oversight.

      **D.**      **Timeline for turnover of the Debtor's property.**

      20.      As set forth in Parts A and B above, LPC is willing to cooperate with the Debtor to promptly turnover its property, while reserving all rights as to the propriety of this bankruptcy filing. However, LPC has only a few individuals available to find and transfer the voluminous documents that the Debtor seemingly requests. Given its severe personnel limitations (which are the direct result of the BETM's threat to put the Debtor into bankruptcy at an unknown date, which it did, and refusal to fund expenses incurred by LPC to support the Debtor's demands), LPC believes that the most efficient way to proceed would be for the Debtor and LPC to work together toward a mutually agreeable timeline based on categories of documents. To this end, LPC has identified the following categories of documents of the Debtor in its possession and believes that it can turnover such documents to the Debtor by the corresponding estimated date to transfer:[3]

| Category of Documents | Estimated Date to Transfer | Notes or Comments |
|---|---|---|
| Vendor Agreements to which the Debtor is a party | April 28, 2021 | |
| Renewable Energy Certificates (REC) of the Debtor | April 28, 2021 | LPC will prioritize Renewable Energy Certificates with parties other than BETM as BETM already has such documents in its control |
| Licenses of the Debtor | April 28, 2021 | |
| FERC License of the Debtor | April 28, 2021 | |
| Contracts between the Debtor and utility companies | May 5, 2021 | |
| ISO Related Documents | May 5, 2021 | |
| Channel Partner Agreements between Brokers/Consultants and the Debtor | May 12, 2021 | |

---

[3]      Notwithstanding the use of a heading "estimated date to transfer" LPC intends to transfer all property of the Debtor as quickly as practicable and to do so on a rolling basis.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

| | | |
|---|---|---|
| Customer Contracts with large, commercial customers of the Debtor | May 12, 2021 | |
| Customer contracts with small and medium size business customers of the Debtor | May 12, 2021 | |
| Historical compliance filings made by the Debtor | May 30, 2021 | |
| Residential contracts with customers of the Debtor | TBD | Need to determine how to extract |
| Telephonic contracts with customers of the Debtor | TBD | Will likely need to be stored on cloud as there are hundreds of thousands of such contracts |
| Customer complaints from customers of the Debtor | TBD | |
| Quality control documents | | Subject to attorney review due to ongoing investigations; documents are voluminous |
| Collections correspondence sent and received by the Debtor | TBD | |
| Financial documents, accounts payable of the Debtor | TBD | Debtor should make specific request for dates and categories and parties will work together to see if such reports can be run or data extracted |
| Sales and marketing materials of the Debtor | TBD | Information is embedded in fields and systems; will need to be extracted. |

In the event the Debtor believes that LPC has additional categories of documents in its possession or control, LPC requests that the Debtor identify such documents or categories of documents and the parties will confer to determine an appropriate time-line for transfer. In addition, to the extent there are documents in the foregoing chart that the Debtor does not want or seek, LPC requests that the Debtor timely inform LPC of such.

## III.    CONCLUSION

21.     For the foregoing reasons, the Turnover Motion is substantively and procedurally improper – in addition to being wholly unnecessary in light of LPC's prepetition offer to provide the Debtor's books and records, which is all the Debtor is entitled to as a matter of law.

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

WHEREFORE, LPC respectfully requests that this Honorable Court enter an Order denying the Motion (without prejudice as to any assets which are property of the estate) and for any and all other relief this Court deems just and appropriate, in favor of allowing the parties to confer as to an appropriate time-table for the turnover of assets of the Debtor.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

MELAND | BUDWICK
3200 SOUTHEAST FINANCIAL CENTER | 200 SOUTH BISCAYNE BOULEVARD | MIAMI, FL 33131 | T 305-358-6363

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on April 22, 2021, via the Court's Notice of Electronic Filing upon the Registered Users listed on the attached **Exhibit 1**.

s/Daniel N. Gonzalez
Michael S. Budwick, Esquire
Florida Bar No. 938777
mbudwick@melandbudwick.com
Daniel N. Gonzalez, Esq.
Florida Bar No. 592749
dgonzalez@melandbudwick.com
MELAND BUDWICK, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
*Local Counsel for Liberty Power Corp., LLC*

and

Charles W. Azano, Esq. (*Pro Hac Vice Pending*)
Massachusetts Bar No. 655775
CWAzano@mintz.com
Breton Leone-Quick, Esq. (*Pro Hac Vice Pending*)
Massachusetts Bar No. 655571
BLeone-Quick@mintz.com
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C.
One Financial Center
Boston, MA 02111
Telephone: (617) 348-1843
*Attorneys for Liberty Power Corp., LLC*

and

Abigail V. O'Brient, Esq. (*Pro Hac Vice Pending*)
California Bar No. 265704
AVObrient@mintz.com
Mintz, Levin, Cohn, Ferris, Glovsky
and Popeo, P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 226-7886
*Attorneys for Liberty Power Corp., LLC*

14

**Electronic Mail Notice List**

The following is the list of **<u>parties</u>** who are currently on the list to receive email notice/service for this case.

- **Scott Andron**     sandron@broward.org, swulfekuhle@broward.org

- **Paul J. Battista**     pbattista@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;gjbecf@ecf.courtdrive.com;vlambdin@gjb-law.com

- **Daniel N Gonzalez**     dgonzalez@melandbudwick.com, ltannenbaum@melandbudwick.com;mrbnefs@yahoo.com;gonzalez@ecf.courtdrive.com; ltannenbaum@ecf.courtdrive.com;phornia@ecf.courtdrive.com

- **Jordi Guso**     jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com;efile@ecf.inforuptcy.com

- **Heather L Harmon**     HHarmon@gjb-law.com, gjbecf@gjb-law.com;ecastellanos@gjb-law.com;gjbecf@ecf.courtdrive.com;jzamora@gjb-law.com

- **Office of the US Trustee**     USTPRegion21.MM.ECF@usdoj.gov

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

LIBERTY POWER HOLDINGS, LLC,                    Case No.: 21-13797-PDR
                                                Chapter 11

      Debtor.

_____/

## DECLARATION OF DAVID HERNANDEZ

I, David Hernandez, am providing this declaration pursuant to 28 U.S.C. § 1746, and declare under the pains and penalties of perjury that the following is true to the best of my knowledge and belief:

1.     I am currently the majority member and CEO of Liberty Power Corp., LLC ("LPC"), which is the sole member of Liberty Power Super Holdings, LLC, which, in turn, is the sole member of debtor Liberty Power Holdings, LLC ("LPH").  LPH has three wholly owned subsidiaries: Liberty Power DC LLC, LPT, LLC, and Liberty Power Maryland LLC.

## Overview of LPC and LPH

2.     LPH, together with its subsidiaries, serves as a retail energy provider ("REP"), and delivers electricity to retail, commercial, and industrial customers.  LPH is the largest and longest tenured founder-operated REP in the United States.  It is also the first minority-owned REP with a national footprint and has been recognized as the largest minority-owned REP in the United States.

3.     In 2001, Alberto Daire and I founded the company that became LPC in 2002, to provide an alternative way for consumers to purchase electricity than through the traditional utilities that – prior to deregulation – functioned as monopolies over their respective regions.  We

EXHIBIT A

focused on being able to provide our customers with price certainty and price savings, and excellent customer service. We founded LPC on the principles of "Built to Last," which was a concept popularized by the Jim Collins book of that same name. We focused on the company's culture, which was built around people who were humble, hungry, and smart. We wanted a cohesive leadership team and a meritocracy mindset where the best ideas prevailed.

4.      To start LPC, Alberto and I used personal savings, credit cards, and a home equity loan. Neither one of us took any salary during the first couple of years of the business, and did not start taking any salary until the company had grown large enough so that it could cover its expenses and meet payroll for all of its other employees.

5.      As corporations and consumers increasingly weigh the importance of Environmental, Social, and Governance factors in allocating their resources, Liberty is the only minority-owned REP that can sell power to its customers from all sources, including renewable sources that are in increasingly high demand. Indeed, nearly all of the electricity that Liberty provides to its residential customers comes from renewable sources. In addition, Liberty offers a program for its customers to purchase Renewable Energy Certificates ("RECs"), which represent 1 MWh of electricity produced from a renewable source. Purchasing RECs is a way for businesses and consumers to promote the use and development of renewable energy sources.

6.      Over time, we grew LPH into a mid-sized REP with a national footprint. Over the years, LPH has served more than 100 Fortune 500 companies, and hundreds of thousands of small and medium sized business, not-for-profits, and residential customers.

**How REPs Work**

7.      The generation and delivery of electricity to consumers consists of three components. The first component is the generation of power by a power generating facility. The

second component is transmission of the electricity from the generator to the power grid.  The final component involves the sale and distribution of electricity from the power grid to consumers (*i.e.*, businesses and residential homes).

8.    REPs do not generate power, and are not involved in its transmission.  They also do not directly purchase or receive delivery of electricity themselves. They are, however, involved in the sale and distribution of electricity directly to consumers.

9.    The way that REPs do this involves participating in the energy trading market and entering derivative contracts (also referred to as hedges) that provide them the right to direct delivery of electricity to their retail customers in a specific amount and for a specific price at a specific time.  In order to make money, therefore, REPs need to be able to purchase their derivatives at prices lower than what they charge their customers.

10.    REPs need access to a significant amount of capital to participate in the energy trading market, and so they need to enter expensive "credit sleeve" arrangements with larger energy trading companies.  These credit sleeve arrangements are structured so that the credit sleeve provider becomes a secured lender to the REP.  In return for providing the credit the REP needs to participate in the energy trading market, the credit sleeve provider receives a fee for each unit of energy (MWh) delivered by the REP to its customers.  In addition, the credit sleeve provider receives security, typically in the form of collateral consisting of the customer agreements, receivables, and licenses that belong the REP.

**LPH Enters a Credit Sleeve Arrangement with BETM**

11.    The credit sleeve arrangement that LPH has with Boston Energy Trading and Marketing, LLC ("BETM") is at the heart of the dispute which resulted in the commencement of this case.

12.    By the spring of 2020, LPH was looking to replace its current credit sleeve provider, and began negotiations with BETM to be its new credit sleeve provider.  At or around this time, LPH was also having discussions with three or four other potential credit sleeve providers, but the discussions with BETM began to advance more quickly than the others, given BETM's enthusiasm for becoming a credit sleeve provider to a REP.

13.    Effective July 6, 2020, LPH and BETM closed on the new credit sleeve arrangement, which was reflected in numerous different agreements.  First and foremost, there was the Supply and Services Agreement ("SSA"), which set forth the terms under which LPH would seek to place trades in the energy market, and BETM would make those trades on behalf of LPH. The SSA established how BETM would be paid for providing these services, and how proceeds that LPH received from its customers would be applied as between the two entities.  The SSA also contained numerous representations, warranties, ands covenants by each party.

14.    Because the energy markets are highly regulated, and because the pricing in the energy markets can be subject to considerable swings through regulatory action, LPH specifically bargained for a Change in Law provision.  This provision read, in relevant part:

> In the event of any change in applicable laws, rules or regulations during the Term of this Agreement by a Governmental Authority that…(b) result in a materially adverse change in a Party's economics under this Agreement . . . [the Affected Party] may provide the other Party with written notice of the Regulatory Event. The Parties shall for thirty (30) Business Days after such notice is delivered attempt in good faith to reach mutual agreement to resolve the material adverse impact on the Affected Party or the inability of the Affected Party to continue to perform or to amend the terms of this Agreement in light of the Regulatory Event to give effect to the original intention of the Parties, consistent with the original economic expectation of both Parties.

15.    As set forth above, the fundamental economic expectation for LPH with respect to the credit sleeve arrangement was that it enabled it an opportunity to purchase derivative contracts

for the delivery of power to its customers at prices below what it would then charge and collect from its customers. Put another way, the only way that LPH could make money under the credit sleeve arrangement is if the SSA provided LPH an opportunity to purchase derivative contracts for the delivery of electricity to its customers at prices lower than what it would charge and collect from its customers. Any "Change in Law" that materially and adversely impacts this opportunity would therefore trigger the Change on Law provision of the SSA.

16.    In addition to the SSA, the parties also executed several other agreements as part of the overall credit sleeve arrangement, including a Pledge and Security Agreement. Under that agreement, LPH provided a security interest in all of its assets to BETM. Notably, the negotiated and executed Pledge and Security Agreement did not give any rights to BETM to any of the property or assets owned by LPC, and LPC is not a party to either the SSA or the Pledge and Security Agreement.

17.    Prior to closing the transaction, BETM understood that LPH did not have any employees, did not own any technology, intellectual property, or have any other business infrastructure. Rather its assets and property primarily consisted of its membership interests in its subsidiaries, contracts with retail customers for electricity, receivables, and the licenses necessary to function as a REP.

18.    On the other hand, all of the intellectual property, human capital, and other business infrastructure (including the premises where the employees work and the operations occur) are assets that belong to LPC. Notably, BETM did not receive any rights over these assets that belong to LPC.

19.    LPH has a Management Services Agreement ("MSA") with LPC where LPH outsources its business operations to LPC, which uses its own intellectual capital and technology

to provide certain services to LPH that LPH needs to conduct its operations.  The MSA requires that LPH provide the funding to LPC that is necessary for LPC to provide the services it is obligated to provide to LPH pursuant to the MSA.  The MSA was renegotiated with BETM as part of the other transaction documents that became effective in July 2020.

**LPH and BETM Begin Operating Pursuant to the Credit Sleeve Arrangement**

20.     After the closing of the transaction, LPH and BETM began working together.  LPC and LPH provided assistance to BETM as BETM learned the details and gained the capacity to support a REP through a credit sleeve arrangement because BETM had never done so before with a company the size and national scale of LPH.  BETM frequently praised the LPC team for helping them get up the learning curve.  BETM said that they reviewed a couple dozen retailers both before the transaction and afterward, as they had received numerous inquires after the press release announcing the deal.  BETM said that of all the retailers they reviewed "none hold a candle to you" and said that they were "spoiled" by the LPC team for its responsiveness, quality of data and reporting, and technical and subject matter competency.  After the initial transition work, the discussions with BETM quickly evolved to the opportunity for the two companies to grow together within the retail space by combining BETM's financial capital and wholesale market access and expertise with LPC intellectual capital and experience.

21.     As a result of working with LPC and LPH and getting experience with providing a credit sleeve to an REP, BETM began getting additional opportunities for it to work with other REPs.  BETM met with several of these REPs to explore a potential credit sleeve arrangement with them.  But after conducting their diligence on these other REPs, BETM consistently came back to LPH and stated how LPH was in a class of its own, and superior to the other REPs BETM

6

was seeing, based on the sophistication of LPH's management team, its sales and marketing, and its risk management practices.

**A Winter Storm of Unprecedented Severity Strikes Texas in February 2021**

22.     The week of February 15, 2021 saw a historically severe winter storm paralyze Texas. On February 12, as the weather system approached, Texas Governor Greg Abbott declared a state of disaster covering every one of Texas' 254 counties.   Record-setting subfreezing temperatures and winter precipitation set in across Texas from February 13 through 18.

23.     The winter storm's historically low temperatures and unusual winter precipitation caused massive, far-reaching injury to person and property across Texas.   Millions were left without power or water, some for days on end.  Most homes in Texas use electric heating and are much more poorly insulated than homes in colder regions of the country.

24.     As temperatures dropped, the demand for electricity soared as Texans sought to keep their homes warm.  While consumer demand on the electric grid climbed, supply was stretched to the breaking point as the extreme cold impaired the state's power generating infrastructure, diminishing power plants' ability to generate electricity and the natural gas system's capacity to deliver fuel.

25.     Texas, alone among the other continental states, operates its own, essentially independent power grid, with limited ability to receive power from neighboring states.  The Texas power grid is managed by the Electric Reliability Council of Texas ("ERCOT"), which schedules and manages power for more than 26 million Texas customers (roughly 90% of the state's electric load).   One of ERCOT's core responsibilities is maintaining the electric system's reliability. ERCOT, in turn, is overseen by the Public Utility Commission of Texas ("PUCT").

26.     On February 15, PUCT held a six-minute emergency meeting to address the critical situation facing the power grid.  During that meeting, PUCT took the extraordinary step of ordering ERCOT to raise electricity prices to the statutory market cap of $9,000 per MWh, instead of continuing to allow market forces to prevail.  To place this astronomical increase in context, the average system-wide pricing for January 2021 was $20.79 per MWh—**hundreds of times lower** than the price required by the PUCT order.

27.     Even though energy prices had been successfully clearing on February 15 as low as $1,200 per MWh, PUCT ordered prices to be immediately raised to the statutory maximum in an attempt to send "scarcity pricing signals" to the market (the "PUCT Order").  PUCT evidently believed the $9,000 per MWh price would incentivize power generators to begin supplying additional power, notwithstanding that they knew or had reason to know that nearly half of the grid's power generating capacity had already been incapacitated by the extreme weather.  ERCOT dutifully followed PUCT's order and artificially set prices at $9,000 per MWh, where it allowed prices to remain until February 19.

28.     The PUCT Order resulted in electricity prices being set and maintained at the statutory maximum instead of stepping in to halt the market to ensure that nobody gained in equitable profits (or suffered inequitable losses) as a result of this weather and humanitarian crisis.  This occurred even well after conditions improved to the point where ERCOT no longer needed to "shed load," *i.e.*, institute controlled power outages, to serve consumer demand.  As PUCT's Independent Market Monitor reported following the winter storm, ERCOT held electric prices artificially high for longer than necessary, resulting in billions of dollars in overcharges to ERCOT's market, including REPs such as LPH.  The artificially high energy prices set by the PUCT's Order had a direct effect on the prices for ancillary services, which are payments to

generators for providing short-term reliability services to stand by and be responsive.  These ancillary services prices, often in excess of $20,000/MWh were a very significant additional driver of the excessive charges to customer serving entities.  Most market participants at the time had commented and even the PUCT Chairman stated as not realizing that such prices were even possible. These astronomical prices and the related charges were also identified by the Independent Market Monitor as being excessive and inappropriate.

29.     The extreme spike in energy prices in Texas resulting from the PUCT Order caused LPH to pay millions of dollars more for the electricity to be delivered to its Texas customers than it would normally need to pay.

30.     In addition, while LPH customers are technically liable to LPH for these amounts, it is certain that LPH will never be able to collect the amounts owed by its customers, due to the fact that PUCT does not allow for any disconnections.

**LPC and LPH Enter Negotiations With BETM on Possible Solutions**

31.     In large part as a result of the events in Texas and this liability, on February 17, 2021, BETM sent LPH a Notice of Potential Event of Default under the SSA.  On February 19, 2021, BETM sent LPH a Notice of an Event of Default.  That same night, Derik Viner, who was President of LPC, and I had dinner with Louis Martinsen, our primary contact at BETM in order to begin discussions of possible solutions for LPC, LPH and BETM in the wake of the Texas events.  At this meeting and in subsequent discussions it was made clear to us that BETM understood that the event was driven by wholly unexpected, unpredictable exogenous conditions, and that, specifically, Liberty Power "did everything right" and that there was absolutely nothing the company could have done to mitigate such circumstances.

32.     Over the next couple of weeks, and as we began discussions with BETM on this issue, BETM sent additional Notices of Events of Default to LPH.  Despite receiving these letters that seemed intended to unnecessarily escalate the situation and gain leverage over LPC and LPH, LPC and LPH remained engaged in negotiations with BETM to try and find a potential resolution. LPC and LPH provided BETM with numerous concepts and ideas for a solution, but BETM expressed no overt interest in exploring any of these options.

33.     At the same time, BETM and LPC and LPH collaborated to develop a formal dispute of charges with ERCOT, which BETM submitted on the parties' behalf on March 3rd.  LPC and LPH requested on at least four occasions to BETM to confirm the submission of the dispute and to share a copy of this dispute.  The formal dispute with ERCOT was sent to LPC and LPH on March 26th. In this dispute BETM.  In this dispute BETM argues "Real-Time Reliability Deployment Prices for Energy (RTRDP) as applied after PUCT order dated 2/15/2021 appear arbitrary, unreasonable, inconsistent with ERCOT tariff, and inconsistent with the unmodified scarcity pricing on 2/15/21 (HE1 – HE22), and the entire history of Liberty's prior nodal settlements (2010 to present)." And further argues "The RTRDP adder continued beyond the end of forced load shed through 2/19/21, which as numerous entities have noted in PUCT filings appears arbitrary, capricious, and inconsistent with the Tariff."

34.     Specifically, in early March, LPH and BETM began negotiations on a term sheet for a forbearance agreement, which was intended to be a collaboration between LPC, LPH and BETM in an attempt to maximize the value of LPH and its assets in a potential sale scenario.  One key component of this term sheet was the level of involvement that LPC would have in any sale process.  From LPC's and LPH's perspective, having LPC assist and participate in any sale process was the best way to maximize the value of LPH.  In addition, LPC was also willing, depending on

the terms, to put itself up for sale along with LPH so that a buyer could purchase a fully functioning ongoing concern. As set forth above, because LPH had no employees or ability to operate its business without LPC, any sale of LPH would potentially result in a higher price for the LPH assets if the buyer also was able to purchase LPC in a manner that would allow LPC to continue to provide services to LPH to support LPH's operations. LPC and LPH also demonstrated for BETM why waiting (rather than engaging in a hasty sale or bankruptcy) would return more value from any sale. But BETM resisted these ideas for some reason, and consistently downplayed the importance of LPC to LPH. BETM did not seem interested in maximizing the value of LPH, but rather seemed intent on as rapid of a sale of LPH as possible. In addition, BETM seemed to be assuming that LPC was obligated (or would) provide additional services to LPH and BETM as part of any sale transaction of LPH or bankruptcy process. We tried to make it clear that LPC did not have any obligation to provide this type of assistance to LPH and BETM.

35.    On March 15, 2021, in order to preserve its rights and because it started to become clear that BETM would not be willing to enter a forbearance agreement designed to maximize LPH's value and recognize LPC's contributions to any sale process, LPH exercised its rights under Section 12.2 of the SSA and provided notice to BETM of a Change of Law. Specifically, Liberty's notice identified that the February 15, 2021 PUCT Order constituted a Change of Law, as defined in the SSA, and that this Change in Law resulted in a materially adverse impact to LPH's economics under the SSA.

36.    BETM sent LPH a response on March 17, 2021. Notably, in that response, BETM did not dispute that the PUCT Order that caused electricity levels to spike constituted a Change of Law. Rather, BETM somewhat incredibly claimed that the spike in pricing and resulting millions

of dollars in liability incurred by LPH did not constitute a material adverse change to LPH's economics under the SSA, and thus the Change in Law provision was not triggered.

37.     LPC and LPH continued to stay engaged with BETM to try and agree on a process for maximizing the value of any sale of LPH.  Specifically, on Friday, April 9, 2021, LPH sent a detailed analysis to BETM demonstrating the added value that LPC involvement in a sale of LPH would have, as well as the impact of value destruction resulting from not having use of LPC's platform.

38.     On Monday April 12, 2021, without responding to the analysis that LPH sent on April 9, BETM surprisingly sent a Notice of Termination of the SSA to LPH.  Along with the Notice of Termination, BETM sent LPH a Preliminary Debtor-in-Possession (DIP) Financing Term Sheet, making it very clear that BETM intended to seek to exercise its rights under the Pledge and Security Agreement and force LPH to file bankruptcy.

39.     Because LPC relies on LPH for its funding, BETM's intention to put LPH into bankruptcy threatened LPC's ability to be able to satisfy its debts and obligations. Accordingly, on April 12, 2021, in order to obtain this critical past due funding and ensure retention of key employees, LPC sent LPH a formal notice under the MSA of LPH's failure to provide funding for these key payments.  LPH forwarded this funding request to BETM, but BETM indicated that it would not agree to fund these payments, despite knowing the adverse impact to LPC and LPH that losing these key employees would have.

40.     On April 13 and 14, LPC, LPH and BETM continued to discuss options for a collaborative path forward that would ensure LPH had the support it needed prior to or during any bankruptcy.  On April 14, 2021, BETM's representatives expressed their desire to have LPH file bankruptcy by Friday, April 16, 2021.

41.    On April 15, 2021, as our discussions were ongoing and without any advance notice, BETM sent LPH and Liberty Power Super Holdings a Notice of Exercise of Step-In Rights under the Pledge and Security Agreement.  Under the Pledge and Security Agreement, and in certain situations, BETM purportedly had the ability to "step-in" and exercise the voting rights that Liberty Power Super Holdings had with respect to LPH, which is its wholly owned subsidiary. Through the Notice of Step-In Rights, BETM sought to remove certain mangers from the LPH Board of Managers, appoint three new persons (including two persons who were BETM employees) as managers, and appoint Bob Butler as the Chief Restructuring Officer of LPH.

42.    Also on April 15, 2021, because it appeared as if BETM was planning to use its purported control over LPH to put LPH into bankruptcy, LPC exercised its rights under the MSA to send LPH an advanced funding request for payment to prospectively cover two weeks of payroll for its employees, and two weeks of vendor expenses that would be incurred by LPC.  The amount of these expenses was consistent with the amounts LPH had been regularly paying to LPC in the past.  Under the terms of the MSA, LPH was obligated to make a payment on this advanced funding request on April 16, 2021.  LPC conveyed this advanced funding request to BETM, which now controlled LPH.

43.    On April 16, 2021, Liberty Power Super Holdings sent BETM a detailed letter describing why – for several reasons – BETM's exercise of its step-in rights was invalid under the SSA and the Pledge and Security Agreement.  To date, BETM has not provided any written response to that letter disputing its lack of authority to exercise its step-in rights.

44.    Because we believe that BETM's use of its step-in rights was invalid, we do not believe that this Bankruptcy has been properly authorized or initiated by LPH, and will be seeking to dismiss this bankruptcy in short order.

45.    Also on April 16, 2021, representatives from LPC and BETM discussed LPC's request for advance funding, and why receiving this funding would be critical to keep LPC's operations going in light of BETM's plans to cause LPH to file for bankruptcy.  Critically, while BETM made representations that it would allow LPH to provide advanced funding to cover payroll expenses for two weeks, it did not provide any assurances beyond that, and it stated that it would not do so for vendor expenses and would instead pay those vendor expenses which it chose to approve in the ordinary course as they became due.  LPC explained to BETM that this was untenable for several reasons (as well as being a breach by LPH of the MSA).  For example, LPC faced the risk of incurring liability to its vendors that LPH would not be able to fund once it filed for bankruptcy, or which BETM would choose not to fund.  LPC explained that unless it received reasonable assurances from LPH and BETM for advanced funding for these liabilities LPC would be incurring, it could not continue to utilize the services of its vendors given that it would lack the ability to pay them.  LPC also explained to BETM the critical services that these vendors provided to LPC to perform under the MSA, and that LPH's and BETM's agreement to provide advance funding for payroll would be meaningless because the employees could not do their jobs without the involvement of the vendors.

46.    Despite these discussions, BETM remained non-committal about whether it would provide advance funding for LPC's vendors by the end of the day on Friday, April 16.

47.    Over the course of the weekend (April 17 and 18), and in the absence of any reasonable assurances from LPH and BETM that they would provide advance funding to LPC so that LPC could have money to pay its vendors so that LPC could continue its operations, I struggled to decide on what LPC should do.  Ultimately, I made one of the most difficult decisions of my life and on Sunday, April 18, authorized LPC to provide notice to its employees terminating their

employment. Had LPH and BETM provided assurances that they intended to provide advanced funding for the vendor charges that were critical to allow LPC to continue to operate, I would not have made this decision. LPH's and BETM's lack of commitment to provide this funding appeared to me to be part of a pattern of them trying to continually squeeze LPC, especially given that LPH had a clear obligation to provide the advanced funding pursuant to the MSA, and its failure to do so represented a breach of that agreement.

48.     I have read the Declaration of Bob Butler and want to address his attempts to blame me and LPC for taking the steps we took. Simply put, for Mr. Butler to suggest that I terminated employees in bad faith or out of pique is incredibly offensive to me and inexcusable. As set forth above, I founded LPC nearly 20 years ago, helped build it from the ground up, and have spent a majority of my professional life overseeing its growth and operations. Over the years, the members have had LPC reinvest over $100 million into the business in order to make it grow, rather than taking those funds for ourselves. I have remained incredibly dedicated to LPC's employees, just as I was form the start when I refused to take any pay until the company had enough capital to pay all of its other employees. At the time of the original deal with BETM in July 2020, I contributed a significant amount of my personal net worth to save jobs at LPC and to protect its vendors. And throughout the more recent negotiations with BETM, I consistently advocated for employee incentive payments would have to be part of any deal. To be clear, despite Mr. Butler's statements that he was working on the funding issues and expected everything to be taken care of on Monday, April 19, none of this was ever communicated to me or anyone else at LPC prior to LPC's decision to terminate its employees, and, in fact, the only communications from BETM we received on this issue were extremely non-committal. We have been telling BETM for the past several weeks the importance of LPC's vendors, and we specifically repeated to them on Friday, April 16 how critical

it was to LPC's operations to get advanced funding for vendor payments, but provided no assurances on that day or prior to the terminations on Sunday evening that they would provide this critical funding.

49.     I also take issue with Mr. Butler's claims that LPC has been uncooperative in the aftermath of the terminations.  I responded to a text message from Mr. Butler within minutes and then personally spoke with him on Monday morning in order to discuss a path forward and possible solutions, including a proposal that LPC would seek to rehire some or all of its employees to resume operations.  As for Mr. Butler's requests for records, I explained to him that LPC's ability to gather these records was inhibited due to the fact that it had to terminate its employees, and that without employees or funding, it would be difficult for LPC to provide records, but that LPC was interested in trying to negotiate a solution with LPH and BETM on this point.

50.     Unfortunately, those negotiations did not lead anywhere, but not because – as Mr. Butler suggests – LPC took unreasonable positions or imposed unreasonable conditions. Throughout the negotiations with BETM – going all the way back to February 19 – I have only insisted on terms that I felt in good-faith were fair to LPC and reasonable in light of its added value.

51.     At 12:51 p.m. on April 19, Mr. Butler sought to schedule an emergency meeting for the Board of LPH for 2:30 p.m.  In response, we reiterated our objection to any Board meeting called or involving managers that we did not believe had been appropriately appointed given the infirmities with BETM's exercise of its step-in rights, but stated that we would be willing to reserve rights on this issue and proceed with a meeting in order to continue to explore a potential path forward that would work for all the stakeholders.  We also requested an agenda for the meeting, but did not get one.  We also noted how the attempt to schedule the meeting violated the 24-

16

advance notice requirement for any Board meeting, and that it was difficult to waive this advance notice requirement without knowing what would be on the agenda so that we could have some ability to prepare in advance.  We explained that we would still be willing to proceed with the meeting at 2:30 p.m. that day, and would be willing to put any objections to the meeting on the back burner in order to try to reach a potential resolution expeditiously.  In response, Mr. Butler postponed the Board meeting to the following day, April 20.

52.     During the Board meeting, the managers that had been appointed by BETM and Mr. Butler (who was appointed by the BETM managers) all advocated for an immediate bankruptcy filing for LPH.  I explained how this would be premature and would destroy value, and that the parties should continue to work on a potential resolution.  But it became clear to me that Mr. Butler and the inappropriately appointed BETM Board members had previously made up their mind to proceed with a bankruptcy filing and the Board discussion was nothing more than a perfunctory gesture.  Ultimately, the three managers appointed by BETM voted in favor of a bankruptcy, with the other two managers (myself and Martin Halpern) voting against a bankruptcy.

53.     That evening, I continued to advocate for a negotiated resolution, and conveyed a new offer to BETM from LPC that would result in LPC taking steps to rehire employees and resume operations in exchange for some modest financial commitments from BETM.

54.     On April 21, that next morning, and without BETM providing LPC with any counter-offer or feedback on LPC's offer, LPH filed their petition for bankruptcy with this Court. We immediately reached out to BETM and expressed our desire to continue our negotiations despite what we felt was an unnecessary step of LPH filing for bankruptcy.  As part of that outreach, and prior to LPH filing its turnover motion, we offered to discuss providing BETM with direct access to certain of LPH's records.  Despite this fact, LPH filed its turnover motion that –

in my view – is incredibly overbroad and seeks to get access to property and assets belonging to LPC. My personal belief is that the BETM managers instructed LPH to overreach in this regard in an attempt to get access to the LPC assets that were not part of the deal that BETM negotiated and agreed to back in 2020 as part of its credit sleeve arrangement with LPH. This is an improper attempt by BETM to enlist this Court's assistance in essentially rewriting the agreements BETM previously executed.

55.     Later in the afternoon of April 21, BETM contacted me to set up a call at 4:15 p.m. to discuss their counter-offer. During the call we discussed their counter-offer, and after our call, they sent me their counter-offer in writing. We are now preparing a counter-offer back to BETM that we plan to communicate today.

56.     In closing, my sense is that LPC and BETM are closer to finalizing a deal than we have ever been, and this deal will include provisions providing that LPC and BETM will work together to ensure that LPH gets the staffing, operational support, and access to records it will need to continue its operations, and to ensure that LPC's employees are provided appropriate transition support, and LPC's vendors are also paid. For this reason, I think it makes sense for this Court to defer entering any order on LPH's turnover motion for a short period of time in order to allow LPC and BETM to finalize their agreement and resolve this issue without the need for this Court's involvement.

David Hernandez, CEO
Liberty Power Corp. LLC

Dated: April 22, 2021