**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                        Chapter 11

**LIBERTY POWER HOLDINGS, LLC,**              Case No. 21-13797-SMG

          Debtor.

_____/

**DEBTOR'S  EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN SECURED POST-
PETITION FINANCING  PURSUANT TO 11 U.S.C. §§ 105, 361, 362, AND 364, (II)
GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIMS IN
CONNECTION THEREWITH, (III) AUTHORIZING USE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (IV) GRANTING ADEQUATE  PROTECTION
IN CONNECTION THEREWITH PURSUANT TO 11 U.S.C. §§ 361, 363 AND
507, AND (V)  SCHEDULING A FINAL  HEARING
UNDER BANKRUPTCY  RULE 4001**

**(Emergency Hearing Requested on Thursday, May 6, 2021 at 9:30 a.m.)**

**Statement of Exigent  Circumstances**

The Debtor seeks to continue operating its business post-petition in the ordinary
course to preserve the going  concern  value of the estate, to preserve jobs, to
maintain operations, to pay vendors, to service customers and to begin an orderly
sale process.  Without the immediate authorization to use cash collateral and obtain
the financing as set forth herein, the Debtor will not be able to meet its day-to-day
obligations as set forth in the Budget (as defined herein) and will not be able
to achieve these goals.

The Debtor respectfully requests that the Court conduct a hearing on this Motion
on May 6, 2021, consistent with Local Rule 9013-1(F), as the Debtor believes
that a hearing on this Motion is needed as soon as possible in order for it to
continue to operate.  The Debtor respectfully requests that the Court  waive the
provisions of  Local Rule 9075-1(B) which requires an affirmative statement that
a bona fide effort was made in order to resolve the issues raised in the Motion,
as the relief requested herein is urgent in nature and does not lend itself to advance
resolution.

          **LIBERTY POWER HOLDINGS, LLC** (the "Debtor" or "Liberty"), by and through its

undersigned counsel, hereby files this emergency motion (the "Motion") requesting this Court to

enter an interim order (the "Interim Order"), substantially in the form attached hereto as **Exhibit "A,"**[1] and thereafter a final order (the "Final Order", together with the Interim Order, (collectively, the "DIP Financing Orders") pursuant to Sections 105, 361, 362, 363, 364 and 507(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 2014(a), 4001(c), 2016, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's *Guidelines for Motions Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing* (the "Guidelines"): (i) authorizing the Debtor (a) to obtain secured post-petition financing from Boston Energy Trading and Marketing, LLC or its designee or assignee ("BETM" or the "DIP Lender") in an amount equal to $4,000,000 on an interim basis based on the Interim Order, and thereafter in an amount up to $40,000,000 pursuant to the Final Order (inclusive of any interest or fees) (collectively, the "DIP Financing"), in each case to fund the payment of those obligations set forth in that certain 13-week budget attached hereto as **Exhibit "B"** (the "Budget"), all on the terms and conditions set forth in the Interim Order and the BETM – Debtor Summary Of Terms, dated as of May 5, 2021 (substantially in the form attached hereto as **Exhibit "C,"** and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Term Sheet"), together with all agreements, documents, instruments and/or amendments delivered in connection therewith between the Debtor and DIP Lender (collectively, the "DIP Documents"),[2] (b) to grant certain liens and security interests to BETM in connection therewith, (c) to grant BETM a superpriority administrative expense claim in this Chapter 11 case having priority over any and all other administrative expense claims, (d) to use cash collateral of BETM pursuant to the Budget,

---

[1] In the event of any inconsistency between the summary of the terms contained in this Motion and the terms set forth in the Interim Order, the terms of the Interim Order shall control.

[2] The Debtor will file any additional DIP Documents with the Court no later than two (2) business days prior to the Final Hearing (as defined herein).

(e) to grant adequate protection to BETM in connection therewith, (f) to authorize the Debtor to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith, including the modification of certain credit-support arrangements, and (g) to schedule an emergency interim hearing and final hearing on the Motion.

In support of this Motion, the Debtor relies upon the *Declaration of Bob Butler in Support of First Day Pleadings* [ECF No. 10] (the "First Day Declaration"), and respectfully states as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364, 507(a)(8), 541, 1107(a) and 1108 of the Bankruptcy Code, Rules 2002, 2014(a), 4001(c), 2016, 6003, 6004 and 9014 of the Bankruptcy Rules and Local Rule 4001-2 and 4001-3.

## II.     DISCLOSURES UNDER BANKRUPTCY RULES, LOCAL RULES AND GUIDELINES

4.      Pursuant to Bankruptcy Rule 4001(b), Local Rules 4001-2, 4001-3, 9013-1(F), (G) and (H), and the Guidelines, the Debtor submits the following list and summary of the material terms of its proposed secured financing and use of cash collateral pursuant to the proposed Interim Order, setting forth the location of such material terms[3] in the Interim Order:

---

[3] The following summary contains truncated descriptions of material terms and is qualified in its entirety by the actual terms of the proposed Interim Order. Capitalized but undefined terms shall have the meanings given to such terms in the Interim Order and/or this Motion, as applicable.

| Material Provision | Location in Interim Order | Summary Description |
|---|---|---|
| Prepetition Lender | p. 2 | Boston Energy Trading and Marketing, LLC |
| DIP Lender | p. 2 | Boston Energy Trading and Marketing, LLC |
| Principal balance due Prepetition Lender | p. 6 | $121,031,960.56 |
| DIP Financing Amount | p. 2, 3 | For purposes of the Interim Order, the DIP Financing shall not exceed $4,000,000, which subject to entry of the Final Order and the DIP Lender's sole discretion, may be increased to $40,000,000. |
| Interest Rate | Term Sheet | If funds in the Lockbox are not sufficient to pay any amounts due on the monthly payment date, then (subject to remaining availability) DIP Lender shall, at Debtor's request, extend the payment date for amounts due to it ("Deferred Supply Obligation" or "DSO") until the next monthly payment date. Except as DIP Lender may agree, a DSO may not extend payment obligations under a prior DSO (i.e., DSOs do not "roll" automatically).<br><br>DSOs will incur interest at the higher of the Secured Overnight Financing Rate ("SOFR") plus 1000 basis points or 10.0% for the first 30 days and thereafter, the higher of SOFR plus 1200 basis points or 12.0%.<br><br>To the extent unpaid amounts owed to DIP Lender do not constitute DSO, such amounts will accrue interest at the treasury bill rate plus 1200 basis points. |
| DIP Financing Fees | Term Sheet | Supply Fee: $1.00/MWh, provided that non-standard transactions will be assessed an additional 5% of the notional amount.<br><br>Sleeve Fee: $0.25 per MWh<br><br>Credit Support Fee: For non-ISO collateral postings, the higher of (a) SOFR plus 1200 basis points or (b) 12% per annum. |

| | | |
|---|---|---|
| Superpriority Administrative Expense Claim | p. 13 | Subject to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against the Debtor with priority over any and all administrative expenses and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtor and all proceeds thereof. |
| DIP Liens and Collateral | p. 13-15 | Subject to the Carve-Out, pursuant to section 364(d)(1) of the Bankruptcy Code, fully-perfected first priority senior priming lien (*pari passu* with the Pre-Petition Liens) on, and security interest in, all tangible and intangible prepetition and post-petition property of the Debtor, whether existing on or as of the Petition Date or thereafter acquired, including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing (the "DIP Liens").<br><br>With the exception of the Debtor's money market account (x3760), each of the bank accounts maintained by the Debtor (collectively, the "Bank Accounts") is subject to an account control agreement (each, a "Control Agreement") among the Debtor, JP Morgan, and DIP Lender.<br><br>Notwithstanding anything in the Interim Order to the contrary, the DIP Liens shall not attach to any claims and causes of action arising under state or federal law under chapter 5 of the Bankruptcy Code or any proceeds thereof (the "Avoidance Actions"). |

5

| Termination Date | p. 27 | The maturity of the DIP Facility (the "<u>Maturity Date</u>") would be the earliest of: (i) the effective date of a Chapter 11 plan, (ii) the closing of sale of all or a substantial part of the Debtor's assets, (iii) December 1, 2021, or (iv) the occurrence and declaration of an Event of Default by the DIP Lender. |
| --- | --- | --- |
| Remedies and Notice Period | p. 17-18 | Upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtor (with a copy to counsel to the United States Trustee), the DIP Lender may seek relief from the automatic stay on an emergency basis and obtain authority to exercise all other rights and remedies against the Collateral provided for in the DIP Documents and the Interim Order.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default or Maturity Date has occurred and is continuing. |
| Adequate Protection | p. 15 | As adequate protection for the use of its Cash Collateral, BETM will receive a security interest in and lien upon all the personal property of the Debtor, whether owned or existing as of the Petition Date or thereafter acquired or arising, and all proceeds, products, rents, revenues, or profits of such property, excluding, however, the Avoidance Actions (the "<u>Replacement Liens</u>"). The Replacement Liens shall be junior and subordinate to the DIP Liens and the Carve Out.  The Replacement Liens shall be deemed attached, perfected, and enforceable against the Debtor and all other persons, including without limitation, any subsequently appointed trustee for the Debtor, without the filing of any financing statements or other compliance with non-bankruptcy law. |

| Debtor's Stipulations, Admissions, Releases and Agreements And Challenges | p. 3-7 | The Debtor and the Debtor's estate is unconditionally, irrevocably, and fully forever releasing, remising, acquitting, relinquishing, irrevocably waiving, and discharging BETM and the Representatives (defined below) of and from any and all claims with respect to or relating to the DIP Obligations, the Post-Petition Liens, the DIP Documents, the Pre-Petition Agreement or the Pre-Petition Liens including, without limitation, (i) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims arising from or relating to the Pre-Petition Agreements or any transaction or occurrence prior to the Petition Date and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender.<br><br>The Debtor's stipulations, admissions, releases, and agreements shall be binding upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Case (including any official committee appointed in the Case) and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless: (a) such committee, or any other party in interest, with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter by no later than 60 calendar days after entry of this Interim Order, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of any of the Pre-Petition Obligations, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the DIP Lender in connection with matters related to the Pre-Petition Agreements; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. |
| Waiver /modification of stay | p. 17-18 | The DIP Lender may seek relief from the automatic stay on an emergency basis and obtain authority to exercise all other rights and remedies against the Collateral provided for in the DIP Documents and the Interim Order.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default or Maturity Date has occurred and is continuing.  Subject only to and effective upon entry of the Final Order, the Debtor shall waive any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in the Interim Order or the DIP Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.  The DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or the Interim Order shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is |

| | | pursuant to a written instrument executed in accordance with the terms of the DIP Term Sheet. |
|---|---|---|
| Limitation on use of proceeds | p. 25-26 | Neither proceeds from DIP Financing, nor Cash Collateral nor Carve-Out may be used (a) for any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise) against the DIP Lender or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Lender or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations or the security interests in or liens on the Collateral or against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (b) to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or this Interim Order, (c) to seek to modify any of the rights granted to the DIP Lender under this Interim Order or under the DIP Documents, without the DIP Lender's prior written consent, which may be given or withheld by the DIP Lender in the exercise of its sole discretion. |
| Waiver of right to file a plan | | None |
| Deadlines for filing a plan | p. 15-17 | None, however, the DIP Lender requires that the Debtor implement a sale process as set forth below and in the Interim Order. |
| Release/Waiver of claims | p. 18-20 | Subject in all respects to the Challenge, the Debtor and the Debtor's estate on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries and assigns hereby unconditionally, irrevocably, and fully forever releases, remises, acquits, relinquishes, irrevocably waives, and discharges BETM, and each of its affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such (collectively, the "Representatives"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations (as defined below), the Post-Petition Liens (as defined below), the DIP Documents, the Pre-Petition Agreement or the Pre-Petition Liens including, without limitation, (i) any and all claims and causes of action arising under the Bankruptcy |

| | | |
|---|---|---|
| | | Code, (ii) any and all claims arising from or relating to the Pre-Petition Agreements or any transaction or occurrence prior to the Petition Date, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of BETM. |
| Indemnification | Term Sheet | The DIP Lender and its affiliates, directors and employees will be indemnified against all losses, liabilities, claims, damages and expenses relating to or arising out of the Transaction Documents and/or the transactions contemplated herein, including, without limitation, the professional fees and expenses incurred by the DIP Lender in connection with the negotiating and drafting the definitive agreements,  provided that such losses are not the result of the DIP Lender's willful misconduct or gross negligence. |
| Limitation of rights of parties under section 506(c) | p. 20 | Subject only to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained herein, no costs or expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. |
| Granting of lien on claims/causes of action | p. 14 | The DIP  Liens shall not encumber the Debtor's avoidance claims or causes of action arising under Chapter 5 of the Bankruptcy Code. |
| Carve-Out | p. 20-21 | The Superpriority Claims, the Replacement Liens and DIP Liens granted to the DIP Lender pursuant to the DIP Financing Orders shall be junior and subordinate to (a) all fees required to paid by the Debtor to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) all fees due the Clerk of the Court, (c) with respect to the Debtor's professionals, the allowed fees and disbursements as may be awarded to such professionals from time to time pursuant to Bankruptcy Code §330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, (d) up to $100,000 in fees and expenses of the Debtor's professionals following an Event of Default, and (e) amounts to pay for post-petition "trust fund" obligations. |

| Binding Effect | p. 18-20 | The Debtor's acknowledgments, stipulations, waivers, and releases (solely with respect to the releases, once they become effective) shall be binding on the Debtor and its respective representatives, successors, and assigns, and on the Debtor's estate and all entities and persons, including any creditors of the Debtor, and each of its respective representatives, successors, and assigns, including, without limitation, but subject in all respects to the Challenge, any trustee or other representative appointed in the Case, or upon conversion to chapter 7, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code. |
| | | The DIP Documents and the provisions of the Interim Order, including all findings in the Interim Order, shall be binding upon all parties in interest in the Case, including without limitation, the DIP Lender, the Debtor and its respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor or with respect to the property of the estate of any of the Debtor) and shall inure to the benefit of the DIP Lender and the Debtor and its respective successors and assigns, provided that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of the Debtor. |
| Interim Order | | The proposed form of Interim Order is attached to the Motion as Exhibit A. |

## III.  **BACKGROUND**

5.       On April 20, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

6.       The Debtor is operating its business and managing its affairs as a debtor-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

7.       For a detailed description of the Debtor and its operations, the Debtor respectfully refers the Court and parties in interest to the First Day Declaration.

8.       The Debtor is a retail energy provider (an "REP") that is active in competitive electricity markets in over a dozen jurisdictions operating in five organized markets. The Debtor

and its subsidiaries are certified and licensed to provide retail electric service by the Public Utilities Commissions or Public Service Commissions in each of California, Connecticut, District of Columbia, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas and Virginia. The Debtor currently services hundreds of thousands of customer accounts in 14 states.

9.      The Debtor sells electricity to residential, commercial and industrial customers, wherein it competes in price and terms with other REPs and the public utility in a given market area. The Debtor typically makes a profit in the form of a margin between the price it charges a customer under a sales contract for electricity and the cost at which the Debtor sources such electricity in the wholesale markets. However, that margin must also account for the costs associated with hedging, financing, and commercial operating expenses, among other things.

10.     Each organized market is operated by an independent system operator (each, an "ISO"), including the Electric Reliability Council of Texas ("ERCOT"), Pennsylvania, Jersey Maryland Power Pool ("PJM"), New York ISO, or ISO-New England. As the Debtor's customers consume electricity, each ISO balances that consumption with generation, and this balancing is treated as a purchase by the Debtor in the wholesale markets and a resale to the customer. Typically, on a monthly basis, the ISO settles accounts and, in doing so, invoices the Debtor for the power collectively consumed by its customers as a purchase in the wholesale market. Because the ISO is effectively taking counterparty credit exposure to the Debtor as any month progresses, the ISO demands that the Debtor provide it with credit assurance.

## IV.  DEBTOR'S PRE-PETITION FINANCING

11.     In July 2020, the Debtor completed a restructuring of its capital structure (the "Restructuring"). In connection thereafter, the Debtor and BETM executed the following

documents:

    a. Supply and Service Agreement, by and among Boston Energy Trading and Marketing LLC, and Liberty Power Holdings LLC, dated as of July 6, 2020 (the "<u>Supply and Services Agreement</u>");

    b. ISDA (International Swap and Derivatives Association, Inc.) 2002 Master Agreement by and among Boston Energy Trading and Marketing LLC, and Liberty Power Holdings LLC, dated as of July 6, 2020;

    c. Pledge and Security Agreement, by and among Liberty Power Holdings LLC, Liberty Power District of Columbia LLC, Liberty Power Maryland LLC, LPT, LLC, and Liberty Power Super Holdings LLC, and Boston Energy Trading and Marketing LLC, dated as of July 6, 2020 (the "<u>Pledge Agreement</u>");

    d. Parent Agreement, by and between Liberty Power Holdings LLC, Liberty Power Super Holdings LLC, and Boston Energy Trading and Marketing LLC, dated as of July 6, 2020;

    e. Consent and Acknowledgement Letter, by and between Liberty Power Holdings, LLC and Boston Energy Trading and Marketing LLC, dated July 6, 2020; and

    f. Intercreditor Agreement by and among Boston Energy Trading and Marketing LLC, David Hernandez, Martin Halpern, Shell Energy North America (US), L.P., Liberty Power Holdings LLC, and the other Grantors party hereto dated as of July 6, 2020 (the "<u>Intercreditor Agreement</u>").

(collectively, the "<u>Pre-Petition Agreements</u>").

12.    Pursuant to the Supply and Services Agreement, BETM provides, among others, the following services to the Debtor:

    a. Provision of credit support to the ISOs and other key service providers or regulators for the operation of an REP like the Debtor;

    b. Hedges, either as financial instruments (e.g., a fixed/float swap) or as physical trades (e.g., selling power to the REP in the wholesale market);

    c. Working capital in the form of payment provisions that, among other things, bridges the gap between when the REP collects invoices from its customers and when the REP must pay the ISO, and allow certain amounts above in excess of available funds to be deferred to following month;

d. Access to third-party sellers in the wholesale markets and or financial hedge provider through intermediation trades; and

e. Supports the REP through various operational services, like risk management and scheduling.

13. BETM also provides a unique form of credit support to the ISOs in order to support the Debtor's activities. In essence, under the Pre-Petition Agreements, BETM provided a guaranty to each ISO for payments due to the ISOs in respect of electricity that the Debtor's customers consumed. In addition, BETM provided collateral to the ISOs in order to secure the Debtor's payment obligation prior to any settlement cycle (this financial support is known as "ISO Credit Support").

14. As of the Petition Date, the Debtor was justly indebted to BETM in the amount of $121,031,960.56, plus interest, costs and attorneys' fees for advances and other financial accommodations extended by BETM to or for the benefit of the Debtor (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness is due to BETM without deduction, setoff, defense or counterclaim.

15. Pursuant to the Pledge Agreement, to secure their obligations under the Pre-Petition Agreements including repayment of the Pre-Petition Indebtedness (collectively, the "Pre-Petition Obligations"), the Debtor, Liberty Power District of Columbia LLC, Liberty Power Maryland LLC, LPT, LLC, and Liberty Power Super Holdings LLC granted BETM a first priority security interest in substantially all of their tangible and intangible personal property (the "Pre-Petition Collateral").

16. On July 6, 2020, BETM protected its first-priority security interest by filing a UCC-1 Financing Statement with the Delaware Secretary of State (U.C.C. Initial Filing No: 2020 4653442). As acknowledged in the Intercreditor Agreement, BETM holds a properly perfected,

duly-enforceable, first priority lien on substantially all of the assets of the Debtor and its subsidiaries, and a perfected first-priority lien on all of the equity interests of the Debtor (the "Pre-Petition Liens").

17.    At the time of the Restructuring, the Debtor was also indebted to Shell Energy North America (US), L.P ("Shell Energy") under a wholesale energy supply arrangement that was replaced by BETM.   In that transaction, Shell agreed to take a third-tier note in lieu of outstanding debt that the Debtor owed to Shell at that time in the amount of $63,492,663 (the "Shell Loan"). In addition, in connection with the Restructuring, Mr. David Hernandez and Mr. Martin Halpern (the "Mezzanine Lenders") provided the Debtor with a $10 million second-tier mezzanine loan (the "Mezzanine Loan").

18.    As of the Petition Date, the Shell Loan was secured by a third lien on the Debtor's assets pursuant to the terms of that certain Term Loan and Restructuring Agreement, dated July 6, 2020, by and among the Debtor and Shell Energy, among others, and related documents.

19.    As of the Petition Date, the Mezzanine Loan was secured by a second lien on the Debtor's assets pursuant to that certain Mezzanine Loan Agreement, dated July 6, 2020, between the Debtor and the Mezzanine Lenders, among others, and related documents.

20.    As of the Petition, the rights of each of Shell Energy and the Mezzanine Lender under their respective loan and security documents were subject to the terms of the Intercreditor Agreement (defined above).

21.    Among other things, the Intercreditor Agreement provides that (i) the liens and claims of Shell Energy and the Mezzanine Lenders are fully subject and subordinate to the liens and claims of BETM in all respects, (ii) BETM has the exclusive right to take and continue with any enforcement action without consultation with or the consent of either Shell Energy or the

Mezzanine Lenders, (iii) each of Shell Energy and the Mezzanine Lenders agrees not to oppose, object to, interfere with, hinder or delay, in any manner any enforcement action undertaken by BETM, and (iv) with respect to any insolvency proceeding of the Debtor, Shell Energy and the Mezzanine Lenders agreed that they shall have been deemed to have consented to the use of Cash Collateral or the provision of DIP Financing to the extent consented to or provided by BETM as the case may be.

## V.  POSTPETITION SECURED DIP FINANCING AND CASH COLLATERAL

22.     Through this Motion, the Debtor seeks (i) to obtain the DIP Financing from BETM in an amount equal to $4,000,000 on an interim basis based on the Interim Order, and thereafter in an amount up to $40,000,000 pursuant to the Final Order (inclusive of any interest or fees), in each case to fund the payment of those obligations set forth in that certain 13-week Budget, all on the terms and conditions set forth in the DIP Term Sheet and other DIP Loan Documents, (ii) to grant certain the DIP Liens and Superpriority Claims to BETM in connection therewith, (iii) to authorize the Debtor to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith, including the replacement of certain credit-support arrangements, and (iv) to schedule an emergency interim hearing and final hearing on the Motion.

23.     In addition to seeking authority to obtain the DIP Financing, the Debtor seeks authority to use the cash collateral of BETM pursuant to the Budget and to grant adequate protection to BETM in connection therewith.  The cash collateral proposed to be used by the Debtor includes cash-on-hand and cash to be generated from the continued operations of the Debtor's business, including the collection of its accounts receivable. The Debtor believes that the cash constitutes "Cash Collateral" as that term is defined in the Bankruptcy Code. See 11

U.S.C. § 363(a). As section 363(a) states:

> cash collateral includes: cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

24.    Through this Motion, the Debtor seeks to utilize Cash Collateral in order to maintain its business. The Debtor's request for use of Cash Collateral is meant to cover the Debtor's essential expenses contained in the Budget, and to ensure successful operations to allow the Debtor to promptly begin and implement a sale process.

25.    BETM has consented to the Debtor's use of its Cash Collateral under the terms contained in the DIP Financing Orders.  Unless authorized to use the cash received in the ordinary course of business, the Debtor will be unable to remain in business. The Debtor will default under its obligations and will have no ability to operate and conduct an orderly sale process.

26.    As conditions to the provision of DIP Financing by the DIP Lender and as adequate protection for the use of BETM's Cash Collateral, the Debtor has agreed, with the Court's permission, to the following:

(i)    <u>Adequate Protection Pre-Petition Collateral</u>. As adequate protection for the use of its Cash Collateral, BETM shall be granted a security interest in and lien upon all the personal property of the Debtor, whether owned or existing as of the Petition Date or thereafter acquired or arising, and all proceeds, products, rents, revenues, or profits of such property, excluding, however, the Avoidance Actions (the "<u>Replacement Liens</u>"). The Replacement Liens shall be junior and subordinate to the DIP Liens and the Carve Out.  The Replacement Liens shall be deemed attached, perfected, and enforceable against the Debtor and all other persons, including without limitation, any subsequently appointed trustee for the Debtor, without the filing of any financing statements or other compliance with non-

bankruptcy law.

(ii)     <u>Administrative Expense Claim</u>. Subject to the Carve-Out (as defined in the Interim Order), pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "<u>Superpriority Claims</u>") against the Debtor with priority over any and all administrative expenses and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtor and all proceeds thereof.

(iii)    <u>Payment</u>. BETM will invoice the Debtor for amounts due on or about the 10th day of each month with respect to services, advances, and settled transactions in the prior calendar month.  The invoice is payable on the 25th day of the same month as the invoices.  In general, this timing bridges a timing gap between when amounts are payable to the ISOs and when receivables are paid by customers, which is often through a receivables program operated by the local utility.  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of the Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.

(iv)     <u>Replacement of Credit Support</u>.  The Debtor shall replace any outstanding credit support provided under the Pre-Petition Supply Facility with credit support provided under the DIP Documents, with such changes as set forth in the DIP Term Sheet, including the DIP Lender providing the Borrower with collateral to deliver to an ISO in lieu of the DIP Lender acting as a party directly responsible to an ISO in respect of the obligations of the Debtor.  Any such replaced credit support will be returned or deemed returned under the Pre-Petition Supply Facility.

(v)      <u>DIP Liens</u>.  As security for the DIP Obligations, and subject to the Carve-Out, effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any DIP Collateral, the following security interests and liens are granted

by the Debtor to DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Post-Petition Collateral", and all such liens and security interests granted to the DIP Lender, pursuant to the Interim Order and the DIP Documents, the "DIP Liens"):

    a. <u>Priming Liens on Pre-Petition Collateral</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior lien (*pari passu* with the Pre-Petition Liens) on, and security interest in, all tangible and intangible prepetition and post-petition property of the Debtor, whether existing on or as of the Petition Date or thereafter acquired, including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing. Notwithstanding anything in this Interim Order to the contrary, the DIP Liens shall not attach to any claims and causes of action arising under state or federal law under chapter 5 of the Bankruptcy Code or any proceeds thereof (the "<u>Avoidance Actions</u>").

    b. <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (B) any liens or security interests arising after the Petition Date, including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor, or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise

    c. <u>Deposit Accounts.</u>  With the exception of the Debtor's Money Market Account (x3760), each of the bank accounts maintained by the Debtor (collectively, the "<u>Bank Accounts</u>") is subject to an account control agreement (each, a "<u>Control Agreement</u>") among the Debtor, JP Morgan, and DIP Lender.  Notwithstanding the commencement of this Case and Section 552 of the Bankruptcy Code, each Control Agreement shall remain in full force and effect and  DIP Lender's perfected security interest shall continue to attach to the Bank Accounts and the proceeds thereof, including as to funds deposited in the Bank Accounts from and after the Petition Date.

(vi)   <u>Fees and Costs of DIP Lender</u>.

18

a. The Debtor shall pay any and all reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Documents, including the fees and expenses of attorneys, advisors, accountants and other consultants, whether incurred before, on or after the Petition Date, including, but not limited to fees and expenses incurred in connection with (a) the preparation, negotiation and execution of the Interim DIP Order, and the DIP Documents; (b) the creation, perfection or protection of the DIP Liens and the Replacement Lien (including all search, filing and recording fees); (c) the on-going administration of the DIP Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Case (including the filing of any proofs of claim); (d) the enforcement of the DIP Documents or the Interim Order; and (e) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Documents or the Interim DIP Order including this Case and any credit bid of the DIP Obligations and/or the Pre-Petition Obligations. Payment of all such professional fees and expenses shall not be subject to allowance by the Bankruptcy Court or to the U.S. Trustee guidelines; provided that requests for payment of such professional fees and expenses shall be provided to the Debtor, the U.S. Trustee and any statutory committee appointed in the Case on a 10 days' notice.

(vii)    <u>Credit Bid</u>.  Subject to and effective upon entry of the Final Order, and further subject to the rights of holders of Existing Liens, the DIP Lender shall have the right to credit bid all or any portion of the outstanding DIP Obligations in any sale of the Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

27.    As a further condition to the provision of DIP Financing by the DIP Lender and as adequate protection for the use of BETM's Cash Collateral, the DIP Lender requires that the Debtor implement and proceed with a sale process for the marketing and sale of the Debtor's business and assets as a going concern.  In connection therewith, the DIP Lender has established the following sale milestones by the dates set forth below (or such later date as may be agreed by the DIP Lender) (the "<u>Milestones</u>").  For avoidance of doubt, the failure of the Debtor to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Documents and the Interim Order and permit DIP Lender to exercise the rights and remedies

provided for in the Interim Order and the DIP Documents.  The Milestones are as follows:

    a.      On or before May 18, 2021, the Debtor shall have filed a motion seeking approval of sale and bidding procedures for the sale of substantially all the Debtor's assets (the "<u>Bidding Procedures Motion</u>")  in the Bankruptcy Court;

    b.      On or before June 4, 2021, the Bankruptcy Court shall have entered an order granting the Bidding Procedures Motion, in form reasonably acceptable to the DIP Lender (the "<u>Bidding Procedures Order</u>");

    c.      No later than fifteen (15) calendar days after entry of the Bidding Procedures Order, Debtor shall deliver a draft confidential information memorandum (the "<u>CIM</u>") to DIP Lender along with a proposed draft purchase agreement for the sale;

    d.      No later than forty-five (45) calendar days after entry of the Bidding Procedures Order, Debtor shall deliver a final version of the CIM and a final version of the draft purchase agreement (together with the related disclosure schedules) to prospective purchasers, including those prospective purchasers that Debtor believes in good faith could submit a binding bid, and such final version of the CIM, together with a list of such prospective purchasers, shall be delivered to DIP Lender;

    e.      On or before August 16, 2021, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred;

    f.      On or before August 19, 2021, the Debtor, in consultation with the DIP Lender, will select a bid that it believes represents the highest and best offer for the sale received by the Bid Deadline;

    g.      On or before August 20, 2021, the Debtor shall have commenced the Auction (as defined in the Bidding Procedures Order), if necessary;

    h.      On or before August 26, 2021, a hearing shall have occurred in the Bankruptcy Court to consider approval of the sale contemplated by the Bidding Procedures Order;

    i.      On or before August 31, 2021, the Bankruptcy Court shall have entered the Sale Order (as defined in the Bidding Procedures Order).

    28.      Since the Petition Date, the Debtor has been in good faith discussions with the DIP Lender about the use of Cash Collateral and obtaining the DIP Financing proposed herein to enable the Debtor to operate its business in the ordinary course so as to preserve the going

concern value of the estate, to preserve jobs, to maintain operations, to pay vendors, to service customers and to begin an orderly sale process.  If the Debtor were not able to obtain the use of Cash Collateral or obtain the DIP Financing as proposed herein, then the Debtor, its estate, its creditors, its employees, its vendors and its customers will be severely harmed.

29.     Given the urgent and immediate circumstances surrounding the filing of this Chapter 11 case, the amount and unique nature of the financing and credit support provided by BETM to the Debtor prior to the Petition Date, the financial support provided by BETM to the ISOs of the Debtor's obligations, and the liens held by BETM on all of the Debtor's assets (including Cash Collateral), the Debtor concluded in the exercise of its business judgment that it would not be possible or feasible to solicit, obtain and implement any other source of proposed debtor-in-possession financing.  As a result, the Debtor believes that BETM is the only feasible source of debtor-in-possession financing.

30.     The Debtor believes that the DIP Lender has acted in good faith in consenting to the use of Cash Collateral and in agreeing to provide the DIP Financing.  The DIP Lender and the Debtor have negotiated at arms' length and in good faith regarding the DIP Financing and the Debtor's use of Cash Collateral to fund the continued operations of the Debtor.  The DIP Lender will not agree to provide the DIP Financing, or agree to the Debtor's use of Cash Collateral, absent the approval of the terms and conditions set forth herein and in the Interim Order.

31.     The Debtor submits that the terms and conditions of the DIP Financing, taken as a whole, are fair and reasonable under the circumstances, are the best terms available to the Debtor in order to accomplish its goals, reflect the Debtor's and its management's exercise of prudent business judgment consistent with their fiduciary duty; and are supported by reasonably

equivalent value and fair consideration.  The DIP Financing proposed herein resolves the issues facing the Debtor in this Chapter 11 case, which the Debtor believes is in the best interests of all stakeholders, and simultaneously paves the way for a successful exit from this Chapter 11 case.

32.    If the DIP Financing proposed herein is not approved, then the Debtor and all stakeholders will face the unfortunate prospect of ceasing its operations, terminating its workforce and losing all of its customers and going concern value.

33.    The DIP Lender has indicated a willingness to provide the DIP Financing and consent to the use of its Cash Collateral, but solely on the terms and conditions contained herein.

34.    As a result, the Debtor asserts that the relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtor's business and the ability of the Debtor to maximize the going concern value of its business.  Therefore, for the reasons stated above, it is in the best interest of the Debtor, the Debtor's estate and all stakeholders to approve the DIP Financing and use of Cash Collateral on the terms and conditions contained herein.

## VI.    BASES FOR THE RELIEF REQUESTED

### A.    Incurrence of Secured Debt Pursuant to Bankruptcy Code Section 364

35.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain credit or to incur debt in and outside the ordinary course of business. Namely, if unsecured credit is unavailable, Section 364(c) authorizes the debtor to obtain credit or to incur debt: (1) with priority over all other administrative expenses, (2) that is secured by a lien on unencumbered assets, or (3) that is secured by a junior lien on already encumbered property. *See* 11 U.S.C. § 364(c)(1)-(3).

36.    In addition, section 364(d)(1), which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that, the Court may, after notice and a hearing:

(1)    authorize the obtaining of credit or the incurring of debt secured
by a senior or equal lien on property of the estate that is subject to a lien

22

only if –

    (A)    the trustee is unable to obtain such credit otherwise; and

    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

37.    Pursuant to section 364 of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate. *See* 11 U.S.C. §§ 364(c), (d); *In re Nat'l Litho, LLC*, 2013 WL 2303786 (Bankr. S.D. Fla. 2013) (Isicoff, J.); *In re Trigeant Holdings, Ltd.*, 2014 WL 5789926, at*3 (Bankr. S.D. Fla. Oct. 10, 2014); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990)(with respect to post-petition credit, courts "permit debtor[s]-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); 3 COLLIER ON BANKRUPTCY  364.03, at 364-7-18 (15th ed. rev. 2001).

38.    To satisfy the standards of section 364 of the Bankruptcy Code, a debtor is not required to seek credit from every possible source: "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Sav. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). Rather, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Id.*; see also *In re Ames*, 115 B.R. 38, 40 (Bankr. S.D.N.Y. 1990). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988). In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and proposed use of funds unless such judgment is arbitrary and capricious.

*In re Curlew Valley Associates*, 14 B.R. 507, 511-14 (Bankr. D. Utah 1981).

39.     The Debtor has satisfied the requirements of sections 364(d) because, under current circumstances, it is unable to obtain credit other than as provided herein.  The liens granted to the DIP Lender shall, except as provided in the Interim Order, be first priority liens on all tangible and intangible personal property of the Debtor *pari passu* with the Pre-Petition Liens held by BETM.  As discussed above, the Debtor asserts that it is unable to obtain financing on more favorable terms from sources other than the DIP Lender pursuant to, and for the purposes set forth in, the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

40.     The Debtor firmly believes that the financing to be provided as contemplated by the Interim Order represent the best — and only — financing available to it at this time, warranting approval of the proposed Interim Order on an emergency basis, pending a final hearing thereon (the "Final Hearing").

41.     In the exercise of its business judgment, the Debtor has concluded that the Lender is the only lender able to offer a post-petition credit facility that meets the Debtor's working-capital needs on the terms, and within the time frame, required by the Debtor.  Courts routinely defer to the business judgment of the debtor on most business decisions, including borrowing decisions.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("business judgments should be left to the board room and not to this Court"); I*n re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981) (courts generally will not second-guess a debtor's business decisions where those decisions constitute "a business judgment made in good faith, upon a reasonable basis, and within the scope of its authority under the Code"); *In re Weaver Oil Co.,*

*Inc.*, 2008 WL 8202063, at *2 (Bkrtcy. N.D. Fla. ,2008) ("Under the "business judgment rule", the Bankruptcy Court recognizes that it is "no more equipped to make subjective business decisions for insolvent businesses than [the Court is] for solvent businesses," and the formulation of the business judgment rule in corporate litigation is also the appropriate formulation of the business judgment rule in the Bankruptcy Court"). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     In the instant case, the Debtor's granting of the priming liens to the DIP Lender are essential to maintain the value of the Debtor's estate. Further, access to the proceeds of the DIP Financing will preserve the value of the Debtor's business to the greatest extent practicable under the circumstances.

43.     More fundamentally, unless the Debtor has access to the DIP Financing, it will not have sufficient funds to continue to operate its business and to preserve its assets. Indeed, in the absence of such financing, it will not continue as a going concern, resulting in a dramatic decrease in the value of the Debtor's assets and the overall estate. Accordingly, the use of funds provided by the DIP Financing to avert an immediate shutdown and "fire sale" liquidation of the Debtor, and to enable the Debtor to effect a preservation of the value of the Debtor's assets is clearly in the best interests of the Debtor's estate.

44.     The DIP Financing, which similar to the supply and financing arrangements in place between the Debtor and DIP Lender prior to the commencement of this Case ("Pre-Petition Supply Facility"), will provide the Debtor:

(i)     credit support to each ISO that operate the organized markets in which the Debtor is active and other key service providers or regulators for the operation of a retail energy provider similar to the Debtor;

(ii)    hedges, either as financial instruments (e.g., a fixed/float swap) or as physical trades (e.g., selling power to the Debtor in the wholesale market);

(iii)   working capital in the form of payment provisions that, among other things, bridges the gap between when the Debtor collects payment from its customers and when the Debtor must pay the applicable ISO, and allow certain amounts in excess of available funds to be deferred to following month;

(iv)    access to third-party sellers in the wholesale markets and/or financial hedge providers through intermediation trades; and

(v)     various operational services, like risk management and scheduling.

45.     Based on the circumstances present here, and the grounds and authorities set forth above, the Debtor firmly believes that the financing sought is the best financing available, and that it is in the best interests of its estate and creditors to enter into the DIP Financing.   It respectfully requests authority to do so.

**B.      Other Prepetition Secured Lenders Interests Are Adequately Protected.**

46.      As set forth above, each of Shell Energy and the Mezzanine Lenders have junior liens on the assets of the Debtors, subject and subordinate to the liens and claims of BETM pursuant to the terms of the Intercreditor Agreement.

47.      Section 363(e) provides that "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or

condition such use, sale, or lease as is necessary to provide adequate protection of such interest."
11 U.S.C. § 363(e).  The principal purpose of adequate protection "is to assure that the lender's
economic position is not worsened because of the bankruptcy case." *In re DeSardi*, 340 B.R. 790,
804 (Bankr. S.D. Tex. 2006).  Said differently, adequate protection is designed to preserve the
position of existing lienholders and requires a debtor to provide those existing lienholders with the
same level of protection they would have had in the absence of any post-petition superpriority
financing. *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*,
16 F.3d 552, 564 (3d Cir. 1994) (*en banc*). In other words, the adequate protection remedy "should
as nearly as possible under the circumstances of the case provide the creditor with the value of his
bargained-for rights." *Id.* (quotation marks omitted). "Whether protection is adequate depends
directly on how effectively it compensates the secured creditor for loss of value caused by the
superpriority given to the post-petition loan." *Id.* (quotation marks omitted).

  48. The Bankruptcy Code does not explicitly define adequate protection, but does
provide a non-exclusive list of the means by which a debtor may provide adequate protection,
including other relief resulting in the "indubitable equivalent" of the secured creditor's interest in
such property.  *See* 11 U.S.C. §361.  Because the term "adequate protection" is not defined in the
Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-
case basis.  *In re Swedeland Dev. Group Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*citing In re
O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. l987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1995)
(same); *In re Senior Care Properties, Inc.*, 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same); *see
also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978) and H.R. Rep. No. 595, 95th Cong., 2d
Sess. 339 (1978) (acknowledging that the statute confers upon "the parties and the courts flexibility
by allowing such other relief as will result in the realization by the protected entity of the value of

its interest in the property involved.").

49.     Under the facts of the present case, Shell Energy and the Mezzanine Lender have agreed in the Intercreditor Agreement to subordinate their liens and claims to those of BETM, and importantly have agreed with respect to any insolvency proceeding of the Debtor that they shall have been deemed to have consented to the use of Cash Collateral or the provision of DIP Financing to the extent consented to or provided by BETM as the case may be.   Since BETM is consenting to the use of its Cash Collateral and it providing the DIP Financing pursuant to the terms herein, then neither Shell Energy nor the Mezzanine Lenders can object to the terms hereof, including specifically the proposed DIP Liens, Replacement Liens and Superpriority Claims.

50.     As a result of the above, the Debtor is not required to provide or prove the existence of adequate protection to Shell Energy or the Mezzanine Lenders in order to proceed with the proposed DIP Financing and use of Cash Collateral with BETM hereunder.

**C.**     **Use of Cash Collateral.**

51.     Bankruptcy Code section 363(c)(2), which governs the postpetition use of cash collateral by a debtor in possession, provides as follows:

> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless — (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. U.S.C. § 363(c)(2)(A), (B).

52.     The Debtor seeks authorization to use the Cash Collateral of BETM pursuant to 11 U.S.C. § 363(c)(2)(B). The Cash Collateral proposed to be used by the Debtor includes cash-on-hand and cash to be generated from the continued operations of the Debtor's business, including the collection from the credit card merchants. If the Debtor is unable to use Cash Collateral or obtain such additional liquidity, it will not be able to meet essential obligations thereby forcing a shutdown of its operations and inability to commence an orderly sale process. Accordingly, the

Debtor and its creditors face a substantial risk of immediate and irreparable harm if the relief sought herein is not permitted on an interim as well as final basis.

53.     Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361(1)-(3); *In re Fountainbleau Las Vegas Holdings, LLC*, 434 B.R. 716, 748 (S.D. Fla. 2010) (Altonaga, J.). What constitutes adequate protection must be decided on a case-by-case basis. *See MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396-1397 (10th Cir. 1987); *Martin v. U.S.* (*In re Martin*), 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).

54.     The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[t]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value of which he bargained prebankruptcy") (internal citations omitted); see also *In re Carbone Companies, Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("[t]he test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral"). It is well-established that a bankruptcy courts grant the use of cash collateral in order to preserve or enhance a debtor's ability to remain a going-concern. *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984). In addition, the grant of a replacement lien provides ample adequate protection of a secure creditor's interest in cash collateral. *O'Connor,* 808 F.2d at 1397; *In re Harbour E. Dev., Ltd.*, 2011 WL 6097063, at *4 (Bankr. S.D. Fla. Dec. 6, 2011) (Cristol, J.).

55.     Pursuant to the terms of the proposed Interim Order, the Debtor is providing BETM

with, among other things, the Superpriority Claims, the Replacement Liens and DIP Liens.   The

Debtor submits that the foregoing protections, and the fact that the use of Cash Collateral and

provision of DIP Financing will enable the Debtor to preserve value by continuing to operate in

the ordinary course of business, should adequately protect BETM from any diminution in the

value of any interests in its prepetition collateral, including any cash collateral.  Moreover, BETM

has consented to the use of its Cash Collateral pursuant to the terms of the Interim Order.

> ### D.    **Request For Modification Of Automatic Stay.**

56.    The proposed DIP Financing herein includes a provision that immediately upon

the occurrence of an Event of Default or the Maturity Date (as defined in the DIP Documents)

under the DIP Financing, the DIP Lender's commitment to lend shall terminate and the DIP

Lender shall be under no further obligation to provide credit under the DIP Documents. In

addition, upon the occurrence and during the continuance of an Event of Default, and the giving

of five (5) business days' prior written notice to the Debtor (with a copy to counsel to the United

States Trustee), the DIP Lender may seek relief from the automatic stay on an emergency basis

and obtain authority to exercise all other rights and remedies against the Collateral provided for

in the DIP Documents and the Interim Order.  In any hearing regarding any exercise of rights or

remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in

fact, an Event of Default or Maturity Date has occurred and is continuing.  Subject only to and

effective upon entry of the Final Order, the Debtor shall waive any right to seek relief, including

without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in

any way impair or restrict the rights and remedies of the DIP Lender set forth in the Interim Order

or the DIP Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of

"marshaling" or any similar doctrine with respect to the Collateral.  The DIP Lender's delay or

failure to exercise rights and remedies under the DIP Documents or the Interim Order shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Term Sheet.

57.     Stay modifications of this sort are ordinary and typical features under these circumstances and, in the Debtor's business judgment, are reasonable. Accordingly, the Debtor respectfully requests that the Court modify the automatic stay as provided in the proposed Interim Order.

       **E.**       **Request for Interim Emergency Relief.**

58.     Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), a final hearing on a motion to obtain postpetition financing and to use cash collateral may not be commenced earlier than 14 days after service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize postpetition financing and the use of cash collateral to the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." *See* Bankruptcy Rule 4001(b)(2) and (c)(2).

59.     In the present case, it is essential for the Debtor to obtain the immediate use of Cash Collateral and access to the DIP Financing in order to continue its operations pending the Final Hearing on the Motion.  Thus, funds are urgently needed to meet all of the Debtor's working capital and other liquidity needs.  In the absence of immediate relief, the Debtor's attempts to continue its business in the ordinary course will be immediately and irreparably jeopardized.

60.     Accordingly, the Debtor respectfully requests approval of the Motion, pending a final hearing on the Motion, on an emergency interim basis, on the terms and subject to the

conditions set forth in the Interim Order and Budget, or on such other terms that the Court may deem appropriate

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order substantially in the form attached hereto as **Exhibit "A"**: (i) authorizing the Debtor to obtain the DIP Financing from the DIP Lender on the terms set forth herein, (ii) authorizing the Debtor to use BETM's Cash Collateral on the terms set forth herein, (iii) authorizing the Debtor to grant the DIP Liens, Replacement Liens and Superpriority Claims as set forth herein to the DIP Lender, (iv) setting the Final Hearing on the Motion; and (v) granting the Debtor such other and further relief as may be proper and just.

Dated this 5th day of May, 2021.

Respectfully Submitted,

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Debtor-in-Possession*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile:  (305) 349-2310

By:    /s/ *Paul J. Battista*
    Paul J. Battista, Esq.
    Florida Bar No. 884162
    pbattista@gjb-law.com
    Mariaelena Gayo-Guitian, Esq.
    Florida Bar No. 813818
    mguitian@gjb-law.com
    Heather L. Harmon
    Florida Bar No. 13192
    hharmon@gjb-law.com

## EXHIBIT A
## PROPOSED INTERIM ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                              Chapter 11 Case

LIBERTY POWER HOLDINGS, LLC,          Case No. 21-13797-SMG

      Debtor.
_____/

**INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) AND 364(e) AND BANKRUPTCY RULES 2002, 4001, 6004 and 9014 (I) AUTHORIZING DEBTOR TO (A) USE CASH COLLATERAL, AND (B) OBTAIN SENIOR SECURED POST-PETITION FINANCING, (II) GRANTING RELATED RELIEF, AND (III) SCHEDULING FINAL HEARING**

      **THIS CAUSE** came before the Court on  May __, 2021 at ____ a.m./p.m. (the "Interim Hearing") upon the motion, dated May 5, 2021 [ECF No. ___] (the "Motion")[1], of Liberty Power Holdings, LLC (the "Borrower" or the "Debtor"), as debtor-in-possession in the above-captioned case (the "Case") for interim and final orders under sections 105, 361, 362, 363, 364(c)(1),

---

[1] Capitalized terms used in this Interim Order and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

10498971-9

364(c)(2), 364(c)(3), 364(d), 364(e) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (as amended, the "<u>Bankruptcy Code</u>"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), and the local bankruptcy rules for the United States Bankruptcy Court for the Southern District of Florida (the "<u>Local Bankruptcy Rules</u>"), seeking:

(a)    authorization to use the Cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) to fund its day-to-day operating expenses, including to retain employees;

(b)    authorization for the Borrower to obtain up to $40,000,000 in amount of post-petition financing (inclusive of any interest or fees) (collectively, the "<u>DIP Financing</u>"), all on the terms and conditions set forth in this Interim Order and the Preliminary Debtor-In-Possession (DIP) Financing Term Sheet, dated as of April 29, 2021, presented by Boston Energy Trading and Marketing, LLC or its designee or assignee (the "<u>DIP Lender</u>") (substantially in the form attached to this Interim Order as <u>Exhibit A</u>, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Term Sheet</u>"); together with all agreements, documents, instruments and/or amendments delivered in connection therewith, including the Post-Petition Supply and  Services Agreement between the Debtor and DIP Lender (collectively, the "<u>DIP Documents</u>")[2], and the budget annexed hereto as <u>Exhibit B</u> (the "<u>Budget</u>");

(c)    authorization for the Debtor to execute and deliver the DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith, including the replacement of certain credit-support arrangements;

(d)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing on the Motion to be held before this Court to consider entry of the proposed interim order annexed to the Motion

---

[2] The Debtor will file any additional DIP Documents no later than two business days prior to the Final Hearing.

10498971-9

(the "<u>Interim Order</u>") authorizing the Borrower, on an interim basis, to use Cash Collateral and incur new indebtedness under this Interim Order and the DIP Documents up to $4,000,000,[3] plus interest and fees as described in paragraph 6(a) below, and

(e)     to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") on the Motion to be held before this Court to consider entry of a final order (the "<u>Final Order</u>") authorizing and approving, on a final basis, the transactions described in the foregoing clauses (a) through (d) pursuant to the Final Order;

The Interim Hearing having been held by the Court to consider the relief sought in the Motion, and upon the record of the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor, and the Debtor and the DIP Lender having stipulated as follows:

I.    *STIPULATIONS*.

A.     On April 20, 2020 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition commencing this Case.

B.     The Debtor is a retail energy provider (an "<u>REP</u>") that is active in competitive electricity markets in over a dozen jurisdictions operating in five organized markets. The Debtor and its subsidiaries are certified and licensed to provide retail electric service by the Public Utilities Commissions or Public Service Commissions in each of California, Connecticut, District of Columbia, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Texas and Virginia. The Debtor currently services hundreds of thousands of customer accounts in 14 states.

C.     The Debtor sells electricity to residential, commercial and industrial customers,

---

[3] For purposes of this Interim Order, the DIP Financing shall not exceed $4,000,000, which subject to entry of the Final Order and the DIP Lender's sole discretion, may be increased to $40,000,000.

10498971-9

wherein it competes in price and terms with other REPs and the public utility in a given market area. The Debtor typically makes a profit in the form of a margin between the price it charges a customer under a sales contract for electricity and the cost at which the Debtor sources such electricity in the wholesale markets. However, that margin must also account for the costs associated with hedging, financing, and commercial operating expenses, among other things.

D.       Each organized market is operated by an independent system operator (each, an "ISO"), including the Electric Reliability Council of Texas ("ERCOT"), Pennsylvania, Jersey Maryland Power Pool ("PJM"), New York ISO, or ISO-New England. As the Debtor's customers consume electricity, each ISO balances that consumption with generation, and this balancing is treated as a purchase by the Debtor in the wholesale markets and a resale to the customer. Typically, on a monthly basis, the ISO settles accounts and, in doing so, invoices the Debtor for the power collectively consumed by its customers as a purchase in the wholesale market. Because the ISO is effectively taking counterparty credit exposure to the Debtor as any month progresses, the ISO demands that the Debtor provide it with credit assurance.

E.       In July 2020, the Debtor completed a restructuring of its capital structure. In connection thereafter, the Debtor and Boston Energy Trading and Marketing, LLC ("BETM") executed the following documents:

    i.   Supply and Service Agreement, by and among Boston Energy Trading and Marketing LLC, and Liberty Power Holdings LLC, dated as of July 6, 2020 (the "Supply and Services Agreement");

    ii.  ISDA (International Swap and Derivatives Association, Inc.) 2002 Master Agreement by and among Boston Energy Trading and Marketing LLC, and Liberty Power Holdings LLC, dated as of July 6, 2020;

    iii. Pledge and Security Agreement, by and among Liberty Power Holdings LLC, Liberty Power District of Columbia LLC, Liberty Power Maryland LLC, LPT, LLC, and Liberty Power Super Holdings LLC, and Boston Energy Trading and Marketing LLC, dated as of July 6, 2020 (the "Pledge

Agreement");

    iv.   Parent Agreement, by and between Liberty Power Holdings LLC, Liberty Power Super Holdings LLC, and Boston Energy Trading and Marketing LLC, dated as of July 6, 2020;

    v.   Consent and Acknowledgement Letter, by and between Liberty Power Holdings, LLC and Boston Energy Trading and Marketing LLC, dated July 6, 2020; and

    vi.   Intercreditor Agreement by and among Boston Energy Trading and Marketing LLC, David Hernandez, Martin Halpern, Shell Energy North America (US), L.P., Liberty Power Holdings LLC, and the other Grantors party hereto dated as of July 6, 2020 (the "Intercreditor Agreement").

(collectively, the "Pre-Petition Agreements").

    F.    Pursuant to the Supply and Services Agreement, BETM provides, among others, the following services to the Debtor:

    i.   Provision of credit support to the ISOs and other key service providers or regulators for the operation of an REP like the Debtor;

    ii.   Hedges, either as financial instruments (e.g., a fixed/float swap) or as physical trades (e.g., selling power to the REP in the wholesale market);

    iii.   Working capital in the form of payment provisions that, among other things, bridges the gap between when the REP collects invoices from its customers and when the REP must pay the ISO, and allow certain amounts above in excess of available funds to be deferred to following month;

    iv.   Access to third-party sellers in the wholesale markets and or financial hedge provider through intermediation trades; and

    v.   Supports the REP through various operational services, like risk management and scheduling.

    G.    BETM also provides a unique form of credit support to the ISOs in order to support the Debtor's activities. In essence, BETM provided a guaranty to each ISO for payments due to the ISOs in respect of electricity that the Debtor's customers consumed. In addition, BETM provided collateral to the ISOs in order to secure the Debtor's payment obligation prior to any

settlement cycle (this financial support is known as "ISO Credit Support").

H.      As of the Petition Date, the Debtor was justly indebted to BETM in the amount of $121,031,960.56, plus interest, costs and attorneys' fees for advances and other financial accommodations extended by BETM to or for the benefit of the Debtor (the "Pre-Petition Indebtedness").   The Pre-Petition Indebtedness is due to BETM without deduction, setoff, defense or counterclaim.

I.       To secure their obligations under the Pre-Petition Agreements including repayment of the Pre-Petition Indebtedness (collectively, the "Pre-Petition Obligations"), pursuant to the Pledge Agreement the Debtor and the Pledgors granted BETM a first priority security interest in substantially all of their tangible and intangible personal property (the "Pre-Petition Collateral").

J.      On July 6, 2020, BETM protected its first-priority security interest by filing a UCC-1 Financing Statement  with the Delaware Secretary of State (U.C.C. Initial Filing No: 2020 4653442).  As acknowledged in the Intercreditor Agreement, BETM holds a properly perfected, duly enforceable, first-priority lien on substantially all of the assets of the Debtor and its subsidiaries, and a perfected first-priority lien on all of the equity interests of the Debtor (the "Pre-Petition Liens").

K.      Subject in all respects to paragraph 10 below, the Debtor and the Debtor's estate on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries and assigns hereby unconditionally, irrevocably, and fully forever releases, remises, acquits, relinquishes, irrevocably waives, and discharges the DIP Lender, and each of its affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such

6

(collectively, the "Representatives"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations (as defined below), the Post-Petition Liens (as defined below), the DIP Documents, the Pre-Petition Agreement or the Pre-Petition Liens including, without limitation, (i) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims arising from or relating to the Pre-Petition Agreements or any transaction or occurrence prior to the Petition Date and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lender.

L.      The Debtor's foregoing acknowledgments, stipulations, waivers, and releases (solely with respect to the releases, once they become effective) shall be binding on the Debtor and its respective representatives, successors, and assigns, and on the Debtor's estate and all entities and persons, including any creditors of the Debtor, and each of its respective representatives, successors, and assigns, including, without limitation, but subject in all respects to paragraph 10, any trustee or other representative appointed in the Case, or upon conversion to chapter 7, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.

## II.      *FINDINGS REGARDING THE DIP FINANCING.*

M.      This Court has core jurisdiction over the Case, the Motion, and the parties and

10498971-9

property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 6004 and the Local Bankruptcy Rules.

N.      Notice of the Motion, the relief requested therein and the relief sought at the Interim Hearing was served by the Debtor by either electronic mail, facsimile or overnight mail to: (a) the Office of the United States Trustee, 51 SW First Avenue, Room 1204 Miami, FL 33130; (b) the creditors known to the Debtor holding the twenty largest unsecured claims against the Debtor's estate; (c) Eversheds Sutherland (US) LLP, 700 6th Street, NW, Suite 700, Washington, DC 20001-3980, Attn: David T. McIndoe, Esq., attorneys for the DIP Lender; (d) Eversheds Sutherland (US) LLP, 101 Fannin Street, Suite 3700, Houston, TX 77002-6760, Attn: Mark D. Sherrill, Esq., attorneys to the DIP Lender; (e) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso, Esq., attorneys for the DIP Lender, (f) any creditor known to the Debtor asserting a pre-petition lien and/or security interest in any of the Debtor's assets, and (g) all parties who have filed a request for notice in this Case.  Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof, complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

O.      Good and sufficient cause has been shown for the entry of this Interim Order.

P.      The Debtor has an immediate need to obtain use Cash Collateral to preserve its assets, including its valuable contracts, and to pay its ordinary and necessary operating expenses, including to its vendors and employees.  The Debtor also requires access to the DIP Financing in

10498971-9

order to continue to support its retail energy business.   The DIP Financing, which similar to the supply and financing arrangements in place between the Debtor and DIP Lender prior to the commencement of this Case ("Pre-Petition Supply Facility"), will provide the Debtor:

      (i)      credit support to each ISO that operate the organized markets in which the Debtor is active and other key service providers or regulators for the operation of a retail energy provider similar to the Debtor;

      (ii)      hedges, either as financial instruments (e.g., a fixed/float swap) or as physical trades (e.g., selling power to the Debtor in the wholesale market);

      (iii)      working capital in the form of payment provisions that, among other things, bridges the gap between when the Debtor collects payment from its customers and when the Debtor must pay the applicable ISO, and allow certain amounts in excess of available funds to be deferred to following month;

      (iv)      access to third-party sellers in the wholesale markets and/or financial hedge providers through intermediation trades; and

      (v)      various operational services, like risk management and scheduling.

Q.      Access to such DIP Financing is necessary and vital to ensure that the Debtor has sufficient working capital and liquidity to preserve and maintain the value of its estate and to facilitate a sale of the Debtor's assets.

R.      The Debtor has proffered that under the facts and circumstances of this Case it is unable to obtain financing on more favorable terms from sources other than the DIP Lender pursuant to, and for the purposes set forth in, the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1),

364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtor granting the DIP Liens (as defined in paragraph 8 below) and the Superpriority Claims (as defined in paragraph 7 below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

S.     The Debtor has proffered that the terms of the DIP Documents pursuant to this Interim Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

T.     The DIP Documents and the DIP Financing have been the subject of negotiations conducted in good faith and at arms'-length among the Debtor, the DIP Lender, and all of the Debtor's obligations and indebtedness arising under or in connection with the DIP Financing, including, without limitation, (i) all advances made or credit support provided to the Debtor pursuant to the DIP Documents and (ii) all other obligations of the Debtor under the DIP Documents or this Interim Order owing to the DIP Lender, including any obligations to indemnify the DIP Lender and to pay any interest, fees, expenses (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and its affiliates in "good faith", as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

U.     The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the relief sought by this Interim Order, the Debtor's estate will be immediately and irreparably

harmed.  Consummation of the DIP Financing in accordance with the terms of this Interim Order and the DIP Documents is therefore in the best interests of the Debtor's estate and is consistent with the Debtor's exercise of its fiduciary duties.

Accordingly,

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.      *Disposition*.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the interim relief sought in the Motion with respect to the entry of this Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      *Authorization to Use Cash Collateral.*  Subject to the terms and conditions of this Interim Order, the Debtor is authorized to use Cash Collateral for the period from the Petition Date through the date of the Final Hearing (as defined below) for those purposes and in the amounts set forth in the Budget

3.      *Authorization of the DIP Financing and the DIP Documents*.

   a.   The Debtor is hereby authorized to execute, enter into and perform under the DIP Documents and to incur new indebtedness thereunder up to an aggregate amount of $4,000,000 (including interest, fees and other expenses provided for in the DIP Documents), pending entry of the Final Order, all of the foregoing in accordance with the terms of this Interim Order and the other DIP Documents (collectively, the "DIP Obligations").  All of the indebtedness incurred by the Debtor shall be used solely for the purposes permitted under this Interim Order and the other DIP Documents and in accordance with the Budget.

   b.   In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and

11

documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) and to pay all reasonable fees and expenses that the DIP Lender incurs in connection with the preparation, execution and delivery of the DIP Documents, or the Debtor's performance of its obligations under the DIP Documents and the DIP Financing, including without limitation:

(i)    the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtor and the DIP Lender may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) unless such amendments, waivers, consents or other modifications are material; and

(iii)    the performance of all other acts required under or in connection with the DIP Documents.

c.    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor in accordance with the terms of this Interim Order and the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

d.   In connection with the execution and delivery of the DIP Documents and to support future obligations of the Debtor to third parties, the Debtor is authorized and directed to facilitate the modification of any outstanding credit support provided under the Pre-Petition Supply Facility with credit support to third parties provided under the DIP Documents, with such changes as set forth in the DIP Term Sheet, including the DIP Lender providing the Borrower with collateral to deliver to an ISO in lieu of the DIP Lender acting as a party directly responsible to an ISO in respect of the obligations of the Debtor.

4.    *Superpriority Claims*.  Subject to the Carve-Out (as defined in paragraph 12 below), pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against the Debtor with priority over any and all administrative expenses and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and post-petition property of the Debtor and all proceeds thereof.

5.    *DIP Liens; Deposit Accounts*.  As security for the DIP Obligations, and subject to the Carve-Out (as defined in paragraph 12 below), effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtor (or recordation or other

13

filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any Post-Petition Collateral (as defined in this paragraph 5), the following security interests and liens are hereby granted by the Debtor to DIP Lender (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Post-Petition Collateral"[4], and all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

a. *Priming Liens on Pre-Petition Collateral.* Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior lien (*pari passu* with the Pre-Petition Liens) on, and security interest in, all tangible and intangible prepetition and post-petition property of the Debtor, whether existing on or as of the Petition Date or thereafter acquired, including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing. Notwithstanding anything in this Interim Order to the contrary, the DIP Liens shall not attach to any claims and causes of action arising under state or federal law under chapter 5 of the Bankruptcy Code or any proceeds thereof (the "Avoidance Actions").

b. *Liens Senior To Certain Other Liens.* The DIP Liens shall not be (i) subject or

---

[4] The Pre-Petition Collateral and the Post-Petition Collateral are, collectively, the "Collateral."

subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (B) any liens or security interests arising after the Petition Date, including without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor, or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code or otherwise.

     c.  *Deposit Accounts.*  With the exception of the Debtor's Money Market Account (x3760), each of the bank accounts maintained by the Debtor (collectively, the "Bank Accounts") is subject to an account control agreement (each, a "Control Agreement") among the Debtor, JP Morgan, and DIP Lender.  Notwithstanding the commencement of this Case and Section 552 of the Bankruptcy Code, each Control Agreement shall remain in full force and effect and  DIP Lender's perfected security interest shall continue to attach to the Bank Accounts and the proceeds thereof, including as to funds deposited in the Bank Accounts from and after the Petition Date.

     6.  *Adequate Protection for Use of Cash Collateral.*  As adequate protection for the use of its Cash Collateral, DIP Lender is hereby granted a security interest in and lien upon all the personal property of the Debtor, whether owned or existing as of the Petition Date or thereafter acquired or arising, and all proceeds, products, rents, revenues, or profits of such property, excluding, however, the Avoidance Actions (the "Replacement Liens"). The Replacement Liens shall be junior and subordinate to the DIP Liens and the Carve Out.  The Replacement Liens shall be deemed attached, perfected, and enforceable against the Debtor and all other persons, including without limitation, any subsequently appointed trustee for the Debtor, without the filing of any financing statements or other compliance with non-bankruptcy law.

     7.  *Milestones*.  The DIP Lender is hereby entitled to performance of the following

milestones by the dates set forth below (or such later date as may be agreed by the DIP Lender) (the "Milestones"), and for the avoidance of doubt, the failure of the Debtor to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Documents and this Interim Order and permit DIP Lender to exercise the rights and remedies provided for in this Interim Order and the DIP Documents:

    a.  On or before May 18, 2021, the Debtor shall have filed a motion seeking approval of sale and bidding procedures for the sale of substantially all the Debtor's assets (the "Bidding Procedures Motion")  in the Bankruptcy Court;

    b.  On or before June 4, 2021, the Bankruptcy Court shall have entered an order granting the Bidding Procedures Motion, in form reasonably acceptable to the DIP Lender (the "Bidding Procedures Order");

    c.  No later than fifteen (15) calendar days after entry of the Bidding Procedures Order, Debtor shall deliver a draft confidential information memorandum (the "CIM") to DIP Lender along with a proposed draft purchase agreement for the sale;

    d.  No later than forty-five (45) calendar days after entry of the Bidding Procedures Order, Debtor shall deliver a final version of the CIM and a final version of the draft purchase agreement (together with the related disclosure schedules) to prospective purchasers, including those prospective purchasers that Debtor believes in good faith could submit a binding bid, and such final version of the CIM, together with a list of such prospective purchasers, shall be delivered to DIP Lender;

    e.  On or before August 16, 2021, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred;

    f.  On or before August 19, 2021, the Debtor, in consultation with the DIP Lender, will select a bid that it believes represents the highest and best offer for the sale received by the Bid Deadline;

    g.  On or before August 20, 2021, the Debtor shall have commenced the Auction (as defined in the Bidding Procedures Order), if necessary;

    h.  On or before August 26, 2021, a hearing shall have occurred in the Bankruptcy Court to consider approval of the sale contemplated by the Bidding Procedures Order;

    i.  On or before August 31, 2021, the Bankruptcy Court shall have entered the Sale

10498971-9

Order (as defined in the Bidding Procedures Order).

8.      *Event of Default*.  The occurrence of any of the following events shall constitute an

"Event of Default" under this Interim Order:

      a.  the granting of relief from the automatic stay to foreclose a lien or the taking of control or possession of, or the exercise of any right of setoff with respect to, any Post-Petition Collateral;

      b.  the failure to obtain the entry of the Final Order with terms satisfactory to the DIP Lender on or before  June 1, 2021, unless agreed to otherwise in writing by the DIP Lender in its sole discretion;

      c.  the failure to achieve or perform any of the Milestones set forth in paragraph 7 of this Interim Order;

      d.  the entry by the Bankruptcy Court or another court of competent jurisdiction of an order disallowing any of the DIP Obligations or determining that any provision of the DIP Documents is not enforceable according to its terms;

      e.  the entry by the Bankruptcy Court of an order determining that the DIP Liens are invalid or do not have the priority and extent provided in the DIP Documents, this Interim Order or the Final Order;

      f.  the expiration or termination of the Debtor's exclusive right to file and solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code without the solicitation and filing of acceptances thereof; and

      g.  the occurrence of an Event of Default under the DIP Documents (and the expiration of any period of cure, grace or notice, if any, set forth in such agreement relating to such default).

9.      *Remedies after Event of Default*.  Immediately upon the occurrence of an Event of Default or the Maturity Date (as defined in the DIP Documents), the DIP Lender's commitment to lend shall terminate and the DIP Lender shall be under no further obligation to provide credit under the DIP Documents. Upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtor (with a copy to counsel to the United States Trustee), the DIP Lender may seek relief from the automatic stay on an emergency basis and obtain authority to exercise all other rights and remedies against the

17

Collateral.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default or Maturity Date has occurred and is continuing.  Subject only to and effective upon entry of the Final Order, the Debtor shall waive any right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in this Interim Order or the DIP Documents.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.  The DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Interim Order shall not constitute a waiver of the DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Term Sheet.

10.    *Effect of Stipulations on Third Parties*.  The Debtor's stipulations, admissions, releases, and agreements contained in this Interim Order, shall be binding upon the Debtor and any successor thereto (including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor) in all circumstances and for all purposes.  The Debtor's stipulations, admissions, releases, and agreements contained in this Interim Order, shall be binding upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Case (including any official committee appointed in the Case) and any other person or entity acting or seeking to act on behalf of the Debtor's estate, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor, in all circumstances and for all purposes unless:  (a) such committee, or any other party in interest, with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter by no later than 60 calendar days after

18

entry of this Interim Order, (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of any of the Pre-Petition Obligations, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the DIP Lender in connection with matters related to the Pre-Petition Agreements; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified before the expiration of the Challenge Period shall be deemed forever, waived, released and barred. If (a) no such Challenge is timely and properly filed during the Challenge Period, or (b) the Court does not rule in favor of the plaintiff in any such proceeding then: (i) the Debtor's stipulations, admissions, releases, and agreements contained in this Interim Order, shall be binding on all parties in interest; (ii) the obligations of the Debtor under the Pre-Petition Agreements, shall constitute allowed claims (without the need to file a proof of claim) not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Case, and any subsequent chapter 7 case; (iii) the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens on the Pre-Petition Collateral, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Pre-Petition Indebtedness and the Pre-Petition Liens on the Pre-Petition Collateral shall not be subject to any other or further claim or challenge by any statutory committee appointed or formed in the Case or any other party in interest acting or seeking to act on behalf of the Debtor's estate, including any successor thereto (including any chapter 7 trustee

or chapter 11 trustee or examiner appointed or elected for the Debtor) and any defenses, claims, causes of action, counterclaims and offsets by any non-statutory committee appointed or formed in the Case, or any other party acting or seeking to act on behalf of the Debtor's estate, including any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor), whether arising under the Bankruptcy Code or otherwise, against the DIP Lender, its officers, directors, managers, parent, subsidiaries, affiliates, professionals and representatives arising out of or relating to any of the Pre-Petition Agreements, the commencement or administration of the Case or any transactions between the Debtor and BETM shall be deemed forever waived, released and barred.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any non-statutory committee appointed or formed in the Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its estate.

11.    *Limitation on Charging Expenses Against Collateral*.  Subject only to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained herein, no costs or expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.    *Carve-Out.* The Superpriority Claims, the Replacement Liens and DIP Liens

20

granted to the DIP Lender pursuant to this Interim Order shall be junior and subordinate to (a) all fees required to paid by the Debtor to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) all fees due the Clerk of the Court, (c) with respect to the Debtor's professionals, the allowed fees and disbursements as may be awarded to such professionals from time to time pursuant to Bankruptcy Code § 330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, (d) up to $100,000 in fees and expenses incurred by the Debtor's professionals following an Event of Default, and (e) amounts to pay post-petition "trust fund" obligations (collectively, the "Carve-Out").

13.    *Fees & Expenses.*    The Debtor is authorized and directed to pay any and all reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Documents, including the fees and expenses of attorneys, advisors, accountants and other consultants, whether incurred before, on or after the Petition Date, including, but not limited to fees and expenses incurred in connection with (a) the preparation, negotiation and execution of this Interim DIP Order, and the DIP Documents; (b) the creation, perfection or protection of the DIP Liens and the Replacement Lien (including all search, filing and recording fees); (c) the on-going administration of the DIP Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Case (including the filing of any proofs of claim); (d) the enforcement of the DIP Documents or this Interim Order; and (e) any legal proceeding relating to or arising out of the DIP Facility or the other transactions contemplated by the DIP Documents or this Interim DIP Order including this Case and any credit bid of the DIP Obligations and/or the Pre-Petition Obligations. Payment of all such professional fees and expenses shall not be subject to allowance by the Bankruptcy Court or to the U.S. Trustee guidelines; provided that requests for payment of such professional fees and

21

expenses shall be provided to the Debtor, the U.S. Trustee and any statutory committee appointed in the Case on a 10 days' notice.

14. *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.  DIP Lender shall apply the proceeds of the Pre-Petition Collateral to reduce the Pre-Petition Obligations and shall apply proceeds of the Post-Petition Collateral to reduce the DIP Obligations.

15. *Perfection of DIP Liens and Adequate Protection Liens*.

a.   The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination at the time and on the date of entry of this Interim Order.  The Debtor shall execute and deliver to the DIP Lender, all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP

22

Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

b.   A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

c.   Any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign or otherwise transfer any such interest or the proceeds thereof or other Collateral, is hereby and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting the DIP Lender a security interest in and lien on such interest or the proceeds of any assignment and/or sale thereof by the Borrower in favor of the DIP Lender in accordance with the terms of the DIP Documents and this Interim Order.

16.    *Preservation of Rights Granted Under the Order*.

a.   Subject to the Carve-Out (as defined in paragraph 12 above), no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Lender shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof) remain outstanding and the DIP Documents have not been terminated, and the DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

b.    Unless all DIP Obligations shall have been indefeasibly paid in full in cash and the Commitment shall have been terminated (i) the Debtor shall not seek, and it shall constitute an immediate Event of Default under the DIP Documents if the Debtor seeks, or if there is entered, any modification of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender or (ii) it shall constitute an immediate Event of Default under the DIP Documents if any order is entered converting or dismissing the Case.  If an order dismissing the Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (w) the Superpriority Claims, the Replacement Liens and the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been indefeasibly paid in full in cash, and the Commitment shall have been terminated, (x) such Superpriority Claims, the Replacement Liens and DIP Liens shall, notwithstanding such dismissal, remain binding on all parties in interest, (y) the other rights granted by this Interim Order shall not be affected and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

c.    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation, as applicable, or (ii) the validity, priority or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations incurred by the Debtor to the

24

DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all DIP Obligations.

d.   Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Replacement Liens, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Case to a case under chapter 7 of the Bankruptcy Code, dismissing the Case, or (ii) the entry of an order confirming a plan of reorganization in the Case and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in the Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Obligations, the Replacement Liens, the Superpriority Claims, and all other rights and remedies of the DIP Lender granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash, and the Commitment has been terminated.

17.   *Limitation on Use of DIP Financing Proceeds, Cash Collateral and Collateral.* The Debtor shall use the proceeds of the DIP Financing and the Cash Collateral solely as provided in this Interim Order and in the DIP Documents (including, but not limited to, the Budget). Notwithstanding anything herein or in any other order of this Court to the contrary, no credit extensions under the DIP Documents, Cash Collateral or Carve-Out may be used (a) for

professional fees and expenses incurred for any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise) against the DIP Lender or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Lender or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations or the security interests in or liens on the Collateral or against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (b) to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or this Interim Order, (c) to seek to modify any of the rights granted to the DIP Lender under this Interim Order or under the DIP Documents, without the DIP Lender's prior written consent, which may be given or withheld by the DIP Lender in the exercise of its sole discretion, or (d) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents (including, but not limited to, the Budget).

18.    *Subsequent Financing*.    So long as any portion of the DIP Obligations remains in effect, absent the prior written consent of DIP Lender (which consent may be withheld in DIP Lender's sole discretion) the Debtor shall not seek (a) an order dismissing or converting the Case, or (b) any order which authorizes under any section of the Bankruptcy Code the granting of any lien or security interest in any Post-Petition Collateral in favor of any party other than the DIP Lender or the obtaining of any credit or the incurring of any indebtedness that is entitled to superpriority administrative status superior to that granted to the DIP Lender pursuant to this Order.

19.    *Plan of Reorganization or Other Subsequent Orders.*  The validity, priority and

extent of the liens and security interests granted by the Debtor to DIP Lender pursuant to this Interim Order or the DIP Documents shall not be modified, altered, or affected in any manner, absent prior written consent of DIP Lender, by (i) any plan of reorganization in this case, whether filed by the Debtor or a party in interest; (ii) any order confirming such a plan for the Debtor; (iii) by any other financing or extensions of credit, whether made pursuant to section 364 of the Bankruptcy Code or otherwise; or (iv) any other order of this Court.

20.    *Termination Date.*    The DIP Obligations shall mature and become due and payable on the earliest of: (i) the effective date of a chapter 11 plan, (ii) the closing of sale of all or a substantial part of the Debtor's assets, (iii) December 1, 2021, or (iv) the occurrence and declaration of an Event of Default by the DIP Lender (the "Maturity Date").

21.    *Exculpation.*    Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or post-petition activities of the Debtor in the operation of its business or maintenance of assets, or in connection with its restructuring and sale efforts.  So long as the DIP Lender complies with its obligations under the DIP Documents and its obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

22.    *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

10498971-9

23.     *Retention of Jurisdiction.*  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtor  notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

24.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Case, including without limitation, the DIP Lender, the Debtor and its respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtor  or with respect to the property of the estate of any of the Debtor) and shall inure to the benefit of the DIP Lender and the Debtor and its respective successors and assigns, *provided* that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of the Debtor.

25.     *Credit Bid.*  Subject to and effective upon entry of the Final Order, and further subject to the rights of holders of Existing Liens, the DIP Lender shall have the right to credit bid all or any portion of the outstanding DIP Obligations in any sale of the Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

26.     *Effectiveness.*  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable effective as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or

9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

27. *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

28. *Final Hearing.* The Final Hearing will be held by this Court on **May ____, 2021 at ____ a.m/p.m.** (prevailing Eastern time). The Debtor shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee. Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon (a) Genovese Joblove & Battista, PA, 100 SE 2nd Street, Suite 4400, Miami, FL 33131, Attn: Paul J. Battista, Esq., attorneys for the Debtor; (b) Genovese Joblove & Battista, PA, 200 East Broward Blvd., Suite 1110, Fort Lauderdale, FL 33301, Attn: Mariaelena Gayo-Guitian, Esq., attorneys for the Debtor; (c) Eversheds Sutherland (US) LLP, 700 6th Street, NW, Suite 700, Washington, DC 20001-3980, Attn: David T. McIndoe, Esq., attorneys for the DIP Lender; (d) Eversheds Sutherland (US) LLP, 101 Fannin Street, Suite 3700, Houston, TX 77002-6760, Attn: Mark D. Sherrill, Esq., attorneys to the DIP Lender; (e) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso, Esq., attorneys for the DIP Lender; (f) the Office of the United States Trustee, 51 SW First Avenue, Room 1204 Miami, FL 33130, and (g) all parties who have filed a request for notice in this Case, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of Florida, to allow actual receipt by the foregoing no later than **_____, 2021** at **2:00 p.m.** (prevailing Eastern time).

29

# # #

Submitted by:
Paul J. Battista, Esq.
Genovese Joblove & Battista, PA
100 SE 2nd Street, Suite 4400
Miami, FL 33131
Tel. (305) 349-2300
Fax (305) 349-2310
E-mail:  pbattista@gjb-law.com

*(Paul J. Battista, Esq. shall serve a copy of the signed order on all interested parties and file with the Court a Certificate of Service conforming with Local Rule 2002-1(F).*

10498971-9

## EXHIBIT B
## BUDGET

**Liberty Power Holdings LLC**
**DIP Budget**
**($ in 000's)**

| | 7-May | 14-May | 21-May | 28-May | 4-Jun | 11-Jun | 18-Jun | 25-Jun | 2-Jul | 9-Jul | 16-Jul | 23-Jul | 30-Jul | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Receipts** | | | | | | | | | | | | | | |
| 1.) Total Receipts | 4,379 | 4,195 | 4,802 | 5,613 | 3,582 | 4,160 | 3,768 | 4,883 | 5,698 | 4,359 | 4,033 | 5,042 | 6,249 | 60,762 |
| **II. Disbursements** | | | | | | | | | | | | | | |
| 2.) Total Operating Disbursements | (5,447) | (1,180) | (2,434) | (13,402) | (1,314) | (803) | (2,151) | (14,081) | (1,363) | (810) | (1,517) | (1,540) | (15,399) | (61,441) |
| 3.) Operating Cash Flow | (1,068) | 3,015 | 2,367 | (7,789) | 2,268 | 3,357 | 1,617 | (9,199) | 4,335 | 3,549 | 2,516 | 3,502 | (9,150) | (679) |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| 4.) Critical Vendor Expenses | (1,100) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (245) | - | - | - | (5,345) |
| 5.) Other Restructuring Related | (365) | (365) | (440) | (940) | (440) | (440) | (425) | (606) | (675) | (425) | (435) | (435) | (1,099) | (7,090) |
| 6.) Total Disbursements | (6,912) | (2,045) | (3,374) | (14,842) | (2,254) | (1,743) | (3,076) | (15,187) | (2,538) | (1,480) | (1,952) | (1,975) | (16,498) | (73,876) |
| 7.) Net Cash Flow | (2,533) | 2,150 | 1,427 | (9,229) | 1,328 | 2,417 | 692 | (10,305) | 3,160 | 2,879 | 2,081 | 3,067 | (10,249) | (13,114) |
| **III. Financing** | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | |
| 8.) Beginning Cash Balance | 22,870 | 24,338 | 22,488 | 23,915 | 24,186 | 22,514 | 22,931 | 22,623 | 24,318 | 22,479 | 23,358 | 23,439 | 22,505 | 22,870 |
| 9.) Net Cash Flow | (2,533) | 2,150 | 1,427 | (9,229) | 1,328 | 2,417 | 692 | (10,305) | 3,160 | 2,879 | 2,081 | 3,067 | (10,249) | (13,114) |
| 10.) ISO Collateral Contingency LC | - | - | - | (12,500) | - | - | - | - | - | - | - | - | - | (12,500) |
| 11.) DIP Draw/(Repayment) | 4,000 | (4,000) | - | 22,000 | (3,000) | (2,000) | (1,000) | 12,000 | (5,000) | (2,000) | (2,000) | (4,000) | 12,000 | 27,000 |
| 12.) Ending Cash Balance | 24,338 | 22,488 | 23,915 | 24,186 | 22,514 | 22,931 | 22,623 | 24,318 | 22,479 | 23,358 | 23,439 | 22,505 | 24,256 | 24,256 |
| 13.) Contingent Reserve Amount | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) | (8,456) |
| 14.) Net Available Cash | 15,881 | 14,032 | 15,459 | 15,730 | 14,058 | 14,475 | 14,167 | 15,862 | 14,023 | 14,902 | 14,982 | 14,049 | 15,800 | 15,800 |
| **Memo:** | | | | | | | | | | | | | | |
| 15.) Specified Admin Expense | (697) | (220) | (504) | (490) | (635) | (123) | (599) | (439) | (658) | (171) | (410) | (98) | (442) | (5,486) |

EXHIBIT C
TERM SHEET

**BETM – Debtor**
**DIP - Supply and Services Agreement**
**Summary of Terms**
**May 5, 2021**

*The transaction summarized below is subject to the approval of the Bankruptcy Court and the Parties execution and delivery of the DIP Documents as defined in the Interim Order.*

| | |
|---|---|
| **BETM:** | Boston Energy Trading and Marketing LLC ("BETM") |
| **Debtor:** | Liberty Power Holdings LLC ("Debtor"), as debtor-in-possession |
| **Credit Facility Maximum:** | The total amount of the credit facility shall be capped at $40 million, subject to an initial cap of $4 million until the Bankruptcy Court issues the final order approving the DIP financing. |
| **Credit Base:** | Debtor will report the Credit Base to BETM at the beginning of each week. |

The Credit Base will be the lesser of (i) $4 M initially and then $40 M after the final DIP order and (ii) the sum of the following, all of which are subject to BETM's ongoing due diligence:

- Cash held in the lockbox accounts @ 100%
- Eligible POR Billed Accounts Receivable @ 95%
- Eligible POR Unbilled Accounts Receivables @ 90%
- Eligible Non-POR Billed Accounts Receivable @ 70%, subject to diligence
- Eligible Non-POR Unbilled Accounts Receivables @ 70%, subject to diligence
- Outstanding and undrawn letters of credit, and/or cash equivalent deposited with approved non-ISO parties @ 70%
- Forward Value of Customer Contracts @ 100%

To be eligible for inclusion in the Credit Base, all receivables must be owing under an executed agreement between Debtor and its customer or owing by the applicable utility under agreement or tariff; current with payment terms acceptable to BETM, but in no event to exceed 60 days from date of the due date on the relevant invoice. Receivables beyond 60 days from the due date will be excluded from the Credit Base.

| | |
|---|---|
| **Initial Term:** | The maturity of the DIP Facility (the "Maturity Date") would be the earliest of: (i) the effective date of a Chapter 11 plan for Debtor, (ii) the closing of sale of all or a substantial part of the assets of LPH, (iii) December 1, 2021, or (iv) the occurrence and declaration of an Event of Default by the DIP Lender. |
| **Lien:** | Debtor will grant BETM an unconditional first lien on assets of Debtor, including customer contracts, bank accounts, etc., and equity interests of Debtor held by its members. The Lien will be *pari passu* with the lien held by BETM in connection with the supply facility in force before the petition date of the Debtor's bankruptcy proceeding (the "Prior SSA") Debtor will maintain deposit accounts |

|  | and lockbox accounts (the "Controlled Accounts") as may be associated with Debtor's business at financial institutions as the parties may agree (collectively, the "Bank").  Each Controlled Account will be subject to a deposit account control agreement among BETM, the Bank and Debtor. |
|---|---|
| **Lien Release Condition:** | BETM will not be required to release its lien associated under the DIP Documents until all obligations are satisfied or it has received sufficient collateral in respect of such obligations. |
| **Additional Services Provided:** | 1.  Physical Supply Service– |

BETM provides Debtor physical electricity, capacity, and certain ancillary services in the Approved Regions (e.g., PJM, NYISO, ISO-NE, ERCOT, and MISO, the ("ISOs")).

> *Electricity*:   In general, Debtor will source electricity to meet the consumption of its customers by participating in the day-ahead and real-time markets operated by the ISOs.
>
> Debtor will be the market participant in each of the Approved regions. Subject to Availability, BETM (a) will provide Debtor with amounts to cover payments to the ISOs, and (b) provide collateral support as any ISO may require of Debtor.
>
> BETM will provide scheduling services in the Approved Regions at no additional cost. Scheduling services generally constitute arranging for electricity for Debtor's customers in the day-ahead markets.
>
> Forecasting of load demand will be the responsibility of Debtor.
>
> Subject to Availability, BETM may enter into direct bilateral transactions with Debtor for electricity (which effectively are accounted for outside the organized markets of each ISO for purposes of sourcing electricity to service Debtor's load).

2.  Hedging Service –

BETM will hedge or sleeve forward volumes of retail electricity commitments without the need for Debtor to post margin for related exposures, subject to Availability (defined below).

3.  Collateral Commitment –

BETM will provide collateral on behalf of Debtor for the benefit of local distribution companies, pipelines, electric distribution companies, regulators and the ISOs in connection with the supply services provided hereunder.

| | |
|---|---|
| **Sleeving – Approved Counterparties:** | In accordance with the DIP Documents, including the procedures for pricing any proposed transaction, BETM will "sleeve" supply and hedging transactions on behalf of Debtor with Approved Counterparties. |
| | "Approved Counterparty" means any counterparty that is acceptable to BETM as a trading counterparty in accordance with BETM's customer and credit policies, consistently applied, and that has an executed trading agreement with BETM; <u>provided</u> that BETM maintain not less than five (5) Approved Counterparties. |
| **Availability; Utilized Amount:** | Debtor can enter into physical supply transactions and financially settled hedges, and BETM will provide collateral support, only to the extent of the Availability and the Remaining Adjusted Availability under the credit facility, subject to the Credit Facility Maximum. |
| **Deferred Supply Obligation (DSO):** | If funds in the Lockbox are not sufficient to pay any amounts due on the Monthly Payment Date, then (subject to remaining Availability) BETM shall, at Debtor's request, extend the payment date for amounts due to it ("Deferred Supply Obligation" or "DSO") for a Deferred Supply Obligation Period. Except as BETM may agree a DSO may not extend payment obligations under a prior DSO (i.e., DSOs do not "roll" automatically). |
| | DSOs will incur interest at the higher of SOFR plus 1000 basis points or 10.0% for the first 30 days and thereafter, the higher of SOFR plus 1200 basis points or 12.0%. |
| **Budget:** | The Budget, approved by BETM and the Bankruptcy Court. |
| **Supply Fee:** | $1.00/MWh* |
| | (*) The fee rate will be multiplied by the volume of wholesale load responsibility as reported by the applicable ISO.  Any reduction in wholesale volumes due to physical hedging would be trued-up to be included in the wholesale volume. |
| | Non-standard transactions (e.g., bespoke shaped load products) will be assessed an additional 5% of the notional amount. |
| **Sleeve Fees:** | $0.25 per MWh |
| | For basis trades, applied only to one leg of the transaction |
| **Credit Support Fee Rate:** *(ref SSA Sect 2.5)* | For non-ISO collateral postings, the higher of (a) SOFR plus 1200 basis points or (b) 12% per annum. |
| **Interest Rate:** | To the extent unpaid amounts owed to BETM do not constitute DSO, such amounts will accrue interest at the treasury bill rate plus 1200 basis points. |

| | |
|---|---|
| **Invoices and Monthly Payment Date:** | BETM will invoice Debtor for amounts due on or about the 10th day of each month with respect to services, advances, and settled transactions in the prior calendar month.  The invoice is payable on the 25th day of the same month as the invoices. |
| | In general, this timing bridges a timing gap between when amounts are payable to the ISOs and when receivables are paid the customer, which is often through a POR program operated by the local utility. |
| **Debt-related Covenants:** | Debtor will covenant to BETM that it will not create, assume, issue or permit to exist, directly or indirectly, any indebtedness, without the prior written consent of BETM, except for certain amounts incurred in the normal course of business or to which BETM has consented. The DIP Documents will include other covenants customary for a transaction of this nature. |
| **Representations:** | The DIP Documents will contain customary representations for transactions of the kind described in this term sheet.  Debtor will affirm that all material facts as presented by Debtor to BETM are true and accurate and that there are no material facts that have been withheld from BETM. |
| **Indemnification:** | BETM and its affiliates, directors and employees will be indemnified against all losses, liabilities, claims, damages and expenses relating to or arising out of the DIP Documents and/or the transactions contemplated herein, including, without limitation, the professional fees and expenses incurred by BETM in connection with the negotiating and drafting the definitive agreements,  provided that such losses are not the result of BETM's willful misconduct or gross negligence. |
| **Governing law:** | The Supply Agreement would be governed by and construed in accordance with the laws of the State of New York. |
| | Each of the Parties submits to the exclusive jurisdiction of the United States Bankruptcy Court in the Southern District of Florida, Fort Lauderdale Division. |
| **Transaction Documents:** | Customary documentation for an agreement of this type will be required, including, without limitation: |

— Debtor-In-Possession Supply and Services Agreement;
— ISDA Master Agreements with a Credit Support Annex, Power Annex, Gas Annex, and REC Annexes (which will take the form of an amendment to the prior ISDA)
— DIP Pledge and Security Agreement;
— UCC Questionnaire and Filings; and
— Account Control Agreements with Debtor's account banks; and

Any other document as reasonably required by BETM.

The terms set forth in this term sheet are summary and not exhaustive of the provision to be included in the DIP Documents.