# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION**

FILED
2/18/2020 10:40 AM
~~DOROTHY~~ BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020CH01954

8512458

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) | |
| Plaintiff, | ) ) | 2020 CH  <u>2020CH01954</u> |
| v. | ) ) | Judge  _____ |
| LIBERTY POWER HOLDINGS LLC, a Delaware Limited Liability Company, | ) ) ) | |
| Defendant. | ) ) | |

FILED DATE: 2/18/2020 10:40 AM  2020CH01954

## VERIFIED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, The People of the State of Illinois, by and through Kwame Raoul, Attorney General of the State of Illinois, brings this action against Defendant, Liberty Power Holdings LLC ("Liberty"), for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 *et seq.*

## INTRODUCTION AND BACKGROUND

1.      Liberty Power runs a scam. Since at least 2012, Liberty has used an illegal and deceptive marketing scheme to deceive Illinois consumers into switching their electric supplier. Commission-hungry Liberty agents, caught red-handed on audio recordings, recycle the same lies, the same false comparisons, the same artful omissions, all in the service of knowingly tricking Illinois consumers into paying more for their electricity—and lining Liberty's pockets.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

2.      The fraud is intentional. The explosive audio recordings alone reveal, among other reprehensible business practices, that Liberty targets the elderly and people with disabilities. According to Liberty's own words, its over-priced products are "specifically designed for people on a fixed income," such as "people with disabilities" and those on "disability income."

3.      Liberty's fraudulent scheme also includes outright theft. Its agents steal consumers' personal information, forge their signatures, and switch their service without their consent, a reviled practice known in the industry as "slamming."

4.      The size of the fraud is even more staggering than the methods are despicable. Liberty has scammed tens of thousands of Illinois consumers out of over $77 million. Since 2016, Liberty has overcharged Illinois consumers by an average of over $1 million per month. During that same period, Liberty's rates—rates that Liberty promises are "low," will provide "price protection," and will result in "savings"—have been higher than the comparable utility's rate *over 99% of the time*. The fraud is ongoing.

5.      The State brings this action to stop Liberty's illegal conduct, recover tens of millions of dollars Illinois consumers have lost to Liberty's fraud, require Liberty to pay civil penalties authorized under the Consumer Fraud Act, and revoke Liberty's authority to operate in the State.

## PARTIES

6.      Plaintiff, the People of the State of Illinois, by Kwame Raoul, the Attorney General of the State of Illinois, is authorized to enforce the Consumer Fraud Act and the Telephone Solicitations Act.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

7.      Defendant, Liberty, a Delaware limited liability company with its principal place of business at 2100 W. Cypress Creek Road, Suite 130, Fort Lauderdale, Florida, 33309, is an alternative retail electric supplier ("ARES") certified by the Illinois Commerce Commission ("ICC") to engage in the sale of electricity to residential retail customers in the service area of the Illinois public electric utilities, ComEd and Ameren. At all relevant times, Liberty was engaged in trade and commerce in Illinois by marketing, selling, and promoting electricity supply to Illinois residents.

8.      For purposes of this Complaint, any references to the acts and practices of Liberty shall mean such acts and practices are by and through the acts of Liberty's officers, owners, members, directors, employees, representatives and/or other agents, including especially third-party vendors who market electricity supply on Liberty's behalf.

## PUBLIC INTEREST

9.      The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to the Illinois Consumer Fraud Act and the Illinois Telephone Solicitations Act.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to the Court's general jurisdiction and pursuant to 815 ILCS §505/1 *et seq*. and 815 ILCS 525/1 *et seq*., as the cause of action arises from actions taken by Liberty in Illinois.

11.      This Court has personal jurisdiction over Liberty because it transacts business in Illinois, including in Cook County, Illinois.

12.      Venue for this action is proper in Cook County, Illinois, pursuant to Section 2-101 and Section 2-101(a) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, 101(a), because

3

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

Liberty is doing business in Cook County, Illinois, and some of the transactions out of which this action arose occurred in Cook County, Illinois.

## TRADE AND COMMERCE

13.     Subsection 1(f) of the Consumer Fraud Act, 815 ILCS 505/1/(f), defines "trade" and "commerce" as:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

14.     At all times relevant to this Complaint, Liberty was engaged in trade and commerce in the State of Illinois by marketing, selling, and promoting electricity supply to Illinois residents.

## RETAIL ELECTRICITY SUPPLY INDUSTRY

15.     Each public electric utility in Illinois has a defined service territory and serves all retail (i.e., residential and small business) customers in that territory.  Traditionally, electric utilities have provided both electricity supply and the distribution service that delivers the electricity to consumers.

16.     The ICC reviews the prices public electric utilities are permitted to charge eligible residential customers for electricity supply.  This default price reflects the utility's cost for purchasing the electricity, without any mark-up for profit.

17.     Public electric utilities, like ComEd and Ameren, are the default suppliers of electricity to consumers. However, under the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et seq*., consumers may choose to purchase their electricity supply from an ARES rather than their public utility.  If a consumer decides to switch

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

to an ARES, the consumer continues to pay the utility for delivery service but pays the ARES to acquire the electricity that the utility delivers to the consumer. Regardless of which entity the consumer selects as their supplier, the utility continues to deliver electricity to the consumer's home.

18.     Even if a consumer chooses an ARES for electricity supply, the utility continues to bill and collect from the customer the total of the supply charge (as set by the ARES) plus the delivery charge (the rate approved by the ICC) and other incidental fees and taxes. The ARES does not send a separate bill to the consumer.

19.     ARES must be licensed by the ICC in order to sell electricity supply in Illinois. But unlike public utilities, ARES' rates are not regulated or reviewed by the ICC, and ARES are permitted to profit from the sale of electricity supply.

20.     According to the ICC, ARES customers would have saved more than $870 million over just the last five years if they had instead elected to purchase their electricity directly from the public utility.

## LIBERTY'S BUSINESS PRACTICES

21.     In April 2007, Liberty received a Certificate of Service Authority from the ICC to operate as an ARES in Illinois. Under the certificate, Liberty may sell electricity to eligible residential and nonresidential retail customers in the ComEd and Ameren service areas, and has a continuing statutory obligation to comply with all enumerated requirements for certification and "all other applicable laws and regulations," pursuant to 220 ILCS 5/16-115(d)(8) and 220 ILCS 5/16-115A(a)(ii).

22.     Since 2012, Liberty has engaged in the marketing and sale of electricity to Illinois residential customers in the ComEd and Ameren service territories.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

23.    Liberty charges its customers based on how much electricity (measured in kilowatt hours) the customer uses each month.  Liberty offers different rates (price per kilowatt hour), rate types (fixed rates and variable rates), and lengths of contract.

24.    Liberty typically enrolls consumers in a fixed rate product, usually for a term of 12 or 24 months. During the term, Liberty charges consumers the same rate each month for their electricity supply. This rate is almost always higher than the default utility rate.

25.    Near the end of the initial contract term, Liberty contacts the customer offering to enter the customer into a new fixed rate. If the customer does not respond to the notice, or chooses not to enter into a new fixed rate with Liberty by the time the initial fixed rate contract expires, Liberty automatically renews the customer's account without any affirmative act by the customer, on a month-to-month basis at a variable rate. The customer remains on this variable rate indefinitely.

26.    Liberty's variable rates can dramatically increase at any time without prior notice to the customer and are almost always higher than the default utility price. The only time this rate is regularly disclosed to customers is at the end of the month when they receive their monthly bill, after they have already used and been billed for their electricity supply at that rate.

27.    Regardless of the rate plan, the rates charged to customers for Liberty's products were usually higher than the default rate customers would have paid to their utility. In fact, since 2016, Liberty's rates have been higher than the default utility's rate over 99% of the time.

28.    Liberty conducts marketing activities in Illinois in the form of door-to-door solicitations, in-person solicitations at retail establishments (e.g., shopping mall kiosks), and telephone solicitations ("telemarketing"). Liberty advertises its product on its website and also has engaged in some digital marketing.

29.    Since 2012, Liberty has employed third-party vendors to market the sale of electricity supply (collectively "sales representatives") to Illinois consumers via door-to-door solicitations, in-person solicitations at retail establishments, and telemarketing.

30.    Liberty provides scripts to its sales representatives. The scripts instruct the sales representatives on how to interact with customers by telephone and in person and how to market Liberty's products and services. Liberty prohibits sales representatives from using any scripts that it does not approve.

31.    When enrolling a new customer either by telephone or in person, Liberty uses a two-step process. First, a sales representative attempts to convince the consumer to enroll with Liberty. Second, if a consumer agrees to enroll, Liberty confirms the enrollment using a statutorily-required third-party verification ("TPV") system or letter of agency.

32.    Illinois law prohibits sales representatives from performing the enrollment verification, and the verifier must be independent from both the electric supplier and its marketing agent.

33.    Liberty is responsible for selecting and contracting with third parties to perform verifications.

34.    The purpose of a third-party verification is to ensure that the consumer fully understands the terms and conditions of the service being offered, has the legal authority to effect a change on the account, and authorizes the change in electric suppliers. However, Liberty's third-party verifiers quickly roll through the verification process, frequently without allowing the consumer to fully answer or confirm an understanding of the questions presented—all in an effort to subscribe the consumer to Liberty, and all in violation of Liberty's statutory obligations under Illinois law.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

35.     In order to keep the sales solicitation separate from the enrollment verification, Illinois law requires that during the third-party verification of the customer's enrollment, sales representatives must drop off the call once the consumer is connected with the verification system. However, in violation of Illinois law, Liberty's sales representatives remain on the telephone line during the third-party verification process and direct the consumer on how to answer certain questions.

36.     Once a sale is completed and the enrollment is verified, the vendor sends the consumer's information to Liberty to complete the enrollment.

37.     Liberty pays third-party marketing vendors based, in part, on the number of new customers they enroll with Liberty. This commission-based compensation model creates powerful incentives for Liberty's agents to defraud consumers.

### Liberty's Misrepresentations, Omissions, and Other Violations

38.     Liberty's sales representatives make misrepresentations and omissions with the intent that consumers rely on those misrepresentations and omissions.

*Savings Misrepresentations*

39.     Liberty's sales representatives tell consumers that they will save money on their electricity bill if they enroll with Liberty. For nearly every consumer, this representation is false.

40.     Liberty makes savings claims and omits information about the cost of its service in order to convince consumers to switch suppliers. Liberty makes these savings claims with the intent that consumers rely on them when they choose Liberty as their electric supplier.

41.     In recorded solicitations, Liberty's sales representatives portray Liberty's rates as a discount on the service consumers are currently receiving from their utility, when, in fact, consumers would enter into a new contract with a new electric supplier at a new, higher rate.

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

Liberty's sales representatives offer consumers a "new low fixed rate" and tell them that the rate on the "open market" is "between 12 and 14 cents per kilowatt hour." Compared to this alleged "market rate" of 12 to 14 cents, Liberty's offer of a fixed rate—often for as long as two years— at 9 or 10 or even 11 cents is intended to seem like a bargain.

42.     It isn't. The market rate is not, and never was, "between 12 and 14 cents." That is a lie, repeated by Liberty sales representatives, including "floor supervisors." The market rate is drastically lower: the default utility rate has not exceeded 8.8 cents per kilowatt hour in ComEd territory, or 6.6 cents per kilowatt hour in Ameren territory, since June 2011, the earliest date for which such rates are publicly available on the ICC's website.[1]

43.     On Liberty's website, it advertises "low fixed rate electricity plans" that "fit[] your budget."

44.     Liberty intends for consumers to rely on these claims about savings and low prices, yet Liberty's rates are almost always higher than the rate the consumer would be charged if they purchased their electricity supply from their default public utility.

45.     In addition to promising savings that almost never materialize, Liberty makes the less bold, but equally deceiving, claim that consumers' electricity bills will stay the same with Liberty.

46.     Liberty also assures consumers their electricity bills will go up *only* if they use more electricity. These statements, often made in response to consumers asking if their *rate* will be higher with Liberty, are deceptive. Liberty also intentionally avoids answering the question posed (about the rate) and instead diverts attention to the consumer's usage. But consumers' rates, and, in turn, their electricity bills, *do* go up with Liberty.

---

[1] Consumers can view the public utilities' rates from June 2011 to the present at https://www.icc.illinois.gov/downloads/public/pluginillinois/HistoricalPriceToCompare.pdf.

9

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

47.    Liberty also tells consumers that the utility rate is about to increase when, in fact, the utility rate is scheduled to stay the same or even decrease.

48.    Since 2012, Liberty charged its customers over $77 million more for electricity supply than they would have been charged had they purchased supply from their default public utility.

*Misrepresentations about "Price Protection"*

49.    Liberty directs its sales representatives through sales scripts to offer consumers "price protection." Under this "price protection" plan, Liberty's customers pay a fixed rate, typically for one or two years. That rate, which is typically between 9 and 12 cents per kilowatt hour, stays constant throughout the term, and it is meant to "protect" against alleged rate spikes, especially in the summer months, when consumers use the most electricity to cool their homes.

50.    But at 9 to 12 cents per kilowatt hour, this "protected rate" inflicts precisely the harm Liberty claims it is meant to protect against. Consumers who receive their electricity supply from their default public utility have historically paid a variable rate between 2.7 and 6.6 cents per kilowatt hour in Ameren territory and between 5.0 and 8.8 cents per kilowatt hour in ComEd territory. Switching to Liberty's rate locks in a price increase. Liberty is offering "protection" from a risk that is not real.

51.    In order to convince consumers that they need this sort of "protection," Liberty makes one or more of the following three misrepresentations.

52.    First, Liberty tells consumers—before consulting their bill—that they are on a variable rate. But Liberty does not (and cannot) know whether a consumer is on a fixed or variable rate. Additionally, Liberty does not (and cannot) know, without consulting the

consumer's bill, whether a consumer is receiving electricity supply from the utility (ComEd or Ameren) or another ARES.

53.    Second, Liberty tells consumers their rate can change "at any time." But, in fact, if a consumer is currently receiving electricity supply from the utility, their rate is determined and publicly available months in advance and will change, at most, once every 3 months, excluding a small monthly purchased electricity adjustment that is capped at one half of one cent. It can, and often does, remain the same for 6 months at a time. It cannot change "at any time." If a consumer is currently with another ARES, they may be on a fixed rate for a year or more, or they may be on a variable rate that changes every month. But one thing is clear: Liberty has no way of knowing, as it purports to know, how frequently a consumer's rate will change—or even if it will change.

54.    Third, Liberty misrepresents that consumers will be "stabilizing" their current rate by agreeing to a fixed rate plan with Liberty. Liberty agents use terms like "stabilize" and "price protection" to trick consumers into believing that they are locking in their *current rate* and avoiding any future price increases. In fact, they are locking in a price increase.

55.    Liberty makes these above misrepresentations to trick consumers into paying an unnecessarily high price for electricity.

### *Association with Consumer's Public Utility*

56.    Consumers are generally wary of door-to-door salespeople and telemarketers. To combat this, Liberty's sales representatives misrepresent an association with ComEd or Ameren, utility companies consumers know and depend upon to deliver their electricity and respond to emergencies.

11

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

57.     Some lies are flagrant. Consumers have complained of Liberty sales representatives telling them that they work for the utility. Liberty door-to-door sales representatives will often say that they are "in the area" on behalf of ComEd or Ameren to read meters or check electricity bills or offer savings on consumers' ComEd or Ameren bills.

58.     Others misrepresentations are more subtle. Liberty sales representatives ask to speak with the person who handles the "ComEd bill" or "Ameren bill" or say they are contacting the consumer regarding their "ComEd account" or "Ameren account." Because of this language, consumers believe that Liberty sales representatives are contacting them on behalf of the consumer's public utility rather than a private supplier.

59.     Similarly, Liberty sales representatives tell consumers, at the beginning of the sales pitch, that the consumers are "entitled to a rate reduction on their ComEd or Ameren electricity bill." By specifically referencing the utility by name, Liberty intends for consumers to believe that the agents are calling on behalf of the utility to offer savings, rather than calling to switch consumers to a new electric supplier.

60.     Liberty also tells consumers, again at the outset of the sales pitch, that the sales agent is merely contacting the consumer to "update the utility's system" or to "verify the utility's information." Liberty intends for this language to suggest to consumers the agent is a representative of the utility and has access to the utility's system. But Liberty has no access to ComEd's or Ameren's system or to consumers' information within those systems. These misrepresentations are intended to trick consumers into revealing their unique utility account numbers, which the Liberty sales agent can then use to switch a consumer's electric supplier.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

61.     By using this language, sales representatives portray the enrollment process as a clerical step, performed by the utility, towards claiming a discount, when in fact customers are unknowingly giving their authorization to enter into a new contract with a new supplier.

62.     Liberty also lies to consumers about its knowledge of consumers' account information. Liberty misrepresents that it has access to details of consumers' accounts, such as the name of a consumer's electric supplier or the consumer's utility account number. For example, Liberty asks consumers to "confirm" their utility account number. This suggests to consumers that the agent on the phone or at the door already has the utility account number and the consumer is merely "confirming" that number. By pretending to know information that a representative from the utility would know (but that Liberty does not and cannot know), Liberty intends for consumers to believe that its agents are contacting them on behalf of the utility.

*Misrepresentations Regarding a State "Program"*

63.     Liberty's sales representatives intentionally mislead consumers by claiming the consumer is eligible for savings on their electricity bills through a program sanctioned by the State of Illinois. There is no such program.

64.     Liberty tells consumers that they are eligible for savings through the "energy choice program," "choice program," or just "the program." Liberty explains to consumers that they are "administering" this "program" on behalf of the State or the ICC, and that consumers will save money by enrolling in such a "program."

65.     Nothing in Illinois law entitles consumers to reductions on their electricity bills. Although an Illinois deregulation law does exist, the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 16-103, does not guarantee savings to consumers, and it does not create a "program" for private suppliers to "administer." In fact, the deregulation law

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

precludes the ICC from regulating the prices charged by alternative retail electric suppliers like Liberty. It is simply a statute that allows consumers to voluntarily decide whether to stay with their public utility or select a retail electric supplier to provide their electricity supply.

*Slamming*

66.     Liberty switches consumers over to Liberty without their consent. This conduct is commonly referred to in the alternative retail electricity supply industry as "slamming." It is illegal.

67.      Liberty utilizes a number of slamming strategies.

68.     In order to switch a consumer's electric supplier, Liberty first needs that consumer's unique utility account number. Liberty often obtains that utility account number under false pretenses. For example, Liberty tells consumers it is contacting them to update the utility's system, update the consumer's billing information, check on their utility bill, inform them that the electric supplier in their area is "switching," or even threaten that their "power bill may be illegal" and the consumer "could be in legal trouble."

69.     Liberty then uses this utility account number to switch consumers without their consent. Liberty forges consumers' signatures, submits switch requests even after consumers have withdrawn their approval, and, on at least one occasion, "bullied" a consumer's underage child to lie and say he was 18 in order to switch electric suppliers.

*Failure to Drop Off the Call During Third-Party Verification*

70.     Illinois law prohibits suppliers and suppliers' representatives from remaining on the line once a 3-way connection has been established among the consumer, the supplier or supplier's representative, and the third-party verifier. 815 ILCS 505/2EE.

FILED DATE: 2/18/2020 10:40 AM  2020CH01954

71.     Liberty's sales representatives instruct consumers that they are "not going to drop the line," meaning that they do not intend to drop off the line once the third-party verifier is connected.

72.     Liberty's sales representatives can be heard on audio recordings of third-party verifications.

*Failure to Immediately Disclose Liberty's Name*

73.     The Telephone Solicitations Act, 815 ILCS 413/15, requires telemarketers to "immediately state his or her name, the name of the business or organization being represented, and the purpose of the call."

74.     Liberty's telemarketing sales agents fail to immediately state they represent Liberty.

*Failure to Obtain Consent to Solicit*

75.     The Telephone Solicitations Act, 815 ILCS 413/15, prohibits telemarketers from soliciting without first asking the person called whether they consent to the solicitation. If the person called does not consent, the telemarketer must end the call.

76.     Liberty's telemarketing sales agents solicit customers without inquiring at the beginning of the call whether the person called consents to the solicitation.

**Representative Examples of Liberty's Fraud**

*Recorded In-Person Solicitations*

77.     A recorded in-person solicitation from December 2019 begins with the consumer, Ms. B., asking if the Liberty sales agents are trying to switch her supplier: "But they're not trying to switch my stuff (indiscernible)?" The Liberty sales agent lies: "No, no, no. *You stay with ComEd*. It's all one bill. We're just giving out price protection." (emphasis added). The Liberty

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

sales agent tells Ms. B. she is "going to be protected at a rate of 0.0999 cents[2] per kilowatt." Ms. B. is confused: "Now, what am I protecting though?" Liberty lies to Ms. B. about ComEd's rates: ComEd "always raise[s] their rates on you in the winter and summer because they know that you use more electricity." Liberty then suggests that Ms. B. can avoid ComEd's alleged seasonal price increases, lock in her current rate, and save money, by enrolling in "price protection": "So we're just making sure that your rate is going to stay at that same rate." Ms. B. could have paid only 6.72 cents per kilowatt hour with ComEd rather than 9.99 cents per kilowatt hour with Liberty.

78.    On a recorded in-person solicitation from November or December 2019, Mr. D. asks, "Well, are you change – are you changing my supplier?" The Liberty sales agent lies: "No." Liberty enrolls Mr. D. at a fixed rate of 9.99 cents per kilowatt hour for the next two years. Mr. D. could have paid only 6.72 cents per kilowatt hour with ComEd.

79.    On a recorded in-person solicitation from November 2019, a Liberty sales agent tells Ms. R. that "[w]e're just making sure you did have that rate protection program." Ms. R. asks if she's signing up with an ARES: "It's not like Spark Energy or…any other?" The Liberty sales agent lies: "No. We just protect the rate…from increasing…for the next two years." Ms. R. continues: "Because I'm already in trouble and they're always hounding me for [sic] to pay them all back because somebody is always telling me something like that." The Liberty sales agent lies again: "No. So what we do is just protect the rates, okay?" Liberty enrolls Ms. R. in a "protected" rate of 9.99 cents per kilowatt hour for two years. Ms. R. could have paid only 6.724 cents per kilowatt hour with ComEd.

80.    On a recorded in-person solicitation from November 2019, a Liberty sales agent tells Mr. D. that she is enrolling him in a "rate protection program" where he will "receive a

---

[2] Liberty routinely misstates its own rates. Here, the rate is 0.0999 *dollars*, or 9.99 cents, per kilowatt hour—not 0.0999 cents per kilowatt hour. Excerpts from Liberty solicitations are uncorrected throughout this Complaint.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

guaranteed rate of 0.0999 kilowatts per hour." Although she is switching his supplier, the Liberty sales agent lies to Mr. D. by telling him that his relationship with ComEd will not change: "But, you know, Liberty Power does not affect the relationship with the utility *in any way*." (emphasis added). Mr. D. could have paid only 6.724 cents per kilowatt hour with ComEd.

81.     On a recorded in-person solicitation from November 2019, a Liberty sales agent tells Ms. T. "we're making sure everybody has that protected rate for the winter so it does—the rates don't increase on there." Liberty enrolls Ms. T. in "rate protection" at "0.0699 cents a kilowatt." While Ms. T. steps away to get her identification, Liberty pitches another consumer: "We're just making sure everybody has that protected rate for this year before the winter….and so the rates don't increase. *And it's a free program for Ameren's customers*….And it stabilizes your rate for two years." (emphasis added). Ms. T. could have paid only 4.677 cents per kilowatt hour with Ameren.

82.     On a recorded in-person solicitation from November 2019, a Liberty sales agent tells Mr. C. he's enrolling in a free program designed to "protect" his rate: "So pretty much all that we're doing, boss, we're making sure that everybody did receive their protective rate on the supply portion of their Ameren bill for the winter so the rates just stay stable, which means they cannot go up. *It's a free program, for all Ameren customers, okay?*" (emphasis added). Liberty enrolls Mr. C. at 9.99 cents per kilowatt hour. He could have paid only 4.677 cents per kilowatt hour with Ameren.

83.     On a recorded in-person solicitation from November 2019, a Liberty sales agent tells Ms. W. that he is "checking here" whether she is on the "protective rate so your rates cannot increase for the next two years." Liberty also offers to make sure "extra charges get removed from the bill." Liberty promises to provide Ms. W. with energy "at no extra…charge to you." Liberty

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

then enrolls Ms. W. at a rate of 9.99 cents per kilowatt hour. She could have paid only 6.724 cents per kilowatt hour with ComEd.

84.     On a recorded in-person solicitation from December 2019, a Liberty sales agent tells Ms. B., a senior citizen, she is "mak[ing] sure all the accounts have the new rate protection program." Liberty misleadingly claims its "rate protection program" cannot guarantee savings only because the consumer, not Liberty, controls the usage: "The rate protection program does not guarantee savings because it only affects the rate, not the usage." Ms. B. asks if it matters that she lives in a senior building, but Liberty assures her she still qualifies for a "better benefit." "We just make sure you have the better and new rate….Nobody want[s] to be overcharged for the holiday," Liberty tells Ms. B. Liberty claims only to be "updating you for the *lowest rate*." (emphasis added). "It's just your rate is much lower" with the rate protection program, Liberty explains. Liberty deceives Ms. B. into thinking that she is not, in fact, switching her electric supplier, but is instead merely adding "rate protection" to her ComEd account: "Liberty Power does not affect your relationship with the utility *in any way*." (emphasis added).  Liberty enrolls Ms. B. at a rate of 9.99 cents per kilowatt hour for 24 months. She could have paid only 6.27 cents per kilowatt hour with ComEd.

85.     On a recorded in-person solicitation from in or around January 2019, a Liberty sales agent tells Ms. C. that he is "assigned to the area" to "make sure all accounts receive the new rate protection." The agent promises savings: "It's going to guarantee and protect your account from any future rate increases." Ms. C. asks if her rate is "going to be any higher." The agent's answer implies that Ms. C.'s rate will not go up: "The rate is guaranteed and protected from any future rate increases, so you're protected for the next two years." The Liberty agent also suggests that he is merely enrolling Ms. C. in a money-saving "program" affiliated with the utility, rather than

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

switching her supply away from the utility to a new company: "Records indicate that you don't have a program in place. Liberty Power is the supply company for this program. It protects your account from any future rate increases." He also implies that enrollment in the nonexistent ComEd program, for which Liberty is the supply company, is free: "There's no fees for the program." And again: "There's no fees of any kind." Liberty enrolls Ms. C. for two years at 10.69 cents per kilowatt hour. Ms. C. could have paid only 6.719 cents per kilowatt hour with ComEd.

86.    On an undated recorded in-person solicitation, a Liberty sales agent misrepresents the purpose of his visit to Ms. L.: "All we do is make sure that your rate does not go up for any reason for the next two years. Just it's called a protective rate." The Liberty agent then tells Ms. L. this "protection" is a free service: "You guys don't have to pay anything. There's no charges and no fee. Everything remains with ComEd." The agent then enrolls Ms. L. with Liberty without telling her the new rate.

87.    On an undated recorded in-person solicitation, a Liberty agent enrolls Ms. S. in Liberty's "rate protection program." Although the agent convinces Ms. S. to hand over her account number, she doesn't understand why the Liberty agent is at her door. "Now, this is for what?" she asks. "This," the agent responds, "is to make sure that you have a rate protection program." The Liberty agent then purports to show Ms. S. on her utility bill where proof of such "rate protection" would appear: "So in this portion right here, there should be a program that protects the account from rate increases, which means the price per kilowatt, so how much energy you use, okay? We want to make sure that that rate doesn't get any higher for you." He continues: "It kind of caps off the cost. So we want to make sure it [is] showing up. So when I plug in the account number, it'll tell me if it's—if the account has already been serviced." These statements are intended to make it seem like the agent is searching Ms. S.'s bill for an indication

19

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

that she is already taking part in some "rate protection program." And if she is not—that is, if her account has not "already been serviced"—then it is the agent's job to "service[]" it. Of course, nothing on Ms. S.'s utility bill indicates whether she is part of a "rate protection" "program." The Liberty agent is attempting to switch her electric supplier. The agent later explains that the "rate protection program" "does not guarantee financial savings" but that is because "it only effects [sic] the rate, not the usage." He makes clear that the only way Ms. S.'s bill will go up is if her usage goes up: "So if you use a lot more power, you'll still see that fluctuation there, we just make sure that the actual price per kilowatt does not go up for you, okay?" Ms. S. later asks if the new rate "will make my bill go up?" The agent's response once again makes it seem that the only factor that can make her bill go up is increased usage: "No, not necessarily. I can't say that it will make it go down, only because I don't know how much energy you use." Liberty enrolled Ms. S. for two years at 7.29 cents per kilowatt hour. Ameren's rate has always been between 2.7 and 6.6 cents per kilowatt hour in the last eight years since such rates have been publicly available on the ICC's website.

88.    On an undated recorded in-person solicitation, a Liberty agent tells Mr. K. that he is currently on a variable rate and that "means your rate can change at any time." The Liberty agent enrolls Mr. K. in a fixed rate at 10.29 cents per kilowatt hour. That rate is considerably higher than either ComEd or Ameren has charged for electricity supply since June 2011, the earliest date for which such rates are publicly available.

89.    On an undated recorded in-person solicitation, the recording begins with the consumer, Mr. W., asking a sales agent "with Liberty Power" if his electricity is "going to be changed over to Liberty." The sales agent lies to him: "No. You can still be with ComEd, okay?"

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

90.     On an undated recorded in-person solicitation, a Liberty sales agent tells Mr. W. that signing up with Liberty "is pretty much definitely going to save you for the summer with the rate increases." The agent presents his tablet for Mr. W. to sign the contract, apparently before the agent has disclosed the key terms. Mr. W. is wary: "No, I'm not signing—I'm not authorizing anything right? Until I know what the terms [are]." Liberty lies to Mr. W. about what he is signing: "You're updating your account." Mr. W. is concerned about the rate: "Yeah, because I need to know what the rate is based on what I'm paying right now. I don't want to pay a higher rate." The recording ends with the Liberty agent rushing Mr. W. into the third-party verification process before ever disclosing the new rate.

91.     On an undated recorded in-person solicitation, a sales agent "with Liberty Power" tells Mr. F. that "you'll be protected at 10 per cents per kilowatt for two years." The default utility rate has never risen above 8.8 cents per kilowatt hour in the last eight years of data that is publicly available on the ICC's website.

92.     On an undated recorded in-person solicitation, a sales agent "with Liberty Power" tells Ms. R. that "everything went through for you…you just get protected for two years at .0728 cents per kilowatt." At no time since June 2011, the earliest date for which the ICC lists Ameren's default utility rate, has Ameren charged above 6.6 cents per kilowatt hour.

93.     On an undated recorded in-person solicitation, a sales agent "from Liberty Power" enrolls Mr. C. on a fixed rate for two years at 11.104 cents. Mr. C. asks if his rate will go "higher or low." The Liberty agent avoids answering the question posed (about the rate) and instead diverts attention to the consumer's usage: "Well, it comes down to the usage." Mr. C. is looking to save money: "Yeah, because it was 84 bucks this month." The Liberty agent, attempting to direct the conversation away from price, tells Mr. C. about the environmental benefits of

21

Liberty's "100 percent green energy, which is a good benefit for the—you know, the environment." But Mr. C. is not interested in buying green energy: "Trump don't care about that shit." Mr. C. wants to save money on his electricity bill. And the Liberty agent has led Mr. C. to believe that Liberty is going door-to-door providing savings: "But you do this for everybody, right?" The agent answers: "Yeah, we're going from apartment to apartment."

94.    On an undated recorded in-person solicitation, a Liberty sales agent enrolls Mr. S. on a fixed rate for two years at 10.6 cents per kilowatt hour—nearly 2 cents higher than his utility's rate has ever risen throughout the previous eight years, according to the publicly available rate data compiled on the ICC website.

95.    On a recorded in-person solicitation from in or around October 2016, a sales agent "from Liberty Power" misrepresents the purpose of his visit to Ms. Z.: "So what I'm just going to do is just verify in the system and make sure your rates remain stable, so it won't allow your rates to increase or change for you, all right?...It'll be really fast….And you don't have to worry about dealing with this for two years, okay?" The Liberty agent makes it seem like he is locking in Ms. Z.'s *current* rate: "So it doesn't switch any billing or service from ComEd. It all remains the same. 10.627 per kilowatt, pretty much 10 pennies…." The agent repeats this misrepresentation that all he is doing is "stabilizing" Ms. Z.'s current rate: "So what happens, you get a letter from ComEd in seven to 10 days, just letting you know that [for] 24 months your rates are going to remain stable for your supply, so it won't allow it to fluctuate or change for you, okay?" And again: "So pretty much, yeah, it doesn't switch anything from your service or billing from ComEd, just stabilizes your rate for the 24 months." Had Ms. Z. purchased her electricity from ComEd, she would have paid only 5.888 cents per kilowatt hour, just over half the Liberty rate.

22

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

96.    On an undated recorded in-person solicitation, a sales agent "on behalf of Liberty Power" tells Mr. J. that the purpose of his visit is to "[m]ake sure that the rate stays fixed." The agent then tells him the new rate and misrepresents that Mr. J. is getting a good deal: "So it's fixed for—at 0.1069 cents per kilowatt, which is amazing. Congratulations." In the eight years of publicly available rate data on the ICC's website, the ComEd rate has not risen above 8.8 cents per kilowatt hour.

97.    On a recorded in-person solicitation in or around October 2018, a Liberty sales agent tells Mr. B. that the purpose of his visit is to "make sure you're not on a seasonal rate getting extra charges." The agent tells Mr. B. that he is on a "seasonal rate" with another ARES, AP Energy, "which is going to keep going up. It's going to get even more expensive with them." The Liberty agent may have learned Mr. B.'s supplier from looking at his electricity bill, but even assuming Mr. B. was receiving his supply from another ARES, the agent could not have known whether Mr. B. was on a "seasonal rate" rather than a fixed rate, or whether the rate from the other ARES "is going to keep going up." Liberty leads Mr. B. to believe that the "protection" it is offering is a benefit: "So that's why we're making sure you're on a protected rate. We do this every year for everybody." Liberty also misrepresents to Mr. B. what exactly he is signing. "What am I signing?" asks Mr. B., after Liberty presents him with the contract that will switch his supplier. Liberty responds: "Just to verify that I was here doing my job correctly, basically." When Mr. B. presses him, the Liberty agent admits the form calls for Mr. B. to agree to the key terms of the contract, including the rate. Later in the solicitation, Mr. B asks if he'll be saving money: "So I'm rejecting American Electric Power and signing up with you for a lower rate. Is that what the—." Liberty interrupts him: "Exactly." Shortly after Mr. B. tells the agent "You're talking too fast" and "This is getting more and more complicated" the recording ends abruptly.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

The fixed rate Liberty offers Mr. B is 10.5 cents per kilowatt hour. Mr. B.'s utility, ComEd, was charging only 6.792 cents per kilowatt hour.

98.    On a recorded in-person solicitation in or around October 2018, a sales agent "on behalf of Liberty Power" tells Mr. B. that "you will have a price reduction." Liberty tells Mr. B. that currently he's "on [the] open market, so you don't have price protection." "So right now I'm paying more?" asks Mr. B. The Liberty agents ducks the question but implies that he will save money with Liberty, assuming his usage doesn't increase: "It will still depend how much you use electricity." Liberty offers Mr. B. a fixed rate of 10.5 cents per kilowatt hour. Mr. B.'s utility, ComEd, was charging only 6.792 cents per kilowatt hour.

99.    On an undated recorded in-person solicitation, a sales agent "on behalf of Liberty Power" offers Mr. W. "price protection" at a fixed rate of 10.69 cents per kilowatt hour. But Mr. W. is confused. After Liberty presents him with a contract to sign, he says he doesn't "understand why I'm doing this, actually, because I just signed up with NRG [another ARES]." In response, the Liberty agent offers a new justification for his visit: "So we're just making sure that the supply—energy you're receiving is Illinois windmill energy."  Mr. W. does not seem to understand: "It's difficult to—I'm taking some heavy-duty medication right now." The sales agent immediately responds by complimenting Mr. W.'s "professional autograph" as he signs the contract, and he sends him to the third-party verification just before the recording abruptly ends. The "price protected" rate Liberty sold to Mr. W. was nearly 2 cents higher than the ComEd rate has ever been in the past eight years, according to publicly available rate data on the ICC's website.

100.    On an undated recorded in-person solicitation, a sales agent "with Liberty Power" tells Ms. L. "you just get protected for the two years at .0969 cents per kilowatt. Everything

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

about your bill stays the same. You stay with ComEd." "So—but how much does it cost me?"
Ms. L. asks. The Liberty agent's response leads Ms. L. to believe that the agent is "protecting"
her rate for free: "It doesn't cost you anything." Ms. L. is confused: "So why would anybody
want not to be protected?" "Exactly," says the Liberty agent. Switching to Liberty was not free
for Ms. L.: she would have paid less if she purchased her electricity supply from her utility,
ComEd.

      101.    On an undated recorded in-person solicitation, a sales agent "on behalf of Liberty
Power" tells Mr. A. "you'll start receiving the price protection for the next 24 months." Mr. A.
asks what it will cost: "Is it for free for a limitation time or a fee forever?" The Liberty agent
deceives Mr. A. by dodging the question: "It's—whatever you use in your apartment is what you
pay for….There's no extra fees. Just whatever you use is what you pay for, okay?" In fact,
Liberty enrolls Mr. A. at a fixed rate of 9.69 cents per kilowatt hour, which is higher than Mr.
A.'s utility rate has been in the last eight years, according to publicly available rate data on the
ICC's website.

      102.    On an undated recorded in-person solicitation, a sales agent "from Liberty Power"
tells Ms. C. she "will be protected for the next 24 months" at a fixed rate of 10.145 cents per
kilowatt hour. When Ms. C. asks if she will be "charge[d] anything," the Liberty agent lies to
her: "No, they're not going to charge anything." Ms. C. would have saved money if she
purchased electricity from her default supplier, ComEd.

      103.    On a recorded in-person solicitation from November or December 2019, a Liberty
sales agent offers Ms. N. "price protection to make sure that you don't fluctuate in the market."
Ms. N. interrupts the pitch: "I'm not getting any of this because I don't hear so well." But Ms.
N.'s comprehension is of little concern to Liberty. "This is just a script for me to get through it,"

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

says the agent as he continues to race through his script. Ms. N. cuts him off again: "I'm not signing up for anything." The Liberty sales agent conceals the purpose of the solicitation, which is to switch Ms. N.'s supplier: "You're just making sure that on the supply section, you're receiving two things, which is that price protection, like I mentioned, and pollution-free energy." Liberty enrolls Ms. N. for two years at a rate of 9.99 cents per kilowatt hour. Ms. N. could have paid only 6.72 cents per kilowatt hour with ComEd.

104.    On a recorded in-person solicitation from December 2019, a Liberty sales agent tells the consumer she is "going to be protected at a rate of 0.0719 cents per kilowatt" for the "next 24 months." Liberty urges the consumer, once the 24-month period expires, to "make sure that you sign and renew that so that you stay protected." The consumer could have paid only 4.71 cents per kilowatt hour with Ameren.

105.    On an undated recorded in-person solicitation, an agent "with Liberty Power" misrepresents to Ms. V. that he is merely "updat[ing]" her account. "So you get protected for two years at .1066 cents a kilowatt," the agent tells Ms. V. "So what am I signing up for?" she asks. The agent tells her that she's not signing up for anything, but instead he's just updating her account: "Oh, no. You're just an agreement—because basically your account wasn't updated. You don't have the protected rate. So basically now your rates are going to be protected for two years; so no matter where the rates go, yours won't go up."

*Better Business Bureau Complaints*

106.    Mr. W. complained to the Better Business Bureau in September 2019 that a Liberty door-to-door sales agent slammed him. The Liberty agent "came to my door and didn't introduce himself, only said that my power bill may be illegal and I could be in legal trouble so he needed to verify." Mr. W. told the Liberty agent that the electric account is in his roommate's

26

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

name. The Liberty agent then "forced me to hack her comed account and show him the details, which he copied without consent, and used that information to sell her electricity without her ever being notified."

107.    Ms. H. complained to the Better Business Bureau in June 2019 that a Liberty door-to-door sales agent slammed her. The agent "bullied" her underage child "to lie and say he was 18" in order to "agree" to switch electric suppliers. When Ms. H returned home, she saw the Liberty agent in her neighborhood, and the agent "proceeded to lie to [her] over and over." The agent had forged Ms. H.'s signature and enrolled her without her consent. Ms. H.'s complaint concludes: "Horrible sales practice and illegally enrolling me by forging my signature. Awful awful."

108.    Ms. E. complained to the Better Business Bureau in January 2017 about an interaction with a Liberty door-to-door agent. The agent told Ms. E. and her husband that Liberty "could save us money on our bill." Ms. E.'s husband said they were not interested. The agent responded that they "had to listen to the pitch or we would get evicted."

109.    Mr. B. complained to the Better Business Bureau in September 2017 that Liberty re-enrolled his elderly parents suffering from dementia even after he requested they be placed on the Do Not Call list. On July 24, 2017, Mr. B., who has power of attorney over his elderly parents' finances, told a Liberty representative that his parents "have dementia and are not capable of making decisions regarding finances." Liberty cancelled the account and returned Mr. B.'s parents to the utility. But two months later, on September 23, 2017, Mr. B. "received a letter from the local supplier…stating that my parents were being switched to Liberty Power again." Mr. B. reached back out to Liberty to once again cancel the account and put his parents on the Do Not Call list. Mr. B. contacted the utility and "discovered that the price Liberty Power was

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

charging for electricity was almost double the price from the local supplier. I feel this company is targeting elderly people especially after they were notified that my parents are not capable of making such decisions and they called again convincing them to make a decision they are not capable of making."

110.    Ms. S. complained to the Better Business Bureau in March 2018 that Liberty continues to solicit her elderly mother, who suffers from dementia, even though Ms. S. asked that her mother be placed on the Do Not Call list. According to her complaint: "I take care of my mom's billing due to the fact that she has dementia. Liberty power had got her to switch over to them (she didn't understand what it was about)." After cancelling, Liberty agents "still keep calling her trying to get her to switch back. I have called them, a couple of times, and told them to take her name off their list and to not call her anymore. They say they won't call her anymore. Last week they called while I was at her house. So I checked her caller ID and found that they call her every week day. I just want them to stop calling."

111.    Mr. M. complained to the Better Business Bureau in November 2017 that a Liberty telemarketing agent misrepresented the rate he was currently paying in order to switch his electric supplier. Liberty called Mr. M., then a 91 year-old World War II veteran living alone, and told him he "could save money on [his] utilities by switching from Ameren Illinois" to Liberty. Liberty quoted Mr. M. "a fixed rate of 8.055 cents per kwh" and said he "was currently paying more than that." If Mr. M. switched to Liberty, the agent said, his "bill of $83.48" would halve to "around $42." Based on these representations, Mr. M. "thought that was a great savings and said yes." After consulting with an energy consultant friend, Mr. M. realized he had been paying 5.795 cents per kilowatt hour, "which is considerably less than the Liberty Power quote," and conflicts with the Liberty agent's assertion that Mr. M. was "currently paying more" than

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

Liberty's rate of 8.055 cents per kilowatt hour. Mr. M. then searched the Illinois Commerce

Commission website, which listed Liberty's rate at 5.572 cents per kilowatt hour, not the 8.055

cents per kilowatt hour he was offered. When Mr. M. confronted Liberty with this discrepancy, a

Liberty customer service representative said "the rate on the internet was cheaper because it was

self service, not using a representative." Mr. M. sums up his experience with Liberty: "I want

Liberty Power to stop misleading consumers, especially senior citizens and veterans about their

utility charges. Had I not been friends with the energy consultant, I would have been horribly

overcharged by a company through deceptive practices."

112.    Ms. B. complained to the Better Business Bureau in September 2019 that Liberty

had switched her account without her permission. "I am the only person handling bills and I

never authorized a switch," she told a Liberty customer service representative. Ms. B. had "never

in [her] life heard of this company" and has "been with ComEd for over 50 years." Without her

knowledge, Liberty had switched her service back in October 2017. Her husband having recently

died, Ms. B. complained that she "cannot deal with this added stress of knowing that my account

was compromised."

113.    Mr. P. complained to the Better Business Bureau in July 2019 that a Liberty door-

to-door agent "entered my apartment complex despite a no solicitation sign…and tried

aggressively to sell me on switching to clean energy." The agent then "asked forcefully to see

[Mr. P.'s] most recent bill…[and] the agent then wrote down my contact info and account

number." Mr. P. continued: "I should have known better than to share any info, but as I was a bit

thrown off by the agent's presence in my building (as well as from the fatigue I faced while

taking care of my four month old during the exchange), I shared what was clearly too much of

my personal information and was forced to sign what I believe in retrospect was an enrollment

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

agreement." Believing that he was "duped into a scam," Mr. P. called ComEd the next day and learned that all Liberty needs to switch his supplier is his utility account number: "THE SAME ACCOUNT NUMBER THE AGENT WANTED SO FORCEFULLY TO SEE ON MY BILL. Duh. This left me feeling stupid, angry, and taken advantage of. Shame on this company for preying on unwitting individuals."

114.    Ms. M. complained to the Better Business Bureau in December 2016 that Liberty slammed her. Months after cancelling her service with Liberty, Ms. M. received an email saying that she had signed back up with the company. "I absolutely did not consent to be signed up for this reseller's services as I had not personally communicated with the company in months," she complained.

115.    Ms. D. complained to the Better Business Bureau in June 2016 that Liberty slammed her. "A sales person for [Liberty] came to my door trying to get me to switch power supply companies. I politely told them no I was not interested in switch[ing] and they said ok and left. I never signed anything or told them I wanted to switch. I just received my [C]omEd bill and it was switched to [Liberty] which was double the cost. It went from $70 to $150. When I called Liberty power company they stated I had signed for authorization to switch to them. I asked for a copy of the contract and when [I] received it the signature is not mine. They forged my name on the contract and switched me without my consent."

116.    Mr. C. complained to the Better Business Bureau in January 2016 that Liberty "told me the electric supplier in my area was switching to trick me into switching to Liberty Power by implying I had no choice." The Liberty sales agent "made it sound like the decision was being made for [Mr. C.], and that [he] had no choice." Mr. C. continues: "I received paperwork[] congratulating me on my 'decision' to switch to Liberty Power and researched it

some more, and figured out that I never had to switch at all. I was mislead [sic] into 'switching' to Liberty Power through deceitful marketing and sales tactics."

117.    Ms. W. complained to the Better Business Bureau in October 2019 that a Liberty door-to-door agent "claim[ed] to be apart [sic] of Comed" and "asked to view my bill and all of my Comed information." Ms. W. grew "suspicious" and "immediately told him to cancel my contract." "I…should not have to worry about being scammed by random compan[ies] in the comfort of my own home," she said.

118.    Mr. W. complained to the Better Business Bureau in March 2019 that a Liberty door-to-door agent had lied about his affiliation with ComEd. The Liberty agent "claimed to be 'with' ComEd, but then tried to get me to sign on my ComEd account on his phone. Turns out he works with Liberty Power. Our landlords approached him and asked if he was soliciting, and he denied it. They asked for his permit to solicit (given by the town) and he did not have one."

119.    Mr. H. complained to the Better Business Bureau in January 2019 that a Liberty sales agent slammed him. "A gentleman knocked at my condo and told my wife that he was here to update my billing information for [my] Commonwealth Edison power bill. He said it [is] to make sure the person on the bill was actually living there. My wife gave him my cell phone number and called me at work. He told me he needed my last 4 of my SS#. I asked him if this was a solicitation for another service, he said no. I gave him the number, he said thank you and hung up. My wife said he then called another number, gave him the SS#[,] hung up and went to the ne[x]t door in my condo complex." The Liberty agent had enrolled Mr. H. without his permission.

120.    Mr. H. complained to the Better Business Bureau in March 2019 that a Liberty door-to-door agent "claim[ed] to be from both ComEd and Liberty Power." The Liberty agent

31

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

"said he was updating my policy with ComEd but instead forced me into signing a contract instead of updating my information." The agent was "illegally on private property with no soliciting signs posted…and went to each person[']s door claiming to be from ComEd. This is a scam."

121.    Ms. S. complained to the Better Business Bureau in June 2019 that a Liberty door-to-door agent lied about his affiliation with ComEd in order to switch her service. Ms. S. explained that the Liberty agent "identified himself as a ComEd employee" and "informed my partner that he needed to see our power statement to check about a seasonal charge that wasn't supposed to be on there." Ms. S.'s partner handed over the utility bill and the agent "entered our account number in his iPad and started asking for further personal information." Ms. S. asked him on two separate occasions whether he worked for ComEd, and both times he said he did. The agent switched Ms. S.'s supplier even though she told him she was "not signing up for anything and would be contacting ComEd directly."

122.    Ms. A. complained to the Better Business Bureau in August 2016 that in the winter of 2015 "two Liberty Power salesmen…identified themselves as ComEd and stated that I must sign these documents because I am a ComEd customer." Ms. A. complained that, with Liberty as her supplier, her "bill has been higher than ever." She has resorted to "sometimes just refus[ing] to use electricity such as air conditioning, lamps, chargers, etc." because she "cannot afford to pay these bills."

123.    Mr. E. complained to the Better Business Bureau in November 2015 that a Liberty door-to-door agent lied about his affiliation with ComEd and "tricked" him into switching his supplier. The Liberty agent said that "he is from ComEd" and that Mr. E. "need[ed] to give them my ComEd account number so that they can take off extra charges from

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

my bill." Mr. E. "asked twice…if this [is] a mandatory procedure by ComEd, [and] he bluntly

lied and said yes." The agent also said that ComEd was "doing this to all other apartments in the

building." The agent "took my information including comed account number." The agent "made

me sign some document on the I-PAD."

124.    Ms. S. complained to the Better Business Bureau in May 2017 that Liberty's

"[d]oor to door salesmen use tricks and lies to get someone to switch." The Liberty agent "told

me I would be saving money" and that "I would still have the same electric company." Ms. S.

"ended up closing the door in his face because he wouldn't leave."

125.    Ms. M. complained to the Better Business Bureau in June 2018 about two

incidents with Liberty door-to-door salespeople. The first Liberty agent was "asking to see our

Ameren bill, with the promise of some sort of 'rebate.'" The next day another Liberty agent

came to her doorstep. That agent "was rude and instead of asking to see my Ameren bill he

demanded to see it saying that 'they need to update all units today.'" When Ms. M. told him she

didn't have the bill "he became even more rude demanding I find it, and that this NEEDS to be

done." This made Ms. M. "extremely uncomfortable."

126.    Ms. L. complained to the Better Business Bureau in August 2018 about three

interactions with Liberty door-to-door agents. "The first time," she complained, "I was told that

the representatives were from Ameren." The second time Ms. L. refused to open her door.

Liberty returned a third time. Ms. L. "advised the Liberty Power representative that there was no

solicitation in the building." The agent said she "was a peddler and not a solicitor" and said she

had a permit from the landlord to be in the building. But Ms. L. "know[s] this is a lie because it

was the landlord who advised us to call the police" on solicitors. After Ms. L. told the agent she

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

wasn't interested the agent responded that Liberty agents "will keep coming back until I switched my electrical services over to Liberty Power."

127.    Ms. K. complained to the Better Business Bureau in November 2016 that Liberty "continues to send outside sales agents to the apartment complex I manage despite our strict NO SOLICITING policy." Liberty's agents "knock on doors, threaten tenants and refuse to leave the complex. This has been going on for awhile [sic]. I had to call the police today because more than 20 tenants called us complaining of their scary and shady sales practices."

128.    Mr. T. complained to the Better Business Bureau in February 2016 about Liberty's deceptive telemarketing practices. A Liberty agent called Mr. T. and told him that "the electric power rates where [sic] going to rise next month." Mr. T. later contacted his utility, which told him "the rates where [sic] actually being lowered."

129.    Mr. R. complained to the Better Business Bureau in January 2016 that Liberty lied about his rate. Liberty told Mr. R. that his "electric bill would stay the same." But Mr. R. noticed that Liberty "charges nearly double" what he was paying. That "was not what I was told or signed up for."

130.    Ms. D. complained to the Better Business Bureau in November 2017 that a Liberty sales agent "told lies and manipulated me." Liberty "told me my bill with them would never be over $20." Liberty then charged Ms. D. $85 for her electricity supply.

131.    Ms. B. complained to the Better Business Bureau in February 2017 that Liberty lied to her about the rate she would be charged. The Liberty door-to-door agent "convinced me to switch power companies by telling me the rates would be cheaper than what I already had." After enrolling, Ms. B. discovered the "new rate was double what I had been paying."

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

132.     Ms. H. complained to the Better Business Bureau in May 2019 that calls from Liberty telemarketing agents "continue every day, sometimes multiple times per day," and the agent "is extremely rude and is harassing."

133.     Ms. P. complained to the Better Business Bureau in April 2019 that Liberty "lied to me to get my business." In the span of 10 days, Liberty called Ms. P. "at least 19 times." She also complained that a Liberty telemarketing agent "pretended to be Ameren."

134.     Ms. O. complained to the Better Business Bureau in May 2019 that a Liberty sales agent slammed her. Liberty's door-to-door sales agent asked for Ms. O.'s "ComEd bill because he needed to verify if they had the meter serial number on their account." The Liberty sales agents are "very pushy and demanding." After calling ComEd, Ms. O. was "mortified" to find out that she had been enrolled with Liberty since 2015, without her knowledge.

135.     Ms. Y. complained to the Better Business Bureau in July 2019 about Liberty's deceptive sales practices and harassment. Liberty sales agents had come to Ms. Y.'s door "at least once a week, every week for the past couple months." The sales agents have told Ms. Y. that they are there to "'look at your bill and see the charges and make corrections,'" to "'decrease the price,'" or to "'check your usage.'" Her complaints ends: "Stop harassing people."

136.     Ms. S. complained to the Better Business Bureau in November 2018 that Liberty "told me they were cheaper" than Ameren even though they are "not cheaper." According to Ms. S., Liberty "told me one thing and did another."

137.     Ms. A. complained to the Better Business Bureau in August 2019 that Liberty door-to-door sales agents "tried to scam me and took my account information." Two agents came to Ms. A.'s door "claiming that they came from our electricity service provider to get our information because we didn't have a service provider listed." After seeing Ms. A.'s ComEd bill,

35

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

the Liberty agents "started saying that since I didn't have a service provider information listed, they were going to send a 'welcome package.'"

138.    Mr. H. complained to the Better Business Bureau in August 2019 of a Liberty door-to-door agent harassing his wife. A Liberty agent asked to see the ComEd bill "to verify if we were getting a low enough rate for our electricity bill." After Mr. H.'s wife "stated she was not interested" the Liberty agent "aggressively persisted stating that this was a requirement in the state of Illinois and this is his job." Mr. H. complained that "this happens once a year for the past 3 years and I cannot find a way to get rid of these people."

139.    Mr. A. complained to the Better Business Bureau in September 2019 that a Liberty door-to-door agent slammed him. The Liberty agent made "it seem as though I needed to change electric suppliers and that his company would be taking over as the supplier while my current company would continue to be my provider." The agent then "requested to see my electric bill, took several pictures of the bill and proceeded to call someone at his home office who asked me several questions which they recorded." Twice Mr. A. asked the Liberty agent to "cancel everything." Liberty switched him, anyway. After receiving his welcome letter, Mr. A. called Liberty to cancel. But he was "put on hold for well over an hour and my call was not taken."

*Recorded Telemarketing Calls*

140.    On a February 24, 2017 recorded telemarketing call, a sales agent "calling with Liberty Power in regard to the Ameren account" contacts Ms. B. "just to let you know that after the next meter reading, you may be eligible to receive a new low rate and rate protection for 24

36

months." The agent makes it seem as though he is merely "appl[ying]" this "new low rate" and "rate protection" to her current Ameren account rather than switching her supplier: "I just have to verify the information with you to make sure it's applied to the correct account." The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. The Liberty agent refers to a nonexistent "program" to aid his pitch: "[T]his is a program sponsored by the state of Illinois and the utility commission" that is "designed for people that may be on a fixed income, large families, tight budgets, and people with disabilities, disability income, okay?" The agent then accuses Ameren, a highly regulated utility, of charging excessive rates: "They charge, like, distribution delivery fees, electric environmental adjustment fee, purchasing fee, purchasing electric adjustment, and transmission service charges, also a delivery service charge. These are fees that they're charging you for supposedly buying electricity for you. And what it typically does, to be quite honest with you, Ms. B., it about doubles the rate that you're paying for your electricity, okay?" After claiming to "look by your zone by your address," the Liberty agent tells Ms. B. "we see people paying anywhere from *12 and [a] half to 14 cents per kilowatt hour*" (emphasis added). But Ms. B., it turns out, is in luck: "Right now, the state is allowing us to offer it at about 10 cents. So at three to four cents less a kilowatt hour, that can be quite a savings for you." The agent's misrepresentations about the rate continue: He says that over the last four months Ameren's rates "have gone up…15 to 20 percent." In fact, Ameren's rates from October 2016 through January 2017 were stable: as low as 6.159 cents per kilowatt hour and never higher than 6.249 cents per kilowatt hour. The Liberty agent again misrepresents that the consumer will be enrolling in a state-sponsored "program" that Liberty somehow "administer[s]" on the state's behalf. Enrollment in this "program" is such a privilege, he tells Ms. B., that she will get "a letter from Ameren verifying that—congratulating you for enrolling in the choice program and getting

37

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

the fixed rate because it's a benefit for you." The Liberty agent elaborates on the "benefit" Ms.
B. will receive: "Understand that that's the only way we can do it if this helps you. [If] [t]his is
not going to save you money, I'm not allowed to enroll you." The new Liberty rate is 10.017
cents per kilowatt hour, which is almost 4 cents higher than Ms. M. would have paid to Ameren
for her electricity. Ms. B. does not know her utility account number, so the Liberty agent initiates
a conference call with Ameren, and instructs Ms. B. to ask for her utility account number. But
Ms. B. is confused. Her response to the Ameren representative, who has asked Ms. B. how she
can help her, reveals that she has not been following the conversation: "Oh, I don't know. I'm
supposed to have somebody give me my account number and I'm supposed to give it to
somebody. I don't know." After warning Ms. B. that giving her account number to the sales
agent will give him "full access to your account information," the Ameren representative asks
her what company the sales agent represents. Ms. B. doesn't know. Liberty proceeds with the
sale, anyway, enrolling Ms. B. in a 24-month contract at a price 60% above the utility.

141.    On a February 23, 2017 recorded telemarketing call, a sales agent identifies
herself as calling on behalf of Liberty and tells Mr. M. that she is "giving you a call today I have
information in regards to your ComEd electric account. Because as of your next meter reading,
sir, you will not receive price protection, as well as the new low fixed rate, so you're not subject
to anymore of the high increases that have already began on your bill." The Liberty sales agent
never asks for, or receives, Mr. M.'s consent to be solicited. Mr. M. asks the agent whether he is
currently receiving his electricity supply from Liberty. Despite not actually being able to access
this information, the Liberty agent tells Mr. M. that "you're actually on the open market which
means that your rates just went up 15 to 30 percent, and what we're going to try to do is give you
a new low rate." When Mr. M. later asks, again, whether he is currently receiving his electricity

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

supply from Liberty, the agent reverses herself and admits she's "not sure" who his current supplier is. Mr. M. asks if "this is supposed to be a lower rate now" with Liberty, to which the agent responds, "Yeah." "By enrolling into the energy choice program with Liberty Power, as your supplier, you're going to get that fixed rate for the next 12 months at 0.09921," says the Liberty agent, referring to a state-sanctioned "program" that does not exist. Mr. M. later asks, in reference to the 9.921 cents per kilowatt hour rate he is quoted, "This is a cheaper rate than I've got in my hand on the bill, right?" Liberty responds: "Exactly. Exactly." But the "new low rate" Liberty offers is 70% higher than the then-current ComEd rate of 5.818 cents per kilowatt hour. Near the end of the solicitation, the Liberty agent admits that she will be staying on the line throughout the third party verification: "I can hear the verification, Mr. M., but I can't speak with you." The agent later interrupts the third party verifier in the middle of the verification process.

142.    On a February 15, 2017 recorded telemarketing call, a sales agent says he is "calling from Liberty Power" to offer Ms. R. "the home independence plan, and for your electric, we are offering you [a] fixed rate, which is 0.10107 cents per kilowatt hour for the next 24 months, which will begin from February 2017. The best part is that this rate will not go up for the next 24 months." The worst part, which the Liberty agent fails to mention, is that Ms. R. could have been paying only 6.197 cents with her utility (Ameren) rather than over 10 cents with Liberty. That is over a 63% price increase for electricity, paid every month, for two years. The Liberty agent never asked for, and did not receive, Ms. R.'s consent to solicit.

143.    On an undated recorded telemarketing call, a sales agent calls Ms. J. "on behalf of Liberty power" "to set you up with wind renewable energy on your utility bill *at absolutely no cost to you*." (emphasis added). The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. Liberty asks for Ms. J.'s utility account number and begins the

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

process for switching her service before even disclosing the new rate or contract term. The Liberty agent once again assures Ms. J.: "You do qualify for this at no cost." Only within moments of transferring Ms. J. to the third part verifier does Liberty disclose the new rate of 10.731 cents per kilowatt hour. That rate is almost 2 cents higher than the default utility rate has been in over eight years, according to the ICC's publicly available data. The agent also admits that she will not drop off the line during the third party verification: "And if you have any more questions, I'm not going to drop the line."

144.    On an undated recorded telemarketing call, a sales agent calls Ms. J. "on behalf of Liberty Power" to "set you up with your renewable wind energy on your utility bill *at absolutely no cost to you*" (emphasis added). The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. The agent explains what she's offering: "[Y]ou're going to pay [a] fixed rate for the next two years so you're not going to have to worry about any rate increases. So that's a beautiful thing. You don't have to do anything." Ms. J. is wary: "I don't know if after it's not going to be more expensive. You know what? I'm not sure if I'm ready to do this." Liberty then guarantees savings: "And it's not going to – it's not going to make it more expensive because in the long run, you're going to save more money because you have a fixed rate for two years….You don't want to be on a variable rate and pay more than you have to, right?" Liberty never receives Ms. J.'s express consent to switch her energy supplier to Liberty. Just before moving Ms. J. onto the third party verification process, the Liberty agent first discloses "this low rate" of 10.731 cents. The default utility rate has not been over 8.8 cents since June 2011, the earliest date for which the ICC lists the comparable ComEd rate on its website.

145.    On an April 27, 2017 recorded telemarketing call, a sales agent "with Liberty Power" calls Ms. H. "in regards to the electric bill for the residence" "with a notification just in

regards to the price protection that you're entitled to on your electric supply portion of your bill."
The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. The
agent lies to the consumer about her current rate in order to make Liberty's rate seem attractive:
"[R]ight now over the open market *you're paying anywhere between 12 and 14 cents per*
*kilowatt hour* and, of course, what we'd be able to do is price protect you at a rate of only eight
and a half cents per kilowatt hour" (emphasis added). In fact, Ms. H. was only paying 5.9 cents
per kilowatt hour. So Liberty told Ms. H. she was paying over double the utility's rate in order to
sell her a new rate that was still 40% higher than the utility's rate. In order to sell the benefits of
"price protection," Liberty misrepresents that Ms. H.'s current rate "changes every single
month." Liberty also assures Ms. H. that her receipt of disability benefits makes her particularly
well-suited for paying 40% more for her electricity: "[T]his is specifically designed for people on
a fixed income." At one point, Ms. H. asks what she is currently paying. The Liberty agent
calculates her rate by walking Ms. H. through her bill and dividing her charges by her usage. But
the agent misrepresents her rate by combining her delivery charges ($35.95) with her supply
charges ($33.20), and then dividing that sum ($69.15) by her usage (558 kilowatts). The delivery
charge, however, has no bearing on consumers' electricity *supply* rate. Based on this misleading
miscalculation, the agent tells Ms. H. she is currently paying 12.39 cents per kilowatt hour. In
fact, she was only paying 5.9 cents per kilowatt hour ($33.20 in supply charges / 558 kilowatts).
During the third-party verification, the Liberty sales agent stays on the line.

146.    On an April 24, 2017 recorded telemarketing call, a sales agent "at Liberty
Power" begins his conversation with Mr. M. by misrepresenting the purpose of the call: "I'm just
following back up or following back up with you to make sure everything gets taken care of with
the price protection that you're entitled to." The Liberty agent does not tell Ms. M. that this is a

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

solicitation call, and he certainly never asks for, and does not receive, the consumer's permission to solicit. Instead, the Liberty agent tells Mr. M. that he is performing an administrative task on behalf of his utility, ComEd: "[O]ur job is to make sure that we promptly update the system." The sales agent claims to be fixing an error that will save the consumer money: "Definitely want to make sure you know your next meter reading coming up, you're going to start back receiving that price protection. Everything will remain the same with the billing, you're just going to get a more competitive price for the cost of your energy through Commonwealth Edison, all right?" The agent assures Mr. M. that "this is all for your protection." But Mr. M. wants to know how much he would save. The Liberty agent responds with the same inflated range heard in other sales calls: "Right now, most customers in your area—I just spoke with someone that stayed over there in Chicago. They were paying about 11 and a half to 12 cents, okay? We're going to bring that down to 10 cents. It's going to be 0.10063. That's pretty much 10 cents flat. That potentially saves most customers about 15 to 18 percent on their bill. So let's just say your monthly bill right now is at around $65, okay? Had we been your suppliers, your Commonwealth [Edison] bill, your electric price, it would have only been about $48.33." ComEd's then-current rate was 5.818 cents per kilowatt hour. So Liberty deceived Mr. M. into paying a 73% premium for his electricity by lying about the market rate and promising a 15% to 18% savings. In addition, the Liberty sales agent stays on the line during the third-party verification.

147.    On an undated recorded telemarketing call, a sales agent "on behalf of Liberty Power" calls Mr. H. to "set you up with renewable wind energy on your utility bill *at absolutely no cost to you*" (emphasis added). The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. Within seconds, Mr. H. asks: "Are you switching my electric service?" Liberty lies to him: "No. No, sir." The sales agent quotes Mr. H. a rate of 10.731 cents;

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

the ComEd rate has not been over 8.8 cents in the over eight years since such rates have been publicly available on the ICC's website. Mr. H. asks if this new rate is "increased" or if it is a "savings." Liberty again lies: "It's going to be a savings."

148.    On a February 15, 2017 recorded telemarketing call, a sales agent "from Liberty Power" calls Ms. L. to sign her up to pay a fixed rate of 10.107 cents per kilowatt hour for 24 months, which will then convert into a month-to-month "competitive variable rate with your utility company." The Liberty agent never asks for, and does not receive, Ms. L.'s permission to solicit. At the time of the call, the rate with Ms. L.'s utility (Ameren) was 6.197 cents per kilowatt hour.

149.    On an April 24, 2017 recorded telemarketing call, a sales agent "with Liberty Power" tells Ms. H. that she has "some important information in regards to your Ameren account, because as of your next meter reading, ma'am, your account will now start to receive price protection, as well as a new fixed rate, so no matter how high the rates go up on the bill, you're no longer subject to paying those higher rates." The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. Ms. H., it turns out, is already a Liberty customer. But that is of no concern to the agent, who simply converts the enrollment process into a re-enrollment process. Without knowing Ms. H.'s current rate, or even asking her what she is paying with Liberty, the sales agent plows ahead to offer her a "new low rate that we have available for you." The Liberty sales agent tells Ms. H. that she is merely "making sure that I gave you the fixed rate that you're entitled to." Liberty re-enrolls Ms. H. at a rate of 8.521 cents per kilowatt hour, which is well above the 5.996 cents per kilowatt hour Ms. H. would have paid with her utility, Ameren. Before sending Ms. H. to the third-party verification agent to confirm the re-enrollment, the Liberty agent admits she'll be staying on the line: "I can hear the

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

verification, Ms. H., but I can't speak to you, so if you have any questions, try to keep them until the end."

150.    On a March 16, 2017 recorded telemarketing call, a sales agent "with Liberty Power" informs Mr. B., who is "80-some years of age," that she "was giving you a call today in regards to your Ameren electric account, because as of your next meter reading, your account will now start to receive price protection mas [sic] well as a new low fixed rate." The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. The sales agent misrepresents the purpose of the call: "My job today is just to verify the information so we could go ahead and get your account price protected." Liberty enrolls Mr. B. in the "energy choice program" for 24 months at 9.881 cents per kilowatt hour. At the end of the 24-month term, Liberty tells Mr. B. that he can "return to Ameren's high open market variable rates, or you could see what new low rate Liberty Power may have for you at that time." At the time of the call, Ameren's "high open market variable rate[]" was only 6.071 cents per kilowatt hour; it has never risen above 6.6 cents in the last eight years since such rates have been publicly available on the ICC's website. A Liberty "floor supervisor" who was listening in on the third-party verification interrupts the third-party verification process.

151.    On an April 19, 2017 recorded telemarketing call, a sales agent "with Liberty Power" calls Mr. V. "with some important information regarding your electric account." "As of your next meter reading," the agent says, "you will be able to receive a price protection as well as a competitive rate with Liberty Power. My job today as your consultant is to make sure it is applied to your account today." The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. Liberty's promise of "price protection" and a "competitive rate" is enticing to Mr. V.: "I appreciate this help because, boy, this is out of hand. I'm on a fixed

44

income." Liberty quickly moves Mr. V. onto the third-party verification process to confirm the sale, where the third-party verification agent reminds him that his new rate will be 9.546 cents per kilowatt hour and tells him, for the first time, that he is enrolling in the "Liberty Green Plan," which allegedly "includes the voluntary purchase of renewable energy credits." Mr. V. is confused: "That wasn't—that wasn't made very clear to me exactly what I'm going to be paying per month because otherwise I—you know, I'm not benefitting anything, because I need my bill lowered." The sales agent as well as the "floor supervisor," who were both listening in on the third-party verification, interrupt the verification process. They then lie to Mr. V. about what he is currently paying. According to the "floor supervisor": "[R]ight now over the open market *you're paying anywhere between 13 and 14 cents per kilowatt hour*. What we're doing is we're price protecting it at the rate of 9.546 cents per kilowatt hour for the next 24 months. So you can see this is a significant difference in your supply rate….[T]his will make a significant difference in your bill" (emphasis added). Mr. V. asks one more time: "So this will be a substantial decrease still on my bill, right?" The "floor supervisor" assures him: "Oh, of course, because the rate that you're paying right now…*over the open market is around 14 cents*. So bringing that down to 9.5 is definitely going to make [a] significant difference" (emphasis added). At the time of the call, the rate with Mr. V.'s utility, Ameren, was 5.996 cents per kilowatt hour, over 3.5 cents cheaper than Liberty's "competitive rate."

152.    On a February 15, 2017 recorded telemarketing call, a sales agent "from Liberty Power" calls Mr. A. to offer him a fixed rate of "only" 10.107 cents per kilowatt hour for the next 24 months, to be followed by a month-to-month "competitive" variable rate. The Liberty agent never asks for, and does not receive, the consumer's permission to solicit. At the time of

45

the call, the rate with Mr. A.'s utility, Ameren, was 6.197 cents per kilowatt hour, nearly 4 cents

cheaper than Liberty's rate of "only" 10.107 cents per kilowatt hour.

153.    On a March 29, 2017 recorded telemarketing call, a "senior energy advisor with

Liberty Power" introduces himself only to be told by Ms. M. that she is "not interested, okay?"

The Liberty agent plows forward with the solicitation over the consumer's objection. He never

asks for, and does not receive, the consumer's permission to solicit. He misrepresents the

purpose of the call: "So you know the only reason that I'm calling, ma'am, is to go over the

information that [sic] are already prequalified for and to make sure that it's added to the correct

account….I mean, that's all, okay?" He next lies about the market rate for electricity: "[T]he

price that you guys have been paying for your electricity has been going up through the roof.

Like the last customer I just talked to was paying 13 cents. I mean, she went from paying $70 a

month on her electricity bill to 130, you know, and it kind of spooked her, but I showed her that

she went to 13 cents. All right? What we only want to do [sic] is the fixed rate that we offer is

the price protection. It's a fixed rate for the cost of the electricity for 24 months so no matter how

high these prices continuously may rise, you're not going to be affected by it. Your price will be

locked in, okay?" Ms. M. is wary: "But since I've been scammed so many times, what's my

guarantee that this will be true?" The Liberty agent reassures her that, unlike other ARES,

Liberty is not offering "one of those introductory prices that is good for the first couple months

and then it skyrockets on you." Liberty is offering a rate "for your protection" "because our job

is to offer you the best competitive price." Liberty once again misrepresents the market rate for

electricity in order to make its own inflated price seem like a deal: "*Instead of you paying around

12 cents*, would [sic] most customers I save -- that's 12 to 13 and a half. The highest I've seen it

in the last week was 13.8, okay? But I -- right now, it's only going to be at 0.09740" (emphasis

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

added). Ms. M. could have purchased her electricity supply through her utility, Ameren, for 6.071 cents per kilowatt hour.

154.    On an undated recorded telemarketing call, a Liberty agent calls Ms. P. to switch her electric supplier. The agent fails to identify the company he works for. The agent never asks for, and does not receive, the consumer's permission to solicit. The agent also misrepresents his purpose for calling: "[T]his call is in regards to your Ameren electric bill. And just to make sure you qualify for the benefits, ma'am, may I please have your zip code?" In fact, Liberty is not calling to check whether Ms. P. "qualif[ies] for the benefits"—whatever those may be. Liberty is calling to switch Ms. P.'s electric supplier. After Ms. P. responds with her zip code, the Liberty agent—based on this information alone—congratulates her because she is "qualified to receive this benefit on your Ameren electric bill for the next two years." Liberty tells Ms. P. that the rate she has "qualified for" is 8.055 cents per kilowatt hour. It is not until halfway through the call, after Ms. P. is told, repeatedly, that the purpose of the call is to apply "benefits" to her "Ameren electric bill" that she is "qualified for," that the agent identifies himself as a Liberty representative: "Now, please write down the name of the generation company, the sponsoring company that is sponsoring these benefits on your electric bill for two years. That is Liberty Power, ma'am, like Statue of Liberty. Liberty Power." Of course, Liberty is not "sponsoring" any "benefits" on Ms. P.'s Ameren bill. Liberty has just switched Ms. P.'s electric supplier. Had Ms. P. purchased her electricity with Ameren, and declined these "benefits" from Liberty, she would have paid between 2.7 and 6.6 cents per kilowatt hour for her electricity supply, rather than the 8.055 cents per kilowatt hour Liberty charged her.

155.    On an undated recorded telemarketing call, a Liberty agent calls Ms. W. to switch her electric supplier. The agent does not immediately state his name or the name of the company

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

he is representing. The agent never asks for, and does not receive, the consumer's permission to solicit. The agent says the call "is in regards to your electric bill," and he offers Ms. W. "[c]ongratulations" because, based solely on her zip code, she is "qualified to receive these benefits on your electric bill for next one year [sic]." The Liberty agent mentions these "benefits" to Ms. W. six times during the six-minute call. The rate Ms. W. has "qualified for" is 8.004 cents per kilowatt hour. Had Ms. W. purchased her electricity with her utility (Ameren), and declined these "benefits" from Liberty, she would have paid between 2.7 and 6.6 cents per kilowatt hour for her electricity supply.

156.    On a recorded telemarketing call placed in or around December 2017, a sales agent "from Liberty Power" calls Ms. H. to offer her "[c]ongratulations" because she is "eligible for getting a fixed rate on your Ameren electric bill." The agent never asks for, and does not receive, the consumer's permission to solicit. Liberty enrolls Ms. H. on a 24-month fixed rate of 8.107 cents per kilowatt hour. Ameren's rate was 6.068 cents per kilowatt hour.

## Liberty Uses Marketing Vendors as Its Agents

157.    Liberty has employed approximately 67 different companies since 2012 to market electricity supply on its behalf to Illinois consumers.

158.    Liberty exercises control over its sales representatives.

159.    For example, before a company begins telemarketing or in-person solicitations in Illinois on Liberty's behalf, Liberty approves the scripts or any changes to scripts that Liberty's sales representatives will use.

160.    Liberty's telemarketing and in-person solicitation scripts require sales agents to identify themselves as authorized representatives of Liberty. For example, scripts begin with

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

language substantially similar to the following: ██████████████████████████

████████████████████

     161.    ██████████████████████████████

████████████████████████████████████████

████████████████████████████████

     162.    Liberty exercises its control over sales representatives through training materials,

guidance documents, and training videos. ██████████████████████████████████

████████████████████████████████████████

████████████████████

     163.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

     164.    ██████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

     165.    ██████████████████████████████

████████████████████████████████

     166.    ██████████████████████████

████████████████████████████████████████████

██████████████████

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

167. 

168.

## VIOLATIONS OF SECTION 2 OF THE CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

169. Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, prohibits "unfair or deceptive acts or practices…in the conduct of any trade or commerce."

170. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 2 of the Consumer Fraud Act.

### Count I

### Misrepresentations Regarding Savings

171. Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

172. Through the means described in Paragraphs 39 to 48, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has represented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that:

    a)    Consumers will save money with Liberty;

    b)    The market rate for electricity supply is between 12 and 14 cents per kilowatt hour, and so enrolling in a two-year fixed rate anywhere below 12 cents per kilowatt hour is a benefit;

50

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

    c)    Consumers' electricity bills will only go up with Liberty if consumers use more electricity;

    d)    Consumers' electricity bills will stay the same;

    e)    The utility's rate is about to increase.

173.    In truth and fact, where Liberty has made the misrepresentations set forth in Paragraph 172 of this Complaint:

    a)    Consumers did not save money with Liberty.

    b)    The market rate for electricity supply is between 4 and 8 cents per kilowatt hour, and so enrolling in a two-year fixed rate above 8 cents per kilowatt hour is not a benefit.

    c)    Consumers' electricity bills will, and nearly always do, go up with Liberty because Liberty's electricity supply rate is nearly always higher than the default utility rate.

    d)    Consumers' electricity bills will, and nearly always do, go up—sometimes doubling or more.

    e)    The utility's rate stayed the same or decreased.

174.    The making of the representations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth as described in Paragraph 172 constitutes a deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

175.    Wherefore, the Plaintiff prays that this honorable Court:

    a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

b)   Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

c)   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)   Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)   Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)   Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

FILED DATE: 2/18/2020 10:40 AM  2020CH01954

g)      Assess a civil penalty as provided in Section 2FF of the Consumer Fraud
        Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with
        a disability;

h)      Require Defendant to pay all costs for the prosecution and investigation of
        this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS
        505/10; and

i)      Provide such other and further equitable relief as justice and equity may
        require.

### Count II

**Misrepresentations Regarding "Price Protection"**

176.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

177.    Through the means described in Paragraphs 49 to 55, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has represented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that:

a)      Consumers are currently on a variable rate, that rate can change "at any
        time," and therefore fixing the rate at anywhere below 12 cents per kilowatt
        hour provides a benefit to consumers;

b)      "Price protection" merely stabilizes consumers' current rates and protects
        against future price increases.

178.    In truth and fact, where Liberty has made the misrepresentations set forth in Paragraph 177 of this Complaint:

53

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

a)  Liberty representatives have no way of knowing whether consumers are on a variable rate. That rate (if variable) cannot change "at any time." Fixing the rate at 9 or 10 or 11 cents per kilowatt hour—a rate higher than the default utility rate has been in recent history—provides no benefit to consumers.

b)  "Price protection" locks consumers in a new, fixed rate higher than the default utility rate has gone in recent history, effectively guaranteeing consumers will pay more for their electricity supply.

179.  The making of the representations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth as described in Paragraph 177 constitutes a deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

180.  Wherefore, the Plaintiff prays that this honorable Court:

a)  Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

b)  Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

c)  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings),

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)    Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)    Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with disability;

h)    Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)    Provide such other and further equitable relief as justice and equity may require.

## Count III

**Misrepresentations Regarding Affiliation with Utility**

55

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

181.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

182.    Through the means described in Paragraphs 56 to 62, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has represented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that:

a)    The sales agent is merely contacting the customer to update the utility's system, verify the utility's information, or "confirm" the consumer's account information;

b)    The sales agent works for the utility;

c)    Customers are entitled to a rate reduction on their ComEd or Ameren electricity bill;

d)    The sales agent is affiliated with the utility because the sales agent has access to the customer's account information, including the name of the customer's electric supplier;

e)    The sales agent needs to see the customer's bill to confirm the serial number on the meter;

f)    The customer's electricity supply "may be illegal" so the sales agent needs to see the bill.

183.    In truth and fact, where Liberty has made the misrepresentations set forth in Paragraph 182 of this Complaint:

a)    The sales agent cannot update the utility's system and cannot verify the customer's utility information. The sales agent does not have access to this

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

information. By expressing an interest in updating or verifying the utility's information, Liberty's sales agents suggest they are affiliated with the utility. In fact, Liberty's sales agents are attempting to switch the customer's electric supplier to Liberty.

b)      The sales agent represents Liberty and never the utility.

c)      Customers are not "entitled to" a rate reduction. By using this expression, Liberty falsely implies that its sales agents work for the utility and are administering a benefit rather than switching consumers' electricity provider.

d)      The sales agent does not know whether a customer is receiving electricity supply from the utility or an alternative supplier. Only the utility and the consumer hold that information. By pretending to have this information, Liberty's sales agents suggest that they are affiliated with the utility.

e)      The sales agent has no lawful reason to know the serial number on a customer's meter. By pretending to need to know this information, Liberty's sales agents suggest that they are affiliated with the utility.

f)      The sales agent has no authority to determine whether a customer's electricity supply is "illegal." By pretending to have such authority, Liberty's sales agents suggest that they are affiliated with the utility.

184.    The making of the representations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth as described in Paragraph 182 constitutes a deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

185.  Wherefore, the Plaintiff prays that this honorable Court:

    a)  Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

    b)  Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

    c)  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

    d)  Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

    e)  Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

58

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

f)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with disability;

h)    Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)    Provide such other and further equitable relief as justice and equity may require.

<u>**Count IV**</u>

**Misrepresentations Regarding a State "Program"**

186.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

187.    Through the means described in Paragraphs 63 to 65, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has represented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that consumers are eligible for savings on their ComEd or Ameren electricity bills through a state-sponsored or state-sanctioned "program" "administered" by Liberty.

188.    In truth and fact, where Liberty has made the misrepresentations set forth in Paragraph 187 of this Complaint, there is no such state-sponsored or state-sanctioned "program"

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

through which consumers are "eligible" for savings on their electricity bills, and by referring to such a "program," Liberty falsely implies its sales agents are administering a benefit rather than switching consumers' electric supplier.

189.    The making of the representations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth as described in Paragraph 187 constitutes a deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

190.    Wherefore, the Plaintiff prays that this honorable Court:

a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

b)    Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

c)    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

d)      Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)      Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)      Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)      Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with disability;

h)      Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)      Provide such other and further equitable relief as justice and equity may require.

### VIOLATIONS OF SECTION 2EE OF THE CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

191.    Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE, specifically addresses fraud by electricity service providers, such as Liberty.

### Count V

### Slamming

61

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

192.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

193.    Under Section 2EE of the Consumer Fraud Act, "[a]n electric service provider shall not submit or execute a change in a subscriber's selection of a provider of electric service unless and until…the provider has obtained the subscriber's express agreement to accept the offer…." 815 ILCS 505/2EE.

194.    Slamming is the illegal practice of switching a consumer's electric supplier without permission.

195.    Through the means described in Paragraphs 66 to 69, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has stolen customers' utility account numbers and/or forged customers' signatures in order to switch customers' electric supplier to Liberty without their permission.

196.    Liberty's practices as described in Paragraph 195 constitute deceptive practices in violation of Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE.

197.    Wherefore, the Plaintiff prays that this honorable Court:

    a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

    b)    Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

c)    Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendant's violations of the Consumer Fraud

Act, including but not limited to, restitution as to all claims in the amount of

at least $77,191,092 (accurate as of Liberty's November 2019 billings),

rescission of contracts entered into between the Defendant and Illinois

consumers, the refund of monies paid, and the disgorgement of ill-gotten

monies;

d)    Revoke Defendant's Certificate of Service Authority to operate as an

alternative retail electric supplier in the State of Illinois;

e)    Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act,

815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an

additional $50,000 for each act or practice found to have been committed

with intent to defraud;

f)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud

Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly

consumer, defined as a person 60 years of age or older;

g)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud

Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with

a disability;

h)    Require Defendant to pay all costs for the prosecution and investigation of

this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS

505/10; and

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

i)      Provide such other and further equitable relief as justice and equity may

require.

**Count VI**

**Failure to Drop Off the Call During Third-Party Verification**

198.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to

170.

199.    Under the Consumer Fraud Act, "[a] supplier or supplier's sales representative

initiating a 3-way conference call or a call through an automated verification system must drop

off the call once the 3-way connection has been established." 815 ILCS 505/2EE.

200.    Through the means described in Paragraphs 70 to 72, and as exemplified in

representative consumer solicitations in Paragraphs 77 to 156, Liberty fails to drop off the call

during the third-party verification process once the 3-way connection has been established.

201.    Wherefore, the Plaintiff prays that this honorable Court:

a)      Award Plaintiff such preliminary injunctive and ancillary relief as may be

necessary to avert the likelihood of consumer injury during the pendency of

this action, and to preserve the possibility of effective final relief, including

but not limited to a preliminary injunction and the appointment of a

receiver;

b)      Enter a permanent injunction to prevent future violations of the Consumer

Fraud Act by Defendant;

c)      Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendant's violations of the Consumer Fraud

Act, including but not limited to, restitution as to all claims in the amount of

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)    Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)    Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)    Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with a disability;

h)    Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)    Provide such other and further equitable relief as justice and equity may require.

### Count VII

**Misrepresentations Regarding Affiliation With Utility**

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

202.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

203.    Under Section 2EE of the Consumer Fraud Act, "[a]n alternative retail electric supplier shall not utilize the name of a public utility in any manner that is deceptive or misleading, including, but not limited to implying or otherwise leading a consumer to believe that an alternative retail electric supplier is soliciting on behalf of or is an agent of a utility." 815 ILCS 505/2EE(b)(1).

204.    Through the means described in Paragraphs 56 to 62, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has represented, directly or indirectly, expressly or by implication, that:

  a)    The sales agent is merely contacting the customer to update the utility's system, verify the utility's information, or "confirm" the consumer's account information;

  b)    The sales agent works for the utility;

  c)    Customers are entitled to a rate reduction on their ComEd or Ameren electricity bill;

  d)    The sales agent is affiliated with the utility because the sales agent has access to the  customer's account information, including the name of the customer's electric supplier;

  e)    The sales agent needs to see the customer's bill to confirm the serial number on the meter;

  f)    The customer's electricity supply "may be illegal" so the sales agent needs to see the bill.

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

205.    In truth and fact, where Liberty has made the misrepresentations set forth in

Paragraph 204 of this Complaint:

a)    The sales agent cannot update the utility's system and cannot verify the

customer's utility information. The sales agent does not have access to this

information. By expressing an interest in updating or verifying the utility's

information, Liberty's sales agents suggest they are affiliated with the

utility. In fact, Liberty's sales agents are attempting to switch the customer's

electric supplier to Liberty.

b)    The sales agent represents Liberty and never the utility.

c)    Customers are not "entitled to" a rate reduction. By using this expression,

Liberty falsely implies that its sales agents work for the utility and are

administering a benefit rather than switching consumers' electricity

provider.

d)    The sales agent does not know whether a customer is receiving electricity

supply from the utility or an alternative supplier. Only the utility and the

consumer hold that information. By pretending to have this information,

Liberty's sales agents suggest that they are affiliated with the utility.

e)    The sales agent has no lawful reason to know the serial number on a

customer's meter. By pretending to need to know this information, Liberty's

sales agents suggest that they are affiliated with the utility.

f)    The sales agent has no authority to determine whether a customer's

electricity supply is "illegal." By pretending to have such authority,

Liberty's sales agents suggest that they are affiliated with the utility.

67

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

206.    The making of the representations as set forth as described in Paragraph 204 constitutes a deceptive or misleading use of the name of the public utility in violation of Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE.

207.    Wherefore, the Plaintiff prays that this honorable Court:

a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

b)    Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

c)    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)    Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)    Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)     Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)     Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with disability;

h)     Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)     Provide such other and further equitable relief as justice and equity may require.

## VIOLATIONS OF THE TELEPHONE SOLICITATIONS ACT

208.    Defendant has initiated, or caused its agents to initiate, "[t]elephone solicitation[s]" to Illinois consumers, as that term is defined in the Telephone Solicitations Act, 815 ILCS 413/5.

209.    Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, requires a telesales agent to "immediately state his or her name, the name of the business or organization being represented, and the purpose of the call."

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

210.    Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, requires a telesales agent to "inquire at the beginning of the call whether the person called consents to the solicitation."

211.    A knowing violation of the Telephone Solicitations Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 413/25(e) and 815 ILCS 505/2Z.

## Count VIII

### Telemarketing Without Immediately Disclosing Liberty's Name

212.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to 170.

213.    Through the means described in Paragraphs 73 to 74, and as exemplified in representative consumer solicitations in Paragraphs 77 to 156, Liberty has knowingly solicited customers without immediately naming the business it represents, Liberty Power.

214.    Liberty's practices as described in Paragraph 213 constitute violations of Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, as well as Section 2Z of the Consumer Fraud Act, 815 ILCS 505/2Z.

215.    Wherefore, the Plaintiff prays that this honorable Court:

a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction;

b)    Enter a permanent injunction to prevent future violations of the Telephone Solicitations Act and Consumer Fraud Act by Defendant;

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

c)   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Telephone Solicitations Act and Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)   Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)   Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)   Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)   Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with a disability;

h)   Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

71

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

i)    Provide such other and further equitable relief as justice and equity may

require.

## Count IX

### Telemarketing Without Consent

216.    Plaintiff re-alleges and incorporates by reference the allegations in Paragraphs 1 to

170.

217.    Through the means described in Paragraphs 75 to 76, and as exemplified in

representative consumer solicitations in Paragraphs 77 to 156, Liberty has knowingly solicited

customers without inquiring at the beginning of the call whether the person called consents to the

solicitation.

218.    Liberty's practices as described in Paragraph 217 constitute violations of Section

15 of the Telephone Solicitations Act, 815 ILCS 413/15, as well as Section 2Z of the Consumer

Fraud Act, 815 ILCS 505/2Z.

219.    Wherefore, the Plaintiff prays that this honorable Court:

a)    Award Plaintiff such preliminary injunctive and ancillary relief as may be

necessary to avert the likelihood of consumer injury during the pendency of

this action, and to preserve the possibility of effective final relief, including

but not limited to a preliminary injunction and the appointment of a

receiver;

b)    Enter a permanent injunction to prevent future violations of the Telephone

Solicitations Act and Consumer Fraud Act by Defendant;

c)    Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendant's violations of the Telephone

FILED DATE: 2/18/2020 10:40 AM    2020CH01954

Solicitations Act and Consumer Fraud Act, including but not limited to, restitution as to all claims in the amount of at least $77,191,092 (accurate as of Liberty's November 2019 billings), rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

d)   Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

e)   Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 per deceptive act or practice and an additional $50,000 for each act or practice found to have been committed with intent to defraud;

f)   Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

g)   Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF, of $50,000 for each violation against a person with a disability;

h)   Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

i)   Provide such other and further equitable relief as justice and equity may require.

73

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

Respectfully submitted,


THE PEOPLE OF THE STATE OF ILLINOIS,
by KWAME RAOUL,
Attorney General of the State of Illinois


BY:  /s/ Aaron Chait

Thomas J. Verticchio
Assistant Chief Deputy Attorney General
Aaron Chait
Darren Kinkead
Caitlyn McEllis
Krenice Roseman
Assistant Attorneys General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Phone: (312) 814-3659
tverticchio@atg.state.il.us
achait@atg.state.il.us
dkinkead@atg.state.il.us
cmcellis@atg.state.il.us
kroseman@atg.state.il.us
Attorney No: 99000

FILED DATE: 2/18/2020 10:40 AM   2020CH01954

**VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

 /s/ Aaron Chait
Assistant Attorney General