UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| **In re:** | **Chapter 11 Cases** |
| **LIBERTY POWER HOLDINGS, LLC,** | Case No. 21-13797-SMG |
| **LPT, LLC,** | Case No. 21-15537-SMG |
| **LIBERTY POWER MARYLAND, LLC,** | Case No. 21-15539-SMG |
| **LIBERTY POWER DISTRICT OF COLUMBIA, LLC,** | Case No. 21-15540-SMG |
| **Debtors.** _____/ | (Jointly administered 21-13797-SMG) |

**DEBTORS' REPLY TO OBJECTION OF COMMONWEALTH EDISON COMPANY TO DEBTORS' EXPEDITED MOTION TO COMPEL COMMONWEALTH EDISON COMPANY TO COMPLY WITH SALE ORDER [ECF NO. 385] AND FACILITATE TRANSFER OF DEBTORS' LOW-INCOME CUSTOMER CONTRACTS TO BUYER AND THE DEBTORS' SUPPLEMENT THERETO**

**(Hearing Set for May 18, 2022 at 2:30 p.m.)**

Liberty Power Holdings, LLC ("Holdings"), Liberty Power District of Columbia, LLC ("Liberty District of Columbia"), LPT, LLC ("LPT") and Liberty Power Maryland, LLC ("Liberty Maryland")(collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this *Reply* (the "Reply") to the *Objection* [ECF No. 666] of Commonwealth Edison Company ("ComEd") (the "Response") to the *Debtors' Expedited Motion To Compel Commonwealth Edison Company To Comply With Sale Order [ECF No. 385] and Facilitate Transfer Of Debtors' Low-Income Customer Contracts To Buyer* [ECF No. 630] and the Debtors' *Supplement* thereto [ECF No. 651] (collectively, the "Motion to Compel"). The Motion to Compel seeks entry of an order compelling ComEd to comply with this Court's *Order (I) Approving Sale Of The Purchased Assets Free And Clear Of Liens, Claims, Encumbrances, And Other Interests, (II) Authorizing Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases In*

1

*Connection Therewith And (III) Granting Related Relief* [ECF No. 385] (the "Sale Order") and to facilitate the transfer of approximately 994 residential low-income customer contracts enrolled by the Debtors in the State of Illinois (collectively, the "Customer Contracts")[1] to Direct Energy (as defined below) pursuant to the Sale Order. In support of this Reply, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

ComEd advances two principal arguments in its Response as to why the Court should deny the Debtors' Motion to Compel, namely because (i) Illinois law prevents ComEd from transferring the Debtors' low income customers in Illinois to Direct Energy Services, LLC ("Direct Energy") (the Illinois affiliate of NRG Retail, LLC ("NRG")) because Direct Energy is not a registered participant in the Savings Guarantee Program (as defined in the Response) in Illinois, and (ii) ComEd was never properly served with any of the Sale Pleadings. As outlined below, ComEd's arguments fail for several reasons and therefore the Court should overrule ComEd's objection and grant the Motion to Compel.

First, it is important to note that ComEd takes no position in the Response on the Sale Order or any of the Sale Pleadings and, in fact, does not even address or challenge any of the applicable provisions of the Sale Order discussed in the Motion to Compel. Rather, ComEd relies entirely on its argument regarding lack of notice. ComEd's "notice" analysis in the Response, however, misses the mark. ComEd argues that the Debtors were required to serve the Sale Pleadings

---

[1] A schedule of the low-income Customer Contracts by contract number is attached to the Motion to Compel as Exhibit "A". In the Motion to Compel, the Debtors were seeking to transfer 1,015 low income Customer Contracts based on information provided by ComEd. Since filing the Motion to Compel, ComEd has advised that 21 of such Customer Contracts are not low income and so the Debtors are removing those 21 from the Motion to Compel, leaving 994. Of the 21 Customer Contracts, 10 of them are being transferred to Direct Energy and the remaining 11 have been blocked by the customer and are in the process of being returned to standard service.

2

pursuant to Bankruptcy Rules 6004(c), 9014 and 7004(b)(3). However, such Bankruptcy Rules do not apply because Rule 6004(c) only applies to secured creditors, which ComEd is not, Rule 9014 only applies if Rule 6004(c) applies, which it does not, and Rule 7004 only applies in an adversary proceeding, which does not exist. Rather, as discussed below, the applicable Bankruptcy Rules are Rules 2002(a)(2), 2002(c)(1) and 6004(a). When the Debtors served the Renewed Sale Notice on ComEd on August 25th and 26th, 2021 at its P.O. Box mailing address (which ComEd does not dispute) [ECF Nos. 323, 650, 654], the Debtors complied with and satisfied Bankruptcy Rules 2002(a)(2), 2002(c)(1) and 6004(a). As a result, ComEd received proper, adequate, timely and sufficient notice of the proposed sale of the Debtors' Customer Contracts to Direct Energy, and therefore is bound by the Sale Order.

Second, ComEd asserts that Illinois law prevents the Debtors from transferring the Illinois Customer Contracts to Direct Energy unless and until Direct Energy becomes a "registered participant in the Savings Guarantee Program." However, as outlined below, ComEd's interpretation of Illinois law is not only inconsistent with the plain language of the applicable state statutes and regulations, but it also defies logic and common sense. Moreover, as discussed below, ComEd's reliance on Section 365(c) of the Bankruptcy Code and 28 U.S.C. §959(b) is misplaced as such provisions simply do not apply to the present situation.

A. **ComEd received proper, adequate, timely and sufficient notice of the Sale Order, and is bound by its terms.**

1. As discussed above, ComEd argues that it did not receive "actual" notice of the Sale Pleadings or the Sale Order until after the sale closed, and therefore it is not bound by the Sale Order. *See* Response at ¶51. In connection therewith, ComEd asserts that the Debtors were required to serve the Sale Pleadings on ComEd pursuant to Bankruptcy Rules 6004(c), 9014 and 7004(b)(3), and that such service was required to be made on "an officer, a managing or general

agent, or to any other agent authorized by appointment or by law to received service of process" of ComEd. *See* Response at ¶50.

2. However, the Bankruptcy Rules cited by ComEd in support of its notice argument simply do not apply to the present situation. Specifically, Bankruptcy Rule 6004(c) only applies to service of sale pleadings on parties with liens or other interests in the property proposed to be sold, *i.e.* secured creditors, when such sale is to be free and clear of such creditors' liens or other interests in the property being sold. To be clear, ComEd is not a secured creditor in these Chapter 11 cases, does not have any lien on, or other interest in, the Debtors' Customer Contracts that were sold to NRG, and has not asserted any such rights in these Chapter 11 cases. As a result, because Bankruptcy Rule 6004(c) does not apply to ComEd, then by its express terms, Bankruptcy Rule 9014 also does not apply to ComEd. In addition, Bankruptcy Rule 7004(b)(3) only applies to the service of a summons in an adversary proceeding. While the Court recently directed the Debtors to serve the Motion to Compel on ComEd pursuant to Rule 7004, such service was not required for any of the Sale Pleadings, and clearly no adversary proceeding has been filed against ComEd.

3. Contrary to ComEd's notice arguments, Bankruptcy Rule 6004(a) makes clear that "notice" of the sale of property shall be made pursuant to Bankruptcy Rules 2002(a)(2) and (c)(1). Bankruptcy Rule 2002(a)(2) makes clear that "notice" of any proposed sale shall be "by mail" and Bankruptcy Rule 2002(c)(1) provides that any such "notice" shall "include the time and place of any public sale, the terms and conditions of any private sale and the time fixed for filing objections." When the Debtors served the Renewed Sale Notice on ComEd on August 25th and 26th, 2021 at its P.O. Box mailing address (which address ComEd does not dispute)[2] [ECF Nos.

---

[2] ComEd admits that the P.O. Box address is a general mailing address at which ComEd receives numerous mailings per day. As a result, based on the Supplemental Certificate of Service filed by Stretto [ECF No. 650], Stretto mailed the Renewed Sale Notice and the Order Continuing Sale Hearing on ComEd at such P.O. Box address and therefore ComEd is presumed to have received the Renewed Sale Notice and the

323, 650, 654], the Debtors satisfied Bankruptcy Rules 2002(a)(2), 2002(c)(1) and 6004(a).  In serving the Renewed Sale Notice, the Debtors also complied with Local Rule 2002-1(H)(3) for chapter 11 cases with more than 75 creditors.  The Renewed Sale Notice clearly delineates the sale pleadings that were filed, the proposed sale of substantially all of the Debtors' assets, the bid deadline for such sale (August 30, 2021 at 2:00 p.m.), the auction date for such sale (September 1, 2021 at 9:00 a.m.), and the date of the sale hearing (September 10, 2021 at 1:30 p.m.).  Moreover, the Renewed Sale Notice made specific reference to all of the other related sale pleadings and encouraged all parties in interest to review such documents, including providing information as to how any such party in interest could obtain such pleadings.  Importantly, the Court also entered its Order Continuing Sale Hearing [ECF No. 320], which was also properly served on ComEd on August 25th and 26th, 2021 [ECF No. 650]. The Order Continuing Sale Hearing specifically contained the respective deadlines (ie. September 7, 2021 at 5:00 p.m.) for any party in interest to object to the proposed sale and/or to object to the assumption and assignment of any of the Debtors' Customer Contracts to NRG and its affiliate, Direct Energy.

4. As a result of the above, ComEd received proper, adequate, timely and sufficient notice of the proposed sale of the Debtors' Customer Contracts.  Therefore, ComEd is bound by the terms of the Sale Order.  Because ComEd has not contested (or even addressed) the provisions of the Sale Order, the Debtors request that the Court enforce such provisions to compel ComEd to facilitate the transfer of the Debtors' low income Customer Contacts in Illinois to Direct Energy, as the assignee of NRG Retail.

---

Order Continuing Sale Hearing. *See In re TFLO, LLC*, 572 B.R. 391, 431-433 (Bankr. S.D. Fla. 2016) (citing, *Konst v. Fla E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996) ("presumption of receipt arises upon proof that the item was properly addressed, had sufficient postage, and was deposited in the mail"))). Whether ComEd receives numerous daily mailings to that P.O. Box or only a few is not relevant to the fact that ComEd received such notice  *Id.* at 432; *See also, Anderson v. Branch Banking & Trust Co.*, 119 F.Supp.3d 1328, 1341 (S.D. Fla. 2015) (mere denial of receipt is insufficient to rebut presumption).

**B.    ComEd's reliance on Section 365(c) of the Bankruptcy Code and 28 U.S.C. §959(b) is misplaced.**

5.    Section 365(c) of the Bankruptcy Code provides:

> The Trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if –
>
> (1)(A) applicable law excuses **a party**, other than the debtor, **to such contract or lease** from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) **such party** does not consent to such assumption or assignment;….

(emphasis added).  Importantly, ComEd is not a party to any of the Debtors' Customer Contracts. As a result, the Debtors submit that this Court does not need to go beyond the plain language of Section 365(c) itself to determine that Section 365(c) simply does not apply in these Chapter 11 cases *vis a vis* ComEd.

6.    28 USC § 959(b) states:

> Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage **and operate** the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

(emphasis added).  In the instant case, the Debtors are not operating, but merely maintaining status quo until such assets can be fully liquidated and transferred to Direct Energy (a process that ComEd is thwarting).  In fact, as a direct result of ComEd's refusal to comply with the Sale Order, Illinois state law requires that the Debtors' must continue to provide services to its customers until there is a new supplier in place.  The Debtors have continued to provide such services.

7. The majority of courts hold that a trustee's obligation to comply with state laws under Section 959(b) applies only when the trustee continues to operate the debtor's business. *In re Globe Bldg. Materials*, 345 B.R. 619, 637 (Bankr. N.D. Ind. 2006). The Eleventh Circuit has noted, quoting *Vass v. Conron Bros. Co.*, 59 F.2d 969, 971 (2d Cir.1932), that to 'merely to hold matters in the status quo; to mark time, as it were; to do only what is necessary to hold the assets intact; such activities are not a continuance of the business." *In re N.P. Mining Co.*, 963 F.2d 1449, 1460 (11th Cir. 1992). In *N.P. Mining*, the trustee liquidated the debtors' assets, but was required to engage in coal brokering to keep an asset (an executory contract) alive after the debtor's mining operations had ceased and that such brokering was to maintain the status quo and protect an asset of the estate. *Id.* at 1461.

8. Further, Courts have held that state or local laws are preempted where compliance with those laws would frustrate a liquidation. See e.g., *In re Baker & Drake, Inc.,* 35 F.3d 1348, 1353–54 (9th Cir. 1994); *In re Ray*, 355 B.R. 253, 257–58 (Bankr. D. Ore. 2006); *In re Shenango Group, Inc.*, 186 B.R. 623, 628 (Bankr.W.D.Pa.1995). Pursuant to Section 365(a) of the Bankruptcy Code, a debtor can maximize the value of its estate by accepting contracts that are beneficial to it and rejecting those that are not. *In re Dial-A-Mattress Operating Corp., et al*, 2009 WL 1851059 (Bankr. E.D. NY 2009), citing *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr.S.D.N.Y.2003). The Debtors submit that the HEAT Act cannot impair their rights under Section 365. *See*, *In re City of Vallejo*, 403 B.R. 72, 77 (Bankr.E.D.Cal.2009) ("Congress enacted section 365 to provide debtors the authority to reject contracts ... [t]his authority preempts state law by virtue of the Bankruptcy Clause [and] the Supremacy Clause."); *In re Tom Stimus Chrysler–Plymouth, Inc.*, 134 B.R. 676, 679 (Bankr.M.D.Fla.1991) (Holding that Section 365 of the

Bankruptcy Code governs the assumption or rejection of a contract, even if the agreement otherwise would have been terminated under Florida dealer laws).

9. In the instant case, there should be no dispute that ComEd is frustrating the liquidation process and that the Debtors are maintaining the status quo until such time as ComEd accepts the Customer Contracts which are the subject of the Motion to Compel.

10. Moreover and importantly, even if Section 959(b) applied to the present situation, as discussed below, the Debtors are, in fact, in compliance with Illinois state law not only in respect of the service provided by the Debtors under the applicable Customer Contracts, but also in their attempt to transfer such Customer Contracts to Direct Energy pursuant to this Court's Sale Order, which ComEd had notice of, did not object to and is bound by.

**C.    The plain reading of the applicable provisions of Illinois state law do not prohibit the transfer of the Debtors' low income Customer Contracts.**

11. In the Response, ComEd asserts that its interpretation of the HEAT Act and related regulations prohibits ComEd from accepting and processing a transfer of the Debtors' low income Customer Contracts to Direct Energy because Direct Energy is not a registered participant in the Savings Guarantee Program in Illinois. At the outset, ComEd also points out, correctly, that the Debtors are not registered participants in the Savings Guarantee Program in Illinois. The Debtors apologize to the Court and to ComEd for the mis-statement in paragraph 17 of the Motion to Compel. However, to be clear and as discussed below, the fact that the Debtors are not and were not registered participants in the Savings Guarantee Program exposes the fallacy in ComEd's arguments because it is inconsistent at best to allow the Debtors to continue servicing the Customer Contracts and not allow Direct Energy to service the very same Customer Contacts when both of them are not registered participants.

12. The majority of the Debtors' low income Customer Contracts at issue in the Motion to Compel (approximately 80%) were entered into and enrolled by the Debtors ***prior to*** the effective date of the HEAT Act, which was January 1, 2020. As a result, such Customer Contracts – even if the customers thereunder are receiving public energy assistance funds – simply were not and are not subject to the provisions of the HEAT Act. Moreover, the Debtors were not prohibited from entering into and enrolling such customers even though the Debtors were not registered participants in the Savings Guarantee Program.

13. The balance of the Debtors' low income Customer Contracts at issue in the Motion to Compel (approximately 20%) were entered into after the effective date of the HEAT Act. The Debtors assert that they properly enrolled such customers and, importantly, ComEd processed such enrollments without any reference to whether those customers were "low income" and therefore could not be enrolled based on the Debtors not being a registered participant in the Savings Guarantee Program. To be clear, the Debtors would not know if such customers were "low income" and received financial assistance, and needed to rely on ComEd to advise them accordingly. The Debtors did not learn from ComEd that these customers – despite being properly enrolled post-effective date - were or became "low income" customers until December 2021 when the Debtors proposed to transfer them to Direct Energy. As a result, the Debtors assert that these Customer Contracts did not violate the HEAT Act when originally enrolled and as such should be treated the same as the proposed transfer of Customer Contracts that were enrolled prior to the effective date of the HEAT Act.

14. As a result, the main issue before the Court in connection with the Motion to Compel is whether the HEAT Act applies to prevent the "transfer" of the Debtors' Customer Contracts. In the Debtors' Supplement, the Debtors cite to the applicable provision of the HEAT

Act that makes clear that a retail electric supplier (an "RES") "*shall not knowingly submit an **enrollment** to change a customer's electric supplier if*" the customer at issue either received financial assistance within the past 12 months or is currently receiving financial assistance. *See* Supplement at ¶3. The Debtors also focused the Court on the language of subsection (c) of Section 16-115E of the HEAT Act which makes clear that only an "*agreement entered into between an [RES] and a customer in violation of this Section is void and unenforceable.*" *Id.* By its plain language, the HEAT Act does not prevent a "transfer" of an already existing Customer Contract, but rather only prohibits an "enrollment" of a customer. It is axiomatic that a "transfer" is not the same thing as an "enrollment." In support thereof, the Debtors referred the Court in the Supplement to a definition of the term "enrollment," which definition makes clear that an "enrollment" occurs only when (i) a customer *first* makes contact with a retail electric supplier and then enters into a contract with that supplier, and (ii) the supplier submits a direct access request to the utility to effect the customer's contract. This sequence of events does not apply to a "transfer" of an existing Customer Contract between one RES and another RES.

15. Importantly, in the Response, ComEd does not reference any of the above provisions of the HEAT Act and does not challenge or refute the Debtors' arguments in connection therewith. Specifically, ComEd does not attempt to explain why a "transfer" is the same as an "enrollment" under the HEAT Act. ComEd's failure to do so speaks volumes, especially when these provisions are the crux of the HEAT Act provisions.

16. Moreover, common sense supports the Debtors' interpretation of these provisions. Specifically, ComEd does not assert that the Debtors are prohibited from continuing to service the low income Customer Contracts subject of the Motion to Compel – even though the Debtors are not registered participants in the Savings Guarantee Program. ComEd also does not assert that the

Debtors' low income Customer Contracts are void and unenforceable because they violate the provisions of the HEAT Act. In fact, ComEd has no objection to the Debtors continuing to service the low income customers under the applicable Customer Contracts. Importantly, the proposed transfer of the Debtors' low income Customer Contracts from the Debtors to Direct Energy has no effect whatsoever on the Debtors' customers or the terms of the Debtors' Customer Contracts. Rather, the terms of such Customer Contacts will remain exactly the same, with the only difference being that Direct Energy will be the electric provider in place of the Debtors. ComEd offers no explanation as to why the Debtors can continue to provide service under such terms and Direct Energy cannot do so (especially when both the Debtors and Direct Energy are not registered participants in the Savings Guarantee Program). ComEd also does not explain how the policy behind the HEAT Act (which is described by ComEd in the Response) is violated by the proposed transfer of the Customer Contacts to Direct Energy when the same terms and conditions of such Customer Contracts will remain in place.

17. In its Response, ComEd refers to certain regulations dealing with an assignment of customer contracts, namely 83 Ill. Adm, Code Section 412.250, and asserts that the Debtors cannot assign any contracts unless the provisions of such section are satisfied. *See* Response at ¶22. The Debtors assert that such provisions are in fact satisfied by the proposed transfer of the Debtors' low income Customer Contracts to Direct Energy. Importantly, ComEd's sole argument on this provision is that Direct Energy is not in compliance with the applicable provisions of the Commission because it is not a registered participant in the Savings Guarantee Program.[3] ComEd's argument, however, misses the mark because it builds on an incorrect interpretation of the HEAT Act outlined above. To be clear and as outlined above, the Debtors do not need to be a

---

[3] There is no suggestion whatsoever by ComEd that Direct Energy is not otherwise in full compliance with all of the applicable requirements in Illinois to act as an RES.

11

registered participant in the Savings Guarantee Program to provide service under the low income Customer Contracts, and therefore Direct Energy should not need to be a registered participant in the Savings Guarantee Program to provide the same service under the same terms as the Debtors. Moreover, ComEd does not assert that the applicable Customer Contracts are void or unenforceable under the HEAT Act in the hands of the Debtors and therefore should not be able to assert otherwise in the hands of Direct Energy.

18. ComEd also makes reference in its Response to the "ComEd Tariff" and asserts that ComEd must "reject a DASR [Direct Access Service Request] for each retail customer for which an RES seeks to provide electric power" if such customer either received financial assistance within the past 12 months or is currently receiving financial assistance. *See* Response at ¶44. ComEd's argument here is misplaced because ComEd fails to include the definition of a "DASR" under the ComEd Tariff, which definition makes clear that the ComEd Tariff does not apply to the facts of the present case, where the Debtors propose to transfer their low income Customer Contracts to Direct Energy. Specifically, the ComEd Tariff defines a "DASR" as "an electronic communication by which the Company [ComEd] is informed of a ***retail customers' election*** to switch its provider of electric power and energy supply service or its provider of metering service." *See* Exhibit A attached hereto (emphasis added). Based on the above, the ComEd Tariff requires that ComEd reject a DASR only in a situation where an election is made by the retail customer – as opposed to an RES – to switch providers. In the present case, none of the Debtors' retail customers are making an election to switch providers. Therefore, the ComEd Tariff and ComEd's reliance thereon does not apply to the present situation.

## Conclusion

**WHEREFORE**, the Debtors respectfully request entry of an Order: (i) compelling ComEd

to comply with the Sale Order and facilitate the transfer of the Customer Contracts set forth on **Exhibit "A"** to the Motion to Compel (as modified herein) to Direct Energy in accordance with the Sale Order; and (ii) granting such other relief as is just and proper.

Dated: May 17, 2022

                                      Respectfully Submitted,

                                      **GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Debtors-in-Possession*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:    /s/   *Paul J. Battista*
      Paul J. Battista, Esq.
      Florida Bar No. 884162
      pbattista@gjb-law.com
      Mariaelena Gayo-Guitian, Esq.
      Florida Bar No. 813818
      mguitian@gjb-law.com
      Heather L. Harmon
      Florida Bar No. 13192
      hharmon@gjb-law.com

# **EXHIBIT A**

## **EXCERPT OF DEFINITIONS UNDER THE COMED TARIFF**

| | | |
|---|---|---|
| Commonwealth<br>Edison Company | ELECTRICITY | ILL. C. C. No. 10<br>5th Revised Sheet No. 128<br>(Canceling 4th Revised Sheet No. 128) |

## GENERAL TERMS AND CONDITIONS

(Continued from Sheet No. 127)

### DEFINITIONS (CONTINUED)

**ComEd Zone**
ComEd Zone means the PJM defined load zone for the Company.

**Company**
Company means Commonwealth Edison Company.

**CPT**
CPT means Central Prevailing Time, which is Central Standard Time or Central Daylight Savings Time, as applicable.

**Customer Supply Groups**
Customer supply groups mean the designations for retail customers located in the Company's service territory so that retail customers can be categorized for the purposes of computing charges for the procurement of electric power and energy and applying such charges to retail customers.

**DASR**
DASR means Direct Access Service Request. A DASR is an electronic communication by which the Company is informed of a retail customer's election to switch its provider of electric power and energy supply service or its provider of metering service.

**Delivery Classes**
Delivery classes mean the designations for retail customers located in the Company's service territory so that retail customers can be categorized for the purposes of computing charges for the delivery of electric service and applying such charges to retail customers.

**Developer**
Developer means any person or entity that has an interest in developing a Distributed Generation or Distributed Storage Resource Project that would be interconnected with the Company's distribution system.

**Distributed Generation or Distributed Storage Resource Project**
Distributed Generation or Distributed Storage Resource Project means proposed facilities to generate or store electricity with the intent to interconnect and operate in parallel with the Company's electric distribution system.

(Continued on Sheet No. 128.1)

Filed with the Illinois Commerce Commission on November 12, 2021. Filed pursuant to the Illinois Public Act 102-0662 enacted September 15, 2021.

Date Effective: December 29, 2021
Issued by T. R. Donnelly, President and COO
Post Office Box 805379
Chicago, Illinois 60680-5379