**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | **Chapter 11 Cases** |
| | |
| **LIBERTY POWER HOLDINGS, LLC,** | **Case No. 21-13797-SMG** |
| **LPT, LLC,** | **Case No. 21-15537-SMG** |
| **LIBERTY POWER MARYLAND, LLC,** | **Case No. 21-15539-SMG** |
| **LIBERTY POWER DISTRICT OF** | |
| **COLUMBIA, LLC,** | **Case No. 21-15540-SMG** |
| | |
| **Debtors.** | **(Jointly administered 21-13797-SMG)** |

_____/

**DEBTORS' RESPONSE AND OBJECTION TO**
**REQUEST OF LYRIA O'BRIEN AND SHAWN O'BRIEN FOR**
**ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE**

Liberty Power Holdings, LLC ("Holdings"), Liberty Power District of Columbia, LLC

("Liberty District of Columbia"), LPT, LLC ("LPT") and Liberty Power Maryland, LLC ("Liberty

Maryland") (collectively, the "Debtors"), by and through their undersigned counsel, file this

Response and Objection (the "Response") to the Request of Lyria O'Brien and Shawn O'Brien for

Allowance and Payment of an Administrative Expense [ECF No. 620]. In support thereof, the

Debtors respectfully represent as follows:

**RELEVANT BACKGROUND**

1.      On April 20, 2021, (the "Holdings Petition Date"), Holdings filed a voluntary

petition in this Court for relief under Chapter 11 of Title 11 of the Bankruptcy Code. Since that

time, Holdings has operated as a debtor-in-possession pursuant to Sections 1107 and 1108 of the

Bankruptcy Code.

2.      On June 4, 2021 (the "Subsidiary Petition Date"), the Subsidiary Debtors each filed

chapter 11 bankruptcy petitions, which bankruptcy cases were jointly administered with the

chapter 11 case of Holdings, including to facilitate the sale of all or substantially all of the Debtors' assets, including without limitation, retail customer contracts, pursuant to Sections 363 and 365 of the Bankruptcy Code.

3.    As of the date hereof, no creditors' committee has been appointed in these cases. In addition, no trustee or examiner has been appointed.

4.    For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the *Declaration of Bob Butler, Chief Restructuring Officer, in Support of the Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [ECF No. 10].

5.    After the Debtors conducted a fulsome marketing and sale process of the Debtors' assets pursuant to several orders of the Court [ECF Nos. 98, 156, 255, 264, 277, 282, 320, 323], on August 20, 2021, the Debtors filed their *Expedited Motion (I) to Approve Designation of Stalking Horse Bidder, (II) to Approve Asset Purchase Agreement and Related Bid Protections, (III) to Clarify/Modify Bidding Procedures, and (IV) for Related Relief* [ECF No. 324] (the "Stalking Horse Motion"),[1] which Stalking Horse Motion included a fully executed copy of that certain Asset Purchase Agreement, dated August 20, 2021, between the Debtors and NRG Retail, LLC (the "Buyer"), which agreement was subsequently modified and filed with the Court on August 23, 2021 by that certain *Notice of Filing Modifications to Stalking Horse Agreement* [ECF No. 339] (the "Stalking Horse Agreement").  On August 26, 2021, the Court entered an Order granting the Stalking Horse Motion [ECF No. 349].

6.    On August 31, 2021, the Debtor selected the Buyer, NRG Retail LLC, as the Successful Bidder for the Purchased Assets as noted in that certain *Notice of (I) Cancellation Of*

---

[1] All capitalized terms used herein and not otherwise defined shall have the meanings ascribed them in the Stalking Horse Motion.

*Auction Scheduled For September 1, 2021 At 9:00 a.m., and (II) Designation Of Stalking Horse Bidder As The Purchaser* [ECF No. 352] (the "Notice of Successful Bidder").

7.      On September 10, 2021, the Court conducted an evidentiary hearing (the "Sale Hearing") on the proposed sale of the Purchased Assets to the Buyer pursuant to the Debtors' *Expedited Motion For The Entry Of An Order (1) Approving Competitive Bidding Procedures For The Sale Of Substantially All Of The Debtor's Assets, (2) Scheduling Dates To Conduct Auction And Sale Hearing, (3) Approving The Form And Manner Of Notices, (4) Approving The Sale Of Substantially All Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests, (5) Approving Assumption And Assignment Procedures For Executory Contracts, And (6) Granting Related Relief* [ECF No. 98].

8.      On September 14, 2021, the Court entered its *Order (I) Approving Sale of the Purchased As Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (II) Authorizing Assumption and Assignment of Certain Executory Contracts  and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [ECF No. 385] (the "Sale Order").

9.      On September 22, 2021, the Debtors and the Buyer closed on the sale of the Purchased Assets pursuant to the terms of the Stalking Horse Agreement and the Sale Order.  In connection therewith, the Debtors and the Buyer have been working diligently to effect a transition and transfer of the Customer Contracts to the Buyer, including by providing all required notices to customers and regulatory agencies, and by complying with all applicable laws related thereto. Pursuant to the Stalking Horse Agreement, until the transfer of the Customer Contracts is completed, the Debtors will continue to provide electricity and all related services to their Customers whose contracts may be acquired by the Buyer, in accordance with the terms of the Customer Contracts.

10.     On December 29, 2021, the Debtors filed the *Debtors' Expedited Motion (I) To Establish a Bar Date for the Filing of Motions Seeking the Allowance and/or Payment of Administrative Expense Claims, and (II) to Designate the Form and Manner of Notice of Administrative Claims Bar Date* (the "Administrative Claim Motion") [ECF No. 510] and on January 12, 2022, the Court entered the *Order Granting the Administrative Claim Motion* [ECF No. 526] (the "Administrative Claims Bar Date Order") setting the deadline for any party to file and administrative claim on or before February 9, 2022. (the "Administrative Claims Bar Date").

11.     On January 31, 2022, Lyria O'Brien and Shawn O'Brien (together, the "O'Briens") filed Proof of Claim No. 126 in the amount of $125,000.00. The claim was filed as a priority claim under 11 U.S.C. § 507(a), but the O'Briens failed to specify the subsection that allegedly applied to their claim. On March 11, 2022, the O'Briens amended their Proof of Claim No. 126 to remove the priority designation of the proof of claim.

12.     On April 9, 2022, two months after the Administrative Claims Bar Date, the O'Briens filed the Request of Lyria O'Brien and Shawn O'Brien for Allowance and Payment of an Administrative Expense [ECF No. 620] (the "Request for Administrative Expense"). The Request for Administrative Expense seeks $125,000.00 in damages, consisting of time spent, emotional damages, and punitive damages, plus reasonable attorneys' fees and costs.

**RELIEF REQUESTED**

13.     Through this Response, the Debtors respond and object to the Request for Administrative Expense filed by the O'Briens as both untimely and unsupported by law. For the reasons discussed below in detail, the O'Briens are not entitled to the allowance or payment of any administrative expense claim in these Chapter 11 Cases as a matter of law.  As a result, the Debtors assert that the Request for Administrative Expense be denied.

A.      **The Proof of Claim and the Claims Bar Date.**

14.      The deadline to file a proof of claim in these Chapter 11 Cases was June 29, 2021. *See ECF No. 7*. The O'Briens filed their initial proof of claim on January 31, 2022, as a priority claim under 11 U.S.C. § 507 (the "Initial Proof of Claim"). The O'Briens later, on March 11, 2022, amended the Initial Proof of Claim signifying that their claim was not entitled to priority treatment (the "Amended Proof of Claim"). The O'Briens did not seek an extension of time to file a proof of claim, nor did they file a motion to allow their late filed claim. Accordingly, the O'Briens currently hold an unsecured claim pursuant to 11 U.S.C. § 726(a)(2)(C).

15.      On April 9, 2022, the O'Briens filed the Request for Administrative Expense, which seeks $125,000.00 of damages plus reasonable attorneys' fees and costs. The Request for Administrative Expense alleges that the O'Briens "filed a timely Proof of Administrative Claim with Stretto…on January 31, 2022, prior to February 9, 2022, the Administrative Claim Bar Date." *See ECF No. 620 ¶ 3.*

16.      The O'Briens, both of whom are attorneys, had notice of the Chapter 11 Cases prior to the occurrence of the Administrative Claims Bar Date. This is evidenced by the fact that the O'Briens filed the Initial Proof of Claim prior to the Administrative Claims Bar Date. Further, Mr. O'Brien testified that he learned of the bankruptcy "sometime at the end of January". *See* Transcript excerpt attached hereto as Exhibit A.

17.      The Request for Administrative Expense asserts that Proof of Claim No. 126 was a proper filing of the O'Briens' administrative expense claim pursuant to the Administrative Claims Bar Date Order. However, the proof of claim form, executed by Mr. O'Brien, states, "**Read the instruction before filing out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative**

expense. **Make such a request according to 11 U.S.C. § 503**." *See ECF No. 620-1.* (emphasis in original).

18.     Realizing their mistake, on April 9, 2022 – two months following the Administrative Claims Bar Date – the O'Briens filed the Request for Administrative Expense. However, the Administrative Claims Bar Date Order required all creditors and other parties-in-interest who wished to seek the allowance and/or payment of an administrative expense claim *to file an appropriate motion or application with the court* on or before the Administrative Claims Bar Date. *See Administrative Claims Bar Order ¶ 2.* Further, the Administrative Claims Bar Date Order specifically states that "**any holder of an Administrative Claim who fails to comply with the terms of this Order shall be and is hereby barred from pursuing such Administrative Claim in these chapter 11 cases or otherwise. In addition, any such Administrative Claim not subject of an appropriate motion or application filed by the Administrative Claims Bar Date shall be and is hereby denied with prejudice**." *See Administrative Claims Bar Date Order ¶ 3.*

19.     Courts have found that failure to properly and timely file an administrative claim is a bar to relief. "The Bankruptcy Code, the Plan, and applicable case law require the filing of administrative expense claims—like those asserted in the Complaint—on the bankruptcy court's docket, not on another court's, for a claim to be deemed timely filed." *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt. L.P. (In re Highland Cap. Mgmt. L.P.)*, 2022 Bankr. LEXIS 2780, *29 (Bankr. N.D.Tex. 2022).

20.     As the Request for Administrative Expense was filed after the Administrative Claims Bar Date, and the Proof of Claim does not comply with Section 503 or this Court's Administrative Claims Bar Date Order, the O'Briens' request for an administrative expense claim should be disallowed.

**B. The O'Brien's claims do not qualify for administrative expense status because the Debtor was not operating.**

21.     Since the Holdings Petition Date, the intent of Holdings has been to sell its assets for the benefit of creditors. Throughout this case, the Debtors have been acting in good faith to merely maintain the business of Holdings and the Subsidiary Debtors in the ordinary course so as to preserve the going concern value of the estate, to preserve jobs, to pay vendors, to service customers and to conduct and conclude an orderly sale process.

22.     As a provided for in the *Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Secured Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (II) Granting Liens and Superpriority Administrative Claims in Connection Therewith, (III) Authorizing Use Cash Collateral Pursuant to 11 U.S.C. § 363, (IV) Granting Adequate Protection in Connection Therewith Pursuant to 11 U.S.C. §§ 361, 363 and 507, and (V) Scheduling a Final Hearing Under Bankruptcy Rule 4001* [ECF No. 72] (the "DIP Financing Motion"), filed 15 days after the Holdings Petition Date, Boston Energy Trading and Marketing, LLC, the DIP Lender, required, and Holdings agreed, that Holdings would implement and proceed with a sale process for the marketing and sale of the Debtor's business and assets.  In connection therewith, certain sales milestones were established and complied with.

23.     When determining if a creditor is entitled to an administrative expense claim, the terms "actual" and "necessary" should be strictly construed to keep "administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors." *Otte v. United States*, 419 U.S. 43, 53, 95 S.Ct. 247, 254, 42 L .Ed.2d 212 (1974).  In certain cases, postpetition costs "ordinarily incident to operation of a business" that do not confer a benefit on the estate can indeed qualify as "actual, necessary". *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L. Ed. 2d 751 (1968).

24.     The 11th Circuit in *N.P. Mining Co., Inc.*, 963 F.2d 1449 (11th Cir. 1992) ruled that claims incurred by a chapter 11 debtor in possession "receive first priority, but only to the extent that they were incurred as a consequence of […] operations after the bankruptcy petition was filed and while the business was still "operating." *Id.*at 1453. Additionally, the Court in *N.P. Mining* went on to find that "penalties incurred when a trustee is merely maintaining an estate for later distribution of assets cannot be considered costs ordinarily incident to operation of a business." *N.P. Mining* at *1460-1461. (internal quotations omitted).

25.     Courts routinely hold that when determining whether a tort under the *Reading* exception may be an administrative expense, the focus is on whether the tort occurred during the operation of the debtor's business post-petition. *See In re GT Advanced Techs., Inc.*, 547 B.R. 3, 12-13 (Bankr. D.N.H. 2016); *In re Corbett*, 550 B.R. 170, 185 (Bankr. D. Mass. 2016); *In re Energy Conversion Devices, Inc.*, 528 B.R. 697, 709 (Bankr. E.D. Mich. 2015) ("Courts applying the *Reading* doctrine have limited administrative expense priority to claims arising from the bankruptcy debtor's operation of its business … [Creditor's] claim does not arise from the debtor in possession['s] operation of its business after filing bankruptcy."); *In re RadLAX Gateway Hotel, LLC*, 447 B.R. 570, 576-77 (Bankr. N.D. Ill. 2011); *In re Old Carco LLC*, No. 09-cv-50002, 2010 U.S. Dist. LEXIS 118174, 2010 WL 4455648, at *4 (S.D.N.Y. Nov. 2, 2010) (stating that under *Reading*, a claim may be an administrative expense if the expense is "ordinarily incident to operation of a business"); *Suntrust Bank v. Roberson (In re Baseline Sports, Inc.)*, 393 B.R. 105, 130 (Bankr. E.D. Va. 2008) ("[P]ost-petition torts committed by the debtor-in-possession while acting in the furtherance of the operation of the business satisfy the second or 'burden' prong of the administrative expense test, and claims for such torts may be accorded priority as an administrative expense."); *In re Unidigital, Inc.*, 262 B.R. 283, 290 (Bankr. D. Del. 2001) (denying administrative

claim where tort, if there even was one, did not arise from the operation of the debtor's business). This is because the "*Reading* exception provides that a post-petition tort committed by the debtor-in-possession within the course and scope of its continued operation of the estate's business may, itself, be considered a cost of doing business and is, therefore, entitled to administrative expense priority under § 503(b)(1)(A)." *In re Krisu Hosp., LLC,* 2021 Bankr. LEXIS 788, *15-16 (Bankr. N.D.Tex. 2021); quoting *In re Blanchard*, 547 B.R. 347, 353 (Bankr. C.D. Cal. 2016).

26.     As the First Circuit stated in *In re Hemingway Transport, Inc.*, most decisions employing the *Reading* rationale have arisen in the context of reorganization proceedings. *See, e.g.*, *In re Microfab, Inc.,* 105 B.R. 161, 168 n.20 (Bankr. D. Mass. 1989) (*Reading* rationale inapplicable in liquidating chapter 7 case).  Application of the *Reading* rationale "in the context of an ordinary, nonoperating liquidation proceeding appears extremely problematic, as one fundamental justification for the priority is that general creditors stand to benefit from the postpetition operation of the debtor's business, either through the immediate generation of operating profits or through the ultimate reorganization of the debtor as a viable business entity." 954 F.2d at 5, n.5.  *In re Corbett,* 550 B.R. 170, 186 (Bankr. D.Mass. 2016) (citing *Woburn Assocs. v. Kahn (In re Hemingway Transport, Inc.)*, 954 F.2d 1, 5, n.5 (1st Cir. 1992).

27.     This is a Chapter 11 case with a liquidating plan, and at the time of the O'Briens' alleged injuries, the Debtors did not operate as a functioning business, and it did not anticipate reorganizing and continuing as a going concern. The Debtor has conducted a sale of substantially all of its assets and submitted a Plan of Liquidation rather than a plan designed for the continued operation of the business. Thus, the reasoning of *Reading* that fairness dictates that a party injured by a business that by "operation of law" continues to operate during the reorganization process

should be entitled to full recovery of its claim is inapplicable in this case and therefore the O'Brien's request for an administrative claim should be disallowed.

**C. No Benefit even if Reading applies.**

28.    Even if *Reading* applies, the O'Briens request for an administrative expense claim fails as the Debtors have "not benefited from actions post-petition because this Debtor has not gained anything of value." *In re RadLAX Gateway Hotel, LLC*, 447 B.R. 570, 577 (Bankr. N.D.ILL.2011). The O'Briens allege *inter alia*, that in June of 2021, an employee of LPT, without permission, entered the O'Briens into a service contract with the Debtors for electric service. The O'Brien made exactly one payment to the Debtors in the amount of $517.00 on September 8, 2021. Before the end of the following month, this service contract was terminated by the Debtors, the $517.00 payment was returned to the O'Briens in full, and the O'Briens' electrical service was returned to their original electricity provider. *See* Transcript excerpt attached hereto as Exhibit B.

29.    Given that the amounts paid by the O'Briens were returned and the contract was terminated, there was no economic benefit to the Debtors. Torts are permitted as administrative expense when the debtor gains a benefit, such as being able to contract and profit while attempting to reorganize during bankruptcy. *See Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 230-231 (3rd Cir. 2021) ("The employment discrimination [administrative expense] claim arose out of Ellis's employment, which without dispute benefitted the Westinghouse estate."). Here, there was no benefit arising out of the alleged tort. The Debtors retained no compensation and no contractual benefits. Thus, the lack of any benefit to the Debtors militates against the O'Briens receiving an administrative expense claim.

**D. The non-compensatory damages, punitive damages and other non-economic damages being sought by the O'Briens were not necessary.**

30.    The O'Brien's asserted remaining damages consist of lost time, emotional damage,

punitive damages, and attorneys' fees. "A claimant's claim for actual damages would be necessary for preserving the estate because the liability was incurred so that the debtor might receive the benefits of the contract." *NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir. 1991). Thus a claimant "can recover punitive damages from the estate as an administrative expense only if it can prove that this expense was an "actual, necessary cost[] . . . of preserving the estate." *Id*. However, the Fifth Circuit went on to state, "[t]his cannot be said of [claimant]'s claim for punitive damages. Under the facts of this case, we can conceive of no way in which allowing punitive damages would benefit [the debtor's] estate." *Id*.

31.    Similarly, the O'Briens' Request for Administrative Expense provides no basis to show how the O'Briens' alleged remaining damages were necessary for preserving the estate. Compensatory damages directly arising from a tort might be necessary when the Debtor receives the benefit of a contract. However, any compensatory damages were repaid by the return of the $517.00, and the several months of free electricity the O'Brien's received from July 2021 through October 2021. The remaining claimed damages are not necessary and provide no benefit to the Debtors.

**WHEREFORE,** the Debtors respectfully request the Court enter an order: (i) sustaining this Response and objection; (ii) denying the Request for Administrative Expense filed by the O'Briens; (iii) deeming Proof of Claim No. 126 filed by the O'Briens as an untimely unsecured claim; and (iv) awarding such other relief as the Court deems appropriate.

Dated: June 1, 2023.

Respectfully Submitted,

**VENABLE LLP**
*Attorneys for Debtors-in-Possession*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By:    /s/  *Heather L. Harmon*
       Paul J. Battista, Esq.
       Florida Bar No. 884162
       pjbattista@venable.com
       Mariaelena Gayo-Guitian, Esq.
       Florida Bar No. 813818
       mgguitian@venable.com
       Heather L. Harmon
       Florida Bar No. 13192
       hlharmon@venable.com

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on June 1, 2023, a true copy of the foregoing document has

been furnished via CM/ECF notification to all parties entitled to receive notice via CM/ECF, and

via First Class U.S. Mail and email to:

      Lyria O'Brien and Shawn O'Brien
      700 Louisiana Street, Suite 3400
      Houston, TX 77002
      shawnrobertobrien@gmail.com
      sobrien@mayerbrown.com

                By: ___/s/ *Heather L. Harmon*_____
                     Heather L. Harmon, Esq.

# EXHIBIT A

Page 1

1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                     FORT LAUDERDALE DIVISION

3

4

5    IN RE:                          Chapter 11 Cases
6    LIBERTY POWER HOLDINGS, LLC,    CASE NO. 21-13797-SMG
     LPT, LLC,                       CASE NO. 21-15537-SMG
7    LIBERTY POWER MARYLAND, LLC,    CASE NO. 21-15539-SMG
     LIBERTY POWER DISTRICT OF       CASE NO. 21-15540-SMG
8    COLUMBIA, LLC,

                                     (Jointly administered
9         Debtors.                      21-13797-SMG)
     _____/

10

11

12

13

14

                          August 26, 2022
15                    10:55 a.m. to 1:30 p.m.

16

17

18

               DEPOSITION VIA ZOOM VIDEO CONFERENCE
19
                               OF
20
                         SHAWN O'BRIEN
21

22

23                 Taken pursuant to Notice,
                   on behalf of the Debtors.
24

25

Page 2

1       APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2

3              GENOVESE JOBLOVE & BATTISTA, by
                  PAUL J. BATTISTA, ESQUIRE
               MARIAELENA GAYO-GUITIAN, ESQUIRE
4                   On behalf of the Debtors
5

6                   BERGER SINGERMAN, by
                    JORDI GUSO, ESQUIRE
        On behalf of Boston Energy Trading and Marketing, LLC
7

8                    MAYER BROWN, by
                   SHAWN O'BRIEN, ESQUIRE
9          On behalf of Shawn and Lyria O'Brien
10

                    - - - - - - -
11

12                    I-N-D-E-X
13   WITNESS                 DIRECT              CROSS
14   SHAWN O'BRIEN
       By Mr. Battista            3                --
15
16

                    E-X-H-I-B-I-T-S
17

     Debtors'               Description              Page
18   No. 1   Response to Debtors' Request for Production    12
     No. 2          O'Brien Initial Disclosures       16
19   No. 3          O'Brien Amended Disclosures        18
     No. 4          Administrative Claim Request
20   No. 5          Declaration of Shawn O'Brien       74
     No. 6              $517.61 Invoice               82
21   No. 7              $1054,42 Invoice              84
     No. 8                 Receipt                   85
22   No. 9                  Check                    85
23   **All Exhibits were electronically marked at the
     conclusion of the deposition.
24
                    - - - - - - -
25

1          A.     There's a Supreme Court case, Reading, that

2     interpreted 507.  I'm not sure which section of 507(a),

3     but it relates to postpetition torts, allowing for that to

4     have -- to be treated as an administrative claim with

5     priority.

6          Q.     Okay.  But other than reference to that

7     Supreme Court case, do you know what section of 507(a)

8     you're travelling under, and if you don't know, you don't

9     know, please tell me.

10          A.     I think it's 507(a).  Are you talking

11     about -- it's under 507(a).

12          Q.     Okay.  When did you first become aware that

13     Liberty Power Holdings was in bankruptcy?

14          A.     I don't remember exactly the date, but it

15     was sometime at the end of January before -- right before

16     I filed -- I believe it was right before I filed that

17     lawsuit.

18          Q.     So just before you filed the lawsuit and of

19     course just before you filed this proof of claim?

20          A.     Yes.

21          Q.     And when you filed this proof of claim,

22     which is now -- which is Exhibit A here, did you intend it

23     to be an administrative expense claim?

24          A.     Yes.

25          Q.     When you learned about the bankruptcy of

# EXHIBIT B

Page 1

1          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF FLORIDA
2             FORT LAUDERDALE DIVISION

3

4

5   IN RE:                          Chapter 11 Cases
6   LIBERTY POWER HOLDINGS, LLC,    CASE NO. 21-13797-SMG
    LPT, LLC,                       CASE NO. 21-15537-SMG
7   LIBERTY POWER MARYLAND, LLC,    CASE NO. 21-15539-SMG
    LIBERTY POWER DISTRICT OF       CASE NO. 21-15540-SMG
8   COLUMBIA, LLC,

                                    (Jointly administered
9        Debtors.                      21-13797-SMG)
    _____/

10

11

12

13

14

                    August 26, 2022
15              10:55 a.m. to 1:30 p.m.

16

17

18

            DEPOSITION VIA ZOOM VIDEO CONFERENCE
19

                            OF
20

                      SHAWN O'BRIEN
21

22

23              Taken pursuant to Notice,
                on behalf of the Debtors.

24

25

Page 2

1                    APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2

3                    GENOVESE JOBLOVE & BATTISTA, by
                          PAUL J. BATTISTA, ESQUIRE
                       MARIAELENA GAYO-GUITIAN, ESQUIRE
4                         On behalf of the Debtors
5

6                          BERGER SINGERMAN, by
                             JORDI GUSO, ESQUIRE
       On behalf of Boston Energy Trading and Marketing, LLC
7

8                            MAYER BROWN, by
                          SHAWN O'BRIEN, ESQUIRE
9               On behalf of Shawn and Lyria O'Brien
10

                              - - - - - - -
11

12                            I-N-D-E-X
13     WITNESS                     DIRECT              CROSS
14     SHAWN O'BRIEN
         By Mr. Battista                3                --
15
16

                            E-X-H-I-B-I-T-S
17

       Debtors'                Description                Page
18     No. 1   Response to Debtors' Request for Production   12
       No. 2           O'Brien Initial Disclosures           16
19     No. 3           O'Brien Amended Disclosures            18
       No. 4           Administrative Claim Request           47
20     No. 5           Declaration of Shawn O'Brien           74
       No. 6               $517.61 Invoice                    82
21     No. 7               $1054,42 Invoice                   84
       No. 8                  Receipt                         85
22     No. 9                   Check                          85
23     **All Exhibits were electronically marked at the
       conclusion of the deposition.
24
                              - - - - - - -
25

1          A.    No.

2          Q.    Okay.  Do you know sitting here today, when

3   Liberty transferred the power back or the billing back to

4   Varsity?

5          A.    I want to say it was sometime in -- around

6   the October 16th date or somewhere in October.

7          Q.    And how do you know that?

8          A.    Just because I remember receiving a call

9   from somebody at Liberty, which I think is recorded, it's

10  in the discovery, saying that they terminated the

11  contract.

12         Q.    So you learned about that from the discovery

13  that you received in this case, in the Texas case?

14         A.    Well, I also received the PUC response to my

15  complaint, I want to say that was October 18th, but that

16  was like a couple days after I spoke to -- this person

17  called me about saying they terminated the contract.

18         Q.    Okay.  You don't have any understanding that

19  the transfer was made as early as September 9th of 2021,

20  do you?

21         A.    No, I was never notified of that.  I wasn't

22  notified of what actually was going on with the

23  termination until I think that October 16th date.

24         Q.    Okay.  Did your power get turned off again

25  after September 9th through the October 16th date?

Page 68

1          A.    No.

2          Q.    Did Liberty Power refund the payment that

3    you did make of $517 and change?

4          A.    Yes, sometime in late October.

5          Q.    Did Liberty Power write off, to your

6    knowledge, the balance that they had originally alleged

7    was due, roughly $600 as you testified to?

8          A.    I don't have any knowledge of whether they

9    wrote it off.

10         Q.    Okay.  Did Liberty Power ever make further

11   demand of you to pay that roughly $600 charge?

12         A.    I don't know because the address was

13   different, the billing address.  So I don't know if they

14   made any demands by mail or -- they certainly didn't

15   respond to me.

16         Q.    Okay.  Have you checked your credit report

17   with any of the credit bureaus to see whether or not you

18   had an adverse credit report based on these events from

19   Liberty Power?

20         A.    I'm not aware of -- of that.  Although I do

21   note that there was -- my wife's credit was -- there was

22   some type of credit check done on hers.  I get alerts from

23   Experian whenever there's a credit alert, and I don't

24   remember seeing a credit alert, plus I was not the -- I

25   was not the one on the contract.

1    Q.    Do you know whether that credit alert was a
2    function of what Liberty Power did or somebody else?
3    A.    I'm not -- I don't know.
4    Q.    Okay.  Have you checked your wife's credit
5    report to see whether there's anything on there that
6    involves Liberty Power?
7    A.    I have not, no.  I have not personally.
8    Q.    Okay.  Back to the motion.  Go to
9    Paragraph 8, Mary.
10            Do you see, Mr. O'Brien, Paragraph 8 says,
11    as a result of the fraudulent actions by defendants,
12    plaintiffs' existing electric service contract was
13    terminated, and unbeknownst to plaintiffs, debtor LPT
14    became plaintiffs' electric service provider -- sorry,
15    electric provider at significantly higher rates.
16            Do you see that?
17    A.    Yeah.
18    Q.    Are you claiming any damages related to what
19    you describe here as the significantly higher rates
20    charged, assuming that's true?
21    A.    Well, the emotional distress damages
22    certainly this factors into because they were not -- you
23    know, if you compare the rates from Varsity to what was in
24    the contract, they were significantly higher.  I want to
25    say Varsity was nine cents per kilowatt or so, and then

Page 70

1    this one was 13 cents per kilowatt, and -- and the fear of

2    just being left without any information from September 8th

3    through the time we got notified that the contract was

4    actually terminated, there was a fear that we would owe,

5    you know, those additional rates.

6         Q.    Okay.  Do you know -- have you done the

7    calculation as to what the additional charges would have

8    been as -- by Liberty Power, as compared to the Varsity

9    contract from September 9th to the middle of October?

10        A.    It's roughly 45 percent higher, 40 percent

11   higher, I think like that.  So it would have been probably

12   during -- and I don't know what timeframe you're talking

13   about.  On a monthly average, it would have been probably

14   $200 a month more.

15             So over the course of June, July, through

16   October, you know, you're talking about, I don't know,

17   a thousand, 800 more.

18        Q.    So it was from June 23rd through --

19        A.    Well, it was effective July 1st.

20        Q.    So July 1st.  So the month of July, the

21   month of August, and the month of September?

22        A.    Yeah, it would have, and those -- in

23   Houston, those are big months for electricity.  So I don't

24   know, it would have been a difference of about 800 to a

25   thousand dollars, but if it continued for two years, you

Page 71

1  know, then, you know, take, let's say, $200 a month times

2  24 months.

3        Q.    Right, but that's not -- okay.  So we can do

4  that, but right now we're talking about the months of

5  June -- sorry, July, August, September, maybe even

6  October --

7        A.    Correct.

8        Q.    -- of 2021; right?

9        A.    Right.

10       Q.    So is your testimony that --

11       A.    But at the time you have to remember that

12  this -- this relates to a contract, a 24-month contract

13  that was being put in place, and at the time, there was a

14  fear that we would have to pay the full contract

15  difference.

16       Q.    So your testimony is that the possibility of

17  having to pay, if I were to do the calculation, roughly

18  $4800 over two years caused you fear and emotional

19  distress?

20       A.    Yes.

21       Q.    Are you seeking, as part of your damages

22  today, any portion of the increase in the electric charges

23  that result from Liberty Power having higher rates than

24  Varsity?

25       A.    Not in the actual damages.

Page 72

1          Q.    Okay.  Is that because you were refunded the
2    amount you paid and you were not charged for the balance?
3          A.    Yeah, in hindsight it was terminated on
4    October 16th.
5          Q.    Okay.  Let's go to Paragraph 12, Mary,
6    please.
7                So in this paragraph at the conclusion, in
8    addition to the $125,000 number, plus reasonable
9    attorney's fees and all costs, which we talked about a
10   little bit before.  Can you tell me how much you have
11   incurred in your attorney's fees and costs through today
12   in connection with these matters?
13         A.    Well, not -- not the exact number, but
14   probably at a minimum 40,000 between attorney's fees and
15   costs.
16         Q.    And that's on top of the 40,000 that
17   reflects the time that you testified earlier that you put
18   in to deal with these events, as opposed to the
19   litigation; is that right?
20         A.    Yeah, it's the time from the preparation of
21   the original complaint through 12:16 p.m. Central on
22   August 26, 2022.
23         Q.    Through today, is that what you said?
24         A.    Yeah, I think that's a -- that's a minimum.
25         Q.    Do you keep time sheets for the work that