# EXHIBIT 1

**Fill in this information to identify the case:**

Debtor _____Liberty Power Holdings, LLC_____

United States Bankruptcy Court for the District of _____Southern District of Florida_____

Case number _____21-13797_____

## Official Form 410

# Proof of Claim

**04/19**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | BLT Steak LLC and BLT Fish LLC, as Class Representatives<br><br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**    **Where should payments to the creditor be sent? (if different)**<br><br>See Additional/Expanded Creditor Address(es) page:<br><br>BLT Steak LLC and BLT Fish LLC, as     BLT Steak LLC and BLT Fish LLC ...<br>Class Representatives...     Albert A. Ciardi, III, Esqui...<br>Albert A. Ciardi, III, Esquir...     Ciardi Ciardi & Astin<br>Ciardi Ciardi & Astin     1905 Spruce Street<br>1905 Spruce Street     Philadelphia, PA 19103<br>Philadelphia, PA 19103     United States<br>United States     **P:** 215-557-3550<br>**P:** 215-557-3550     **F:** 215-557-3551<br>**F:** 215-557-3551     **E:** aciardi@ciardilaw.com<br>**E:** aciardi@ciardilaw.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_____ |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____<br>                                                        MM/DD/YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

1157906242131421 06600001

| 6. | Do you have any number you use to identify the debtor? | ☑ No |
|---|---|---|
| | | ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| 7. | How much is a claim? | $ 383,112,952.00 | Does this amount include interest or other charges? |
|---|---|---|---|
| | | | ☑ No |
| | | | ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

Litigation

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate.    If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

| 10. | Is this claim based on a lease? | ☑ No |
|---|---|---|
| | | ☐ Yes. Amount necessary to cure any default as of the date of the petition.    $ _____ |

| 11. | Is this claim subject to a right of setoff? | ☑ No |
|---|---|---|
| | | ☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. Check one: | | Amount entitled to priority |
| | A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | _____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | _____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) | | _____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | _____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | _____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. | | _____ |

*Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    06/24/2021 at 09:34 am PT
                           MM / DD / YYYY HH : MM

/s/Albert A. Ciardi, III
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Albert | A. | Ciardi, III |
|---|---|---|---|
| | First Name | Middle Name | Last Name |
| Title | | | |
| Company | Ciardi Ciardi & Astin | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 1905 Spruce Street | | |
| | Number | Street | |
| | Philadelphia | PA | 19103 |
| | City | State | ZIP Code |
| Contact phone | | | |
| Email | aciardi@ciardilaw.com | | |



---

**Additional/Expanded Creditor Address(es):**

**Primary Address (Expanded)**
BLT Steak LLC and BLT Fish LLC, as Class
Representatives
Albert A. Ciardi, III, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103
United States
Phone: 215-557-3550
Fax: 215-557-3551
aciardi@ciardilaw.com

**Distribution Address (Expanded)**
BLT Steak LLC and BLT Fish LLC
Albert A. Ciardi, III, Esquire
Ciardi Ciardi & Astin
1905 Spruce Street
Philadelphia, PA 19103
United States
Phone: 215-557-3550
Fax: 215-557-3551
aciardi@ciardilaw.com

Stretto Corporate Restructuring
855.812.6112 inquiries@stretto.com
cases.stretto.com
Proof Of Claim                                    Page 4

# DAMAGES EXPLANATION

Pursuant to the Affidavit of Dr. Robert Sinclair (the "Expert Report") prepared in support of the class certification of BLT Steak LLC and BLT Fish LLC, individually and as the appointed representatives of the class certified in *BLT Steak LLC and BLT Fish LLC v. Liberty Power Corp., LLC d/b/a Liberty Power New York and Liberty Power Holdings LLC*, Index No. 151293/2013 (N.Y. Sup. Ct., N.Y. County) (hereinafter, the "Representative Plaintiffs"), the Representative Plaintiffs determined there to be an average overcharge of the Debtor and related companies of 7.26% (a true and correct copy of the Expert Report is attached hereto as Exhibit "A").

If you apply the average overcharge of 7.26% to the entire class of plaintiffs, the Representative Plaintiffs have a general unsecured claim in the amount of $383,112,952.00. In support of this calculation, the Representative Plaintiffs provide the following chart summarizing the calculation required to determine the total consumption of Kilowatts during the time period referenced in the litigation.

**Liberty Power Consumption in NY 2009 through Present -- Based on EIA Tables 12 & 13**

| Year | Residential (mwh) | Commercial (mwh) | Total (mwh) | Total (kwh) |
|---|---|---|---|---|
| 2009 | not available | not available | | 63,569,800 |
| 2010 | 14,699 | 1,256,697 | 1,271,396 | 1,271,396,000 |
| 2011 | 13,340 | 1,552,462 | 1,565,802 | 1,565,802,000 |
| 2012 | 44,663 | 1,228,005 | 1,272,668 | 1,272,668,000 |
| 2013 | 97,632 | 1,668,133 | 1,765,765 | 1,765,765,000 |
| 2014 | 77,171 | 1,406,885 | 1,484,056 | 1,484,056,000 |
| 2015 | 62,037 | 1,269,167 | 1,331,204 | 1,331,204,000 |
| 2016 | 70,153 | 672,898 | 743,051 | 743,051,000 |
| 2017 | 41,001 | 281,268 | 322,269 | 322,269,000 |
| 2018 | 30,697 | 165,024 | 195,721 | 195,721,000 |
| 2019 | 22,501 | 246,786 | 269,287 | 269,287,000 |
| 2020 | not available | not available | | 269,287,000 |
| Total (2010-2019) | | | 10,221,219 | 10,490,506,000 |

Source: https://www.eia.gov/electricity/sales_revenue_price/

Assumptions:

1. The Kilowatt data was pulled from publicly available sources.
2. The second half of 2009 is estimated by taking 50% of 2010.
3. The 2020 data is estimated as the same amount of 2019.
4. Class membership is limited to customers subject to a variable rate plan for the provision of electricity in New York State that provided that rates would be based on electricity market pricing. To account for customers that may have been subject to a different type of plan during the class period, the total amount of Kilowatts was reduced by 50%.

# EXHIBIT A

Case 21-13797-SMG    Doc 948-1    Filed 06/30/23    Page 7 of 34

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 17

| | |
|---|---|
| BLT STEAK LLC and BLT FISH LLC, | Index No. 151293/2013 |
| Plaintiffs, | Hon. Shlomo Hagler, J.S.C. |
| v. | **AFFIDAVIT OF DR. ROBERT SINCLAIR IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| LIBERTY POWER CORP, L.L.C., d/b/a LIBERTY POWER NEW YORK, and LIBERTY POWER HOLDINGS LLC, | |
| Defendants. | |

STATE OF VIRGINIA    )
                        ) ss.:
COUNTY OF FAIFAX    )

DR. ROBERT A. SINCLAIR, being duly sworn, deposes and states:

1. I am Vice President of Potomac Economics, which has been retained by the plaintiffs to provide expert consulting services and testimony, and not a party to this litigation. Potomac Economics is a leading provider of independent market monitoring and expert analysis in the electricity and natural gas industries, with extensive experience in New York electricity market pricing and policy, among other areas and jurisdictions.

2. I have a Ph.D. in economics and have worked in the electric utility industry for over 25 years. My primary work has focused on regulatory policies, market design, and market power monitoring in large centrally-organized electricity markets, like the New York Independent System Operator ("NYISO"), which I explain more about below. My work in the energy industry has consisted of a broad range of topics related to the economics of markets and regulation. I have analyzed, studied, and reported on

INDEX NO. 151293/2013
RECEIVED NYSCEF: 12/20/2019

participant conduct and outcomes in electricity markets, especially in the formation of competitive prices and efficient market design.

3. I have worked extensively on issues relating to electric utility restructuring, including retail competition, that has led to the formation of Energy Service Companies (ESCOs), like Liberty Power. ESCOs purchase power from centrally-organized markets (e.g., NYISO) and re-sell it to end-use retail customers. I am familiar with the relationship between the NYISO-type power markets and the retail market and have worked extensively on retail regulation.

4. I have worked extensively on empirical pricing studies concerning the effects of market power, market design, and economic damages to electricity consumers.[1]

5. In this affidavit, I provide expert opinions on three topics:

    a. I explain how New York customers who were placed on Liberty Power's variable rate plan following the expiration of their fixed rate plan were not given a market-based rate as promised by Liberty Power and thereby suffered damages through overcharges. I explain how a market-based rate should be calculated for a customer in New York City and explain that the variable rate offered by Liberty Power was far in excess of the promised market-based rate.

    b. I explain how the difference between the Liberty Power variable rate and a properly-calculated market-based rate is the basis of each customer's damages. Alternatively, customers could have been moved to the local distribution company for its supply upon expiration of the fixed rate plan, thus defaulting to the co-called Market Supply Charge (MSC). The MSC is the local distribution

---

[1] My *curriculum vitae*, are appended hereto.

company's charge for power supply when a retail customer opts not to seek a third-party supplier.

   c. I provide a sample damage calculation for plaintiff BLT Restaurants and explain how damages can be calculated similarly for all customers in New York State who suffered damages as a result of being moved to Liberty Power's variable rate plan.

6. In connection with this affidavit, I have reviewed discovery material including the First Amended Complaint and proposed Second Amended Complaint; Liberty Power's Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion to Amend the First Amended Complaint dated November 13, 2015 ("LP Suppl. Br."); the Affidavit of Harris Rosen, sworn to November 13, 2015 ("Rosen Aff."), including exhibits; relevant portions of the testimony of José Albarran from his deposition on Feb. 5, 2015 ("2/5/15 Albarran Depo. Tr."); and Liberty Power's disclosures in this action regarding the components of the wholesale price of electricity, Liberty Power's "default variable" rate and Liberty Power's "margin" (LP 375-433, 695-697, 704-710); relevant portions of the deposition testimony of Rajiv Kakar ("9/24/19 Kakar Depo. Tr."); Derik Viner ("9/25/19 Viner Depo. Tr."); and Matthew Fuller ("9/27/19 Fuller Depo. Tr.") from September 24, 25, and 27, 2019, respectively.

7. I have also carefully reviewed Liberty Power's "Customer Terms and Conditions, New York Rollover – Variable Rate Plan" (the "Variable Rate Plan") (LP 299-300 and LP 687-88), which includes the terms and conditions of the variable rate price (the "Variable Rate").

FILED: NEW YORK COUNTY CLERK 12/20/2019 04:38 PM    INDEX NO. 151293/2013

NYSCEF DOC. NO. 308                                                    RECEIVED NYSCEF: 12/20/2019

## I.    Liberty Power's Variable Rate Plan

8.    Prior to the mid 1990s in New York, and in the rest of the U.S. as well, end-use retail customers (e.g., households, businesses) received electricity from an "integrated" electric utility, such as Consolidated Edison of New York ("Con Ed"). It was integrated in the sense that the utility was responsible for generating electricity from power plants as well as transmitting and distributing it over an interconnected network of wires and other equipment to final customers.

9.    In the 1990s, restructuring of the electric power industry accelerated and led to widespread reform of regulatory policies, including in New York. These policies introduced competition in the generation sector by opening the "wires" to competitive generation suppliers. This was known as "unbundling" because the retail customers' power supply purchase was no longer "bundled" to the transmission and distribution services of the integrated utility -- all qualified suppliers could offer generation supply.

10.    Unbundling allowed customers to choose an alternative supplier at unregulated supply prices, while the transmission and distribution costs are still recovered from all customers through regulated rates. Hence, the customers were charged monthly for generation "supply" and separately for the cost of distribution. As a result, ESCOs came into existence to compete against the incumbent utilities and each other. In New York, many of the incumbent utilities divested their generation during this restructuring process and providers of competitive generation supply were largely non-incumbent suppliers. However, the incumbent utilities retain a "supplier of last resort" responsibility and procure supply for customers that do not choose a competitive supplier, as I explain more below.

4

11. NYISO is critical to the New York electricity markets. NYISO is the operator of the high-voltage transmission network in New York state. It operates an amalgamation of the high-voltage electricity networks that are owned by the New York public utilities and public power systems. NYISO does not own the networks, but only coordinates their operation, especially the operation of the state-wide electricity markets.

12. In the NYISO markets, generation suppliers and wholesale buyers transact and settle on a multi-lateral basis for deliveries of power utilizing a day-ahead market as well as a real-time balancing market. Liberty Power is an ESCO and, as such, typically relies on these NYISO "spot" market purchases and longer-term contracts derived from NYISO spot prices to supply its customers. ESCOs compete among themselves and against incumbent utilities mainly through price.

13. From at least since 2005, Liberty Power offered the Variable Rate Plan, intended as a Liberty Power market-based rate that would be passed through to consumers directly from the NYISO wholesale markets (see 2/5/15 Albarran Depo. Tr. at 80-81). Essentially, by furnishing power under its Variable Rate Plan, Liberty Power was acting as a middleman between the NYISO and the retail customer. According to Liberty Power, under the Variable Rate Plan, "[t]he Rate for electricity sold ... is established each month based upon the electricity market pricing, including capacity, ancillary services, losses, generation, and any other miscellaneous charges (including, but not limited to ISO/RTO or PUC fees)." (Rosen Aff. ¶ 23.)

14. However, rates charged under Liberty Power's Variable Rate Plan were substantially higher than a market-based rate which was promised under the plan. A reasonable variable rate should reflect the delivered NYISO wholesale costs for electricity at a

given location (which include wholesale transmission charges) plus operating costs and a margin.

15. The cost of wholesale power varies in New York based on NYISO zones. For example, New York City is designated in Zone J. The cost of wholesale electricity in each zone can vary due to transmission constraints which may require higher-priced generation to operate locally because less expensive power in other locations cannot flows into New York City due to transmission limits.

16. The delivered wholesale power costs at a given location in NYISO is public information. For example, during 2011, a year during which customers were charged under Liberty Power's Variable Rate Plan, Table 1 shows NYISO's average monthly cost of wholesale power delivered to Zone J in New York City.

**Table 1: Cost of NYISO Wholesale Power**
**Delivered to New York City**
**2011**

| Month | NYISO NYC Price (¢ per kWh) |
|---|---|
| January | 9.97 |
| February | 8.05 |
| March | 6.97 |
| April | 6.96 |
| May | 8.69 |
| June | 9.74 |
| July | 9.39 |
| August | 7.68 |
| September | 6.96 |
| October | 7.26 |
| November | 4.84 |
| December | 5.74 |

17. The cost in the table is expressed in cents per kWh (kilowatt hour). The kWh is a standard expression of customer usage in the electric utility industry. It is the volume of consumption. It is comparable to "gallons" as one would use to measure water consumption.

18. Customers in New York regardless of location and customer class are charged in substantially the same manner for electricity supply. The total charge is equal to the monthly rate times the monthly volume of electricity consumer. For larger customers, there is sometimes a "demand" charge, which is a measure of highest hourly usage during the month and it is measured in kW (kilowatt). So these customers vary slightly from the volumetric customers in that in addition to the volumetric charge, there is a kW charged times the monthly kW peak. Some customers may also have different rates for different times of day. In that case the customer would have two volumes and two volumetric rates. But the basic idea is the same for all customers and is straightforward – rate times monthly usage.

19. The NYISO costs for NYC cost shown in the Table 1 includes the monthly average price paid in the NYISO day-ahead spot market. The major component of the delivered cost (about 80 percent) is the energy cost, the cost to supply the volume of electricity that actually comes through the wires. Other major costs are transmission costs to pay for the wires; "ancillary services" costs incurred by generators to maintain stability of the grid; and "capacity costs" to pay for generators to stand ready year round to provide service. Aside from some other minor variable costs incurred to purchase wholesale power, the values in the table represent the entirety of the wholesale cost of electricity delivered from the NYISO markets to Zone J in New York City. An energy service

7

company seeking to purchase NYISO power for a pass-through variable rate to its retail customer in Zone J would buy at these costs.

20. For an ESCO servicing a market-based rate (like the rate in Liberty Power's Variable Rate Plan), the NYISO delivered wholesale power cost in Table 1 will account for the vast bulk of the cost. Because the market-based rate is a pass through of these costs, a (competitive) ESCO simply has to cover relatively small operating costs, and a margin covering transaction costs, overhead, and a profit. Hence, a competitive, market-based variable rate to charge customers under Liberty Power's Variable Rate Plan would consist of:

    a. Delivered NYISO wholesale costs (Table 1):

    b. miscellaneous operating costs, and

    c. a margin.

21. *Miscellaneous Operating Costs.* According to Liberty Power, miscellaneous operating costs include various fees to participate in NYISO markets as well as balancing charges. These miscellaneous charges account for about 5 percent of the total variable rate. (See Liberty Power witness José Albarran, who testified on miscellaneous operating costs (see 2/5/15 Albarran Depo. Tr. 108-120).[2]

22. *Margin.* The margin helps cover administrative overhead and profit. Administrative overhead would be associated with running the enterprise, e.g., salaries, office space, license fees, and transaction costs to hedge market risks. Profit would reflect the revenue left over above these costs (see 9/25/19 Viner Depo. Tr. 191-196). The level

---

[2]    As discussed by witness Albarran, these costs include Financing Fee, Billing Transaction Costs, Balancing, and POR Charge.

FILED: NEW YORK COUNTY CLERK 12/20/2019 04:38 PM    INDEX NO. 151293/2013

NYSCEF DOC. NO. 308                                                    RECEIVED NYSCEF: 12/20/2019

of the margin will depend on whether it is a market-based, commercially reasonable variable rate or whether it is above-market, like the Variable Rate charged to Liberty Power customers.

23. In order to compare the Liberty Power variable rate to a commercially reasonable variable rate, I develop a competitive, market-based variable rate for New York City customers. Like the Liberty Power Variable Rate, the market-based variable rate has three components: (1) NYISO delivered wholesale power cost (in the case the Table 1 estimates for Zone J - New York City); (2) the miscellaneous operating costs; and (3) a margin Using the NYISO wholesale power costs from Table 1, above, and the 5.1 cent/kWh margin Liberty Power used at the time (see 2/5/15 Albarran Depo. Tr. 118-119), I was able to calculate the 5 percent overhead for each month in 2011.

24. A commercially-reasonable margin for a variable rate plan is one that would prevail under competitive conditions. For the purposes of developing a market-based variable rate, I could not rely on the margins disclosed by Liberty Power on its Variable Rate Plan because these were not formed under competitive conditions. However, Liberty Power disclosed margins for its fixed-rate plans which it claims were formed under competitive conditions. According to Liberty Power, margin fees on fixed rate plans in recent years (early in 2015) ranged from about 0.3¢/kWh to 0.8¢/kWh. (see 2/5/15 Albarran Depo. Tr. 119:22-120:8.).

25. The margin on a fixed rate plan, because it includes transaction costs, should be higher than on a market-based variable rate. This is because the margin on the fixed rate should be higher than on the variable rate due to the higher administrative and transaction costs of offering the fixed rate. Under the fixed rate, the ESCO must invest

Case 21-13797-SMG    Doc 948-1    Filed 06/30/23    Page 16 of 34

significant resources and expertise in projecting future energy prices, negotiating fixed price contracts with generators, and calculating fixed rates to charge its customers that will permit it to recover costs while remaining competitive (see 9/24/19 Kakar Dep Tr. at 12-17). This results in costs to undertake technological and personnel investment. In addition, the risk on a fixed rate plan is higher for the ESCO because it guarantees a price regardless of market fluctuations (see 9/24/19 Kakar Dep Tr. at 37-38). While the ESCO will try to enter into its own fixed-rate purchase agreements with generators to mitigate that risk, ultimately the risk is higher in a fixed price arrangement than one in which the ESCO is simply buying and reselling electricity at market prices. Because of the increased costs and added risk, the margin on a fixed rate will typically be higher than on a variable rate. Therefore, an upper bound on a market-based variable rate would be the NYISO wholesale costs plus the miscellaneous operating expenses plus the Liberty Power fixed rate margin.

26. It would be appropriate to use an even lower margin in the Variable Rate given the lower cost of offering the Variable Rate. This lower margin can be ascertained either by production of information by Liberty Power or by estimating a reasonable return on invested capital for an enterprise similar to Liberty Power. This would require total asset or invested capital information from the balance sheet and net income information from the income statement that Liberty Power should have. In the event documents supporting the competitive margin are not produced, I can use a proxy required rate of return based on the financial data of other companies with similar risk profiles. There are a variety of valuation service providers that compile such data.

27. Based on the above discussion, a commercially reasonable, market-based variable rate
    is the sum of three components: (1) the delivered wholesale price (from Table 1); (2)
    the miscellaneous operating costs, approximated as 5 percent of the total as per Liberty
    Power witness Albarran as discussed above; and (3) the margin. The margin in this
    calculation is the upper end of the range of Liberty Power fixed rate margins, i.e.,
    0.8¢/kWh. This is a good proxy for establishing the commercially reasonable rate in
    the absence of other data.

28. The market-based rate from these three components for a New York City customer is
    shown in Table 2

### Table 2: Market-Based Variable Rate for NYC Monthly 2011

| Month | NYISO NYC Price (¢ per kWh) | Misc. Operating Costs (¢ per kWh) | Margin (¢ per kWh) | Market-Based Variable Rate (¢ per kWh) |
|---|---|---|---|---|
| January | 9.97 | 0.79 | 0.80 | 11.56 |
| February | 8.05 | 0.69 | 0.80 | 9.55 |
| March | 6.97 | 0.64 | 0.80 | 8.41 |
| April | 6.96 | 0.63 | 0.80 | 8.39 |
| May | 8.69 | 0.73 | 0.80 | 10.22 |
| June | 9.74 | 0.78 | 0.80 | 11.32 |
| July | 9.39 | 0.76 | 0.80 | 10.95 |
| August | 7.68 | 0.67 | 0.80 | 9.15 |
| September | 6.96 | 0.63 | 0.80 | 8.39 |
| October | 7.26 | 0.65 | 0.80 | 8.71 |
| November | 4.84 | 0.52 | 0.80 | 6.16 |
| December | 5.74 | 0.57 | 0.80 | 7.11 |

## II.     Damage Calculation

29. In this section I explain how to calculate the damages suffered by Liberty Power
    customers as a result of Liberty Power failing to provide the competitive market rate as
    promised. I present two sample damage calculations. The first is a damage calculation

11

FILED: NEW YORK COUNTY CLERK 12/20/2019 04:38 PM
Case 21-13797-SMG Doc 948-1 Filed 06/30/23 Page 18 of 34
INDEX NO. 151293/2013

NYSCEF DOC. NO. 308
RECEIVED NYSCEF: 12/20/2019

based on the market-based variable rate shown in Table 2. The second is a damage calculation based on the MSC, which is a supply option available from the local distribution utility to customers that do not choose a third-party ESCO. Both calculations are essentially the same, they calculate Liberty Power's overcharge and multiply it by each customer's kWh volume for the sample period (2011).

## A. Damages Based on Market-Based Variable Rate

30. To illustrate the damage calculation, I use the kWh usage of a BLT-owned restaurant in New York City in 2011 and the rate charged by Liberty Power under the Variable Rate Plan to this customer. I calculated the overcharge based on the market-based variable rate in 2011 that I illustrated above, and I get the resulting monthly damages shown in Table 3.

**Table 3: Illustration of Damages for a BLT Restaurant in New York City 2011**

| Month | (1) Customer Usage (kWh) | (2) Liberty Power Variable Rate (¢ per kWh) | (3) Market-Based Variable Rate (¢ per kWh) | (4) Overcharge (¢ per kWh) (2) - (3) | (5) Damages (1)*(4) |
|---|---|---|---|---|---|
| January | 29,600 | 17.75 | 11.56 | 6.19 | $1,832 |
| February | 31,440 | 14.64 | 9.55 | 5.09 | $1,602 |
| March | 27,440 | 14.16 | 8.41 | 5.75 | $1,579 |
| April | 30,160 | 15.75 | 8.39 | 7.36 | $2,219 |
| May | 39,440 | 17.45 | 10.22 | 7.23 | $2,852 |
| June | 48,080 | 17.03 | 11.32 | 5.71 | $2,746 |
| July | 49,440 | 18.53 | 10.95 | 7.58 | $3,748 |
| August | 40,720 | 15.86 | 9.15 | 6.71 | $2,730 |
| September | 41,680 | 14.78 | 8.39 | 6.39 | $2,663 |
| October | 30,240 | 14.37 | 8.71 | 5.66 | $1,711 |
| November | 36,000 | 12.01 | 6.16 | 5.85 | $2,105 |
| December | 29,440 | 13.13 | 7.11 | 6.02 | $1,773 |
| Total | | | | | $27,560 |

31. Damages are the kWh volume of electricity used by the customer during the month in column (1) times the Overcharge in column (4). For this particular restaurant, the total damages for all months in 2011 was over $27,000. The difference between the Liberty Power rate charged to Variable Rate Customers and the market-based rate is substantial. In more than one-half of the months, the Liberty Power Rate was more than twice commercially reasonable market-based rate.

32. BLT owns other restaurants in New York City, and they suffered damages in the same way. Moreover, the overcharging extended into time periods before and after 2011. The data I would use in my damages calculations for the entire class can be found in common billing data that would be in the possession of Liberty Power. More precisely, Liberty Power could provide dates at which the customer was placed on the Variable

Rate Plan and when the customers left the Plan (9/27/19 Fuller Depo. Tr.); the kWh volume of electricity consumed (Id); and the rate charged by Liberty Power (Id). The market-based variable rate can be calculated for each location using publicly-available data, as shown above in Table 2 for Zone J.

## B. Damages Based on "Market Supply Charge"

33. An alternative to damages based on the market-based variable rate is one based on an overcharge that compares the Liberty Power variable rate to the local distribution utility's Market Supply Charge ("MSC"). An MSC is a power supply rate available to customers that do not choose to buy power from a third-party ESCO. These customers are known as full-service customers because they receive not only distribution service from the local utility, but also the supply service. Local distribution utilities are required under New York regulations to provide this supply service.

34. This supply option is procured by the local distribution utility directly from the NYISO and passed through to end use retail customers. This comparable to how Liberty Power serves its Variable Rate Plan customers – it procures from the NYISO at the wholesale delivered cost in the customer's zone and passes the cost on directly to the customer. The MSC is not a regulated rate in the traditional sense of reflecting the average cost of service. It is a rate that is required by regulators to mimic a pass-through of NYISO wholesale power cost, exactly like the Liberty Power Variable Rate. As Con Ed describes it, both "Con Edison and ESCOs shop for energy in the marketplace, and those prices vary from day-to-day and month-to-month."[3] In this way, the MSC is a competitive benchmark and represents a market-based variable rate that is

---

[3] See Con Ed at https://www.coned.com/_external/cerates/supply_charges.asp

14

commercially reasonable. The New York Public Service Commission approves plans for retail access and oversees the procedures by which local utilities like Con Ed must follow in establishing the default supply charge (MSC). This limits the charged to reasonable incurred market costs, miscellaneous charges, overhead and, because Con Ed is a for-profit company, it will include a competitive profit.

35. Therefore, if customers had not been placed on the Liberty Power Variable Rate Plan and instead been simply discontinued as Liberty Power customers, they would have been placed as customers of the local distribution company and paid the MSC.

36. In the example of the BLT-owned restaurant that we discussed above, Table 4 below shows how the customer is damaged based on the Liberty Power overcharge relative to the MSC. Column (3) in the table shows what the restaurant would have paid each month in 2011 if it had not been rolled over to Liberty Power's Variable Rate Plan and instead simply had been discontinued by Liberty Power and "forced" onto the Consolidated Edison MSC at the end of their fixed rate contract period. As the table shows, the Liberty Power rate was substantially higher in each month than the Con Ed competitive default MSC rate.

**Table 4: Alternative Damages Approach using Con Ed MSC**
**2011**

| Month | (1) Customer Usage (kWh) | (2) Liberty Power Variable Rate (¢ per kWh) | (3) Con Ed NYC MSC (¢ per kWh) | (4) Overcharge (¢ per kWh) (2) - (3) | (5) Damages (1)*(4) |
|---|---|---|---|---|---|
| January | 29,600 | 17.75 | 7.12 | 10.63 | $3,147 |
| February | 31,440 | 14.64 | 7.32 | 7.32 | $2,302 |
| March | 27,440 | 14.16 | 7.70 | 6.46 | $1,773 |
| April | 30,160 | 15.75 | 6.97 | 8.78 | $2,649 |
| May | 39,440 | 17.45 | 8.79 | 8.66 | $3,416 |
| June | 48,080 | 17.03 | 8.30 | 8.73 | $4,198 |
| July | 49,440 | 18.53 | 8.86 | 9.67 | $4,783 |
| August | 40,720 | 15.86 | 6.95 | 8.91 | $3,628 |
| September | 41,680 | 14.78 | 8.56 | 6.22 | $2,593 |
| October | 30,240 | 14.37 | 7.62 | 6.75 | $2,042 |
| November | 36,000 | 12.01 | 6.85 | 5.16 | $1,859 |
| December | 29,440 | 13.13 | 6.50 | 6.63 | $1,951 |
| Total | | | | | $34,341 |

37. The calculation takes the Liberty Power Variable Rate and subtracts what would have been charged had the customer been placed on the Con Ed default rate (the MSC). This rate difference is multiplied by the customer's kWh volume in each month. The damages amount is comparable under this approach to the alternative approach above using the commercially-reasonable market-based variable rate in Table 3. And just like the damages in Table 3, the Liberty Power rate was substantially higher than the MSC rate. In one half of the months the Liberty Power rate was twice the MSC charge.

38. Consolidated Edison's Market Supply Charges are promulgated by regulatory requirements rates and as such are public information. In addition to the publicly-available utility MSC data, this MSC approach to damages will require Liberty Power enrollment, kWh volume, and rate data. This is the same Liberty Power data described above in relation to the first damages calculation (see paragraph 31).

### III.   General Approach to Damages Calculation

39. The calculations above are based on a single BLT-owned restaurant in New York City.

40. The approach shown in these examples would be applicable in a general damages
    model for all New York state customers of Liberty Power:

    a. Identify the customers that were placed on the Variable Rate Plan and identify
       the months they were on this plan;

    b. For each customer and each month identify the monthly kWh volume;

    c. Multiple the kWh volume times the Liberty Power overcharge.

    d. The overcharge is the difference between the Liberty Power Variable Rate and
       the alternative market-based charge (either the market-based variable rate or the
       MSC).

41. The market-based charge will be different in accordance with the following factors:

    a. Zonal wholesale energy cost in NYISO energy market;

    b. Zonal wholesale capacity cost in NYISO capacity market;

    c. Transmission cost for the local utility transmitting the wholesale power; and

    d. Ancillary services charges and NYISO operations cost.

42. Each of the items listed can vary with customer's physical location and is readily
    available public data. Hence, for each customer and for each location, I can calculate
    damages using the Liberty Power customer data and developing the market-based
    variable rate for all locations in New York. Table 5 shows a calculation of the market-
    based variable rate for the Dunwoodie Zone, which is NYISO Zone I. Zone I is north
    of New York City and includes Westchester County localities. The table shows that

the Dunwoodie price has been generally lower than the NYC price, due to the lower

cost of energy and capacity for most periods during 2011.

**Table 5: Market-Based Variable Rate in
Dunwoodie Zone 2011
(Compared to NYC Zone)**

| Month | Dunwoodie ($\phi$ per kWh) | NYC ($\phi$ per kWh) |
|---|---|---|
| January | 9.98 | 11.56 |
| February | 8.19 | 9.55 |
| March | 7.15 | 8.41 |
| April | 6.62 | 8.39 |
| May | 7.08 | 10.22 |
| June | 8.51 | 11.32 |
| July | 9.16 | 10.95 |
| August | 7.41 | 9.15 |
| September | 6.87 | 8.39 |
| October | 6.38 | 8.71 |
| November | 5.86 | 6.16 |
| December | 5.79 | 7.11 |

43. The calculation in Table 5 can be made for all NYISO zones. As a result, the damages

can be calculated for all customers that were overcharged as a result of the Liberty

Power's Variable Rate Plan regardless of their location within New York State.

44. The alternative estimate of the overcharge is to calculate it as the difference between

the Liberty Power Variable Rate and the local utility's Market Supply Charge. Each

New York local distribution company must provide an MSC for purposes of supplying

customers who do not choose an ESCO. Table 6 shows the two rates that Con Ed

charges in two separate zones, the NYC zone, which we explained above, and Con Ed's

Westchester service area, which is in the Dunwoodie NYISO zone. These MSC rates

are available for all New York local distribution utilities.

18

**Table 6: Comparison of MSC Charges in New York City and Westchester**

| Month | Con Ed MSC Westchester (¢ per kWh) | Con Ed MSC NYC (¢ per kWh) |
|---|---|---|
| January | 6.20 | 7.12 |
| February | 5.73 | 7.32 |
| March | 5.98 | 7.70 |
| April | 5.31 | 6.97 |
| May | 7.45 | 8.79 |
| June | 6.29 | 8.30 |
| July | 6.98 | 6.25 |
| August | 5.71 | 6.95 |
| September | 6.79 | 8.56 |
| October | 5.61 | 7.62 |
| November | 6.13 | 6.85 |
| December | 5.83 | 6.50 |

## IV.    Summary of Damages Approach

45. The calculation of damages suffered by Liberty Power New York State customers as a result of Liberty Power failing to provide the promised market-based rate to its rollover customers is straightforward to calculate. The necessary data to do so is either publicly available or in the possession of Liberty Power.

46. The damages are based on the monthly kWh volume for each customer which Liberty Power moved to its rollover rate following expiration of a Liberty Power fixed rate. At his deposition, Liberty Power witness Fuller indicated that Liberty Power has data that can identify these customers, the customers' monthly kWh volume, the Variable Rate the customers were charged, and the period of time for which the customers were on the Liberty Power Variable Rate Plan. The total monthly overcharge to each customer during this time period is the monthly kWh volume times the Liberty Power

overcharge. The overcharge is Liberty Power's Variable Rate less the alternative commercially reasonable rate.

47. I present two alternative commercially-reasonable rates.

    a. The market-based variable rate is based on the pass through of the NYISO wholesale power cost with small adders specific to Liberty Power, as I described above. This calculation is based on publicly-available data and information possessed by Liberty Power. The market-based variable rate will vary by location due to NYISO wholesale zonal cost variations. The NYISO data is readily available.

    b. The MSC rate is a regulatory requirement for New York utilities and is publicly available. These rates vary based on utility.

48. Should the court or jury determine that another value for the variable rate or margin is an appropriate commercially reasonable rate or margin, I can calculate damages using the substantially same approach.

49. In summary, the damages to customers rolled into Liberty Power Variable Rate Plan can be calculated in a direct manner using publicly-available data and data in the possession of Liberty Power.

Robert Sinclair, Ph.D.

Sworn to before me this
20th day of 2019 in Fairfax, VA
December

(Notary Public)

MATTHEW JAMES CARRIER
NOTARY PUBLIC
Commonwealth of Virginia
Reg. # 7233763
My Commission Expires
November 30, 2021

20

Case 21-13797-SMC    Doc 948-1    Filed 06/30/23    Page 27 of 34

**POTOMAC ECONOMICS**

### PROFESSIONAL BACKGROUND OF
### ROBERT A. SINCLAIR
### (2019)

**Business Address**

Potomac Economics
9990 Fairfax Blvd Suite 560
Fairfax VA 22030

**Education**

Ph.D., Economics, University of Pittsburgh (1993)
B.A.,   Economics, Indiana University of Pennsylvania (1986)

**Fields of Concentration**

Applied Microeconomics, Law and Economics, Empirical Industrial Organization

**Professional Experience**

2001 -        Vice President, Potomac Economics, Fairfax, VA
2000 - 2001,  Economic Consultant, Micronomics, Washington, DC
1993 - 2000,  Economic Consultant, J.W. Wilson and Associates, Washington, DC

**Electricity Market Monitoring and Analysis**

Perform market monitoring functions for the Midcontinent ISO, the New York ISO, and ISO New England. Responsibilities include (1) assisting the transmission system operator, federal and state regulators, and other stakeholders by Monitoring anomalies in market operations; Proposing and evaluating market design improvements, including settlements and payments; Regular Reporting on the markets; (2) monitoring and reporting on the conduct of market participants including offers and bids of market participants and their impact on the market; generation costs; and Transmission operations that affect market outcomes; (3) Evaluate the impact of participant conduct and market design rules on consumer prices and market efficiency.  This involves prices for energy, ancillary services, capacity, transmission.  The analyses typically assess prevailing customer usage and prices compared to counterfactual price and usage forecast or estimates.

**Power Supply Monitoring**

Project manager for power supply procurement monitoring engagement, which focused on the economic evaluation of the competing power supply proposals within the utility procurement process.  These engagements sought to monitor and evaluate aspects of utility capacity procurement decisions as part of the of the regulatory approval process to help to ensure that the economic evaluation and selection of proposals were conducted in an accurate and fair manner.  This included monitoring the solicitation process; the economic evaluation process (including methods of evaluation such as production cost models and transmission planning models); the selection process; due diligence and contract

2

Resume of Robert A. Sinclair

negotiation; and regulatory review, including testimony and reports to the regulatory commission.

**Power Supply Monitoring**

Project manager for power supply procurement monitoring engagement, which focused on the economic evaluation of the competing power supply proposals within the utility procurement process. These engagements sought to monitor and evaluate aspects of utility capacity procurement decisions as part of the of the regulatory approval process to help to ensure that the economic evaluation and selection of proposals were conducted in an accurate and fair manner. This included monitoring the solicitation process; the economic evaluation process (including methods of evaluation such as production cost models and transmission planning models); the selection process; due diligence and contract negotiation; and regulatory review, including testimony and reports to the regulatory commission.

**Market Integration -- Eastern Europe**

*Black Sea Regulatory Initiative.* Led the 2016 NARUC/USAID efforts in the Black Sea to develop wholesale market mechanisms for various Black Sea countries. This effort includes assisting in wholesale market design and other processes to bring countries' laws and regulations into accord with the EU Internal Energy Market model. Principal author of one of the project's main deliverables, the Wholesale Market Guidelines. The Wholesale Market Guidelines focused on transmission mechanisms for both day-ahead "market coupling" and real-time mechanisms for ancillary services and balancing energy. The Guidelines emphasized the transition from prevailing regulatory conditions in the Black Sea Region to the EU Internal Energy Market vision based on the EU electricity directives.

*Energy Community of South East Europe.* Led the effort by Potomac Economics as the consultant for the USAID-supported a market monitoring project to assist the countries in the region in restructuring their energy markets. The project focused on cross-border market integration by provided training to regulators through a pilot program and a dry run of a final market monitoring system. The market monitoring focused on providing transparency regarding transmission operators' policies with respect to access to the regional transmission system for cross-border trading. The specific indicators developed for the market monitoring included indicators to monitor the assumption and outcomes of the cross-border capacity calculation and allocation process. This introduced a measure of oversight to this process and increased the regulators visibility on TSO operations. The market monitoring project included development of a web-based interface that allowed data upload, data storage, and the calculation and reporting of specific market monitoring indicators, threshold, and automated reporting. The effort was guided by specific

3

Resume of Robert A. Sinclair

responsibilities of national regulatory authorities under the EU liberalization directives, including the second and third "energy packages" of reforms.

**Expert Testimony**

*Before the Federal Energy Regulatory Commission*, <u>Midcontinent Independent System Operator, Inc.'s Section 205 Filing To Amend Tariff to Exempt from Revenue Sufficiency Guarantee Charges Post-Notification Deadline Supply-Increasing Deviations (2015)</u>, Docket No. ER16-___-000; prepared affidavit in support of changes to the MISO Markets Tariff concerning allocation of certain operating charges.

*Before the State of New York Public Service Commission,* <u>In the Matter of the Implementation of a Large-Scale Renewable Program</u> (2015), Case 15-E-0302; prepared affidavit in support of New York ISO comments on the design of renewable energy procurement policies and their effect on New York ISO wholesale markets.

*Before the Manitoba Public Utilities Board,* <u>Need For and Alternatives To Manitoba Hydro's Preferred Development Plan</u> (2014); prepared and filed an Independent Expert Consultant report on expected prices and conditions for exports to the Midcontinent Independent System Operator (MISO) markets (co-authored with Dr. David Patton).

*Before the Louisiana Public Service Commission,* <u>Application Entergy Gulf States, Inc. for Authorization to Participate in an MSS-4 Contracts, etc.</u> (2011), Docket No. U-32031; and <u>Joint Application of Entergy Louisiana, LLC for approval to Construct Unit 6 at Ninemile Station and of Entergy Gulf States, etc.</u> (2011), Docket No. U-31971; prepared and filed expert testimony at the request of the Louisiana Public Service Commission Staff on the independent monitoring of Entergy's evaluation of power supply proposals.

*Before the Federal Energy Regulatory Commission,* <u>Northeast Utilities Service Company and NSTAR Electric</u> (2009), Docket No. EL09-20-000; prepared affidavit on behalf of Nalcor Energy addressing vertical market power issues associated with a participant-funded transmission line.

*Before the Régie de Énergie, Quebec,* <u>Complaint by Transmission Customer Newfoundland and Labrador Hydro concerning Transmission provider Hydro Quebec's Administration of its Tariff, etc.</u> (2008), Case No: P-110-1692; prepared and filed expert testimony on behalf of Newfoundland and Labrador Hydro on issues relating to the technical requirements for receiving certain-transmission service.

*Before the Régie de Énergie, Quebec,* <u>Complaint by Transmission Customer Newfoundland and Labrador Hydro concerning Transmission provider Hydro Quebec's Administration of its Tariff, etc.</u> (2008), Case No: P-110-1565 and No P-110-1597; prepared and filed expert testimony on behalf of Newfoundland and Labrador Hydro on issues relating to calculation of available transmission capacity and open access policies.

4

Resume of Robert A. Sinclair

*Before the Louisiana Public Service Commission,* <u>Joint Application of Entergy Louisiana, LLC. And Entergy Gulf States, Inc. for Authorization to Participate in Contracts for the Purchase of Electric Power</u> (2007), Docket No.U-29955; prepared and filed expert testimony at the request of the Louisiana Public Service Commission Staff on the independent monitoring of Entergy's evaluation of power supply proposals.

*Before the Federal Energy Regulatory Commission,* <u>Progress Energy, Inc.</u> (2003), Docket No. ER03-1389-000, *et al*; prepared affidavit on behalf of Florida Municipal Power Agency and Seminole Electric Power Cooperative addressing market power issues associated with Progress Energy's application to sell wholesale power at market-based rates.

*Before the United States District Court for the Northern District of California—San Jose Division,* <u>ABB Power T&D Company v. Alstom ESCA Corporation</u> (2001), Case No. C-99-21242 SW PVT ENE; prepared expert report on behalf of plaintiff on economic and structural issues in the electric power industry.

*Before the Connecticut Department of Environmental Protection,* <u>In the Matter of the Determination to Issue the Draft Air and Water Permits to Towantic Energy</u> (2001); prepared expert report on behalf of citizens group opposing new plant construction; report addressed economic benefits of new plant construction.

*Before the Federal Communications Commission,* <u>In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities</u> (2000), GN Docket No. 00-185; prepared affidavit to support comments on behalf of various consumer groups and Internet Service Providers relating to policies on open access cable broadband.

*Before the Superior Court of the State of Arizona in and for the County of Santa Cruz,* <u>Sam and Sherri Chilcote, *et al.*, v. Citizens Utilities Company, *et al.*</u> (2000), Case No. CV 98-471; prepared expert report on behalf of a class of electricity customers relating to damages resulting from inadequate electric service.

*Before the United States District Court for the Southern District of Ohio -- Western Division,* <u>PepsiCo, Inc. v. Central Investment Corporation</u> (2000), Case No. C-1-98-389; prepared expert report on behalf of PepsiCo on economic issues relating to soft drink production and distribution (co-authored with Roy Weinstein).

*Before the Federal Energy Regulatory Commission,* <u>Western Resources, Inc.</u> (1998), Docket No. ER98-2157-000; prepared affidavit on behalf of the Kansas City Board of Public Utilities addressing market power issues associated with Western Resources' application to sell wholesale power at market-based rates.

*Before the Corporation Commission of the State of Oklahoma,* <u>Joint Application of American Electric Power Company, Inc. Public Service Company of Oklahoma and Central and South West Corporation Regarding Proposed Merger</u> (1999), Cause No. PUD 980000444; prepared testimony on behalf of public power entities on merger-related market power issues.

Case 21-13797-SMG   Doc 948-1   Filed 06/30/23   Page 31 of 34

5

Resume of Robert A. Sinclair

*Before the Pubic Service Commission of the State of Wisconsin,* In the matter of Proposed Revision of Chapter PSC 100, Wis. Admin. Code – Rules for Wholesale Merchant Plants (1999), Docket No. 1-AC-174; prepared testimony on behalf of various intervenors concerning market power issues relating to merchant plant development.

*Before the Federal Energy Regulatory Commission,* New England Electric Power Company, et al. (1998), Docket Nos. ER98-6-000 and EC98-1-000; prepared affidavit on behalf of the Town of Norwood addressing market power issues associated with the New England Power's sale of generating assets to U.S. Generating Company.

*Before the Mississippi Public Service Commission,* Report on Retail Market Power Issues (1998), Docket No. 96-UA-389; prepared expert report on market power issues associated with electric utility restructuring in Mississippi on behalf of the Municipal Energy Agency of Mississippi.

*Before the Connecticut Department of Public Utility Control,* Review of the Connecticut Light & Power Company Rates and Charges (1998), Docket No. 98-01-02; prepared testimony and exhibits on cost allocation and rate design issues on behalf of the Connecticut Office of Consumer Counsel.

*In United States District Court for the District of Massachusetts,* Town of Norwood, Massachusetts v. New England Power Company, *et al*. (1998), Case No. 97-CV10818-PBS; prepared affidavit on behalf of the Town of Norwood addressing antitrust issues associated with New England Power Company's sale of generating assets.

*In United States District Court for the District of Massachusetts,* Town of Norwood, Massachusetts v. New England Power Company, *et al*. (1998), Case No. 97-CV10818-PBS; prepared affidavit on behalf of the Town of Norwood addressing recent changes in the corporate organization of Pacific Gas & Electric Company pertinent to New England Power's sale of its generating assets to an affiliate of Pacific Gas & Electric Company.

*Before the Federal Energy Regulatory Commission,* San Diego Gas & Electric Company, Enova Energy, Inc. (1997), Docket No. EC97-12-000; prepared affidavit on behalf of Southern California Public Power Authority addressing market power issues associated with the San Diego Gas & Electric/Southern California Gas merger.

*Before the Federal Energy Regulatory Commission,* The Cleveland Electric Illuminating Company and Market Responsive Energy, Inc. (1997), Docket Nos. ER96-372-000 and ER95-1295-000, respectively; prepared affidavit on behalf of Cleveland Public Power in opposition to CEI's and MREI's settlement offer to resolve market power issues in their filing under §206 of the Energy Policy Act to sell power at market-based rates.

*Before the California Public Service Commission,* Joint Application of Pacific Enterprises, Enova, *et al.* (merger of San Diego Gas & Electric Company and Southern California Gas Company, (1997)), Application No. A96-10-038; prepared testimony on behalf of Southern California Public Power Authority addressing market power issues associated with the merger.

Case 21-13797-SMG   Doc 248-1   Filed 06/30/23   Page 32 of 34

6

Resume of Robert A. Sinclair

*Before the Public Utilities Commission of Ohio,* Application of the Toledo Edison Company and the Cleveland Electric Illuminating Company for authority to increase rates (1996), Case No. 95-299-EL-AIR and 95-300-EL-AIR; prepared testimony on cost allocation and rate design issues on behalf of the Ohio Office of Consumers' Counsel.

*Before the South Carolina Public Service Commission,* South Carolina Electric & Gas Company Application for Increases in Electric Rates and Charges (1995), Docket No. 95-1000-E; prepared testimony on behalf of the South Carolina Department of Consumer Affairs analyzing the Company's proposal to shift depreciation reserves and shorten amortization schedules in order to reduce the unrecovered costs of generation assets in preparation for retail competition.

*Before the Public Service Commission of the District of Columbia,* Application of the Potomac Electric Power Company for an Increase in its Retail Rates (1995), Formal Case No. 939; prepared testimony on cost allocation and rate design issues on behalf of the District of Columbia Office of People's Counsel.

Other Expert Reports

*To the Federal Energy Regulatory Commission,* Quarterly Independent Monitoring Report on Entergy's Weekly Procurement Process, (2012-2013) Docket No. ER09-555, principal author of report to FERC on the Energy weekly activities to procuring network resources from third-party suppliers.

*Energy Community Regulatory Board – Electricity Working Group,* Market Monitoring Guidelines for the 8th Congestion Management Region of Europe, (2010); Developed draft Market Monitoring Guidelines to South East Europe Regulators for screens and indices to monitor cross-border transmission capacity market.

*To the Federal Energy Regulatory Commission,* Seasonal Independent Monitoring Report on Duke Energy Corporation and Progress Energy, (2011-2013) Docket No. EC11-60, principal author of independent monitoring report to FERC addressing interim market power mitigation issues relating to seasonal power sale agreements.

*International Upper Great Lakes Study Hydropower Technical Working Group*, IUGLS Hydropower Technical Working Group (TWG) Contextual Narrative, (2009); Provided technical economic analysis of Hydro production at Sault Ste. Marie to inform the final TWG narrative.

*To the South East Europe Energy Regulation Forum,* Report on Market Monitoring in South East Europe (2007-2008), principal author of market monitoring report for the United States Agency for International Development Market Monitoring Pilot Project addressing electricity market activities among the countries of South East Europe.

*To the Federal Energy Regulatory Commission,* Quarterly Market Monitoring Report on the Public Service Co. of New Mexico, (2005-2010) Docket No. EC05-29-000, principal

Case 21-13797-SMG    Doc 948-1    Filed 08/30/23    Page 33 of 34

7

Resume of Robert A. Sinclair

author of market monitoring report to FERC addressing the potential for market power related to the company's operation of its transmission and generation facilities.

*To the Federal Energy Regulatory Commission,* <u>Quarterly Market Monitoring Report on the Arizona Public Service Co.,</u> (2005-2010) Docket No. EC03-131-000, principal author of market monitoring report to FERC addressing the potential for market power related to the company's operation of its transmission and generation facilities.

*To the Federal Energy Regulatory Commission,* <u>Quarterly Market Monitoring Report on the Oklahoma Gas & Electric Company,</u> (2004-2006) Docket No. EC03-131-000, principal author of market monitoring report to FERC addressing the potential for market power related to the company's operation of its transmission and generation facilities.

## Publications and Papers

### ARTICLES

1. "Electric Power: Generating Controversy," with D.B. Patton <u>Industry Studies</u>, 3rd edition, Larry Duetsch, editor, New York: M.E. Sharpe (2002).

2. "An Empirical Model of Entry and Exit in Airline Markets," (October 1995) 10 *Review of Industrial Organization*

3. "Incremental Transmission Pricing, the Comparability Standard, and an Alternative to the FERC's 'Higher of' Policy," with D. F. Greer and J.W. Wilson (December 1994) *The Electricity Journal*

4. "Airport Dominance and State Action Antitrust Immunity for Airport Operators," (Fall 1991), 96 *Dickinson Law Review*

### BOOK REVIEWS

1. "Designing Competitive Electricity Markets," by Hung-po Chao and Hillard G. Huntington (eds.), for the *Review of Industrial Organization* 2000.

2. "Power Structure - Ownership, Integration, and Competition in the U.S. Electric Utility Industry," by John Kwoka for the *Review of Industrial Organization*, 1998

3. "Electric Utility Mergers - Principles of Antitrust Analysis", by M. Frankena and B. Owens for the *Review of Industrial Organization*, 1994

8

Resume of Robert A. Sinclair

**Teaching Experience**

*The George Washington University* (2005)

Law and Economics

*The University of Pittsburgh* (1989-1993)

Microeconomics (intro and advanced), Industrial Organization and Antitrust, Macroeconomics (intro),

Department of Economics Outstanding Teaching Award (1992)

**Speeches**

1.  "Market Monitoring Process in South East Europe," presented at Regional Workshop on Emerging Issues in Cross-Border Trade, Market Monitoring and Regulatory Role in Energy Efficiency in the Black Sea Region, sponsored by USAID and NARUC, Kiev, Ukraine, October 2013.

2.  "Who Should be the Market Monitor?" presented at Southeast Europe Electricity Market Monitoring Workshop, sponsored by USAID and NARUC, Athens, Greece, October 2005.

3.  "Market Monitoring and Standard Market Design," presented at Standard Market Design – Dealing with the New Giga-NOPR sponsored by Infocast, Washington, D.C., December 5, 2002.

4.  "The Role of Market Monitoring in Competitive Electricity Markets," presented at How's It Going – Snapshots of the Status of Electric Restructuring sponsored by the Energy Bar Association, Midwest Energy Conference, Kansas City Missouri, February 7, 2002.

5.  "Measuring Market Shares in the 'Energy Services' Market," presented at Communicating Competitive Concerns, sponsored by the American Gas Association, Arlington, VA, February 25, 1998.

6.  "Hostile Takeovers in the Electric Utility Merger Wave," presented at Antitrust, Merger Guidelines, and Regulation of Utility Consolidation, sponsored by the Institute of Public Utilities at Michigan State University, Washington D.C., November 7, 1996.

7.  "Telecommunications: Developing the Future at Home and Abroad," presented at The Future of Competition, sponsored by National Association of Regulatory Utility Commissioners, Columbus, OH, September 13, 1996.

8.  "Economic Aspects of FERC's Policy on Electric Utility Mergers," presented at Mergers: A Threat to Competition?" sponsored by the McGraw-Hill Company, Washington, D.C., March 15, 1996.