# EXHIBIT 3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| BLT STEAK LLC and BLT FISH LLC, | |
| Plaintiffs, | Index No. 151293/2013 |
| | [E-Filed Case] |
| v. | |
| LIBERTY POWER CORP, L.L.C., d/b/a | **FIRST AMENDED** |
| LIBERTY POWER NEW YORK, and | **CLASS ACTION COMPLAINT** |
| LIBERTY POWER HOLDINGS LLC, | |
| Defendants. | |

Plaintiffs BLT STEAK LLC and BLT FISH LLC, by their attorneys, Wachtel Missry LLP, on behalf of themselves and all similarly situated customers of Defendants, for their First Amended Class Action Complaint against Defendants LIBERTY POWER CORP, L.L.C., d/b/a LIBERTY POWER NEW YORK ("Liberty Corp") and LIBERTY POWER HOLDINGS LLC ("Liberty Holdings") (collectively, "Liberty Power" or "Defendants"), allege, upon information and belief, except as to their own acts, which are alleged on knowledge, as follows:

## NATURE OF THIS ACTION

1. This is an action to recover damages caused by Defendants' intentional breach of contract. The Defendants are Energy Services Companies ("ESCOs"), a type of private company that arose in the wake of the deregulation of the electricity market. The Defendants are in the business of supplying electricity to residential and commercial customers. Liberty Power offers different rate plans. Among them, and the subject of this litigation, is the Variable Rate Plan (defined below), for which Liberty Power agreed to charge a market-based variable rate, as more fully explained below. According to Liberty Power, the Variable Rate Plan would allow customers to "take advantage of electricity price trends."

2.     Liberty Power breached its obligation to charge a market-based rate. Instead, Liberty Power added an arbitrary and exorbitant hidden fee to the price it charged its customers under the Variable Rate Plan. Liberty Power's hidden fee was frequently higher than the wholesale cost of the electricity itself. As a result, plaintiffs and other customers on the Variable Rate Plan were consistently charged a supposedly "market-based" price that was actually 100% or more higher than the rates they otherwise would have paid to the local utility.

3.     As a result of its intentional breaches of the Variable Rate Plan, Liberty Power has wrongfully pocketed tens of millions of dollars of its customers' money.

## THE PARTIES

4.     By Agreement and Plan of Merger dated as of December 2004, ETA Restaurants Inc. merged with and into ETA Restaurants II LLC (attached as <u>Exhibit A</u>), causing the separate corporate existence of ETA Restaurants Inc. to cease, with only ETA Restaurants II LLC surviving and immediately changing its name to BLT STEAK LLC. Plaintiff BLT STEAK LLC ("BLT Steak") is, and at all relevant times was, a Delaware limited liability company that owns and operates a restaurant having a principal place of business at 110 East 57th Street, New York, New York, which has received and paid for electricity supply via Con Ed accounts no. 42-7203-0767-0005-8 and no. 42-7203-0790-8206-6 (the "BLT Steak Accounts").

5.     By Agreement and Plan of Merger dated as of December 2004, AZ NYC Inc. f/k/a Diversified Capital Investors Corp. merged with and into BLT FISH LLC (attached as <u>Exhibit B</u>), causing the separate corporate existence of AZ NYC Inc. f/k/a Diversified Capital Investors Corp. to cease, with only BLT FISH LLC surviving. Plaintiff BLT FISH LLC ("BLT Fish") is, and at all relevant times was, a Delaware limited liability company that owns and operates a restaurant having a principal place of business at 21 West 17th Street, New York, New York, which has

received and paid for electricity supply via Con Ed account no. 43-6213-0940-0002-6 (the "BLT Fish Account").

6. Defendants Liberty Holdings and Liberty Corp are engaged in the business of supplying electricity to customers within the State of New York.

7. Defendant Liberty Holdings is, and at all relevant times was, a Delaware limited liability company authorized to do business in the State of New York.

8. Defendant Liberty Holdings maintains an office at 1901 W. Cypress Creek Rd., Suite 600, Fort Lauderdale, Florida.

9. Defendant Liberty Holdings has a NYS Department of State service of process address c/o Corporate Creations Network Inc., 15 North Mill Street, Nyack, New York.

10. Defendant Liberty Holdings is a listed ESCO in the PSC's directory of energy suppliers offering services to customers in Plaintiffs' zip codes.

11. Defendant Liberty Corp is, and at all relevant times was, a Delaware limited liability company authorized to do business in the State of New York.

12. Defendant Liberty Corp maintains an office at 1901 W. Cypress Creek Rd., Suite 600, Fort Lauderdale, Florida.

13. Defendant Liberty Corp has a registered agent and NYS Department of State service of process address c/o Corporate Creations Network Inc., 15 North Mill Street, Nyack, New York.

14. The web domain "libertypowercorp.com" was owned and controlled by Liberty Corp.

15. Liberty Corp and Liberty Holdings are affiliated entities.

16. Liberty Corp and Liberty Holdings are directly or indirectly under common control.

3

17.     Liberty Corp and Liberty Holdings are directly or indirectly under common ownership.

18.     Liberty Corp and Liberty Holdings directly or indirectly caused the conduct complained of herein.

19.     Liberty Corp and Liberty Holdings directly or indirectly benefited from the conduct complained of herein.

## JURISDICTION AND VENUE

20.     Pursuant to CPLR 301, this Court has jurisdiction over Defendants, each of which is a foreign limited liability company authorized to do business in the State of New York.

21.     Pursuant to CPLR 302, this Court has jurisdiction over Defendants, as this suit arises out of Defendants' regularly-transacted business in the State of New York.

22.     Pursuant to CPLR 503, venue lies in New York County, where Plaintiffs reside.

## FACTUAL ALLEGATIONS

**Energy Deregulation in New York**

23.     Historically in New York, customers received electricity from a local distribution utility (the "Local Utility"), such as Central Hudson, Orange and Rockland Utilities, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation, Rochester Gas and Electric, and Consolidated Edison of New York ("Con Ed"), which was responsible for both "supplying" electricity (i.e., obtaining electricity from generators) and "delivering" the electricity (i.e., transmitting the electricity over power lines to customers' homes and businesses).

24.     Because the Local Utility had a monopoly, the New York State Public Service Commission ("PSC") regulated rates charged to customers.

25.     In the late 1990s, many states, including New York, deregulated the electricity market by "unbundling" electricity supply and delivery services.

4

26. Accordingly, upon deregulation, the PSC no longer regulated electricity supply rates charged to customers.

27. Instead, customers had the option of purchasing their electricity from any supplier licensed to sell it in New York, with electricity supply rates set by private contract and market forces.

28. In theory, the deregulated market would operate more efficiently and competitively, reducing prices, and thereby benefitting customers.

29. Upon deregulation, a class of ESCOs came into existence to compete against the local utilities and each other.

30. To protect consumers, the PSC promulgated detailed rules and procedures governing the conduct of the ESCOs' business, including rules governing the truthfulness of an ESCO's representations to customers and potential customers.

31. These rules are set forth in the PSC's Uniform Business Practices ("UBP"), which govern the business practices and operations of ESCOs such as Liberty Power.

32. Because the electricity is delivered to the customer by the Local Utility regardless of whether it is purchased from the Local Utility or an ESCO, the predominant, if not only, basis to choose an ESCO over the Local Utility (or to choose among ESCOs) is price. ESCOs came into existence, after all, because of the belief that through market competition they could offer lower rates than the Local Utility could develop products, such as fixed-rate contracts, that would help customers better predict and control costs.

**Liberty Power's Variable Rate Plan**

33. Consistent with a market in which price is the predominant, if not sole, factor for customers, Liberty Power holds itself out as being able to save customers money. For example, Liberty Power's website states that it offers "competitive rates." In a message targeted at

5

businesses such as Plaintiffs, Liberty Power claims that "[w]e can help you control energy costs" and that "many businesses are switching over to Liberty Power to benefit from our low-cost energy solutions."

34.    Other than purchasing electricity for its customers, Liberty Power does not provide any other services to its customers.

35.    Liberty Power offers a variety of different rate plans, which generally run for a fixed period of time. Although New York law forbids ESCOs from enrolling customers without their explicit permission, when a Liberty Power customer's rate term ends and that customer does not explicitly renew that or another rate plan, rather than return the customer to the Local Utility, Liberty Power instead simply places the customer into the "Variable Rate Plan," which Liberty Power refers to as its "default" plan.

36.    Under the Variable Rate Plan (an exemplar copy of which is attached hereto as Exhibit C), a customer's enrollment automatically renews. As a result, once enrolled a customer will remain indefinitely on the Variable Rate Plan.

37.    The Variable Rate Plan provides that the "Rate" that customers will be charged "is established each month based upon the electricity market pricing," including various pricing components such as "capacity, ancillary services, losses, generation and any other miscellaneous charges (including, but not limited to, ISO/RTO or PUC fees)." In truth, the listed components comprise only about half of the price charged by Liberty Power under this Plan with the balance made up by a hidden fee that was not "established each month" but rather remained unchanged for long periods of time, as further explained below.

38.    Liberty Power states on its website that the Variable Rate Plan "allows you [the customer] to take advantage of electricity price trends" because the customer is charged a "market

6

based rate." A copy of the relevant portion of Liberty Power's website is attached hereto as <u>Exhibit D.</u>

39.      Liberty Power further states that a "Market Based Price" is "a price set by the mutual decisions of many buyers and sellers in a competitive market." A copy of Liberty Power's "Glossary" is attached hereto as <u>Exhibit E</u>.

40.      Accordingly, the terms and conditions of the Variable Rate Plan unambiguously promise that Liberty Power customers on that Plan will be charged a competitive price tied to the market price paid by Liberty Power to purchase the electricity on the customer's behalf.

41.      Liberty Power breached this promise to Plaintiffs and class members each and every month that they were Liberty Power customers by failing to charge market prices, and by charging fees that exceeded the rates for electricity supply that customers would have paid their Local Utility every month.

42.      Specifically, Liberty Power adds to its prices a fee, referred to internally as its "margin" and set by a "Revenue Management" department, that represents its pre-determined profit on the sale of electricity. Liberty Power's margin on its fixed rate plans is low — a few tenths of a penny per kilowatt hour — and is adjusted frequently so that Liberty Power can compete with other ESCOs.

43.      In contrast, the margin fee imposed by Liberty Power on its Variable Rate Plan is as much as 17 times higher than on its fixed rate plans. In fact, this fee was frequently higher than the wholesale price of electricity itself. Thus, through the addition of this hidden fee, Liberty Power often gave itself a 100% profit on the Variable Rate Plan.

44.      Meanwhile, contrary to the premise that a variable rate plan would permit customers to take advantage of price trends, Liberty Power's Revenue Management department rarely adjusted the margin fee for the Variable Rate Plan. For example, despite the fact that

wholesale electricity prices fluctuate hourly and vary broadly by season, Liberty Power's margin fee in the Con Ed service territory held at $0.047/kWh on its supposedly Variable Rate Plan for *more than three years*, from February 2009 until July 2012, when the rate was increased to $0.049/kWh.

45.  As a result of Liberty Power's exorbitant and undisclosed fee, the prices it charged customers on the Variable Rate Plan were not remotely tied to the wholesale price for electricity and were vastly higher than the rates charged by the Local Utility. For example, prices that were routinely double those of Con Ed for the very same periods clearly were **not** the product of "the mutual decisions of many buyers and sellers in a competitive market."

46.  Liberty Power knowingly and willfully engaged in the misconduct complained of herein and imposed tens of millions of dollars in fees hidden in its supposedly variable, market rates.

**Plaintiffs Are Among Liberty Power's Victims**

47.  Plaintiffs' restaurants are, and at all relevant times were, in the service territory of Con Ed, the Local Utility that services New York City and Westchester.

48.  Con Ed was the electricity supplier to BLT Fish from July, 2004, when the restaurant opened, through March, 2005, when its electricity supplier was switched to Liberty Power. BLT Fish remained under contract with Liberty Power, and received and paid for electricity supplied by Liberty Power via the BLT Fish Account, until on or about May 31, 2012.

49.  Con Ed was the electricity supplier to BLT Steak from May, 2004, when the restaurant opened, through March, 2005, when substantially all of its electricity came to be supplied by Liberty Power. BLT Steak remained under contract with Liberty Power, and received and paid for electricity supplied by Liberty Power via the BLT Steak Accounts, until on or about June 30, 2012.

50.    As of the time Plaintiffs terminated Liberty Power as their ESCO, and at all relevant times within the statute of limitations preceding such termination, Plaintiffs were enrolled in the "Variable Rate Plan." As described above, according to its terms, the Variable Rate Plan automatically renewed during the term of the parties' relationship.

51.    During the time that Plaintiffs were customers of Liberty Power, the amount they were charged under the Variable Rate Plan exceeded the market rate by at least $350,000.

## CLASS ACTION ALLEGATIONS

52.    Plaintiffs bring this class action under Article 9 of the Civil Practice Law and Rules on behalf of the following proposed class (the "Class"):

> All persons or entities in the State of New York who were or are enrolled in Liberty Power's Variable Rate Plan.

53.    Specifically excluded from the proposed Class are the Court and its staff, Liberty Power, any entity in which Liberty Power has a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries, and/or assigns of any such entity.

54.    All of the members of the proposed plaintiff class, in the aggregate, are citizens of, or own and operate businesses located in, New York. The Defendants conduct business in New York, including specifically the conduct at issue in this case. The principal injuries resulting from Liberty Power's alleged conduct were incurred in New York.

55.    During the 3-year period preceding the filing of this class action, no other class action has been filed asserting the same or similar factual allegations against Liberty Power.

56.    The proposed Class meets all requirements for class certification.

## Numerosity

57.    The proposed Class is so numerous that the individual joinder of all its members in one action is impracticable. While the exact number and the identities of Class members are unknown at this time, they can be ascertained through investigation and discovery in this action.

58.    Liberty Power has been operating as an ESCO in New York for several years. Throughout the applicable time period, as much as 20% of Liberty Power's customers in the Con Ed service area alone were enrolled in the Variable Rate Plan.

## Existence and Predominance of Common Questions of Law and Fact

59.    Common questions of law and fact arising out of the claims here at issue exist as to all members of the Class and predominate over any potential individual issues. These common legal and factual questions include, but are not limited to, the following:

a.    whether the Variable Rate Plan is a contract between one or both of the defendants on the one hand and Plaintiffs and class members on the other;

b.    whether Liberty Power breached its contract with Plaintiffs and class members;

c.    whether Liberty Power's prices under the Variable Rate Plan, including its imposition of fees that sometimes exceeded the wholesale cost of electricity by more than 100%, were market-based;

d.    whether plaintiffs and Class members have been damaged by Liberty Power's conduct as alleged herein and, if so, what measure of damages is proper.

## Typicality of Claims

60.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and members of the Class were victims of the practices detailed herein because they were charged an arbitrary and excessive hidden fee as part of the supposedly market-based rate under the Variable Rate Plan.

Case 21-13797-SMG    Doc 948-3    Filed 06/30/23    Page 11 of 40

Each of the Class members has suffered actual pecuniary damages as a result of the conduct of Liberty Power as alleged herein.

61.     Plaintiffs and the Class have similarly had their legal rights infringed upon, and have sustained injuries, losses, and damages as described herein. The right of plaintiffs and each member of the Class to payment of damages equally arise from and are attributable to Liberty Power's wrongful conduct in violation of law as alleged herein, as these claims arise from the same core set of facts.

**Adequate Representation**

62.     Plaintiffs will fairly and adequately protect the interests of the members of the Class because: (1) they have no irreconcilable conflicts with or interests materially antagonistic to those of the other Class members; (2) plaintiffs' interests are aligned with the interests of the Class; and (3) plaintiffs understand the nature of these allegations and their responsibilities as class representatives to represent the interests of Class members.

63.     Plaintiffs have retained attorneys who are experienced in the prosecution of class actions, including consumer class actions, who have done significant work investigating or identifying potential claims in this litigation, who have extensive knowledge of the applicable law, and who have committed and will continue to commit substantial resources to representing the Class.

**Superiority and Manageability of Class Litigation**

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy and possesses substantial benefits because there is no other available method that has greater practical advantages for handling this litigation on a group-wide basis on behalf of all affected persons.

65.   Individual joinder of all Class members is impracticable as Class members are dispersed throughout the State, and no other method of adjudication of all claims asserted herein is more efficient and manageable while at the same time providing all the remedies available to ensure that the full purpose of the relevant laws is effectuated.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

66.   Plaintiffs repeat and re-allege the foregoing allegations as if fully set forth herein.

67.   Liberty Power breached its contracts to supply electricity to Plaintiffs and class members.

68.   Plaintiffs fully performed their obligations thereunder.

69.   Under the terms of the Variable Rate Plan into which Liberty Power enrolled them, Liberty Power was obligated to charge Plaintiffs and class members only a market-based supply charge based on the purchase of electricity in a competitive market.

70.   Instead, Liberty Power breached this requirement by charging Plaintiffs arbitrary and exorbitant amounts well in excess of market rates, including by assessing a hidden fee that frequently doubled the price customers paid.

71.   Plaintiffs have been damaged in an amount to be determined at trial but estimated to exceed $350,000.

72.   Damages incurred by the class are believed to be in the tens of millions of dollars.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, individually and on behalf of the Class, pray for Order and Judgment as follows:

a. finding that this action satisfies the prerequisites for maintenance as a class action under Article 9 of the CPLR, and certifying the Class as defined herein;

b. designating plaintiffs as Class representatives and their counsel as Class counsel;

c. entering judgment in favor of plaintiffs and the Class and against Defendants;

d. awarding to plaintiffs and to the Class all actual damages, according to the proof at trial, plus pre- and post-judgment interest;

e. awarding plaintiffs their costs, expenses, disbursements and reasonable attorneys' fees for counsel acting on behalf of the class in an amount to be determined at trial; and

f. awarding plaintiffs and the Class such other relief as the Court deems just and proper.

Dated: New York, New York
May 23, 2018

WACHTEL MISSRY LLP

By: _____
Stella L. Sainty
Marc Litt
Dani Schwartz
One Dag Hammarskjold Plaza
885 Second Avenue, 47th Floor
New York, New York 10017
(212) 909-9500

*Attorneys for Plaintiffs BLT Fish LLC
and BLT Steak LLC*

## VERIFICATION

STATE OF NEW YORK    )
                      )    **ss.:**
COUNTY OF NEW YORK  )

JAMES HABER, being duly sworn, deposes and says:

I am the manager of the managing member of Plaintiffs BLT Steak LLC and BLT Fish LLC and authorized to make this Verification on their behalf. I have reviewed the foregoing FIRST AMENDED CLASS ACTION COMPLAINT, know the contents thereof. I verify that the allegations as to Plaintiffs and of which I have personal knowledge are true, and that the remaining allegations are true to the best of my knowledge, information and belief.

_____
JAMES HABER

Sworn to before me this
23 day of May, 2018

_____
Notary Public



Case 21-13797-SMG   Doc 948-3   Filed 06/30/23   Page 15 of 40

# EXHIBIT A

## AGREEMENT AND PLAN OF MERGER

      **AGREEMENT AND PLAN OF MERGER,** dated as of December __, 2004 (the "Agreement") by and between ETA RESTAURANTS INC., a Delaware corporation (the "Corporation"), and ETA RESTAURANTS II LLC, a Delaware limited liability company (the "LLC"). Upon the merger of the Corporation with and into the LLC, the separate existence of the Corporation shall cease. The Corporation and the LLC are hereinafter sometimes collectively referred to as the "Constituent Companies."

      **WHEREAS,** the Corporation and the LLC wish to provide for the terms and conditions upon which a merger of the Corporation with and into the LLC will be consummated;

      **WHEREAS,** the LLC desires to change its name upon the consummation of the merger with the Corporation to BLT STEAK LLC;

      **WHEREAS,** the Board of Directors of the Corporation has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby;

      **WHEREAS,** the sole stockholder of the Corporation has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby;

      **WHEREAS,** the sole member of the LLC has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby; and

      **WHEREAS,** the parties intend for the merger of the Corporation with and into the LLC to qualify as a tax-free reorganization under Section 368 of the Internal Revenue Code of 1986, as amended.

      **NOW, THEREFORE,** in consideration of the mutual agreements contained herein and for the purpose of merging the Corporation with and into the LLC and setting forth certain terms and conditions of such merger and the mode of carrying the same into effect, the parties agree as follows:

## ARTICLE 1

## THE MERGER

    1.1    Surviving Entity. In accordance with the provisions of this Agreement, the Delaware General Corporation Law (the "DGCL") and the Delaware Limited Liability Company Act, (the "DLLCA"), at the Effective Time (as defined in Section 1.3 of this Agreement), the Corporation shall be merged with and into the LLC (the "Merger"), and the LLC shall be the surviving entity in the Merger (hereinafter sometimes referred to as the "Surviving Entity") and shall continue its existence under the laws of the State of Delaware under its new name, BLT

397900/11418.00001

BLT001840

STEAK LLC. At the Effective Time, the separate existence of the Corporation shall cease.

1.2    Corporate Governing Documents.  The Certificate of Incorporation and the By-laws of the Corporation, each as in effect immediately prior to the Effective Time, shall terminate at the Effective Time.  The Certificate of Formation, as amended by the Certificate (as such term is defined below) of the LLC and the Operating Agreement dated as of December 1, 2004 (the "Operating Agreement") of the LLC shall be the Certificate of Formation and the Operating Agreement of the Surviving Entity.

1.3    Effective Time.  The LLC shall file a Certificate of Merger (the "Certificate") with the Secretary of State of the State of Delaware (the "Secretary of State") in accordance with Section 18-209 of the DLLCA.  The Merger shall become effective on December 31, 2004 at 11:59 p.m. (the "Effective Time").

1.4    Effect of Merger.  At the Effective Time, the separate existence of the Corporation shall cease and the Corporation shall be merged with and into the LLC.  The consummation of the Merger will have the effects provided under Delaware law with respect to a merger of a domestic corporation with and into a domestic limited liability company.

1.5    Additional Actions.  If, at any time after the Effective Time, the Surviving Entity shall believe or be advised that any further assignments or assurances in law or any other acts are necessary or desirable to vest, perfect or confirm, of record or otherwise, the Surviving Entity's right, title or interest in, to or under any of the rights, properties or assets of the Corporation acquired or to be acquired as a result of, or in connection with, the Merger or otherwise to carry out the purposes of this Agreement, the Corporation and its proper officers and directors shall be deemed to have granted to the Surviving Entity an irrevocable power of attorney to execute and deliver all such proper deeds, assignments and assurances in law and to undertake all acts necessary or proper to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Surviving Entity or otherwise to carry out the purposes of this Agreement; and the sole member of the Surviving Entity is fully authorized in the name of the Corporation or otherwise to take any and all such action.

1.6    Filing of Final Tax Returns.  The Surviving Entity hereby acknowledges and agrees that it shall be solely responsible for the preparation and filing of all final income tax returns required to be filed by the Corporation.

## ARTICLE 2

## CONVERSION OF SHARES

2.1    The Corporation Common Stock.  As of the date of this Agreement, the authorized capital stock of the Corporation consists of _____ shares of common stock, with $____ par value per share (the "Common Stock"), of which one hundred (100) shares are outstanding and entitled to vote.  All issued and outstanding shares of Common Stock are owned by JSB Holdings, Inc., a Delaware corporation ("JSB Holdings").  All shares of Common Stock

BLT001841

issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into a one hundred (100%) percent equity interest in the LLC. All shares of Common Stock, issued and outstanding immediately prior to the Effective Time, shall no longer be outstanding and shall be cancelled and retired and shall cease to exist.

2.2     The LLC Equity Interest. As of the date of this Agreement, the Corporation is the sole holder of all equity interests in the LLC. As a result of the Merger, JSB Holdings will be the sole holder of all equity interests in the LLC.

## ARTICLE 3

## CLOSING CONDITIONS

3.1     Stockholder/Member Approval. The respective obligations of each of the Constituent Companies to effect the Merger shall be subject to the fulfillment, at or prior to the Effective Time, of the condition that the sole stockholder of the Corporation and the sole member of the LLC shall have duly adopted this Agreement.

3.2     Consents. All authorizations, consents and approvals required to be obtained in order to permit the consummation of the Merger shall have been obtained.

## ARTICLE 4

## TERMINATION AND ABANDONMENT

4.1     Termination. This Agreement may be terminated at any time prior to the Effective Time, whether before or after approval by the sole stockholder of the Corporation, by the Board of Directors of the Corporation or by the sole member of the LLC.

4.2     Effect of Termination. If this Agreement is terminated pursuant to this Article 4, this Agreement shall become void and of no force and effect and the Merger shall be abandoned without further action by any of the parties hereto. If this Agreement is terminated as provided herein, no party hereto shall have any liability or further obligation to any other party to this Agreement.

## ARTICLE 5

## MISCELLANEOUS

5.1     Amendment and Modification. The Board of Directors of the Corporation, may by written agreement amend this Agreement at any time prior to the filing of the Certificate of Merger with the Secretary of State, provided that an amendment made subsequent to the adoption of this Agreement by the sole stockholder of the Corporation shall not alter or change (a) the

BLT001842

amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares or equity interests of any class or series thereof of the Corporation, (b) any term of the Certificate of Formation of the Surviving Entity as it is to be in effect immediately following the Merger, or (c) any of the terms and conditions of this Agreement if such alteration or change would adversely affect the holder of any class or series thereof of such Constituent Company.  The sole member of the LLC may by written agreement amend this Agreement at any time prior to the filing of the Certificate of Merger with the Secretary of State.

5.2     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed wholly within the State of Delaware.

5.3     Counterparts.  This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

5.4     Interpretation; Definitions.  The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

5.5     Entire Agreement.  This Agreement, including the documents and instruments referred to herein, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein.  This Agreement supersedes all prior agreements and understandings among the parties hereto with respect to such subject matter.

[*Remainder of the page intentionally left blank.*]

BLT001843

**IN WITNESS WHEREOF**, the Corporation and the LLC have caused this Agreement and Plan of Merger to be signed by their respective duly authorized officers on the date first above written.

ETA RESTAURANTS INC.

By: _____
    Name: James Haber
    Title: President

ETA RESTAURANTS II LLC

By ETA Restaurants Inc., its Sole Member

By: _____
    Name: James Haber
    Title: President

BLT001844

# EXHIBIT B

## AGREEMENT AND PLAN OF MERGER

**AGREEMENT AND PLAN OF MERGER**, dated as of December __, 2004 (the "Agreement") by and between AZ NYC INC., a Delaware corporation (the "Corporation"), and BLT FISH LLC, a Delaware limited liability company (the "LLC"). Upon the merger of the Corporation with and into the LLC, the separate existence of the Corporation shall cease. The Corporation and the LLC are hereinafter sometimes collectively referred to as the "Constituent Companies."

WHEREAS, the Corporation and the LLC wish to provide for the terms and conditions upon which a merger of the Corporation with and into the LLC will be consummated;

WHEREAS, the Board of Directors of the Corporation has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby;

WHEREAS, the sole stockholder of the Corporation has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby;

WHEREAS, the sole member of the LLC has, by resolutions duly adopted, approved this Agreement and the transactions contemplated thereby; and

WHEREAS, the parties intend for the merger of the Corporation with and into the LLC to qualify as a tax-free reorganization under Section 368 of the Internal Revenue Code of 1986, as amended.

NOW, THEREFORE, in consideration of the mutual agreements contained herein and for the purpose of merging the Corporation with and into the LLC and setting forth certain terms and conditions of such merger and the mode of carrying the same into effect, the parties agree as follows:

## ARTICLE 1

## THE MERGER

1.1    Surviving Entity. In accordance with the provisions of this Agreement, the Delaware General Corporation Law (the "DGCL") and the Delaware Limited Liability Company Act, (the "DLLCA"), at the Effective Time (as defined in Section 1.3 of this Agreement), the Corporation shall be merged with and into the LLC (the "Merger"), and the LLC shall be the surviving entity in the Merger (hereinafter sometimes referred to as the "Surviving Entity") and shall continue its existence under the laws of the State of Delaware. At the Effective Time, the separate existence of the Corporation shall cease.

1.2    Corporate Governing Documents. The Certificate of Incorporation and the By-

398302/11418.00001

BLT001845

laws of the Corporation, each as in effect immediately prior to the Effective Time, shall terminate at the Effective Time. The Certificate of Formation of the LLC and the Operating Agreement dated as of December 1, 2004 (the "Operating Agreement") of the LLC shall be the Certificate of Formation and the Operating Agreement of the Surviving Entity.

1.3     Effective Time. The LLC shall file a Certificate of Merger (the "Certificate") with the Secretary of State of the State of Delaware (the "Secretary of State") in accordance with Section 18-209 of the DLLCA. The Merger shall become effective on December 31, 2004 at 11:59 p.m. (the "Effective Time").

1.4     Effect of Merger. At the Effective Time, the separate existence of the Corporation shall cease and the Corporation shall be merged with and into the LLC. The consummation of the Merger will have the effects provided under Delaware law with respect to a merger of a domestic corporation with and into a domestic limited liability company.

1.5     Additional Actions. If, at any time after the Effective Time, the Surviving Entity shall believe or be advised that any further assignments or assurances in law or any other acts are necessary or desirable to vest, perfect or confirm, of record or otherwise, the Surviving Entity's right, title or interest in, to or under any of the rights, properties or assets of the Corporation acquired or to be acquired as a result of, or in connection with, the Merger or otherwise to carry out the purposes of this Agreement, the Corporation and its proper officers and directors shall be deemed to have granted to the Surviving Entity an irrevocable power of attorney to execute and deliver all such proper deeds, assignments and assurances in law and to undertake all acts necessary or proper to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Surviving Entity or otherwise to carry out the purposes of this Agreement; and the sole member of the Surviving Entity is fully authorized in the name of the Corporation or otherwise to take any and all such action.

1.6     Filing of Final Tax Returns. The Surviving Entity hereby acknowledges and agrees that it shall be solely responsible for the preparation and filing of all final income tax returns required to be filed by the Corporation.

## ARTICLE 2

## CONVERSION OF SHARES

2.1     The Corporation Common Stock. As of the date of this Agreement, the authorized capital stock of the Corporation consists of one thousand (1,000) shares of common stock, with $.01 par value per share (the "Common Stock"), of which one hundred (100) shares are outstanding and entitled to vote. All issued and outstanding shares of Common Stock are owned by JSB Holdings, Inc., a Delaware corporation ("JSB Holdings"). All shares of Common Stock issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into a one hundred (100%) percent equity interest in the LLC. All shares of Common Stock, issued and outstanding immediately prior to the Effective Time, shall no longer be outstanding and shall be cancelled

BLT001846

and retired and shall cease to exist.

    2.2    The LLC Equity Interest. As of the date of this Agreement, the Corporation is the sole holder of all equity interests in the LLC. As a result of the Merger, JSB Holdings will be the sole holder of all equity interests in the LLC.

## ARTICLE 3

### CLOSING CONDITIONS

    3.1    Stockholder/Member Approval. The respective obligations of each of the Constituent Companies to effect the Merger shall be subject to the fulfillment, at or prior to the Effective Time, of the condition that the sole stockholder of the Corporation and the sole member of the LLC shall have duly adopted this Agreement.

    3.2    Consents. All authorizations, consents and approvals required to be obtained in order to permit the consummation of the Merger shall have been obtained.

## ARTICLE 4

### TERMINATION AND ABANDONMENT

    4.1    Termination. This Agreement may be terminated at any time prior to the Effective Time, whether before or after approval by the sole stockholder of the Corporation, by the Board of Directors of the Corporation or by the sole member of the LLC.

    4.2    Effect of Termination. If this Agreement is terminated pursuant to this Article 4, this Agreement shall become void and of no force and effect and the Merger shall be abandoned without further action by any of the parties hereto. If this Agreement is terminated as provided herein, no party hereto shall have any liability or further obligation to any other party to this Agreement.

## ARTICLE 5

### MISCELLANEOUS

    5.1    Amendment and Modification. The Board of Directors of the Corporation, may by written agreement amend this Agreement at any time prior to the filing of the Certificate of Merger with the Secretary of State, provided that an amendment made subsequent to the adoption of this Agreement by the sole stockholder of the Corporation shall not alter or change (a) the amount or kind of shares, securities, cash, property and/or rights to be received in exchange for or on conversion of all or any of the shares or equity interests of any class or series thereof of the Corporation, (b) any term of the Certificate of Formation of the Surviving Entity as it is to be in effect immediately following the Merger, or (c) any of the terms and conditions of this

BLT001847

Agreement if such alteration or change would adversely affect the holder of any class or series thereof of such Constituent Company. The sole member of the LLC may by written agreement amend this Agreement at any time prior to the filing of the Certificate of Merger with the Secretary of State.

5.2  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed wholly within the State of Delaware.

5.3  <u>Counterparts</u>. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

5.4  <u>Interpretation; Definitions</u>. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

5.5  <u>Entire Agreement</u>. This Agreement, including the documents and instruments referred to herein, embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings among the parties hereto with respect to such subject matter.

*[Remainder of the page intentionally left blank.]*

BLT001848

Case 21-13797-SMG   Doc 948-3   Filed 06/30/23   Page 26 of 40

**IN WITNESS WHEREOF**, the Corporation and the LLC have caused this Agreement and Plan of Merger to be signed by their respective duly authorized officers on the date first above written.

AZ NYC INC.

By: _____
    Name: James Haber
    Title: President

BLT FISH LLC

By AZ NYC Inc., its Sole Member

By: _____
    Name: James Haber
    Title: President

BLT001849

# NYS Department of State

## Division of Corporations

**Entity Information**

The information contained in this database is current through February 25, 2015.

Selected Entity Name: DIVERSIFIED CAPITAL INVESTORS CORPORATION
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | AZ NYC INC. |
| **DOS ID #:** | 1662556 |
| **Initial DOS Filing Date:** | AUGUST 31, 1992 |
| County: | NEW YORK |
| Jurisdiction: | DELAWARE |
| **Entity Type:** | FOREIGN BUSINESS CORPORATION |
| **Current Entity Status:** | INACTIVE - Dissolution by Proclamation / Annulment of Authority (Apr 29, 2009) |

Information to reinstate a corporation that has been dissolved by proclamation or annulment of authority by proclamation is available on the New York State Department of Taxation and Finance website at www.tax.ny.gov keyword TR-194.1 or by telephone at (518) 485-6027

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
DIVERSIFIED CAPITAL SERVICES CORPORATION, C/O DIVERSIFIED INVESTOR SERVICES OF NORTH AMERICA, INC.770 LEXINGTON AVE
NEW YORK, NEW YORK, 10021

**Registered Agent**
NONE

BLT 001850

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

### *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

*Stock information is applicable to domestic business corporations.

### Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUL 12, 2002 | Actual | AZ NYC INC. |
| AUG 31, 1992 | Actual | DIVERSIFIED CAPITAL INVESTORS CORPORATION |

A Fictitious name must be used when the Actual name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us

BLT 001851

# EXHIBIT C



**Liberty Power®**

1901 W. Cypress Creek Rd., Suite 600
Ft. Lauderdale, FL 33309
1-866-POWER-99 (Mon - Fri 8:30 am - 8:00 pm ET
Sat & Sun 10:00 am — 6:00 pm ET)
Customer Care Fax: 1-877-772-2354
Email: info@libertypowercorp.com
www.libertypowercorp.com

## CUSTOMER TERMS AND CONDITIONS
### New York – Rollover Variable Rate Plan

"Liberty Power", "us", "we" or "our" means Liberty Power Holdings LLC and refers to the retail electricity provider supplying electricity to you as provided in these Customer Terms and Conditions. "Customer", "you", or "your" means the customer identified in the Voice Authorization or Written Authorization, and as addressed in the Liberty Power Plan Description.

**Entire Agreement:** The voice recording confirming your decision to switch to Liberty Power ("Voice Authorization"), or the signed Energy Services Enrollment Agreement ("Written Authorization"), along with these Customer Terms and Conditions and the Liberty Power Plan Description are your full Agreement ("Agreement") to buy electricity from Liberty Power. They take the place of any and all prior Agreements or oral or written information about your Liberty Power energy supply. Please keep this Agreement for your records. The Plan Description is included in your Liberty Power Welcome Kit and has important information about your Account.

**Rate:** This is a full requirements Agreement. The Rate for electricity sold under this Agreement is established each month based upon the electricity market pricing, including capacity, ancillary services, losses, generation and any other miscellaneous charges (including, but not limited to, ISO/RTO or PUC fees). The Rate will not include taxes, regulated charges from the Utility, including, but not limited to, Utility delivery and distribution charges, customer Account fees or other Utility transition charges.

**Convertibility:** Customer is eligible to convert to a Liberty Power fixed rate plan at any time during the term of this Agreement. The fixed rate for this plan will be based on the available market rate and term. There will be no termination fee associated with making this change.

**Onsite Generation:** If, after the date you signed this Agreement, You intend to install onsite generation units (such as solar panels), You agree to provide Us with 60 (sixty) days prior written notice. Upon receipt of this Notice and at Supplier's discretion, the Rate associated with this Agreement may be reassessed and offered to You based on the Material Change provision of this Agreement. Failure to provide 60 (sixty) days advance Notice of your intent to install onsite generation units will constitute an Event of Default and, at Supplier's discretion, either (i) the Rate associated with this Agreement may be reassessed and offered to you based on the Material Change provision; or, (ii) termination of this Agreement will be processed in accordance with the Termination of Service Provision.

**Billing:** Liberty Power will bill you monthly for electricity supply based on your electricity usage as reported to us by the Local Distribution Utility ("Utility"). You will be billed under one of these billing options: (1) a line item on a consolidated Utility bill; or (2) as a direct bill from Liberty Power for the electricity supply only, with the delivery charges invoiced separately by the Utility. You will be sent a monthly invoice which is payable by check, credit or debit card or Electronic Funds Transfer ("EFT") by the due date on the invoice.

**Payment Instructions for Direct Billed Accounts:** Bills are due and payable by the stated due date on the invoice and will be subject to a finance charge for any late payment (at the lesser of 1.5% per month of the outstanding balance or the maximum rate permitted by applicable law) and collection fees, including reasonable attorneys' fees and court costs. A fee of $30 per transaction will be assessed due to insufficient funds for any method of payment. All direct payments should be sent to Liberty Power Holdings LLC, 25901 Network Place, Chicago, IL 60673-1259.

**Collection of Past Due Charges:** Liberty Power will pass through to you all charges related to the collection of past due invoices, including, but not limited to, collection agency fees, legal and court fees, and Account termination fees. We reserve the right to apply any deposit to balances owed at the time your Account is placed in a collections status.

**Term and Automatic Renewal:** The term of this Agreement is as stated in the Voice or Written Authorization. Service will automatically renew monthly unless you or Liberty Power cancel, upon thirty (30) days written Notice, or as otherwise applicable in this Agreement. Cancellation must be in writing and mailed to Liberty Power Customer Care Team at 1901 W. Cypress Creek Rd., Suite 600, Ft. Lauderdale, FL 33309.

**Credit/Security Deposit:** In completing this Agreement, you authorize credit-reporting agencies to provide Liberty Power with any information it may have on you or your business. Liberty Power may require a security deposit to initiate service, depending on credit or payment history. Any deposit requirement will be sent to you in writing. Deposits held more than thirty (30) days will accrue interest, at the Wall Street Journal Prime Rate, from the date of receipt.

**Dispute Resolution:** Liberty Power's Customer Care Team is available at 866-769-3799 to help with any questions or concerns regarding your Accounts. Our representatives are committed to resourcefully finding resolution; however, if the dispute cannot be settled within 120 days of receipt of written notification, either party may present the dispute to a venue of competent jurisdiction for review such as small claims court, mediation, arbitration, etc. The Department of Public Service ("DPS") will not resolve Non Residential disputes associated with the services provided under this Sales Agreement. However, the DPS will monitor inquiries and contacts from Non-Residential customers regarding energy service companies and an excessive number of confirmed complaints may result in an energy service company no longer being eligible to supply natural gas or electricity in New York State. New York Public Service Commission ("NYPSC") can be reached at 888-697-7728. Customer may contact the DPS by writing the Department of Public Service at the Office of Consumer Services, Three Empire State Plaza, Albany, NY 12223-1350, or by consulting their website at http://www.dps.state .ny.us. If the Dispute cannot be settled in 120 days either party may present the dispute to a venue of competent jurisdiction for review such as small claims court, mediation, arbitration, etc.

**Termination of Service:** Liberty Power may terminate service for any Event of Default that you incur. You will then receive electricity supply from the Utility or will be given the opportunity to choose a different electricity provider, based on the rules of the local Utility. You will be responsible to pay for electricity consumed before service was terminated. You may terminate this Agreement by giving Liberty Power at least forty-five (45) days written Notice.

**Meter Equipment:** Liberty Power does not take ownership of your existing metering equipment. While you have an electricity Agreement with Liberty Power, we have the right to install new metering equipment, at Liberty Power's expense.

**Disconnection of Service:** Only the local Utility has the ability to disconnect your service. Failure to make full payment of the charges due will be grounds for disconnection based on New York law.

**Events of Default:** A Customer Event of Default means: (a) your failure to make, when due, any payment required by this Agreement; or (b) the failure to take electric supply when

delivered under terms of this Agreement unless remedied within ten (10) business days following written Notice; or (c) the significant downgrading of your credit rating since the Effective Date of this Agreement; or (d) tampering or disconnecting of your electric meter which may cause or may reasonably be expected to cause an inaccurate reading or no reading of the usage data provided by the meter; or (e) a breach of any material provisions in this Agreement.

A Liberty Power Event of Default means the failure to fulfill the material obligations of this Agreement with regard to Rate, Term, and the supply of agreed usage volume if not remedied within ten (10) business days after giving Notice.

An Event of Default is applicable to either party who files a petition for bankruptcy, or other action under any bankruptcy or similar law for the protection of creditor, if the petition or other action is not withdrawn or dismissed within twenty (20) business days of its filing.

Remedies for Customer Event of Default: In the event of a Customer Event of Default, Liberty Power has the right to terminate this Agreement in accordance with the Termination of Service provision. In place of termination, we may require an additional deposit from you or request advance payment of an amount up to the average historical consumption for the last three (3) month period.

Material Misrepresentation: This Agreement may be terminated in accordance with the Termination of Service Provision in the event you make a Material Misrepresentation in order to induce us to enter into this Agreement. For purposes of this Agreement, a Material Misrepresentation is any fact provided by you, that we relied upon in agreeing to the Rate, Term or service in this Agreement, and the fact is later found to be false, and which if known to be false, that we would not have entered into this Agreement, or would have entered into this Agreement under different Rate, Term or other service conditions.

Electric Emergencies and Power Quality: The Utility will continue to operate the electric transmission lines and be responsible for power outages and quality. You will hold Liberty Power harmless in the event of a loss of power caused by any entity other than Liberty Power. If you have an electrical emergency, power outage, or reduction in power quality, contact the Utility at its emergency number on your invoice.

Material Change: Except as provided in the Change in Law provision below, Liberty Power will provide you with forty-five (45) calendar days advance written Notice of any Material Change in the Customer Terms and Conditions, either in your invoice or in a separate mailing. The changes will become effective on the date stated in the Notice unless you cancel your Agreement. You may cancel the Agreement no later than ten (10) calendar days before the effective date of the Material Change.

Governing law: This Agreement and the rights and duties of both parties are governed by the laws of the state of New York.

Change in Law: If there is a change in law, regulation, or any fees or costs imposed by a governmental authority or the regional Independent System Operator ("ISO") ("Change in Law") and the change causes Liberty Power to incur operating or other costs or expenses related to the services in this Agreement, in order to maintain the same level and quantity of delivery of electric energy, these costs will be added to your invoice as a pass-through charge and you agree to pay the pass-through charge.

Notices: All Notices and correspondence will be in writing and delivered to you and Liberty Power, as applicable, by regular mail, courier, electronic mail, or facsimile. Notice will be effective upon receipt by the person to whom it is addressed.

Assignment: Assignment of this Agreement, without the prior written consent of the other party, is limited to the following: (a) Liberty Power may assign Accounts, revenues and proceeds, or grant a lien against them, to credit providers. These credit providers may directly enforce Liberty Power's rights under this

Agreement and may, upon foreclosure, assign Liberty Power's rights under this Agreement; and (b) Liberty Power may also assign its rights and obligations under this Agreement to service providers for services such as invoicing and power scheduling; and (c) you will have the right to assign this Agreement to an entity controlled by, controlling, or under common control with, Customer.

Force Majeure: Force Majeure means an event or circumstance not reasonably within the control of, or due to the negligence of, Liberty Power, including without limitation acts of God, accidents, strikes, labor disputes, required maintenance work, inability to access the Utility system, nonperformance of the Utility, cuts to service lines, or Changes in Laws, rules, regulations, practices or procedures of any governmental authority or any other cause beyond the reasonable control of Liberty Power. Liberty Power will endeavor in a commercially reasonable manner to provide service, but cannot guarantee a continuous supply of electrical energy. Force Majeure events may result in interruptions in service. Please be aware that Liberty Power does not produce, transmit or distribute electricity and will not be liable for any damages for interruptions in service.

Indemnity: Each party to this Agreement shall indemnify, defend and hold harmless the other from and against any claims arising from or out of any event, circumstance, act or incident that the indemnifying party caused due to its negligence, willful misconduct, strict liability, or any action or inaction which gives rise to any liability.

Representations and Warranties: The electricity supplied by Liberty Power under this Agreement will be purchased from a variety of sources. Liberty Power makes no representations or warranties other than those expressly stated in this Agreement. Liberty Power expressly disclaims all other warranties, express or implied, including warranties of merchantability, conformity to models or samples, and fitness for a particular purpose.

Limitations of Liability: Liability for damages not related to Force Majeure will be limited to direct actual damages. Neither party will be liable to the other for consequential, incidental, punitive, exemplary or indirect damages, including lost profits or penalties of any nature, which are hereby waived, whether or not there was actual knowledge of such possible damages, or if such damages could have been reasonably foreseen. These limitations apply without regard to the cause or responsibility of any liability or damage.

Service Interruption: Liberty Power is not liable for any damages due to an interruption in service caused by acts of any governmental authority, or any ISO, or Changes in Laws, rules, regulations, practices or procedures of any such entity.

# EXHIBIT D

Business New York



**LibertyPower™**
Powerful Together

ENERGY SERVICES    ABOUT US    KNOWLEDGE CENTER    CUSTOMER CARE    BLOG    CONTACT US    CAREERS

## Business

Search the site    Sub

You are here:    Liberty Power    Business    New York

Connecticut

Delaware

District of Columbia

Illinois

Maine

Maryland

Massachusetts

New Jersey

New York

Ohio

Pennsylvania

Rhode Island

Texas

## New York

### REQUEST A QUOTE

## Take control of your electricity costs!

As a savvy business owner, you have the power to manage and control electricity costs. That's because your state allows retail electricity suppliers like Liberty Power to help you manage your energy needs.

Liberty Power understands running a business takes a lot of time and effort. Choosing one of our electricity plans can yield significant business benefits, including freeing dollars for other business needs.

**Our fixed rate products**

- Offer price certainty and budget control
- Are available in a variety of simple, easy-to-understand product terms
- Allow you to free your business from the volatility of the electricity market

**Our index products**

- Are market-based rate that allows you to take advantage of electricity price trends
- Give you the ability to convert to a fixed rate at any time

**Products**

- Freedom to Save Plan
- Independence Plan
- Super Saver Plan

**Terms and Conditions**

- Freedom to Save Plan
- Freedom to Save Plan (Spanish)
- Fixed Rate Plans
- Fixed Rate Plans (Spanish)
- Flex Plan
- Flex Plan (Spanish)
- PowerMove
- Rollover Variable Plan

Chat now

Business New York



· Rollover Variable Plan (Spanish)

ENERGY SERVICES    ABOUT US    KNOWLEDGE CENTER    CUSTOMER CARE    BLOG    CONTACT US    CAREERS

*Call Toll Free:* 1-866 POWER-99 *(1-866-769-3799)*



© 2013 Liberty Power Corp.    Privacy    Social Responsibility Policy    Contact    CHANNEL PARTNERS    We are social:
Us    Terms of Use

# EXHIBIT E



ENERGY SERVICES    ABOUT US    KNOWLEDGE CENTER    CUSTOMER CARE    BLOG    CONTACT US    CAREERS

# Customer Care

Search the site    Sub

You are here:    Liberty Power    Customer Care    Glossary

Environmental Disclosures

Emergency Contacts

Understanding Your Bill

How to Pay Your Utility-Consolidated Bill

FAQ

Glossary



## Glossary

**ACH Debit:** ACH stands for automated clearing house, which is a network that electronically processes money. Typically this would be an automatic withdrawal from your checking account.

**Aggregator:** A group or organization (generally a Municipality, apartment complex, community or other large entity) that represents energy consumers to purchase electricity. The goal is to negotiate lower prices which are passed on to members of the group. The group of consumers is called a buying group.

**Authorized Decision Maker:** The individual who signed the Liberty Power agreement or gave voice authorization through the TPV process. Only the Authorized Decision Maker has the authority to make changes to the account or appoint other company members to make decisions about the Liberty Power account.

**Base Rates:** The rates utility companies charge to cover its non-fuel costs.

**Billing Cycle:** The Billing Cycle is based on the utility's meter read cycle. Some months the number of days in the billing cycle will vary, but it is approximately every 30 days.

**Broker:** Any entity that serves as an agent or intermediary in the purchase and sale of electricity to retail customers.

**Capacity:** The amount of electric power that can be delivered at one time by a generating unit, generating station, or all the plants on an electric system.

**Change of Ownership Form:** In Texas, a Texas Change of Ownership Request Form must be completed by both the previous and new owners to ensure there is no service interruption. The completed form, a copy of the bill of sale, and a Liberty Power contract should be sent to Liberty Power via fax or mail.

**Co-generator:** A power plant that produces both electrical (or mechanical) energy and thermal (steam or process heat) energy.

**Competition:** Allowing two or more entities to sell similar goods and services, in this case, energy generation, in the same market.

**Competitive Supplier:** The electricity providers that compete in a deregulated market. Also referred to as retail suppliers. Additional terms, based on your state, are REP, RES, EGS, and ESCO.

**Consumer Contract:** A written agreement or verbal authorization (TPV) between a customer and an electricity supplier.

**Contract Terms:** The provisions of an agreement between an electricity supplier and a consumer, including such items as the cost, length of service, and ability to end the contract.

**Cramming:** The practice of adding charges to a customer's monthly bill for services that the customer has not authorized. This is an illegal practice.

**Customer Charge:** A flat monthly charge payable regardless of the level of usage.

Customer care glossary



Powerful Together

ABOUT SERVICES? WHY LIBERTY US    KNOWLEDGE CENTER    CUSTOMER CARE    BLOG    CONTACT US    CAREERS

**Customer Choice:** The ability of electricity consumers to shop, compare prices, and choose the company that generates the power for their electricity.

**Denial of Access:** A Denial of Access letter is sent when the local utility is unable to gain access to read your electric meter. Please contact the local utility to give them access to read your meter and ensure accurate billing of your account.

**Demand:** The amount of energy used at a specific moment in time, measured in watts, kilowatts (kW=1000 watts), or megawatts (mW=1000 kilowatts, or 1 million watts).

**Deregulation:** The elimination of monopoly service in an industry to allow competition to develop, sometimes used interchangeably with restructuring.

**Distribution:** The process of delivering electricity through low-voltage power lines to a consumer's home or business. Distribution includes local wires, transformers, substations, and other equipment used to deliver electricity from the high-voltage transmission lines to homes and businesses.

**Distribution Charges:** The rate (per kilowatt hour) billed by the utility to deliver electricity to a home or business.

**Distribution Utility:** The regulated electric utility entity that constructs and maintains the distribution wires connecting the transmission grid to the final customer.

**Due Date:** Date that your payment must be received by Liberty Power. If you are not sure that your check will arrive in the mail on time to meet the due date, you can pay by phone by calling 1-866-POWER-99.

**Early Termination Fee:** A fee charged for closing an account prior to the end of the contract term to cover the expenses Liberty Power incurs in pre-purchasing your electricity in order to secure your fixed rate for the term of your contract. Please see your terms and conditions for the exact calculation of the fee.

**Electric Supplier:** An entity (including an electric aggregator or participating municipal electric utility) licensed by a state utility regulatory agency to provide electric generation services to consumers. With electric choice, consumers can choose their electric supplier. The power is then delivered by the consumer's electric distribution company.

**Electric Utility:** Any person or state agency with a monopoly franchise (including any municipality) that sells electric energy to end-use customers.

**Energy:** The result of consuming power over a period of time. In electricity, measured in watt hours: 1000 watt hours = 1 kilowatt hour, or the equivalent of a 100 watt bulb running for 10 hours. Most electricity rates/prices for residential service are quoted in kilowatt-hours. In gas, measured in volumes of gas (cubic feet) or a proxy for volumes (therms, q.v.).

**Energy Efficiency Programs:** Programs designed to help consumers use energy more efficiently.

**Enrollment Agreement:** Your written or verbal authorization to purchase electricity from Liberty Power. This is a binding agreement and may involve a fee for early termination.

**Gross Receipts Tax (GRT):** A tax levied in Pennsylvania that must be included with the energy rate to compute your total charge.  The rate that appears on your invoice will include the Liberty Power energy cost as well as the GRT.

**Federal Energy Regulatory Commission (FERC):** The Federal Energy Regulatory Commission regulates the price, terms, and conditions of power sold in interstate commerce and regulates the price, terms, and conditions of all transmission services. FERC is the federal counterpart to state utility regulatory commissions.

**Fixed Rate:** A pricing plan that does not change for the full term of the agreement. Each month you will be billed at the same energy rate, no matter what changes occur in the energy market.

**FPA - Federal Power Act of 1935:** Established guidelines for federal regulation of interstate energy sales. It is the primary statute governing FERC regulation of the electric sector.

**Future Start Date:** Liberty Power offers you the convenience of purchasing your electricity with a flow start that is in the future. This is especially valuable if you are under contract with a different supplier or have a stay requirement with your utility. It's also convenient for renewals so you can be sure that your rate changes to another fixed-rate term and does not rollover to a default variable rate.

**Generation:** The process of producing electrical energy. Generation may also refer to the amount of electrical energy produced, usually expressed in watt-hours, kilowatt-hours (kWh), or megawatt hours (MWh).

**Generation Company:** A company that generates electricity. This energy can be produced by gas, nuclear reactor, coal plant, or a variety of renewable sources.

**Grid:** A system of interconnected power lines and generators that is managed to meet the requirements of the customers connected to the grid at various points.

Customer care glossary

**Liberty Power™**
*All Trade Homepage, Inc.* 866 POWER-99 *(1-866-769-3799)*

HOME   SERVICES   ABOUT US   KNOWLEDGE CENTER   CUSTOMER CARE   BLOG   CONTACT US   CAREERS

**Green Power:** A general term that describes power that is environmentally friendly. It typically uses a mix of energy sources with renewable energy being at least one of the sources.

**Home Independence Plan:** The Liberty Power fixed rate plan for residential customers. Available in 12 and 24 month terms

**IPP – Independent Power Producer:** A company other than a utility that operates a generation facility and sells power to suppliers for resale to retail customers.

**ISO – Independent System Operator:** An organization responsible for maintaining instantaneous balance of the grid system, ensuring that loads match available resources. ISOs in which Liberty Power operates are: NYISO (New York state), NEISO (New England), PJM (Pennsylvania, New Jersey, Maryland – also includes Delaware and Illinois and parts of Ohio will soon join), MISO (Midwest – Ameren Illinois, parts of Ohio); ERCOT (Texas), and CAISO (California).

**Kilowatt-hour (kWh):** This is the basic unit of electric energy equal to one kilowatt of power supplied to or taken from an electric circuit steadily for one hour. One kilowatt-hour equals 1,000 watt-hours.

**Late Fee:** Fee assessed when payment is posted and cleared through the account later than the due date.

**Letter of Authorization:** The Letter of Authorization is required in certain markets to give us permission to obtain usage data from the local utility and exchange on-going information regarding your account as needed. It is required to provide you with your electricity supply service from Liberty Power.

**Load:** The amount of power drawn from a utility system at a given point in time. The peak load is the highest amount of power drawn down at any one time, or the utilities maximum capacity or demand.

**Load Profile:** Information on a customer's energy usage over a period of time, sometimes shown in a graph format.

**Market-Based Price:** A price set by the mutual decisions of many buyers and sellers in a competitive market.

**Marketer:** An entity selling wholesale or retail power in a competitive market.

**Megawatt-hour (MWh):** One megawatt-hour equals one million (1,000,000) watt-hours.

**Minimum Stay Requirements:** A requirement imposed by the utility when a customer returns to the utility from a competitive supplier. Not applicable to all utilities.

**Monopoly:** A single seller has control over market sales.

**Non-Utility Generator (NUG):** Any entity not regulated by the government as a public utility that owns or operates a generating facility and offers electric power for sale to utilities or the public (also known as Independent Power Producer).

**Obligation to Serve:** The obligation of a utility to provide electric service to any customer who seeks that service and is willing to pay the rates set for that service.

**Off-Peak:** Those periods of time when energy is being delivered far below the utility's maximum demand.

**On-Peak:** Those periods of time when energy is being delivered near and including the utility's maximum demand.

**Peak Load:** The maximum load experienced by an electric customer over a given period of time.

**Peaking Capacity:** Capacity used in times of maximum demand.

**Power Pool:** Two or more interconnected electric systems that seek to obtain greater reliability of service and efficiency of operation by coordinating the development and operation of their electric generation and transmission facilities.

**Price to Compare (PTC):** The utility's rate for a specific service class. Each service class will have a different PTC. Also referred to as the Standard Offer Service.

**Price Cap:** A way of setting rates in which the utility is given a limit on the average dollar-per-customer revenue it may collect.

**Provider of Last Resort:** A legal obligation (traditionally given to utilities) to provide service to a customer when competitive suppliers have decided they no longer want to do business what that customer.

**Public Commission:** State agency that is responsible for regulating the state's public utilities. The Commission is overseeing the deregulation of the electric market.

**PURPA – The Public Utility Regulatory Policy Act of 1978:** Among other things, this federal legislation requires utilities to buy electric power from private "qualifying facilities" at an avoided cost rate.

© 2013 Liberty Power Corp.

CHANNEL PARTNERS

We are social:

Chat now

Customer care glossary



**Reliability:** The ability of the electric system to supply the electrical demand and energy requirements at all times and to withstand sudden disturbances such as electric short circuits or unanticipated loss of system facilities.

**Renewable Energy:** Sustainable energy technologies that include solar, wind, trash to energy, water, and methane gas from landfills, fuel cells, and biomass.

**Restructuring:** Usually refers to separation of the utility functions of vertically integrated energy utilities into individually operated and owned entities, sometimes used interchangeably with deregulation.

**Retail Competition:** A system under which more than one electric provider can sell to retail customers and where retail customers are allowed to buy from more than one provider.

**Retail Market:** A market in which electricity and other energy services are sold directly to the end-use customer.

**Retail Supplier:** See Competitive Supplier.

**Rollover Variable:** Also called Default Variable. Month-to-month rate charged to customers that do not renew their fixed rate plan. Rate follows the movement of the energy market and changes each month.

**Securitization:** A process that allows utilities to use the expected future revenue from its monopoly customers to finance bonds. It has been used to pay off stranded costs in some states. (See Stranded Costs)

**Service Area:** The geographical territory served by an electric company.

**Slamming:** A term used when an electric supplier switches a consumer's service without permission. Slamming is illegal.

**Standard Offer Service ("SOS"):** The utility's rate for a specific service class. Each service class will have a different SOS. Also referred to as the Price to Compare.

**Stranded Costs:** Costs electric utilities will not recover as power markets move from protected monopolies to open, competitive environments.

**Switching:** Refers to a customer receiving retail electric service/supplies from a company or organization other the customer's traditional utility.

**Sales and Use Tax (SUT):** A tax levied in New Jersey that must be included with the energy rate to compute your total charge. The rate that appears on your invoice will include the Liberty Power energy cost, as well as the SUT.

**Tariff:** A document, approved by the responsible regulatory agency, listing the terms and conditions, including a schedule of prices, under which utility services will be provided.

**Third Party Verification (TPV), also known as Voice Verification:** This is a binding agreement between you and Liberty Power for the purchase of electricity. It confirms your decision to select Liberty Power as your electricity supplier, as well as the term, rate and other contractual elements. The TPV may be an automated system or have a live operator.

**Time-of-Use (TOU) Rates:** The pricing of electricity based on the estimated cost of electricity during a particular time block, either time-of-day or by season.

**Transmission:** The process of transporting electricity from a generation company to an electric company over high-voltage power lines.

**Transmission and Distribution Service Provider (TDSP):** The company that manages the delivery of electricity to your home or business. The term is most frequently used in Texas; in other markets the utility handles the delivery of electricity.

**Transportation Fee:** Charge for moving natural gas through pipelines from one place to another.

**Unbundling:** Separating electric utility service into its basic components — generation, transmission, and distribution — and offering each component separately for sale with its own rates.

**Utility:** A regulated energy company with the characteristics of a natural monopoly.

**Wholesale Competition:** A system in which a power distributor can buy its power from a variety of power producers.

**Wholesale Power Market:** The purchase and sale of electricity from generators to resellers (who sell to retail customers).

**Wires Charge:** Charges levied for the use of the transmission or distribution wires.

Customer care glossary

Privacy    Social Responsibility Policy    Contact

LibertyPower™
Powerful Together

ENERGY SERVICES    ABOUT US    KNOWLEDGE CENTER    CUSTOMER CARE    BLOG    CONTACT US    CAREERS

Chat now